# Docket No. 2025-2016

*In the*

# United States Court of Appeals

*For the*

# Federal Circuit

———— • ————

OTSUKA AMERICA PHARMACEUTICAL, INC.,
AVANIR PHARMACEUTICALS, LLC,
fka Avanir Pharmaceuticals Inc.,

*Plaintiffs-Appellees,*

v.

HETERO LABS LIMITED, HETERO LABS LIMITED UNIT-III,
CAMBER PHARMACEUTICALS INC.,

*Defendants-Appellants.*

———————————————

*Appeal from the United States District Court for the District of Delaware,*
*Case No.* 1:25-cv-00647-GBW, *Hon. Gregory B. Williams*

## CORRECTED NON-CONFIDENTIAL APPELLANTS' OPENING BRIEF

| | |
|---|---|
| DAVID A. RANDALL | EHAB M. SAMUEL |
| ORBIT IP, LLP | ORBIT IP, LLP |
| 11400 West Olympic Boulevard, Suite 200 | 620 Newport Center Drive, Suite 1100 |
| Los Angeles, CA 90064 | Newport Beach, CA 92660 |
| (310) 887-1333 | (310) 887-1333 |

*Counsel for Defendants-Appellants*

October 14, 2025
Corrected on October 21, 2025

 

## PATENT CLAIMS AT ISSUE

This appeal concerns claims 1-12 of U.S. Patent No. 7,659,282 ("the '282 patent"). Claim 1—the only independent claim—is representative:

1. A method for treating pseudobulbar affect or emotional lability, the method comprising administering to a patient in need thereof dextromethorphan in combination with quinidine, wherein the amount of dextromethorphan administered comprises from about 20 mg/day to about 80 mg/day and wherein the amount of quinidine administered comprises from about 10 mg/day to less than about 30 mg/day with the proviso that the weight to weight ratio of dextromethorphan to quinidine is 1:0.5 or less.

Appx89, 78:2-10.

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

### CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 2025-2016 |
| **Short Case Caption** | Otsuka America Pharmaceutical, Inc. v. Hetero Labs Limited |
| **Filing Party/Entity** | Hetero Labs Ltd., Hetero Labs Ltd. Unit-III, & Camber Pharmaceuticals Inc. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 09/26/2025

Signature: /s/ Ehab M. Samuel

Name: Ehab M. Samuel

**FORM 9. Certificate of Interest**

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Hetero Labs Ltd. | | None/Not Applicable |
| Hetero Labs Ltd. Unit III | | None/Not Applicable |
| Camber Pharmaceuticals Inc. | | Hetero Labs Ltd. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

FORM 9. Certificate of Interest

Form 9 (p. 3)
March 2023

---

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable      ☐   Additional pages attached

| | | |
|---|---|---|
| Jack Phillips, Phillips, McLaughlin & Hall, P.A. | | |
| Megan C. Haney, Phillips, McLaughlin & Hall, P.A. | | |
| | | |

---

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below)      ☐   No      ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

---

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable      ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ............................................................. i

TABLE OF AUTHORITIES ............................................................. viii

STATEMENT OF RELATED CASES ............................................... xii

I.     PRELIMINARY STATEMENT ..................................................1

II.    JURISDICTIONAL STATEMENT ..............................................3

III.   STATEMENT OF THE ISSUES ..................................................3

IV.    STATEMENT OF THE CASE AND FACTUAL BACKGROUND............5

       A.    Procedural Background..........................................................5

       B.    Factual Background ...............................................................6

             1.    The Prior Avanir Litigation Involving the '282 Patent and
                   Otsuka's Prior Improper Orange-Book Listing for
                   NEUDEXTA ...............................................................6

             2.    The '282 Patent and Its Prosecution History ..................7

                   a.    Summary of the '282 Patent .................................7

                   b.    The Asserted Claim of the '282 Patent and Other
                         Claims Relevant to Claim Construction ...........................10

                   c.    The Prosecution History of the '282 Patent........................11

V.     SUMMARY OF THE ARGUMENT ............................................13

VI.    STANDARD OF REVIEW AND LEGAL STANDARD ...........................16

       A.    Standard of Review................................................................16

       B.    Preliminary Injunction Standard ...........................................17

VII.   ARGUMENT..........................................................................18

       A.    The District Court Erred in Ruling That Otsuka is Likely to
             Succeed on the Merits ..........................................................18

1.  The District Court Erred in Construing Dextromethorphan and Quinidine to Include Their Salt Forms ..................................... 19

    a.  The Claim Language Specifies a Weight Ratio of Dextromethorphan to Quinidine—Even When Administered in Salt Form ...................................................... 20

    b.  The Specification Identifies Dextromethorphan and Quinidine by Their Chemical Structures—Confirming Their Plain and Ordinary Meaning Is Used in the Claims ................................................................ 23

    c.  The Specification Teaches Calculating the Weight Ratio Based on the Weights of Dextromethorphan and Quinidine—Not Their Salts ......................................... 26

    d.  The Prosecution History Narrowed the Weight Ratio and Confirmed That the Claimed Ratio Compares the Weight of Dextromethorphan to the Weight of Quinidine—Not Their Salts ............................... 31

    e.  Hetero's Unrebutted Expert Confirms a POSITA's Understanding That the Claimed Weight Ratio Is Based on the Compounds—Not Their Salts ....................... 34

    f.  Otsuka Misled the District Court With Mischaracterizations of the '282 Patent, the Products, and Hetero's Construction ................................. 38

    g.  The District Court's Claim Construction Was Fundamentally Flawed ......................................................... 41

2.  Otsuka Did Not Dispute That Hetero Does Not Infringe Under Hetero's Correct Construction ............................................ 47

3.  The District Court Failed to Address Hetero's Indefiniteness Defense ................................................................. 48

    a.  The District Court Erred by Improperly Relying on the Validity Holdings from the Prior *Avanir* Litigation, Which Did Not Address Indefiniteness ............ 48

    b.  The District Court's Failure to Make Factual Findings on Indefiniteness Constitutes Legal Error and Necessitates Remand ................................................... 50

4.   The District Court Ignored and "Seriously Misjudged" Hetero's Evidence Negating Irreparable Harm...........................54

5.   The District Court Abused Its Discretion in Weighing the Equities and Public Interest by Shifting the Burden, Relying on Unsworn Allegations, and Disregarding the Hardship to Hetero ...................................................................................58

a.   The District Court Improperly Shifted the Burden to Hetero to Prove Compliance with FDA Regulations Governing Service of Notice Letters ...................................58

b.   The District Court Abused its Discretion in Accepting Otsuka's Attorney Argument and Excusing Otsuka's Failure to Submit Competent Evidence.................................................................59

c.   The District Court Overlooked Hetero's Evidence of Harm and the Public's Interest in Timely Generic Access ................................................................61

B.   The District Court Abused its Discretion in Waiving the Rule 65(c) Bond Requirement ...................................................63

a.   FRCP 65 (c) and Third Circuit Law Require a Bond in this Case..........................................................63

b.   The District Court's Rationale for Refusing to Require a Bond Was Flawed ...............................67

VIII.  CONCLUSION.............................................................68

ADDENDUM

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

CERTIFICATE OF SERVICE

**CONFIDENTIAL MATERIAL OMITTED**

The material redacted from this brief is subject to a protective order. The confidential information on pages Appx17-18, Appx26-29 and Appx31. Hetero's proposed redactions are limited to information related to Hetero's ANDA, the parties' pre-suit communications and Hetero's launch plans. The parties have moved to file similar disclosures under seal in this case, which the Court has granted. (See, e.g., D.I. 24, 31, 42, 48). Hetero maintains that any disclosure will cause Hetero harm in the marketplace by providing highly sensitive, commercial information to Hetero's competitors. Additionally, the dispute involves private litigants and relates to Hetero's ANDA, which is confidential and unavailable to the public. As such, there is no public interest in the disclosure of the information contained in Hetero's ANDA.

# TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Andrx Pharms., Inc.*,
  452 F.3d 1331 (Fed. Cir. 2006) ...................................................................16

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
  239 F.3d 1343 (Fed. Cir. 2001) .............................................. 17, 18

*Avanir Pharmaceuticals, Inc. v. Actavis South Atlantic LLC*,
  36 F. Supp. 3d 475 (D. Del. 2014) ........................................... *passim*

*Avanir Pharms., Inc. v. Par Pharm., Inc.*,
  612 F. App'x 613 (Fed. Cir. 2015) ...................................................6, 7

*Ball Metal Beverage Container Corp. v. Crown Packaging Tech., Inc.*,
  838 F. App'x 538 (Fed. Cir. 2020) ...............................................52

*Curtiss–Wright Flow Control Corp. v. Velan, Inc.*,
  438 F.3d 1374 (Fed. Cir. 2006) ...................................................33

*Dow Chem. Co. v. Nova Chems. Corp. (Can.)*,
  803 F.3d 620 (Fed. Cir. 2015) .....................................................54

*E.I. Du Pont de Nemours and Co. v. MacDermid Printing Solutions, LLC*,
  525 F.3d 1353 (Fed. Cir. 2008) ...................................................59

*Enzo Biochem Inc. v. Applera Corp.*,
  780 F.3d 1149 (Fed. Cir. 2015) ...................................................33

*Enzo Biochem, Inc. v. Gen-Probe, Inc.*,
  424 F.3d 1276 (Fed. Cir. 2005) ...................................................37

*Erico Int'l Corp. v. Vutec Corp.*,
  516 F.3d 1350 (Fed. Cir. 2008) ...................................................16

*Fenner Investments Ltd. v. Cellco P'ship*,
  778 F.3d 1320 (Fed. Cir. 2015) ...................................................42

*Ferring Pharms., Inc. v. Watson Pharms., Inc.*,
  765 F.3d 205 (3d Cir. 2014) ........................................................16

*FMC Corp. v. Sharda USA, LLC,*
145 F.4th 1326 (Fed. Cir. 2025) ........................................................25

*Frank's GMC Truck Center, Inc.,*
847 F.2d 100 (3d Cir. 1988) ...............................................................64

*Gemtron Corp. v. Saint-Gobain Corp.,*
572 F.3d 1371 (Fed. Cir. 2009) .................................................. 37, 59

*Glaxo Group Ltd. v. Ranbaxy Pharms., Inc.,*
262 F.3d 1333 (Fed. Cir. 2001) ........................................... 47, 48, 54

*Hansberry v. Lee,*
311 U.S. 32 (1940) .............................................................................49

*High Tech Med. Instr., Inc. v. New Image Indus., Inc.,*
49 F.3d 1551 (Fed. Cir. 1995) ...........................................................57

*Hoxworth v. Blinder, Robinson & Co., Inc.,*
903 F.2d 186 (3d Cir. 1990) ...............................................................64

*Indivior Inc. v. Dr. Reddy's Labs. S.A.,*
930 F.3d 1325 (Fed. Cir. 2019) .........................................................18

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,*
381 F.3d 1111 (Fed. Cir. 2004) ................................................. 20, 22

*Modine Mfg. Co. v. U.S. Int'l Trade Comm'n,*
75 F.3d 1545 (Fed. Cir. 1996) ................................................... 21, 40

*Murata Mach. USA v. Daifuku Co.,*
830 F.3d 1357 (Fed. Cir. 2016) .........................................................16

*Nasalok Coating Corp. v. Nylok Corp.,*
522 F.3d 1320 (Fed. Cir. 2008) .........................................................49

*Natera, Inc. v. NeoGenomics Lab'ys, Inc.,*
106 F.4th 1369 (Fed. Cir. 2024) ........................................................16

*Nautilus, Inc. v. Biosig Instruments, Inc.,*
572 U.S. 898 (2014) ...........................................................................40

*Nazomi Commc'ns, Inc. v. Arm Holdings, PLC,*
   403 F.3d 1364 (Fed. Cir. 2005) .......................................................... 33

*Nutrition 21 v. U.S.,*
   930 F.2d 867 (Fed. Cir. 1991) ............................................................ 50

*Nystrom v. Trex Co.,*
   424 F.3d 1136 (Fed. Cir. 2005) .......................................................... 27

*Orexo AB v. Actavis Elizabeth LLC,*
   371 F. Supp. 3d 175 (D. Del. 2019) .................................................... 49

*Pfizer, Inc. v. Teva Pharms. USA, Inc.,*
   429 F.3d 1364 (Fed. Cir. 2005) .......................................................... 56

*Phillips v. AWH Corp.,*
   415 F.3d 1303 (Fed. Cir. 2005) (*en banc*)................................... *passim*

*Polymer Techs., Inc. v. Bridwell,*
   103 F.3d 970 (Fed. Cir. 1996) ............................................................ 16

*Retractable Techs., Inc. v. Becton, Dickinson & Co.,*
   653 F.3d 1296 (Fed. Cir. 2011) .......................................................... 41

*Sanofi v. Apotex,*
   470 F.3d 1368 (Fed Cir. 2006) ........................................................... 64

*Sciele Pharma Inc. v. Lupin Ltd.,*
   684 F.3d 1253 (Fed. Cir. 2012) ................................................... 16, 17

*SmithKline Beecham Corp. v. Apolex Corp.,*
   403 F.3d 1331 (Fed. Cir. 2005) .......................................................... 53

*Sys. Operations, Inc. v. Scientific Games Dev. Corp.,*
   555 F.2d 1131 (3d Cir. 1977) ............................................................. 64

*Temple Univ. v. White,*
   941 F.2d 201 (3rd Cir. 1991)......................................................... 65, 66

*Teva Pharms. USA, Inc. v. Sandoz, Inc.,*
   789 F.3d 1335 (Fed. Cir. 2015) .......................................................... 54

x

*Toro Co. v. White Consol. Indus., Inc.*,
   199 F.3d 1295 (Fed. Cir. 1999) ........................................................41

*Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*,
   853 F.3d 1272 (Fed. Cir. 2017) .......................................................35

*Winter v. NRDC, Inc.*,
   555 U.S. 7 (2008) ............................................................................58

*Zambelli Fire Works Mfg. Co. v. Wood*,
   592 F.3d 412 (3d Cir. 2010) ...................................................... 64, 66

## Rules

Federal Rule of Civil Procedure 52(a) ................................... 4, 13, 15, 50

Federal Rule of Civil Procedure 65(c) ........................................... *passim*

Federal Rule of Evidence 803(6) ......................................................60

Federal Rule of Evidence 803(7) ......................................................60

Federal Rule of Evidence 902(11) ....................................................60

Federal Rule of Evidence 902(12) ....................................................60

## STATEMENT OF RELATED CASES

The only case that may directly affect or be directly affected by this Court's decision in the pending appeal is the underlying case: *Otsuka America Pharmaceutical, Inc. et al. v. Hetero Labs Ltd. et al.*, Case No. 1:25-cv-00647-GBW (D. Del.).

## I.   PRELIMINARY STATEMENT

This appeal arises from a preliminary injunction that improperly enjoined Appellants Hetero Labs Limited, Hetero Labs Limited Unit-III, and Camber Pharmaceuticals Inc. (collectively, "Hetero") from launching its FDA-approved generic version of NUEDEXTA®. Instead of independently adjudicating key issues, the District Court took a shortcut and improperly relied on the infringement and validity findings from a different litigation: *Avanir Pharmaceuticals, Inc. v. Actavis South Atlantic LLC*, 36 F. Supp. 3d 475 (D. Del. 2014) ("*Avanir*"). But Hetero was not a party in *Avanir*. And that case did not address, let alone decide, Hetero's noninfringement and invalidity defenses.

In *Avanir*, Appellees Otsuka America Pharmaceutical, Inc. through its subsidiary Avanir Pharmaceuticals, Inc. (collectively, "Otsuka") asserted three Orange Book-listed patents against other generic defendants. One was a reissue patent directed to treating chronic pain, not pseudobulbar affect ("PBA")—the approved indication for NUEDEXTA. The District of Delaware found that the reissue patent did not cover NUEDEXTA and that the other generics did not infringe (*id*. at 493-97). It also determined that Otsuka had improperly listed the reissue patent in the Orange Book and ordered its delisting. Civil Action No. 1:11-cv-00704-LPS (D. Del.) (DI 518).

1

Although *Avanir* involved U.S. Patent No. 7,659,282 ("the '282 patent")—the same patent asserted against Hetero in this case—*Avanir* neither construed the claim terms "dextromethorphan" and "quinidine" nor considered indefiniteness. Moreover, the defendants in *Avanir* settled or stipulated to infringement of the '282 patent. Thus, *Avanir* left those critical legal questions unadjudicated.

Here, the District Court inappropriately relied on *Avanir* and the other stipulations of infringement to avoid conducting a noninfringement and invalidity analysis in this case. In doing so, it improperly relied on a litigation involving different generic defendants, different claim constructions, different noninfringement arguments, different determinations as to the qualifications of a person of skill in the art, and different invalidity defenses. As demonstrated through the District Court's opinion and questions at oral argument, the District Court not only effectively treated *Avanir* as binding on Hetero but also dispositive of issues that Hetero did not and could not litigate. The District Court's reliance on *Avanir* prejudiced Hetero and constitutes reversible error.

Otsuka now seeks to unlawfully extend its monopoly, just as it did with the reissue patent a decade ago. There, Otsuka tried to weaponize the Orange Book to block generics with a patent that did not claim NUEDEXTA. It failed and that patent was ordered delisted. Otsuka—***a repeat offender***—has revived the same strategy using the '282 patent, which also does not cover NUEDEXTA. Once

2

again, Otsuka seeks to manipulate the Orange Book to delay competition and preserve market exclusivity at high prices for a product it no longer has the right to monopolize.

Each day the injunction remains in place, customers and patients are denied access to more affordable treatment, while Hetero's already-manufactured generic product sits idle in a warehouse. Because the injunction rests on legal errors and allows Otsuka to continue its pattern of regulatory abuse, the District Court's grant of a preliminary injunction must be reversed and the injunction vacated.

## II.    JURISDICTIONAL STATEMENT

The District Court had subject-matter jurisdiction over this action under 28 U.S.C. § 1331 and 1338. On July 23, 2025, the District Court granted Otsuka's motion for a preliminary injunction against Hetero. Appx16-32, Appx33-34. Hetero timely filed its notice of appeal. Appx1993-95. This Court has jurisdiction over the District Court's order granting a preliminary injunction under 28 U.S.C. §§ 1292 and 1295.

## III.    STATEMENT OF THE ISSUES

1.    Whether the District Court erred in: (i) construing "dextromethorphan" and "quinidine"; and (ii) concluding that Otsuka is likely to succeed on infringement, where Hetero's Abbreviated New Drug Application

3

("ANDA") product does not satisfy the claimed "1:0.5 or less" ratio as established by Hetero's unrebutted expert testimony.

2.      Whether the District Court denied Hetero due process by failing to make the factual findings required by Federal Rule of Civil Procedure 52(a)(2) and meaningfully address Hetero's invalidity defense.

3.      Whether Hetero raised a substantial question of invalidity based on indefiniteness where the District Court's claim construction produces both infringing and noninfringing results.

4.      Whether the District Court abused its discretion in finding irreparable harm where Otsuka delayed seeking injunctive relief for over 17 months.

5.      Whether the District Court erred in holding that the balance of equities and public interest favor Otsuka by ignoring unrebutted evidence of substantial harm to Hetero while failing to account for the strong public interest in prompt generic competition.

6.      Whether the District Court committed reversible error: (i) in waiving the Rule 65(c) bond requirement despite undisputed evidence that the injunction will cause Hetero to lose $80 million in sales; and (ii) by ignoring controlling Third Circuit law that precludes preliminary injunction relief in this situation.

## IV.    STATEMENT OF THE CASE AND FACTUAL BACKGROUND

### A. Procedural Background

This appeal involves Hetero's FDA-approved generic version of NUEDEXTA. In August 2023, Hetero filed an ANDA seeking approval to sell a generic version of NUEDEXTA. Hetero's ANDA included a Paragraph IV certification indicating that Hetero intended to sell its generic product before the expiration of the lone remaining Orange Book patent—the '282 patent.

On August 28, 2024, the FDA approved Hetero's ANDA. Appx128, ¶ 41; Appx336, ¶ 41. Nearly nine months later (May 27, 2025), Otsuka filed a complaint in the District of Delaware alleging infringement of the '282 patent. Appx120-32. Otsuka also moved for a temporary restraining order (TRO) and preliminary injunction (PI). Appx151-318. On June 2, 2025, the District Court denied the TRO as moot and left the preliminary-injunction request pending. Appx323. On the same day, Hetero filed its answer. Appx324-47.

The parties briefed Otsuka's motion for a TRO and PI. Appx348-51, Appx357-589, Appx590-1441, Appx1471-1504. On July 9, 2025, the District Court granted the Motion for a Temporary Restraining Order (Appx1-15), and on July 23, 2025, the District Court granted Otsuka's Motion for a Preliminary Injunction. Appx16-34. Hetero timely filed its Notice of Appeal. Appx1993-95.

## B. Factual Background

### 1. *The Prior Avanir Litigation Involving the '282 Patent and Otsuka's Prior Improper Orange-Book Listing for NEUDEXTA*

In 2011, Otsuka initiated litigation in the District of Delaware against several ANDA filers, asserting infringement of three patents: U.S. Patent No. 8,227,484 (the '484 patent), Reissue Patent No. RE38,115 (the '115 patent), and the '282 patent. Hetero was not a party to this case. After a 2013 trial, the District Court issued its findings of fact and conclusions of law. *See Avanir Pharms., Inc. v. Actavis S. Atl. LLC et al.*, 36 F. Supp. 3d 475 (D. Del. 2014).

With respect to the '282 and '484 patents, the *Avanir* court rejected the obviousness and written-description invalidity challenges raised by the defendants. *Id.* at 497-510. Indefiniteness was not asserted and the defendants stipulated to infringement of the '282 and '484 patents. Consequently, the *Avanir* court did not address Hetero's indefiniteness or noninfringement defenses.

Otsuka also asserted the '115 reissue patent in *Avanir*. That patent claimed administration of a "therapeutically effective" amount of dextromethorphan and quinidine for "substantially reducing chronic or intractable pain." *Id.* at 493-97. The court concluded that the '115 patent did not cover Otsuka's NUEDEXTA product, which is indicated only for the treatment of pseudobulbar affect (PBA), not pain. *Id.* As such, the court found that defendants' ANDA products—which sought approval for treatment of PBA—did not infringe the '115 patent and

6

entered judgment accordingly. *Id.* Following its ruling, the court required Otsuka to delist the '115 patent from the Orange Book. Civil Action No. 1:11-cv-00704-LPS (D. Del.) (DI 518).

On August 10, 2015, this Court affirmed the court's judgment. *See Avanir Pharms., Inc. v. Par Pharm., Inc.*, 612 F. App'x 613 (Fed. Cir. 2015). The '484 patent has expired, and the '282 patent is the only remaining Orange Book-listed patent for NUEDEXTA. The claim construction, noninfringement, and invalidity issues presented in the current litigation—including those raised in connection with the preliminary-injunction proceedings—were not addressed in *Avanir*.

### 2. *The '282 Patent and Its Prosecution History*

#### a. Summary of the '282 Patent

The '282 patent is entitled "Pharmaceutical Compositions Comprising Dextromethorphan and Quinidine for the Treatment of Neurological Disorders." Appx43-89. The patent teaches that dextromethorphan is a well-known compound used, for example, in cough syrup. Appx55, 9:10-41; Appx626, ¶ 26. Quinidine is a well-known compound that protects dextromethorphan from metabolism by the liver. Appx56, 14:6-33 ("Rapid dextromethorphan elimination may be overcome by co-administration of quinidine along with dextromethorphan (U.S. Patent No. 5,206,248 to Smith"); Appx627, ¶ 27.

The specification states that "dextromethorphan" is the "common name for (+)-3-methoxy-N-methylmorphinan" and depicts its chemical structure as:



Appx55, 9:10-36; Appx626, ¶ 26.

Likewise, the specification identifies "quinidine" as a distinct chemical compound and discloses that its co-administration with dextromethorphan was already known to increase and stabilize dextromethorphan blood concentrations:

> Rapid dextromethorphan elimination may be overcome by co-administration of quinidine along with dextromethorphan (U.S. Pat. No. 5,206,248 to Smith). **_The chemical structure of quinidine is as follows:_**

Quinidine co-administration has at least two distinct beneficial effects. ***First, it greatly increases the quantity of dextromethorphan circulating in the blood. In addition, it also yields more consistent and predictable dextromethorphan concentrations.***

Appx57, 14:6-33 (emphasis added).

The specification teaches that the co-administration of dextromethorphan and quinidine within specific ***weight ratios*** improves treatment of neurological and other conditions. Appx58, 15:13-34. The preferred weight ratio range of dextromethorphan to quinidine include from about "1:2" to "1:0.5 or less." Appx58, 15:21-34. The specification then identifies preferred daily dosages for dextromethorphan and quinidine for various ailments. Appx58-59, 15:35-17:3.

The specification then describes suitable routes and forms of administration:

Any suitable route of administration can be employed for providing the patient with an effective dosage of dextromethorphan in combination with quinidine. . . . Suitable dosage forms include tablets, troches, dispersions, suspensions, solutions, capsules, patches, and the like. . . .

\* \* \*

The pharmaceutical compositions of the present invention comprise dextromethorphan in combination with quinidine, or pharmaceutically acceptable salts of dextromethorphan and/ or quinidine, as the active ingredient . . . .

Appx59, 17:10-17:35.

The specification also teaches how to calculate the weights of dextromethorphan and quinidine separately from the respective weights of their salt forms using molecular weights of dextromethorphan, quinidine, and their

9

respective salts. *Id.,* 17:60-18:14. For example, using dextromethorphan

hydrobromide and quinidine sulfate as specific examples, the specification teaches:

> In particularly preferred embodiments, the dextromethorphan is administered in the form of dextromethorphan hydrobromide, and the quinidine is administered in the form of quinidine sulfate. For example, a dose of ***30 mg dextromethorphan hydrobromide*** (of molecular formula $C_{18}H_{25}NO.HBr.H_2O$) and ***30 [mg] quinidine sulfate*** (of molecular formula $(C_{20}H_{24}N_2O_2)_2.H_2SO_4.2H_2O$) may be administered (***corresponding to*** an effective dosage of approximately ***22 mg dextromethorphan*** and ***25 mg quinidine***).

*Id.*, 17:60-18:2 (emphasis added); *see also id.*, 18:2-14.

The examples in the specification teach that dextromethorphan represents

about 73.33% (22/30) of the dextromethorphan hydrobromide hydrate salt form,

and quinidine represents about 83.33% (25/30) of the quinidine sulfate dihydrate

form, consistent with the respective molecular weights of the compounds and their

salts. Appx630-32, ¶¶ 34-35; Appx633-32, ¶ 41.

### b.  The Asserted Claim of the '282 Patent and Other Claims Relevant to Claim Construction

Otsuka asserts that Hetero's FDA-approved generic product infringes at least

claim 1 of the '282 patent (Appx129, ¶ 45), which reads:

> 1.     A method for treating pseudobulbar affect or emotional lability, the method comprising administering to a patient in need thereof dextromethorphan in combination with quinidine, . . . with the proviso that the weight to weight ratio of dextromethorphan to quinidine is 1:0.5 or less.

Appx89, 78:2-10. Other claims relevant to the claim construction analysis include

dependent claims 7-8:

> 7.    The method of claim 1, wherein at least one of the quinidine and
> the dextromethorphan is in a form of a pharmaceutically acceptable salt.

> 8.    The method of claim 1, wherein at least one of the quinidine and
> the dextromethorphan is in a form of a pharmaceutically acceptable salt
> selected from the group consisting of salts of free acids, inorganic salts,
> salts of sulfate, salts of hydrochloride, and salts of hydrobromide.

*Id.*, 78:26-33.

### c.  The Prosecution History of the '282 Patent

During prosecution, applicants consistently distinguished between: (i) the

compounds dextromethorphan and quinidine; and (ii) their pharmaceutically

acceptable salts. Appx953-1036. Original claim 1 of the application recited

administering "an amount of dextromethorphan" and "an amount of quinidine."

Appx955. Dependent claims 7-9 separately refer to administering the compounds

"in a form of a pharmaceutically acceptable salt," listing examples such as

hydrobromide and sulfate. Appx955-56; Appx638-40.

Dependent claim 9 specifically refers to "quinidine sulfate," identifying

dosage ranges of 30-60 mg per day for this salt form. Appx955-56; Appx639-40.

As noted above, the specification explains that quinidine sulfate contains

approximately 83.33% quinidine by weight. Appx59, 17:60-18:2; Appx630-32.

Applying that conversion factor, 60 mg/day of quinidine sulfate corresponds to

11

50 mg/day of quinidine (60 × 0.833 = 50). That amount matches the upper end of the quinidine range recited in the originally filed claim 1 language, ***demonstrating that original claim 1 expressed the quantity of quinidine, while original claim 9 expressed the equivalent amount of quinidine is administered in salt form as quinidine sulfate.***

The applicants narrowed claim 1 in response to a January 2009 Office Action rejecting the pending claims for obviousness. Appx967-81; Appx982-98. The applicants also deleted then-pending claim 10, which had recited a weight ratio of dextromethorphan to quinidine "about 1:1.25 or less," and incorporated a narrower limitation of "1:0.5 or less" into claim 1. Appx955-56, Appx983-94; Appx640-41, ¶55.

> 1. (Currently amended) A method for treating pseudobulbar affect or emotional lability, the method comprising administering to a patient in need thereof dextromethorphan in combination with quinidine, wherein ~~an~~ the amount of dextromethorphan administered comprises from about 20 mg/day to about ~~200~~ 80 mg/day and wherein ~~an~~ the amount of quinidine administered comprises from about 10 mg/day to less than about ~~50~~ 30 mg/day with the proviso that the weight to weight ratio of dextromethorphan to quinidine is 1:0.5 or less.

The examiner allowed the narrowed claims, stating that the limitation of "1:0.5 or less" distinguished the invention from the cited prior art. Appx1033-35. The amendment was incorporated into issued claim 1 as "a weight-to-weight ratio of dextromethorphan to quinidine of 1:0.5 or less."

## V.    SUMMARY OF THE ARGUMENT

The grant of the preliminary injunction should be reversed and the injunction vacated because the District Court committed a series of legal errors, abused its discretion, and issued its opinion after a perfunctory review of the record while ignoring controlling law and misjudging the evidence.

First, the district court wrongly assumed that certain issues in this case had already been decided adversely to Hetero in *Avanir*, even though Hetero was ***not*** a party to that case, and the invalidity issues Hetero raises were ***not*** addressed, let alone decided. The District Court's failure to make findings of fact on material issues violated Fed. R. Civ. P. 52(a)(2) and denied Hetero due process.

Second, the District Court erred in finding that Otsuka was likely to succeed on the merits. It misconstrued the claim language by including the weights of the salt itself in the ratio calculation rather than adopting a construction that compares the weights of dextromethorphan and quinidine regardless of their administration form. In doing so, the District Court disregarded the plain and ordinary meaning that one skilled in the art would understand from the intrinsic record and ignored unrebutted expert testimony. It further erred in accepting Otsuka's mischaracterizations of both the patent and the products, while discrediting Hetero's noninfringement showing under the correct construction.

13

Third, the District Court abused its discretion in finding irreparable harm. ***Otsuka waited 17 months*** before seeking relief, undermining any claim of urgency and irreparable harm. And under the proper claim construction, Otsuka cannot establish infringement, precluding a finding of irreparable harm.

Fourth, the balance of equities and public interest weigh against the injunction. The District Court improperly shifted the burden to Hetero on FDA notice and credited only Otsuka's attorney argument. It then ignored unrebutted evidence that the injunction inflicts substantial harm on Hetero, while depriving customers and patients with timely access to lower-cost generics.

Finally, the court erred in waiving the Rule 65(c) bond requirement. Rule 65, and binding Third Circuit precedent, state that a bond is "almost mandatory" where, as here, an injunction restrains commercial, revenue-generating activities. The record showed unrebutted evidence that the injunction will cause Hetero about $80 million dollars in lost profits, yet the District Court excused Otsuka from posting any security.

Specifically, the District Court's errors include:

(a) Misconstruing "dextromethorphan" and "quinidine" and incorrectly determining infringement of the "1:0.5 or less" limitation based on that construction.

(b) Disregarding the specification's explicit salt-to-compound conversions, the teachings from the file history, and Hetero's unrebutted expert testimony.

(c) Accepting Otsuka's mischaracterizations of the patent and products, while overlooking evidence of noninfringement.

(d) Improperly relying on *Avanir*—in which Hetero was not a party—to refuse to consider Hetero's indefiniteness defense.

(e) Refusing to resolve factual disputes and credibility issues as required by Federal Rule of Civil Procedure 52(a)(2).

(f) Finding irreparable harm despite Otsuka's 17-month delay.

(g) Shifting the burden to Hetero on FDA notice and crediting only attorney argument.

(h) Overlooking Hetero's unrebutted evidence of its hardships if enjoined and the harm to the public interest in being denied timely generic access.

(i) Waiving the bond requirement of Federal Rule of Civil Procedure 65(c) despite undisputed proof of Hetero's substantial commercial losses.

Because Otsuka failed to establish any of the factors required for preliminary injunction, and because the District Court's ruling rests on multiple independent errors, the preliminary injunction must be vacated.

15

## VI.   STANDARD OF REVIEW AND LEGAL STANDARD

### A. Standard of Review

This Court reviews an order granting a preliminary injunction for abuse of discretion. *Erico Int'l Corp. v. Vutec Corp.*, 516 F.3d 1350, 1353 (Fed. Cir. 2008); *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014). "However, the Federal Circuit has itself built a body of precedent applying the general preliminary injunction considerations to a large number of factually variant patent cases, and gives dominant effect to Federal Circuit precedent insofar as it reflects considerations specific to patent issues." *Natera, Inc. v. NeoGenomics Lab'ys, Inc.*, 106 F.4th 1369, 1375 (Fed. Cir. 2024) ) (quoting *Murata Mach. USA v. Daifuku Co.*, 830 F.3d 1357, 1363 (Fed. Cir. 2016)).

"An abuse of discretion in granting or denying a preliminary injunction may be found 'by showing that the court made a clear error of judgment in weighing relevant factors or exercised its discretion based upon an error of law or clearly erroneous factual findings.'" *Abbott Labs. v. Andrx Pharms., Inc.*, 452 F.3d 1331, 1335 (Fed. Cir. 2006) (quoting *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 973 (Fed. Cir. 1996)). To the extent the District Court's decision is based on an issue of law, that decision is reviewed *de novo*. *Sciele Pharma Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1259 (Fed. Cir. 2012). Factual findings are reviewed for clear error. *Ferring*, 765 F.3d at 210 (emphasizing that under the Third Circuit, a district court's

16

"findings of fact are reviewed for clear error and its conclusions of law are subject to plenary review.")

### B. Preliminary Injunction Standard

To obtain an injunction, a district court assesses four factors: (1) a reasonable likelihood of success on the merits; (2) irreparable harm to its interests; (3) a balance of hardships tipping in its favor; and (4) the injunction's impact on the public interest. *Sciele*, 684 F.3d at 1259 (citing *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001)). This Court has further emphasized that "[o]ur case law and logic both require that a movant cannot be granted a preliminary injunction unless it establishes both of the first two factors, i.e., likelihood of success on the merits and irreparable harm." *Amazon.com*, 239 F.3d at 1350.

As such, to demonstrate a likelihood of success on the merits, "a patentee must show that, in light of the presumptions and burdens that will inhere at trial on the merits: (1) the patentee will likely prove that the accused infringer infringes the asserted patent; and, (2) the patentee's infringement claim will likely withstand the accused infringer's challenges to the validity and enforceability of the patent." *Sciele*, 684 F.3d at 1259. If Hetero "raises a substantial question concerning either infringement or validity, i.e., asserts an infringement or invalidity defense that the

patentee cannot prove 'lacks substantial merit,' the preliminary injunction should not issue." *Amazon.com*, 239 F.3d at 1350.

Both noninfringement and invalidity are at issue in this appeal. An infringement analysis involves two steps: the first step requires construction of the asserted claims, and the second step requires determining whether the accused product meets each limitation of the claim as construed. *Indivior Inc. v. Dr. Reddy's Labs. S.A.*, 930 F.3d 1325, 1336 (Fed. Cir. 2019). Claim construction is a question of law reviewed *de novo. Id.*

Meanwhile, "a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Id.* at 1342. Like claim construction, indefiniteness presents a question of law reviewed *de novo. Id.*

## VII.   ARGUMENT

### A. The District Court Erred in Ruling That Otsuka is Likely to Succeed on the Merits

The District Court committed at least five errors in concluding that Otsuka is likely to prevail on the merits. First, it incorrectly determined infringement of claim 1's ratio limitation by adopting a construction that includes the weights of the salt forms rather than the weights of the claimed dextromethorphan and quinidine compounds recited, regardless of administered form. Second, it

18

disregarded the plain and ordinary meaning of the terms "dextromethorphan" and "quinidine," the specification's explicit salt-to-compound conversions, teachings from the file history, and Hetero's unrebutted expert testimony. Third, it accepted Otsuka's mischaracterizations of both the patent and the products, while ignoring Hetero's noninfringement evidence. Fourth, it improperly relied on the prior *Avanir* litigation to avoid adjudicating Hetero's indefiniteness defense. Finally, the District Court compounded these errors by finding irreparable harm—despite Otsuka's 17-month delay—and by skewing the balance of equities and public interest against timely generic entry. Each of these errors independently warrants reversal.

### 1. *The District Court Erred in Construing Dextromethorphan and Quinidine to Include Their Salt Forms*

The asserted claims of the '282 patent recite a pharmaceutical composition having a "dextromethorphan to quinidine" weight ratio of 1:0.5 or less. Appx89, 78:9-10. Dextromethorphan and quinidine have plain and ordinary meanings, and the specification and prosecution history utilize those plain and ordinary meanings by specifying the chemical compound with its chemical name and the structure for each compound. The specification distinguishes those compounds from their pharmaceutically acceptable salt forms and expressly teaches how to calculate the ratio using the weights of dextromethorphan and quinidine when those compounds are administered in salt form. The intrinsic record makes clear that while

19

dextromethorphan and quinidine may be administered as salts, the claimed weight-to-weight ratio compares dextromethorphan to quinidine—not their salts.

A skilled artisan would understand that a claimed weight-to-weight ratio between dextromethorphan and quinidine should not fluctuate depending on the salt or hydrate form in which those compounds are delivered. Unrebutted expert testimony confirmed this. Yet the District Court never construed the meaning of "dextromethorphan" or "quinidine" in the context of the intrinsic record. Instead, it applied an interpretation that treated the gross weight of the salts— dextromethorphan hydrobromide and quinidine sulfate—as satisfying the claimed ratio. That was legal error. The District Court's analysis ignored the compound/salt distinction reflected throughout the patent and prosecution history. It also ignored the specification's conversion guidance, which ensures that the calculated ratio does not depend on the salt form.

### a. The Claim Language Specifies a Weight Ratio of Dextromethorphan to Quinidine—Even When Administered in Salt Form

Claim construction begins with the language of the claims. *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004) (construction "must begin and remain centered on the claim language itself"). And "the words of a claim are generally given their ordinary and

customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*).

Here, the asserted claims require "a weight to weight ratio of dextromethorphan to quinidine of 1:0.5 or less." Appx89, 78:9-10. The claims do not specify the form in which these compounds must be administered, and the parties do not dispute that dextromethorphan and quinidine may be delivered in various pharmaceutically acceptable forms, such as salts or hydrates. Appx374; Appx607; Appx1793-99. But the fact that dextromethorphan and quinidine can be administered in different forms does not alter the claim language, which requires a comparison of the weights of dextromethorphan and quinidine—nothing more. Claim 1 says exactly what it means. It specifies a ratio between the two named compounds, not a ratio of their salts that can be disproportionally skewed depending on the selected salt. Any other reading renders the claim insolubly indefinite (*see infra* VII.A.3.b), and claims should be construed to preserve their validity. *Modine Mfg. Co. v. United States Int'l Trade Comm'n*, 75 F.3d 1545, 1557 (Fed. Cir. 1996).

This construction follows directly from the claim structure. The same claim that defines the 1:0.5 ratio also sets daily dosage ranges for "dextromethorphan" and "quinidine," again without reference to any salt or hydrate form. Appx89, 78:5-8 ("the amount of dextromethorphan administered comprises from about 20

mg/day to about 80 mg/day and ... quinidine ... from about 10 mg/day to less than about 30 mg/day"). The claim compares the weights of dextromethorphan and quinidine, as expressly recited.

That distinction is legally significant. "[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. Unless the patentee clearly redefines a term, courts apply its ordinary meaning as understood by a skilled artisan. *Id*. at 1312. If the patentee had intended to claim a ratio of "dextromethorphan or a salt thereof" to "quinidine or a salt thereof," it could have done so.

While Hetero explained this distinction in opposition to the motion for preliminary injunction (*see, e.g.* Appx606-07, Appx635, ¶¶ 45-46), the District Court never analyzed the language of the claim as *Innova* and *Phillips* require. It did not analyze the terms "dextromethorphan" and "quinidine" in context, nor did it examine how the structure and syntax of the claim inform their meaning. Instead, the District Court adopted a salt-inclusive reading without any analysis of the claim terms themselves. That failure to construe the claim "centered on the claim language itself" constitutes legal error. Accordingly, the plain language of the claim requires the weight-to-weight ratio to be calculated using the amounts of dextromethorphan and quinidine as compounds, regardless of the form in which those compounds are administered.

22

### b. The Specification Identifies Dextromethorphan and Quinidine by Their Chemical Structures—Confirming Their Plain and Ordinary Meaning Is Used in the Claims

The claims "'must be read in view of the specification, of which they are a part.'. . . [I]t is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315. While courts begin with the language of the claim, the specification provides important context that informs the meaning of the term.

Here, the specification describes "dextromethorphan" and "quinidine" in their plain and ordinary meaning as specific, well-known chemical compounds—presenting their molecular structures and pharmacological properties in a way that confirms their plain and ordinary meaning. Nowhere does it equate those terms with salt forms or suggest that salts are part of the compound itself.

Notably, the specification identifies dextromethorphan as "the common name for (+)-3-methoxy-N-methylmorphinan." Appx55, 9:35-7. The specification then provides the chemical structure of dextromethorphan with the statement: "Its chemical structure is as follows." *Id*., 9:22-33.

Quinidine is described in the same manner. The patent introduces quinidine's molecular structure with the statement, "[t]he chemical structure of quinidine is as follows," and depicts the compound structure. Appx57, 14:6-23. It then discusses quinidine's role in modulating dextromethorphan metabolism—again using the compound itself as the operative element. Appx57, 14:25-33.

23

The chemical structures of dextromethorphan and quinidine are depicted in the specification (as shown below), confirming that the patentee intended the terms to refer to the compounds themselves, not their salt forms:



**Dextromethorphan Chemical Structure, Appx55, 9:23-33**



**Quinidine Chemical Structure, Appx57, 14:11-23**

The chemical structure of dextromethorphan is distinct from that of dextromethorphan hydrobromide, just as the chemical structure of quinidine is distinct from that of quinidine sulfate. Appx870-71 (hydrobromide and sulfate groups highlighted below).



**Dextromethorphan Hydrobromide Monohydrate, Appx870**



**Quinidine Sulfate Dihydrate, Appx871**

24

In its opposition to the preliminary injunction motion, Hetero argued that the claim terms "dextromethorphan" and "quinidine" should be afforded their plain and ordinary meaning. *See, e.g,* Appx607-9; Appx636-42, ¶¶ 47-58. Hetero also referred to the chemical structures of these compounds and/or their salts in support of this construction. *See, e.g,* Appx601; Appx626-29, ¶¶ 26-30. Despite this, the District Court did not acknowledge or analyze the chemical structures disclosed in the specification. It never considered how those structures confirm the patent's use of the plain and ordinary meaning of the terms "dextromethorphan" and "quinidine" as distinct from their salt forms. Indeed, its decision is devoid of ***any*** analysis on the plain and ordinary meaning of these disputed claim terms. The District Court's failure to engage with the intrinsic evidence was legal error. *FMC Corp. v. Sharda USA, LLC*, 145 F.4th 1326, 1333 (Fed. Cir. 2025) (the district court erred by failing to adopt the plain and ordinary meaning in its claim construction analysis at the preliminary-injunction stage).

Taken together, the specification's depictions and descriptions of dextromethorphan and quinidine confirm what the claim language demonstrates: those terms refer to the compounds themselves, not their salt forms.

### c. The Specification Teaches Calculating the Weight Ratio Based on the Weights of Dextromethorphan and Quinidine—Not Their Salts

The specification also confirms what the claim language and chemical structures already establish: when dextromethorphan and quinidine are administered in a form of a pharmaceutically acceptable salt, the relevant quantities for calculating the claimed weight-to-weight ratio of dextromethorphan to quinidine are the weights of dextromethorphan and quinidine, not their salts. Appx59, 17:10-18:14.

The patent expressly teaches how to convert salt dosages into compound-equivalent amounts, leaving no ambiguity about how the claimed ratio is to be computed:

> "For example, a dose of **30 mg dextromethorphan hydrobromide** (of molecular formula $C_{18}H_{25}NO \cdot HBr \cdot H_2O$) and **30 [mg] quinidine sulfate** (of molecular formula $(C_{20}H_{24}N_2O_2)_2 \cdot H_2SO_4 \cdot 2H_2O$) may be administered (corresponding to an effective dosage of approximately **22 mg dextromethorphan** and **25 mg quinidine**)."

Appx59, 17:63-18:2 (emphasis added).

The specification then repeats this approach across multiple dosage examples, each time calculating the weight of the dextromethorphan and quinidine present when administered in a pharmaceutically acceptable salt, as summarized in the table below:

**Salt-to-Compound Conversion Table (*See* Appx59, 17:63–18:14)**

| Dextromethorphan Hydrobromide (mg) | Quinidine Sulfate (mg) | Dextromethorphan (mg) | Quinidine (mg) |
|---|---|---|---|
| 30 | 30 | 22 | 25 |
| 45 | 30 | 33 | 25 |
| 60 | 30 | 44 | 25 |
| 45 | 45 | 33 | 37.5 |
| 60 | 60 | 44 | 50 |

In *Nystrom v. Trex Co.*, this Court construed a disputed term by examining the **context** of that term across multiple sections of the specification. 424 F.3d 1136, 1143–44 (Fed. Cir. 2005). Like *Nystrom*, context informs the meaning of the disputed terms. The specification discusses the claimed dextromethorphan-to-quinidine weight ratio (Appx58, 15:20–61), then dosing ranges (15:63–16:58), forms of administration (Appx59, 17:4–63), and finally, conversion examples (Appx59, 17:63–18:14). The conversion examples are central to understanding how the ratio is to be calculated consistently across forms of pharmaceutically acceptable salts. They would serve no purpose—and make little sense—if the ratio were meant to compare salt weights, as Otsuka contends.

In its opposition briefing and expert's declaration, Hetero supported its proposed (and proper) construction based also on the specification's teaching of conversion of salt dosages into compound-equivalent amounts. *See, e.g,* Appx602-03; Appx630-31, ¶¶ 33-34; Appx637, ¶ 50. Yet the District Court never engaged with this portion of the intrinsic record. It failed to analyze the conversion

instructions in the specification. The District Court gave no explanation for ignoring these instructions or how its salt-inclusive reading could be reconciled with them.

Otsuka's arguments compounded that error by advancing a reading that ignores how the patent instructs a skilled artisan to calculate the relevant amounts of dextromethorphan and quinidine. It also conflated these compounds with their salt forms. Otsuka first pointed to a sentence that states that "dextromethorphan includes dextromethorphan hydrobromide" and "quinidine includes quinidine sulfate." Appx1477 (citing '282 patent, 3:21-23, 4:23-25, 5:22-25, 6:19-21). But that cited language is taken out of context. The two preceding sentences explain that (1) the compounds may be administered "in a form of a pharmaceutically acceptable salt," and (2) the salt may be selected from various salt groups, including "salts of hydrobromide" and "salts of sulfate." Appx52, 3:7-20, 4:9-22; Appx53, 5:9-21, 6:5-18. Read together, these sentences merely describe acceptable administration forms, but do not alter the plain and ordinary meaning of "dextromethorphan" or "quinidine" as used throughout the specification and in the claims.

The fact that dextromethorphan may be administered in the form of its hydrobromide salt does not alter the plain and ordinary meaning of "dextromethorphan," nor does it justify including the salt's weight in calculating

28

the claimed weight-to-weight ratio calculation. The same holds true for quinidine and its salt. Indeed, as explained above, the specification distinguishes between compounds and salts by explicitly teaching how to convert from salt dosages to compound weights—a conversion that would be unnecessary if the weight of the salts were to be included in the claimed ratio. Appx59, 17:63-18:14.

Otsuka also contends that the patent "repeatedly refers" to dextromethorphan hydrobromide and quinidine sulfate as simply "dextromethorphan" and "quinidine." Appx1477-78. But that is incorrect. The passages Otsuka cites do not mention hydrobromide or sulfate and do not purport to alter the plain and ordinary meaning of "dextromethorphan" or "quinidine."

Otsuka also cites a paragraph in the patent describing the test formulations used in one clinical study, where capsules containing dextromethorphan hydrobromide and quinidine sulfate were administered to participants. Appx1477-78 (citing '282 patent, 25:31-65). But that paragraph simply describes the dosage forms used in the study—standard for pharmacokinetic trials. It says nothing about how the claimed ratio is to be calculated and cannot support deviating from the plain and ordinary meaning of the terms.

Otsuka's argument that the inventors would have used the phrase "effective dosage" if compound weights were intended also lacks merit. Appx1478. The patent expressly teaches how to convert salt doses into compound-equivalent

29

amounts and then refers to those amounts as the "effective dosage" of dextromethorphan and quinidine. Appx59, 17:63-18:14. In other words, the patent treats "effective dosage" consistently with the plain and ordinary meaning of the terms—not to redefine them. The claims themselves refer to "dextromethorphan" and "quinidine" by name, consistent with this teaching. Otsuka's suggestion that the absence of the words "effective dosage" from the claims somehow changes the analysis ignores the point: the specification already explains how the claimed amounts are to be understood—by converting salt weights to dextromethorphan and quinidine weights.

Finally, Otsuka mischaracterizes Hetero's position by arguing that construing the ratio based on dextromethorphan and quinidine weights would exclude salts from the invention. Appx1478. Hetero has never made such an argument. Otsuka wrongly equates the permissible form of administration (which may include salts) with the metric for calculating the ratio. Claim 1 is silent as to administration form and allows for administration in salt form—but when it comes to calculating the claimed "weight to weight ratio," the patent teaches that the relevant measure is the compounds dextromethorphan and quinidine. It defines dextromethorphan and quinidine by chemical structure, provides salt-to-compound conversion examples, and uses the resulting compound weights in all dosage and ratio disclosures. Appx59, 17:63-18:14. Otsuka's argument not only ignores this

context, but it also attempts to confuse what is being measured (dextromethorphan and quinidine weight) with how the drug is delivered (salt form)—a conflation that contradicts both the claim language and the plain and ordinary meaning of the disputed terms.

The specification demonstrates that when dextromethorphan and quinidine are administered in the form of salts, the corresponding weights of dextromethorphan and quinidine—not salt weights—are used for determining the ratio. The patent consistently uses this approach across dosage examples, terminology, and conversions. The District Court's failure to consider these teachings was not harmless error—it was a failure to apply the fundamental principles of claim construction in view of the intrinsic record.

> **d.  The Prosecution History Narrowed the Weight Ratio and Confirmed That the Claimed Ratio Compares the Weight of Dextromethorphan to the Weight of Quinidine—Not Their Salts**

The prosecution history establishes two critical points that directly refute Otsuka's position. First, the applicants narrowed the claimed "weight to weight ratio of dextromethorphan to quinidine" to 1:0.5 or less to overcome prior art and secure allowance. Second, they consistently treated "dextromethorphan" and "quinidine" as distinct chemical compounds—reserving any reference to salt forms for dependent claims.

Throughout prosecution, the application maintained a deliberate distinction between the compounds and their salts, especially when calculating the weight-to-weight ratio. Original claim 1 recited administration of "an amount of dextromethorphan" and "an amount of quinidine," while original dependent claims 7-9 introduced the administration of these compounds "in a form of a pharmaceutically acceptable salt," such as hydrobromide or sulfate. Appx955-56; Appx638-41, ¶¶53–54. That claim hierarchy preserved the distinction between the compounds and their delivery forms. Appx955-56; Appx638-41, ¶¶53–54; *see also* Appx59, 17:63-18:14 (teaching salt-to-compound weight conversions).

That structural distinction was confirmed quantitatively within the original claims themselves. Original claim 9 recited administration of quinidine sulfate (30–60 mg/day). As the patent teaches—and as Dr. Buckton confirms—quinidine sulfate contains about 83.33% quinidine by weight. Appx59, 17:60-18:2; Appx630-31, ¶34; Appx639-40, ¶54. Applying that ratio, original claim 9's 60 mg/day of quinidine sulfate corresponds to 50 mg/day of quinidine—the precise upper limit of the quinidine range recited in original claim 1 (10–50 mg/day). Appx639-40, ¶54. ***This mathematical alignment proves applicants used claim 9 to express the salt equivalent of the amount of quinidine recited in claim 1***—not to redefine "quinidine" in claim 1 as quinidine *or its salt*. *Id.*

32

Federal Circuit precedent supports Hetero's proposed construction. A dependent claim cannot broaden the scope of the independent claim from which it depends. *See Enzo Biochem Inc. v. Applera Corp.,* 780 F.3d 1149, 1156–57 (Fed. Cir. 2015); *Curtiss–Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006) (noting that claim differentiation presumes that "an independent claim should not be construed as requiring a limitation added by a dependent claim."); *Nazomi Commc'ns, Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1370 (Fed. Cir. 2005). The District Court's construction flips that rule on its head. If "quinidine" in original claim 1 included quinidine sulfate, then original claim 9's 60 mg/day upper limit for quinidine sulfate would exceed—and thus improperly broaden—claim 1's 50 mg/day upper limit, effectively reading into Claim 1 a limitation added by the dependent claim in violation of settled law.

The file history also documents the applicants' narrowing amendment to secure allowance. In response to an obviousness rejection, the applicants deleted a pending claim reciting "about 1:1.25 or less" and amended claim 1 to require a more restrictive "1:0.5 or less" ratio. Appx974-79, Appx982-84; Appx640-41, ¶55. Otsuka cannot evade that amendment by now redefining the ratio's terms to include salt weight.

Hetero raised these prosecution-history arguments before the District Court—pointing to the claim amendments, the dependent-claim structure, and the

33

applicants' narrowing statements—but the District Court did not address them. *See, e.g,* Appx608-09; Appx638-40, ¶¶ 53-55. The District Court's order includes no discussion of the narrowing amendment, no acknowledgment of the compound-versus-salt distinction preserved in the claim hierarchy, and no reference to the examiner's basis for allowance.

Thus, the prosecution history confirms what the claim language and specification already establish: the "weight to weight ratio of dextromethorphan to quinidine" in claim 1 is a comparison between the weight of dextromethorphan to the weight of quinidine—not their salts.

### e. Hetero's Unrebutted Expert Confirms a POSITA's Understanding That the Claimed Weight Ratio Is Based on the Compounds—Not Their Salts

Hetero's expert, Dr. Graham Buckton, confirms that the intrinsic record establishes that the claimed "weight to weight ratio of dextromethorphan to quinidine" refers to the weight-to-weight ratio of just the compounds dextromethorphan and quinidine even if administered in salt form. Appx635-42. Dr. Buckton's unrebutted declaration explains that a person of ordinary skill in the art ("POSITA") would read the patent that way—i.e., to calculate the ratio on compound weights, converting the weight of any administered salt to its compound-equivalent before comparison. Otsuka offered *no* contrary expert, yet

34

the District Court accepted Otsuka's attorney argument over Dr. Buckton's expert analysis.

Expert testimony may assist in understanding how a POSITA interprets technical claim terms "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent … has a particular meaning in the pertinent field." *Phillips*, 415 F.3d at 1318. Further, unrebutted expert declarations that align with the intrinsic record are typically credited. *See Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1284 (Fed. Cir. 2017) (affirming district court's reliance on unrebutted expert testimony over "bare attorney argument").

Dr. Buckton explains that dextromethorphan is a well-known pharmaceutical compound widely used in over-the-counter cough syrup. Appx626-27, ¶26. He further describes quinidine as a compound used in combination with dextromethorphan to inhibit metabolism and increase bioavailability. *Id.*, ¶27. A POSITA would understand both terms—"dextromethorphan" and "quinidine"—as referring to specific chemical compounds, not salt forms, because that is how they are described in the patent and understood in pharmaceutical practice. Appx642, ¶ 58.

Dr. Buckton's analysis then tracks the specification. He explains that salts and hydrates are merely forms of administration, while the claimed ratio is

35

between dextromethorphan and quinidine themselves. Appx628-30, ¶¶ 29–33. He also explains the salt-to-compound conversions disclosed in the patent (Appx59, 17:63-18:14) and quantifies these conversions: dextromethorphan hydrobromide contains approximately **73%** dextromethorphan and quinidine sulfate contains approximately **83%** quinidine. Appx631-34, ¶¶ 35, 41. These percentages—derived from molecular structures—reflect the compound content in the specific salt forms. *Id.*, ¶ 41.

He further explains that a POSITA would rely on the weights of dextromethorphan and quinidine—not salt weights—when assessing compliance with the claimed ratio. Appx636-37, ¶¶ 48-50. Because salt forms (e.g., dihydrate vs. anhydrate) differ in molecular weight, using gross salt weights would yield inconsistent and misleading results. Appx643-44, ¶¶ 62-63. Only by converting to the weight of dextromethorphan and quinidine administered, as the patent itself teaches, can a POSITA apply the claimed ratio in a scientifically sound and reliable way.

Dr. Buckton further emphasizes that there is no ambiguity in the claim language if construed according to its plain and ordinary meaning: a POSITA would understand that "dextromethorphan" and "quinidine" refer to these compounds. Appx636, ¶ 48. He notes that reading is confirmed by the written description, which (a) defines these compounds by name and structure, (b)

distinguishes them from their salt forms, and (c) teaches how to calculate their amounts when administered as salts. *See id*. He also notes that every instance in the patent where a "weight ratio" is referenced—including in the Summary and throughout the detailed description—expresses the ratio between the compounds themselves, not between their salts, confirming what is and is not being measured. *See id.,* ¶49 (citing col. 3, lns. 33, 43, 63; col. 4, lns. 2, 38, 48, 54, 63; col. 6, ln. 3; col. 15, lns. 22–34).

The District Court does not cite—let alone address—any portion of Dr. Buckton's declaration, despite it being the only expert evidence on how a POSITA would interpret the claimed ratio. Instead, the District Court relied on Otsuka's bare attorney argument. That failure violates *Phillips. See also Gemtron Corp. v. Saint-Gobain Corp.*, 572 F.3d 1371, 1380 (Fed. Cir. 2009) (reasoning that a party's "unsworn attorney argument ... is not evidence" and thus cannot rebut record evidence); *Enzo Biochem, Inc. v. Gen-Probe, Inc.*, 424 F.3d 1276, 1284 (Fed. Cir. 2005) ("Attorney argument is no substitute for evidence.").

Dr. Buckton's declaration confirms what the patent consistently teaches: the ratio compares the weights of dextromethorphan and quinidine—not the weight of their respective salts.

### f.  Otsuka Misled the District Court With Mischaracterizations of the '282 Patent, the Products, and Hetero's Construction

Otsuka repeatedly misstated what Hetero argued, mischaracterized the patent, and misstated the composition of Hetero's product, confusing the issues and obscuring the actual claim language. This led the District Court to an incorrect construction and infringement conclusion.

First, Otsuka's infringement theory was based on a false premise: that Hetero's claim construction position "excludes salts" and limits claim 1 to the "free base" form. *See, e.g.,* Appx373-74; Appx1477-78. That was never Hetero's position. Hetero made clear that while dextromethorphan and quinidine may be administered in salt forms, the claimed ratio compares the weights of dextromethorphan and quinidine—not their salt weights. *See* Appx608-10. Otsuka's repeated efforts to re-cast Hetero's position as excluding salts were deliberate attempts to confuse the District Court.

Second, Otsuka misrepresented the composition of its own product, NUEDEXTA. It falsely stated that each capsule "contains 20 mg of dextromethorphan and 10 mg of quinidine," citing Exhibit 1 to the Galanek Declaration. Appx366. But the cited document—NUEDEXTA's FDA-approved prescribing information—expressly states that each capsule contains 20 mg of *dextromethorphan hydrobromide* and 10 mg of *quinidine sulfate*. Appx408 ("Capsules: Dextromethorphan hydrobromide 20 mg/quinidine sulfate 10mg.").

38

Otsuka conflated dextromethorphan and quinidine with their salts to push the false narrative that they are interchangeable. Otsuka's arguments blurred the distinction between dextromethorphan and its salt, as well as between quinidine and its salt, to create the illusion that the accused ANDA product—and even NUEDEXTA itself—falls within the weight-to-weight ratio required by the claims.

Critically, Otsuka's own regulatory submission for the identical product in Europe exposes their misrepresentations. That label—governing the same formulation—states that each capsule contains 15.41 mg of dextromethorphan and 8.69 mg of quinidine, corresponding to the compound weights derived from 20 mg dextromethorphan hydrobromide monohydrate and 10 mg quinidine sulfate dihydrate. Appx1373-74. Even the name of the product reflects this directly, identifying it as "NUEDEXTA 15 mg/9 mg hard capsules." Its label also provides the same quantitative salt-to-compound conversion as the '282 patent.



1.    **NAME OF THE MEDICINAL PRODUCT**

NUEDEXTA 15 mg/9 mg hard capsules

2.    **QUALITATIVE AND QUANTITATIVE COMPOSITION**

Each capsule contains dextromethorphan hydrobromide monohydrate, equivalent to 15.41 mg dextromethorphan and quinidine sulfate dihydrate, equivalent to 8.69 mg quinidine.

*Id*. Otsuka knew the method to calculate the claimed compound ratios, knew that its U.S. label disclosed only salt forms, and knew that its own product does not

meet the claimed ratio. Yet it told the Court otherwise, and had it improperly listed in the Orange Book.

Third, Otsuka did the same with Hetero's ANDA product. It misrepresented that "each capsule of Defendants' product contains 20 mg of dextromethorphan and 10 mg of quinidine." *See* Appx368 (citing Exhibit 5 to the Galanek Declaration); Appx373. But Exhibit 5—Hetero's proposed prescribing information—unambiguously states "Capsules: Dextromethorphan hydrobromide 20 mg/quinidine sulfate 10mg." Appx480-81. Despite accurately calculating the patented ratio for its own European label, Otsuka misrepresented Hetero's product to conflate the compounds with their salts. Hetero's opposition raised these glaring misrepresentations. Appx609. Yet Otsuka never acknowledged the error—let alone corrected it.

Otsuka's mischaracterizations led the District Court to adopt a construction that renders claim 1 indefinite. By blurring the line between the recited compounds and their salts, Otsuka removed any objective boundaries for determining what does and does not infringe. That ambiguity renders the claim indefinite under controlling law. *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). And it violates the axiom that whenever possible, claims should be construed to preserve their validity. *Modine*, 75 F.3d at 1557.

Thus, Otsuka's case was not built on the claim language or intrinsic record, but a carefully constructed series of misrepresentations—of the patent, of the products, and of Hetero's position. Each misrepresentation confused the Court further. The claims unambiguously require a weight-to-weight ratio between dextromethorphan and quinidine and not a weight-to-weight ratio that includes their salt weights.

### g. The District Court's Claim Construction Was Fundamentally Flawed

In granting Otsuka's motion, the District Court relied on three erroneous rationales—each either ignoring the intrinsic record or misapplying controlling Federal Circuit law. As a result, the District Court determined that the "weight to weight ratio of dextromethorphan to quinidine" included the weights of their salts rather than the weight-to-weight ratio of dextromethorphan to quinidine, contrary to both the plain and ordinary meaning of the terms and intrinsic evidence.

First, the District Court misapplied the doctrine of claim differentiation to justify reading the asserted ratio in claim 1 as referring to salt forms. Appx21-22. But it is well-established that while claim differentiation may be a helpful interpretive tool, it "cannot enlarge the meaning of a claim beyond that which is supported by the patent documents." *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011); *see also Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1302 (Fed. Cir. 1999) ("[T]he doctrine of claim

41

differentiation does not serve to broaden claims beyond their meaning in light of the specification, and does not override clear statements of scope in the specification and the prosecution history."); *Fenner Investments Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1327 (Fed. Cir. 2015) (claim differentiation "cannot be used to broaden claims beyond their meaning in light of the patent as a whole"). Yet, the District Court did so with its construction.

Here, claim 1 recites a "weight to weight ratio of dextromethorphan to quinidine," with no reference to salts. As Hetero explained at the oral hearing, the fact that certain dependent claims mention administration of specific salt forms (e.g., hydrobromide or sulfate), that does not change the plain and ordinary meaning of dextromethorphan or quinidine in Claim 1 to include their salt, and by extension, the claimed ratio in Claim 1 to include a salt-to-salt ratio. Appx1800-01, 11:24-12:6. While Claim 1 contemplates administration via salts, the patent makes clear that the claimed ratio must still be calculated based on the weights of administered dextromethorphan and quinidine. *See* Appx607-10; Appx630, ¶ 33; Appx630, ¶¶ 44-46.

That distinction is visually and chemically confirmed by the structures of the salt forms submitted into the record. As shown below, the molecular structures of dextromethorphan hydrobromide monohydrate and quinidine sulfate dihydrate

42

(Appx870-71) make visually apparent that the base compounds remain chemically distinct from the added salts.



**Dextromethorphan Hydrobromide Monohydrate, Appx870**

**Quinidine Sulfate Dihydrate, Appx871**

In the image above for dextromethorphan salt, the base compound—dextromethorphan—remains intact as the core structure, while hydrobromide (HBr) and water ($H_2O$) are merely appended. The same is true for quinidine in its sulfate form, where the core quinidine structure is clearly distinct from the added sulfuric acid and water molecules. These additions affect total molecular weight, but not the identity of the base compounds.

Accordingly, the correct reading of the claim—and the one the patent itself teaches—is to calculate the claimed ratio using the weights of dextromethorphan and quinidine alone, excluding the added weight contributed by salt components such as hydrobromide or sulfate. Dr. Buckton's unrebutted declaration confirms that a POSITA would read the claim exactly this way. *See* Appx630, ¶ 33; Appx633-36, ¶¶ 41-42, 46-50.

Moreover, Hetero's claim construction is consistent with doctrines of claim differentiation. Here, claim 1 of the '282 patent is agnostic as to the form of delivery. Dependent claims 7-8 add narrowing limitations to the form of delivery. Nothing in Hetero's construction contradicts the rules of claim differentiation because claim 1 specifies a method of treatment by administering drug (in any form) while dependent claims 7-8 narrow claim 1 by specifying that the drug must be administered in any salt form (claim 7) or specific salt forms (claim 8).

Second, the District Court also misread the specification. It pointed to passages mentioning dextromethorphan hydrobromide and quinidine sulfate and inferred that the terms dextromethorphan and quinidine standing alone also include salts. Appx22-23. But the mere fact that a patent discusses salt forms as potential vehicles for administration does not redefine the meaning of the claim terms "dextromethorphan" and "quinidine"—nor does it materially transform the dextromethorphan-to-quinidine ratio of claim 1 into their salt-to-salt ratio.

In chemical terms, the addition of hydrobromide (HBr) and water ($H_2O$) to form dextromethorphan hydrobromide monohydrate does not structurally change the base compound "dextromethorphan." Likewise, adding sulfate ($H_2SO_4$) and two molecules of water ($2H_2O$) to quinidine to form quinidine sulfate dihydrate does not change the base compound "quinidine." In fact, the specification expressly defines "dextromethorphan" by its chemical name—"(+)-3-methoxy-N-

44

methylmorphinan"—and similarly identifies the structure of quinidine. Appx55, 9:17–36; Appx57, 14:8–23. It also teaches how to convert the weights of salts into their corresponding amounts of dextromethorphan and quinidine. Appx59, 17:63-18:14. There would be no need to do so under the District Court's construction.

Further, the cited passages actually contradict the District Court's interpretation of them. They teach that 30 mg of dextromethorphan hydrobromide monohydrate corresponds to 22 mg of dextromethorphan, and that 30 mg of quinidine sulfate dihydrate corresponds to 25 mg of quinidine. Appx59, 18:1-14; Appx22 (citing '282 patent at 18:1-14). This confirms that the patent treats "dextromethorphan" and "quinidine" as distinct from, and derivable from, their respective salt forms.

Lastly, the District Court relied on prior litigation involving the '282 patent, asserting that because the patent had previously been successfully asserted against other generic products, the same result should follow here. Appx23. That conclusion rested on a false assumption—not on any actual claim construction or infringement finding. The District Court cited Judge Stark's decision in *Avanir Pharm., Inc. v. Actavis South Atlantic LLC*, 36 F. Supp. 3d 475 (D. Del. 2014), which stated that "each of the asserted claims of the '282 and '484 patents covers the use of NUEDEXTA according to its package insert to treat PBA." *Id.* at 509. But that statement merely reflected the defendants' stipulation of infringement. *Id.*

45

at 478. The meaning of the disputed terms here was neither briefed nor adjudicated.

The District Court then appeared to treat that stipulation-based result as binding against Hetero here, prejudicing Hetero by circumventing the required noninfringement analysis. For example, the District Court asked Otsuka whether there were any differences between the other generics' ANDA products and Hetero's ANDA product:

> THE COURT: Is there anything unique about [Hetero's] product in that it being the salt version of the— then from any of these other generics that—
>
> MR. STOPS: No, Your Honor.

Appx1845, 56:4-7. This question reflected a flawed premise—that if Hetero's ANDA product were identical to those ANDA products in *Avanir*, infringement could be presumed. ***The other generics' ANDA products should have had no bearing on the infringement analysis with respect to Hetero's ANDA product.***

Moreover, Otsuka's counsel ignored that Hetero self-imposed tightening restrictions on its product specification so that Hetero does not have a product to sell with a dextromethorphan-to-quinidine ratio of 1:0.54 or less. Appx737-39, ¶¶20-29; Appx597; Appx604; Appx610. As a result, Hetero's ANDA product is likely unique relative to the other generic ANDA filers and there is nothing in the record that suggests otherwise.

46

Claim construction must rest on intrinsic evidence—not on litigation assumptions or stipulations from proceedings that did not involve Hetero. The District Court's reliance on a stipulation in a different case by different defendants was legal error.

The District Court's likelihood-of-success analysis cannot be reconciled with the patent's disclosures and expert testimony. Because it was legally flawed, the grant of the preliminary injunction must be reversed. *Glaxo Group Ltd. v. Ranbaxy Pharms.*, Inc., 262 F.3d 1333, 1338-39 (Fed. Cir. 2001).

### 2. *Otsuka Did Not Dispute That Hetero Does Not Infringe Under Hetero's Correct Construction*

Otsuka did not contest noninfringement under Hetero's construction. It did not argue that Hetero's product satisfies the claimed "weight to weight ratio of dextromethorphan to quinidine of 1:0.5 or less" when that ratio is properly calculated. Instead, Otsuka's argument was based on its flawed salt-based construction. Under the correct construction, there is no infringement.

As Dr. Buckton explains, 20 mg of dextromethorphan hydrobromide contains 15.41 mg of dextromethorphan and 10 mg of quinidine sulfate contains 8.69 mg of quinidine. Appx630-31, ¶34. This is consistent with Otsuka's European label. Appx1374 ("Each capsule contains dextromethorphan hydrobromide monohydrate, equivalent to 15.41 mg dextromethorphan and quinidine sulfate dihydrate, equivalent to 8.69 mg quinidine.") The resulting ratio is straightforward:

$$\frac{8.69 \text{ mg quinidine}}{15.41 \text{ mg dextromethorphan}} \approx 0.56$$

That ratio exceeds the claimed maximum of 0.50. Using the hydrate forms referenced in the patent yields nearly identical results (15.42 mg of dextromethorphan and 8.74 mg of quinidine, or ~0.57). Appx631-32, ¶¶35–36. Either way, Hetero's product does not infringe.

Otsuka did not dispute this calculation. Instead, it argued that the ratio must be calculated based on salt weights. Under the correct construction, noninfringement is unrebutted. *See Glaxo*, 262 F.3d at 1338–39. Just as in *Avanir,* where the court held that the reissue '115 patent did not cover NUEDEXTA (36 F. Supp. 3d at 493-7), neither does the '282 patent.

Because Otsuka cannot carry its burden of showing likelihood of success on the merits, the preliminary injunction must be vacated.

### 3. *The District Court Failed to Address Hetero's Indefiniteness Defense*

#### a. The District Court Erred by Improperly Relying on the Validity Holdings from the Prior *Avanir* Litigation, Which Did Not Address Indefiniteness

In opposing Otsuka's motion for a preliminary injunction, Hetero asserted that construing "dextromethorphan" and "quinidine" to include their salt forms renders the claimed "1:0.5 or less" ratio invalid for indefiniteness. Appx612; Appx1817, 28:1-8; Appx342-44. This is because the District Court held that

48

"claim 1 must include the salt forms of quinidine and dextromethorphan" (Appx22), which creates ambiguity as to claim scope.

Instead of addressing Hetero's indefiniteness defense, the District Court concluded that Otsuka was likely to succeed on validity solely relying on findings from *Avanir*. That reliance constitutes reversible error for at least two independent reasons.

First, *Avanir* never addressed indefiniteness. The defendants in that case asserted obviousness and lack-of-written-description defenses, not an indefiniteness defense. *Avanir*, 36 F. Supp. 3d 475, 496 ("Defendants contend that both the '282 and '484 patents are invalid due to obviousness and lack of written description."). Those validity challenges do not encompass indefiniteness. As Judge Williams' colleagues in Delaware have explained, "[t]reating validity as a single issue conflicts with the 'well-established policy of freely allowing challenges to the validity of claimed intellectual property protection.'" *Orexo AB v. Actavis Elizabeth LLC*, 371 F. Supp. 3d 175, 186 (D. Del. 2019) (Connoly J.) (quoting *Nasalok Coating Corp. v. Nylok Corp.*, 522 F.3d 1320, 1327 (Fed. Cir. 2008)).

Second, Hetero was not a party to *Avanir* and "[o]ne is not bound by a judgment in personam in a litigation in which he is not designated as a party." *Hansberry v. Lee*, 311 U.S. 32, 40 (1940). Yet the District Court wrongly

49

concluded that Otsuka "will likely be able to prevail on . . . [Hetero's] invalidity claims arising in this action" because: (i) the *Avanir* court had already determined that claims 1 through 9 of the '282 patent were valid; (ii) the Federal Circuit previously affirmed the *Avanir* court's obviousness and written description holdings; and (iii) the *Avanir* court stated that the '282 patent covered NUEDEXTA. Appx23. None of these findings from *Avanir* bear on the issue of indefiniteness, nor are they binding on Hetero.

Thus, the District Court improperly collapsed multiple distinct validity theories into a single issue and foreclosed Hetero from asserting invalidity on any basis. In doing so, it denied Hetero due process and a fair opportunity to litigate the likelihood of success of its indefiniteness defense. These legal errors warrant reversal.

### b. The District Court's Failure to Make Factual Findings on Indefiniteness Constitutes Legal Error and Necessitates Remand

While the District Court: (i) acknowledged the existence of Hetero's indefiniteness defense (Appx23); and (ii) stated that it had "considered" the parties' briefing and oral argument (*id.*), it failed to make any factual findings on indefiniteness under Fed. R. Civ. P. 52(a)(2)—confirming its failure to analyze it and preventing meaningful review. *See Nutrition 21 v. U.S.*, 930 F.2d 867, 871 (Fed. Cir. 1991) (ruling on preliminary injunction that "the District Court could not

50

*sub silentio* reject [invalidity defenses]"). This failure constitutes yet another basis for vacatur. *Id.*

The District Court concluded that "claim 1 must include the salt forms of quinidine and dextromethorphan" (Appx22) such that claim 1 as embedded with the District Court's construction (in red) reads as follows:

> 1. A method for treating pseudobulbar affect or emotional lability, the method comprising administering to a patent in need thereof dextromethorphan or its salt in combination with quinidine or its salt . . . with the provisio that the weight to weight ratio dextromethorphan or its salt to quinidine or its salt is 1:0.5 or less.

This construction makes the claim indefinite, or at the very least, raises a substantial question on indefiniteness that the District Court should have analyzed. Instead of doing so and making any factual findings, the District Court merely acknowledged the existence of the defense: "[Appellants] assert an invalidity defense, which is premised on the same argument regarding the construction of the effective compounds in the '282 patent." Appx21. The District Court failed to recognize that Hetero's indefiniteness defense is not premised on the adoption of Hetero's proposed construction. Instead, Hetero's indefiniteness defense arises only *if Hetero's construction is __not__ adopted.* Appx612; Appx1815-18.

Hetero explained that if "dextromethorphan" and "quinidine" were construed to include salt forms of dextromethorphan and salt forms of quinidine, claim 1's weight ratio would be indefinite because: (i) a product containing

dextromethorphan salt and quinidine salt necessarily also contains dextromethorphan and quinidine; and (ii) depending on whether compounds or salts are selected to calculate claim 1's weight ratio, the calculations produce both infringing and noninfringing results, which is the hallmark of indefiniteness. Appx612 (citing *Ball Metal Beverage Container Corp. v. Crown Packaging Tech., Inc.*, 838 F. App'x 538, 542 (Fed. Cir. 2020)).

During the hearing, the District Court asked Otsuka to respond to Hetero's assertion that the 1:0.5 ratio limitation would be indefinite if the court construed "dextromethorphan" and "quinidine" to include salts (as illustrated above). Otsuka engaged in misdirection by not responding to the question, and instead providing an irrelevant argument that the claims were not indefinite because one could determine the ratio by looking at the contents of an accused infringing product:

> THE COURT: So how do you respond to Hetero's argument that the calculation in Claim 1, if it included salts, would be indefinite?
>
> MR. STOPS: This is not a picking and choosing where -- ***what you use is what is in front of you***. So this product is 20 mg dextromethorphan hydrobromide, 10 mg quinidine sulfate, those are the numbers that you use. ***You use what is in the product***. So there's no indefiniteness. We're not calculating it.
>
> So if the product actually was a product made out of the freebase and the numbers were given for the freebase, that's what you would use. So we're not doing calculations here, we're just using what is, what is actually in the product in front of us, so there's no indefiniteness problem.
>
> THE COURT: Okay.

52

Appx1842-43, 53:17-54:9 (emphasis added).

The District Court should not have accepted Otsuka's argument because "[t]he test for indefiniteness does not depend on a potential infringer's ability to ascertain the nature of its own accused product to determine infringement, but instead on whether the claim delineates to a skilled artisan the bounds of the invention." *SmithKline Beecham Corp. v. Apolex Corp.*, 403 F.3d 1331, 1340-41 (Fed. Cir. 2005). And that precisely describes the fallacy of Otsuka's response to the District Court's question.

Here, claim 1's ratio limitation—as improperly construed by the District Court—requires the calculation of the weight-to-weight ratio by comparing dextromethorphan or its salt to quinidine or its salt. This calculation—without even considering the hydrate forms—can be done in at least ***four*** different ways (*see* Appx612), i.e., by comparing the ratio of:

- Option 1: dextromethorphan to quinidine;

- Option 2: dextromethorphan to quinidine salt;

- Option 3: dextromethorphan salt to quinidine; or

- Option 4: dextromethorphan salt to quinidine salt.

As Hetero's unrebutted expert explained, calculating a ratio by selecting various weights of either compounds or salts produces both infringing and

noninfringing results. Appx643-44, ¶¶ 63-64. The intrinsic evidence does not

instruct which option to use.

This Court has repeatedly held that such ambiguity renders a claim

indefinite. *See, e.g., Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1344-

45 (Fed. Cir. 2015) (holding claim indefinite where molecular weight could be

measured three different ways with three different results and the patent and

prosecution history did not provide guidance as to which measure to use); *Dow*

*Chem. Co. v. Nova Chems. Corp. (Can.)*, 803 F.3d 620, 634 (Fed. Cir. 2015)

(claims invalid for indefiniteness because of the "existence of multiple methods

leading to different results without guidance in the patent or prosecution history as

to which method should be used").

Had the District Court analyzed the indefinite defense, it would have

realized that its claim construction makes the asserted claim indefinite. This legal

error warrants remand.

### 4. *The District Court Ignored and "Seriously Misjudged" Hetero's Evidence Negating Irreparable Harm*

As an initial matter, under a proper claim construction, Otsuka cannot be

irreparably harmed by a noninfringing product. *Glaxo*, 262 F.3d at 1338-39. The

District Court, however, held that Otsuka would suffer irreparable harm absent an

injunction because, among other reasons, Otsuka's delay in filing a preliminary

injunction "appears to be attributed in part to improper notice of Defendants'

ANDA, and in part to attempted negotiations between the parties." Appx26. But even assuming the District Court correctly resolved these factual disputes—which it did not—the District Court committed clear error when it ignored Hetero's other evidence demonstrating that ***Otsuka knew about Hetero's ANDA for NUEDEXTA and waited 17 months before filing its request for an injunction***. Appx1553.

In December 19, 2023, text messages to and from Jack Lin—Otsuka's Senior Director, Associate General Counsel—and Hetero's outside counsel, Hetero informed Otsuka that Hetero's in-house counsel was seeking to discuss Hetero's ANDA for NUEDEXTA:



Appx1553.

Mr. Lin responded within two hours, confirming that he received the text message informing him that Hetero wanted to discuss Hetero's ANDA for NUEDEXTA:

Dec 19, 2023 at 10:20 AM

Hi Charan - can you ask him to contact me at my work email, jack.lin@otsuka-us.com. I'm currently at trial in DE with my Japan colleagues. If Sam is able to contact me today or tomorrow on the topic, I'll be able to discuss with those colleagues and may be able to proceed quicker.

Appx1553.

Hetero introduced these text messages into the record and discussed them at the preliminary-injunction hearing. Appx1553; Appx1824, 35:13-16; Appx1830, 41:6-8; Appx1831, 42:1. The District Court, however, not only "seriously misjudged" Hetero's evidence, but it also ignored consideration of this critical evidence altogether.

"A patentee's undue delay in seeking a preliminary injunction 'negates the idea of irreparability.'" *Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 429 F.3d 1364, 1382 (Fed. Cir. 2005). Here, the parties do not dispute that Otsuka's in-house counsel knew of Hetero's ANDA for NUEDEXTA in December 2023. Appx1553. It is also undisputed that Otsuka: (i) did not contact Hetero until nearly a year later

56

in December 2024 (Appx317; Appx1551-52); and (ii) did not file its preliminary injunction until May 2025—17 months later.

Under similar circumstances, significant delay in requesting a preliminary injunction demonstrates the absence of irreparable harm. For example, in *High Tech Med. Instr., Inc. v. New Image Indus., Inc.*, this Court explained that "[a]bsent a good explanation, not offered or found here, 17 months is a substantial period of delay that militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief." 49 F.3d 1551, 1557 (Fed. Cir. 1995) (collecting cases reporting that 15-month, 9-month, one-year, and 7.5-month delays undercut any claim of irreparable harm).

The District Court, however, did not confront Hetero's evidence or ask Otsuka why it delayed for 17 months before filing its request for an injunction. Instead, it ignored the text messages and credited Otsuka's attorney argument that Otsuka became aware of Hetero's ANDA "based on the FDA's approval" after August 2024. Appx26. But Otsuka's attorney argument cannot be reconciled with Hetero's evidence demonstrating that Otsuka became aware of Hetero's ANDA for NUEDEXTA no later than December 19, 2023.

The District Court should have made factual findings on critical issues such as the date Otsuka's became aware of Hetero's ANDA. Otsuka's 17-month delay was not only significant and inexcusable, it also precludes a finding of irreparable

57

harm. The District Court's failure to make the required factual findings constitutes another independent reason to vacate.

### 5. *The District Court Abused Its Discretion in Weighing the Equities and Public Interest by Shifting the Burden, Relying on Unsworn Allegations, and Disregarding the Hardship to Hetero*

The District Court further abused its discretion in weighing the equities and public interest. It improperly shifted the burden to Hetero to prove compliance with FDA notice regulations and credited nothing more than Otsuka's unsworn attorney argument to conclude improper notice. It then ignored unrebutted evidence that Hetero faces substantial harm including lost first-mover advantages, stranded inventory, and irreversible price erosion. Finally, the District Court failed to account for the strong public interest in timely generic entry, which Congress enshrined in Hatch–Waxman. These cumulative missteps undermine the injunction.

### a. The District Court Improperly Shifted the Burden to Hetero to Prove Compliance with FDA Regulations Governing Service of Notice Letters

As the party seeking a preliminary injunction, Otsuka bore the burden to demonstrate that the balance of equities tipped in its favor. *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008). Otsuka attempted to satisfy that burden by claiming that it purportedly did not receive notice of Hetero's Paragraph IV certification. *See* Appx378. In reply, Otsuka asserted that "although [the] Court lacks jurisdiction to

order the FDA to rescind Hetero's ANDA approval, it can find that Hetero violated the regulations governing service of its Notice Letter and assign that violation weight in the balance of the equities." Appx1484.

The District Court accepted that framing and allowed Otsuka to convert the equities inquiry into a quasi-FDA sufficiency dispute—without any competent evidence from Otsuka supporting non-receipt. Appx27, n. 6. In doing so, the District Court flipped the burden: it faulted Hetero for allegedly not complying with FDA regulations governing service of notice letters, rather than requiring Otsuka, as the movant, to prove non-receipt of Hetero's notice letter. That burden shift is legal error and, standing alone, requires reversal.

> **b. The District Court Abused its Discretion in Accepting Otsuka's Attorney Argument and Excusing Otsuka's Failure to Submit Competent Evidence**

Attorney argument is not evidence. *See Gemtron*, 572 F.3d at 1380 (observing that "unsworn attorney argument ... is not evidence"). That principle applies with full force at the preliminary-injunction stage, where the movant bears the burden to produce competent evidence in support of equitable relief. *See, e.g., E.I. Du Pont de Nemours and Co. v. MacDermid Printing Solutions, LLC*, 525 F.3d 1353, 1359 (Fed. Cir. 2008) (district court abused its discretion by relying on conflicting attorney argument instead of unrebutted factual evidence at the preliminary-injunction stage).

Yet Otsuka offered no declaration from any corporate officer, in-house counsel, registered agent, or mailroom/records custodian. Its entire "non-receipt" showing consisted solely of unsworn attorney assertions in briefing. *See* Appx378-79. Hetero raised this evidentiary failure in its opposition. Appx614, n. 8. That omission alone should have been dispositive, particularly given FDA's acceptance of Hetero's unrebutted evidence of compliance with the regulation governing service of Paragraph IV notice letters, and FDA's subsequent approval of Hetero's ANDA. Appx368; Appx477-79; Appx520-25.

In its reply, Otsuka sought to excuse its evidentiary failure by arguing it could not be expected to obtain "declarations from every employee to prove a negative," and that "only Hetero's insufficient proof of receipt" was relevant. Appx1484. But that argument deflects responsibility and shifts the burden again. The Rules of Evidence do not require declarations from "every employee"; they require a certification from a records custodian or other qualified witness who can: (i) certify to records kept in the ordinary course of a regularly conducted activity per Fed. R. Evid. 803(6) and Fed. R. Evid. 902(11) or 902(12); and (ii) demonstrate the absence of a record from such regularly conducted activity per Fed. R. Evid. 803(7). Otsuka provided none. Its failure to submit even a single declaration—let alone one from a qualified individual—renders its claim of non-receipt facially deficient.

60

More fundamentally, Otsuka cannot credibly assert that it lacked actual notice of Hetero's ANDA submission. As noted above, its own Senior Director and Associate Counsel, Jack Lin—who was the sole Otsuka representative to attend the preliminary injunction hearing—personally received a text message about Hetero's ANDA as early as December 2023 and promptly responded. *See* Appx1792, 3:19-21; Appx1553. Mr. Lin appeared on behalf of Otsuka in court for the hearing on the motion for preliminary injunction, yet Otsuka failed to provide any declaration from him. That failure speaks volumes. Its failure to rebut Hetero's notice evidence exposes the weakness of Otsuka's position on this issue.

Despite the lack of any competent evidence, the District Court once again fully credited counsel's argument, found Hetero's notice "improper," and used that misguided (and irrelevant) conclusion to decide that the equities favored Otsuka. Appx25. That ruling rests on no jurisdiction to adjudicate notice adequacy, no competent evidence, and a misallocation of the burden—errors that require reversal.

### c. The District Court Overlooked Hetero's Evidence of Harm and the Public's Interest in Timely Generic Access

The District Court found that Hetero did not sufficiently explain how it would be harmed by a preliminary injunction. Appx27. But Hetero's opposition and supporting declarations established extensive evidence of concrete harm. *See* Appx615; Appx759-61, ¶¶ 4-7; Appx733-35, Appx751-53; Appx690-693,

Appx706-08. As the sole approved generic, Hetero was positioned to capture 65–80% of the market at launch and earn approximately $80 million between July 18, 2025, and July 30, 2026. Appx760, ¶¶ 5–6. Even Otsuka's own expert, Mr. Mark Rainey, concurred with Hetero's projected market share range. Appx1490; Appx1493, ¶ 10. That first-mover status is time-sensitive and irreversible once lost. *See* Appx706-08, ¶¶ 34–36.

Hetero also built, validated, and staged finished goods in anticipation of launch, reasonably relying on Otsuka's silence after December 2023. It acquired sufficient active pharmaceutical ingredients to manufacture approximately 120,000 bottles (7.2 million capsules) and had already produced 6,250 bottles by the time of the injunction. Appx751-53. The injunction immediately stranded inventory, disrupted validated production lots, and introduced expiration risks—operational harms that are nonrecoverable. *See id.*

The District Court overlooked these harms entirely. It also failed to account for the public interest in having prompt access to lower-cost, FDA-approved generics. Appx28-29. FDA has already determined that Hetero's product meets all safety and efficacy requirements. Yet the District Court, relying on its erroneous conclusion that the patent is valid and infringed, skewed the public-interest analysis in Otsuka's favor, disregarding the cost to patients from delayed generic access. That result is fundamentally at odds with the core purpose of the Hatch–

Waxman Act: to encourage early generic entry when patent rights do not justify exclusion.

## B. The District Court Abused its Discretion in Waiving the Rule 65(c) Bond Requirement

Rule 65(c) and binding Third Circuit precedent state that a bond is "almost mandatory" where an injunction restrains commercial, money-making activities. Yet despite undisputed evidence that the injunction is causing Hetero tens of millions of dollars in lost sales alone, the District Court excused Otsuka from posting any security based on flawed reasoning and inapplicable precedent. This failure independently requires reversal, vacatur or, at minimum, remand with instructions to impose an adequate bond.

### a. FRCP 65 (c) and Third Circuit Law Require a Bond in this Case

Rule 65(c) of the Federal Rules of Civil Procedure states:

(c) Security. The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.

While a district court may, under very limited circumstances, refuse to require that plaintiff post a bond, that very limited circumstance does not apply here. Hetero has been harmed by this improper preliminary injunction and, if not reversed, will continue to be harmed. Indeed, Hetero's expert declaration established that Hetero would have profited approximately $80 million (Appx708,

¶36) but for the injunction. This figure should have been the baseline for setting the

bond.[1]

> The Third Circuit has left no ambiguity on the bond issue:
>
> As we held in *Frank's GMC Truck Center, Inc.*, 847 F.2d 100, 103 (3d Cir. 1988), "[a]lthough the amount of the bond is left to the discretion of the court, the posting requirement is much less discretionary. While there are exceptions, the instances in which a bond may not be required are so rare that the requirement is almost mandatory." *Id*. Such an extremely narrow exception exists "when complying with the preliminary injunction 'raises *no* risk of monetary loss to the defendant.'" *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 210 (3d Cir. 1990) *(quoting Sys. Operations, Inc. v. Scientific Games Dev. Corp.*, 555 F.2d 1131, 1145 (3d Cir. 1977).
>
> . . .
>
> We have ***never*** excused a district court from requiring a bond where an injunction prevents commercial, money-making activities.

*Zambelli Fire Works Mfg. Co. v. Wood*, 592 F.3d 412, 426 (3d Cir. 2010) (emphasis

added).

Bonds have routinely been issued in similar cases. *See, e.g., Sanofi v. Apotex,* 470 F.3d 1368, 1384 (Fed Cir. 2006) ($400M bond in case involving the drug Plavix®); *Pfizer*, 429 F.3d at 1372 ($200M in case involving the drug Accupril®).

---

[1] This assertion is based upon the undisputed fact that the preliminary injunction prevents Hetero from selling a profitable product and thus deprives Hetero of the profits on those sales.

64

At the District Court, Otsuka's $5M bond request relied primarily on the Third Circuit's decision in *Temple Univ. v. White*, 941 F.2d 201 (3rd Cir. 1991), which affirmed an exception to Rule 65(c). Appx1850-52.

The *Temple* case, however, involved very exceptional circumstances that justified no bond in that case. None of those circumstances apply here, as this excerpt from *Temple* shows:

> In this case, Sacred Heart has sued to enforce the rights granted to it under the federal Medicaid statute, and in so doing ***has pursued a course of litigation clearly in the public interest***, i.e., it seeks ***to preserve its role as a community hospital serving a disproportionate share of low income patients***. In light of the District Court's discussion, it appears improbable that, ***had the District Court required Sacred Heart to post a bond, the hospital would have been able to do so. Moreover, had Sacred Heart suffered a financial collapse, it would have been in no position to pursue its claim for increased Medicaid payments, or even to serve its Medicaid patients***. The District Court's waiver of the bond requirement under these circumstances, then, falls within the exception to Rule 65 formulated by the First Circuit - an exception which we adopt today.

*Id.* at 220 (emphasis added; footnotes omitted).

Other than explaining that a district court can waive the bond requirement under exceptional circumstances, the *Temple* case is inapplicable here: Otsuka is not a hospital serving a disproportionate share of low-income patients; Otsuka is a large, profitable multinational drug company that could easily afford to post an $80M bond (Otsuka reported well over $10B in annual revenue in 2024); and if

Otsuka did post a bond, the public interest will not be harmed as Otsuka will continue to offer its products to the public.

The *Temple* court also noted the reason why the lower court did not require a bond:

> The district court did not require Temple to post a bond because of the ongoing relationship between the parties and the ability of DPW to recapture any excessive payments through reductions in future payments, if necessary.

*Id.* at 207. Notably, *Temple* involved a dispute over the payment rates the State of Pennsylvania was paying to the plaintiff hospital under the state's Medicaid program. There was an ongoing relationship between plaintiff and defendant regarding those payments. Therefore, as the Third Circuit noted, the *Temple* defendant could fully recoup any monetary damage caused by an improperly issued injunction in the normal course through reductions in future payments. *Id.* In contrast, there is no such relationship between Otsuka and Hetero from which Hetero can recover its damages in the normal course.

If anything, the *Temple* case highlights just how "exceptional" the circumstances must be to waive the bond requirement. The circumstances in this case do not come close to qualifying. Indeed, the circumstances here are exactly what the Third Circuit addressed in *Zambelli*, 592 F.3d at 426 ("We have never excused a district court from requiring a bond where an injunction prevents commercial, money-making activities.").

66

Otsuka's attempt to cast this case as involving the requisite degree of exceptionality lacks merit.

### b. The District Court's Rationale for Refusing to Require a Bond Was Flawed

The District Court justified its refusal to require a bond by reasoning that Otsuka's case was strong, the patent's validity had already been upheld, and Hetero purportedly violated the rules for "notice" under the applicable regulatory scheme. Appx31-32.

This rationale is flawed for several reasons: (a) a bond is required regardless of the strength of the merits (and as discussed above, the merits actually favor Hetero); (b) whether Hetero failed to give proper "notice" to Otsuka under a regulatory scheme is not a basis for refusing to require a bond; (c) the District Court incorrectly concluded that the prior litigation involving the patent-in-suit and other defendants' ANDA products was dispositive on Hetero; and (d) it runs directly afoul of controlling Third Circuit law.

At a minimum, the bond should have been set at no less than $80 million based on the unrebutted expert declaration. By refusing to require a bond, the District Court committed an abuse of discretion, independently warranting reversal and vacatur.

## VIII.    CONCLUSION

For the foregoing reasons, Hetero respectfully requests this Court to reverse

the District Court's decision and vacate the preliminary injunction.

Respectfully submitted,

Date: October 14, 2025

/s/ Ehab M. Samuel
Ehab M. Samuel
ORBIT IP, LLP
620 Newport Center Drive, Suite 1100
Newport Beach, CA 92660
(310) 887-1333
Counsel for Defendants-Appellants

David A. Randall
ORBIT IP, LLP
11400 W. Olympic Blvd., Suite 200
Los Angeles, CA 90064
(310) 887-1333
Counsel for Defendants-Appellants

# ADDENDUM

# TABLE OF CONTENTS
## [ADDENDUM]

| Docket/ Paper Entry | Description | Page |
|---|---|---|
| 100 | Memorandum Opinion [Sealed], Filed July 23, 2025 | Appx16 |
| 101 | Order, Filed July 23, 2025 | Appx33 |
| 1-1 | Exhibit A:    United States Patent No. 7,659,282 | Appx42 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| OTSUKA AMERICA PHARMACEUTICAL, INC. and AVANIR PHARMACEUTICALS, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 25-647-GBW |
| | ) | **FILED UNDER SEAL** |
| HETERO LABS LIMITED, HETERO LABS LTD. UNIT-III, and CAMBER PHARMACEUTICALS, INC., | ) ) ) ) | |
| Defendants. | ) ) ) | |

---

Jeremy A. Tigan, Cameron P. Clark, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; F. Dominic Cerrito, Eric C. Stops, James Baker, John P. Galanek, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, NY.

*Counsel for Plaintiffs*

John C. Phillips, Jr., Megan C. Haney, PHILLIPS, MCLAUGHLIN & HALL, Wilmington, DE; William A. Rakoczy, Joseph T. Jaros, Neil B. McLaughlin, Greg L. Goldblatt, RAKOCZY MOLINO MAZZOCHI SIWIK LLP, Chicago, IL.

*Counsel for Defendants*

**MEMORANDUM OPINION**

June 23, 2025
Wilmington, Delaware

**CONFIDENTIAL MATERIAL REDACTED**

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

On May 27, 2025, Plaintiffs Otsuka America Pharmaceutical, Inc. and Avanir Pharmaceuticals, LLC (together, "Otsuka" or "Plaintiffs") filed a Complaint (D.I. 1) against Defendants Hetero Labs Limited, Hetero Labs Ltd. Unit-III, and Camber Pharmaceuticals, Inc. (collectively, "Hetero" or "Defendants"), asserting infringement of United States Patent No. 7,659,282 ("the '282 patent") by Hetero's expected launch of its pharmaceutical product containing 20 mg dextromethorphan hydrobromide and 10 mg quinidine sulfate ("Defendants' ANDA product").[1] That same day (i.e., May 27, 2025), Plaintiffs filed a Motion for a Temporary Restraining Order and Preliminary Injunction, seeking an order from this Court enjoining Defendants from "commercially manufacturing, using, offering to sell, or selling within the United States or importing into the United States [Defendants'] generic version of Otsuka's NUEDEXTA® product, which infringes [the '282 patent]." (D.I. 10 at 1).

On May 29, 2025, Defendants submitted a letter to the Court, which stated that the "parties met and conferred" and that Defendants ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ (D.I. 17). As a result, on June 2, 2025, the Court entered an Oral Order which denied-as-moot Plaintiffs' Motion for a Temporary Restraining Order and deferred ruling on

---

[1] The '282 patent is titled, "Pharmaceutical Compositions Comprising Dextromethorphan and Quinidine For the Treatment of Neurological Disorders;" and generally is directed to "methods for treating pseudobulbar affect or emotional liability by administering dextromethorphan in combination with quinidine." (D.I. 1 ¶ 2, *see also* D.I. 1, Ex. A ("the '282 patent")). The '282 patent covers NUEDEXTA®, a branded pharmaceutical drug that is also owned by Otsuka. NUEDEXTA® is the "the first and only FDA-approved treatment" for pseudobulbar affect ("PBA"). (D.I. 43 at 5). PBA is a neurological disorder that "causes uncontrollable episodes of laughing or crying." (*Id.* at 1). "Typically, PBA occurs in patients with underlying conditions or injuries that affect the way the brain regulates emotion, such as amyotrophic lateral sclerosis, multiple sclerosis, Alzheimer disease, or traumatic brain injury." (*Id.* at 5).

Appx17

# CONFIDENTIAL MATERIAL REDACTED

Plaintiffs' Motion for a Preliminary Injunction. (D.I. 22). The Court also entered an Order on the Preliminary Injunction Briefing Schedule and set a hearing on Plaintiffs' Motion for a Preliminary Injunction for July 17, 2025. (D.I. 21).

On June 13, 2025, Plaintiffs filed an Amended Motion for a Temporary Restraining Order and Preliminary Injunction ("the Amended Motion") (D.I. 42), which was fully briefed (*see* D.I. 43, D.I. 51, D.I. 61). In their opening brief in support of the Amended Motion, Plaintiffs asserted that ███████████████████████████████ that a "[temporary restraining order] is necessary to prevent Hetero from launching its generic version of Otsuka's NUEDEXTA® product ██████████████████ (D.I. 43 at 1). On July 9, 2025, the Court granted Plaintiffs' Amended Motion as it pertained to Plaintiffs' request for a temporary restraining order (D.I. 69). On July 17, 2025, the Court presided over a hearing between the parties on the merits of Plaintiff's request for a preliminary injunction. For the following reasons, the Court grants Plaintiffs' request for a preliminary injunction.

## I.   LEGAL STANDARD

Section 283 of the Patent Act provides that the Court "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. Preliminary injunctive relief is "aimed at temporarily preserving the status quo." *Hope v. Warden York Cty. Prison*, 956 F.3d 156, 160 (3d Cir. 2020); *see also Litton Sys. v. Sundstrand Corp.*, 750 F.2d 952, 961 (Fed. Cir. 1984) ("The function of preliminary injunctive relief is to preserve the status quo pending a determination of the action on the merits."). The decision whether to grant or deny injunctive relief, either through the issuance of a temporary restraining order ("TRO") or preliminary injunction, "rests within the equitable discretion of the district courts." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 394 (2006).

"A request for a TRO is governed by the same general standards that govern the issuance of a preliminary injunction." *Takeda Pharm. USA, Inc. v. West–Ward Pharm. Corp.*, Civil Action No. 14-1268-SLR, 2014 U.S. Dist. LEXIS 143737, 2014 WL 5088690, at *1 (D. Del. Oct. 9, 2014). To be entitled to such injunctive relief, the movant must establish (1) a likelihood of success on the merits of its claim; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that the injunction is in the public interest. *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017); *see also Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001). "Particular emphasis, however, is placed on the first two factors and 'a movant cannot be granted a preliminary injunction unless it establishes both of the first two factors, i.e., likelihood of success on the merits and irreparable harm.'" *Abbott Cardiovascular Sys. v. Edwards Lifesciences Corp.*, Civil Action No. 19-149-MN, 2019 U.S. Dist. LEXIS 150395, at *4 (D. Del. Mar. 5, 2019) (quoting *Barnesandnoble.com, Inc.*, 239 F.3d at 1350)).

## II.    ANALYSIS

On the basis of the four factors discussed above, the Court holds that Plaintiffs have established that their request for a preliminary injunction should be granted. The Court discusses these factors below, and also the Court's decision to not require a bond in connection with the preliminary injunction.

### A.    Likelihood of Success on the Merits

The first factor requires Plaintiffs to demonstrate that they are likely to succeed on the merits of their infringement claim. "To establish a likelihood of success on the merits, a patentee must show that it will likely prove infringement of the asserted claims and that its infringement claim will likely withstand the alleged infringer's challenges to patent validity and enforceability." *Metalcraft of Mayville, Inc. v. Toro Co.*, 848 F.3d 1358, 1364 (Fed. Cir. 2017). "A preliminary

4

injunction should not issue if the accused infringer 'raises a substantial question concerning either infringement or validity.'" *Id.* (citation omitted).

While the Court, like others before it, may consider whether to grant a request for a preliminary injunction separate from and after the Court considers whether to grant a request for a temporary restraining order (*see, e.g.*, *Temsa Ulasim Araclari Sanayi Ve Ticaret A.S. v. CH Bus Sales, LLC*, No. 18-698-RGA, 2018 U.S. Dist. LEXIS 149520, at *2 (D. Del. Aug. 31, 2018) ("For the reasons set forth below, the motion for a temporary restraining order is granted in part and denied in part. The motion for preliminary injunction will be decided after discovery and a separate hearing.")), the ultimate analysis for each request may be identical (*see Runyon v. Biden*, No. 08-029-GMS, 2008 U.S. Dist. LEXIS 40548, at *16 (D. Del. May 20, 2008) (denying the requests for a temporary restraining order and preliminary injunction under the same rubric and for the same reason)).

Here, Plaintiffs assert that they are likely to succeed on the merits of its patent infringement claim because Defendants' ANDA product copies the NUEDEXTA® label and "the claims of the '282 patent cover the labeled instructions for use of NUEDEXTA® — instructions that all of the generic filers are required to copy." (D.I. 43 at 10). Plaintiffs further assert that they "already prevailed on infringement (and validity) over a decade ago" in litigation with other, similar generic filers in this Court. (D.I. 43 at 9); *see also Avanir Pharms., Inc. v. Actavis South Atl. LLC*, 36 F. Supp. 3d 475 (D. Del. 2014) (Stark, J.) Although Defendants concede that its ANDA product contains the same FDA label as NUEDEXTA® and the same ratios of pharmaceutical compounds, Defendants argue that neither its product nor NUEDEXTA® are covered by the '282 patent.[2] (D.I.

---

[2] The '282 patent claims "a method for treating pseudobulbar affect or emotional liability, the method comprising administering to a patient in need thereof dextromethorphan in combination

5

51 at 16-18). More specifically, Defendants argue that the compounds listed in the '282 patent –
dextromethorphan and quinidine (together, "the effective compounds") – should be construed to
mean those compounds in their "free base" forms as opposed to in their hydrated salt forms.[3] (*Id.*
at 11-16). Similarly, Defendants assert an invalidity defense, which is premised on the same
argument regarding the construction of the effective compounds in the '282 patent. (*Id.* at 17
(arguing invalidity for indefiniteness on the grounds that the '282 patent's claimed ratio of the
effective compounds would produce both infringing and non-infringing results)).

Having considered the parties' briefing and the arguments raised at the July 17, 2025
hearing, the Court finds that Plaintiffs are likely to succeed on the merits of their infringement
claim and Defendants' invalidity claim.

First, the language of the claims in the '282 patent support Plaintiffs' claim construction
and, thus, its theory of infringement. *See Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d
1359, 1362 (Fed. Cir. 2016) (Courts "begin a claim construction analysis by considering the
language of the claims themselves."). Several dependent claims of the '282 patent specifically
recite salts and, thus, claim 1 of the '282 patent must also include salts. (D.I. 43 at 13). For
example, claim 7 recites: "the method of claim 1, wherein at least one of the quinidine and the

---

with quinidine . . . with the proviso that the *weight to weight ratio of dextromethorphan to quinidine
is 1:0.5 or less.*" ('282 patent, col. 78, lns. 2-10 (emphasis added)).

[3] Dextromethorphan and quinidine can be, but are not always, "prepared as 'pharmaceutically
acceptable salts,' including 'hydrobromide' and 'sulfate' salts." (D.I. 51 at 5). Further, "[s]ome
salts may also be prepared in crystalline solid forms known as 'hydrates.'" (*Id.* at 6). For example,
NUEDEXTA® and Defendants' ANDA product contain dextromethorphan *hydrobromide
monohydrate* and quinidine *sulfate dihydrate*. (*Id.* at 6). The presence of a hydrated salt results
in a greater molecular weight of a compound. Defendants assert that the '282 patent only claims
a method concerning the salt weight of the effective compounds, but not the *hydrated* salt forms
of the effective compounds. (D.I. 51 at 6).

dextromethorphan is in a form of pharmaceutically acceptable salt." ('282 patent, col. 78, lns. 26-28). Additionally, claims 8, 9, 10 and 11 recite methods that include doses of "quinidine sulfate" and "dextromethorphan hydrobromide." (*Id.* at lns. 29-39).

"It is axiomatic that a dependent claim cannot be broader than the claim from which it depends." *Alcon Research, LTD. v. Apotex Inc.*, 687 F.3d 1362, 1367 (Fed. Cir. 2012); *see also AK Steel Corp. v. Sollac*, 344 F.3d 1234, 1242 (Fed. Cir. 2003) ("Under the doctrine of claim differentiation, dependent claims are presumed to be of narrower scope than the independent claims from which they depend."). As such, claim 1 of the '282 patent, the independent claim, must be broader than dependent claims 7 through 11; and, therefore, claim 1 must include the salt forms of quinidine and dextromethorphan. *See Littelfuse, Inc. v. Mersen USA EP Corp.*, 29 F.4th 1376, 1380 (Fed. Cir. 2022) ("By definition, an independent claim is broader than a claim that depends from it, so if a dependent claim reads on a particular embodiment of the claimed invention, the corresponding independent claim must cover that embodiment as well."); *see also e-LYNXX Corp. v. InnerWorkings, Inc.*, 958 F. Supp. 2d 569, 581 (M.D. Pa. 2013) ("To infringe a dependent claim, one must necessarily infringe the independent claim to which it refers.").

Second, the specification of the '282 patent supports Plaintiffs' claim construction and infringement argument. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (stating that the specification is "highly relevant to the claim construction analysis," "is dispositive," and "is the single best guide to the meaning of the disputed term."). The specification repeatedly references dextromethorphan *hydrobromide* and quinidine *sulfate*. (*See* '282 patent col. 18 lns. 1-14; col. 20 lns. 34-49; col. 25 lns. 30-64; *see also* D.I. 61 at 3 (Plaintiffs arguing same)). Furthermore, the specification "provide[s] the molecular formula for the monohydrate and dihydrate forms" which enforces Plaintiffs' position that claim 1 includes the hydrated salt forms

7

of dextromethorphan and quinidine. (D.I. 51 at 8, n. 4 (citing to '282 patent, col. 17, lns. 32-66); *see also* D.I. 61 at 4).

Third, the Court finds the holdings from the prior litigation instructive. As mentioned briefly above, the '282 patent has been the subject of prior litigation in this Court. *See Avanir Pharms., Inc. v. Actavis South Atl. LLC*, 36 F. Supp. 3d 475 (D. Del. 2014) (Stark, J.) ("*Avanir*"). In *Avanir*, following a bench trial, the Court determined that claims 1 through 9 of the '282 patent were valid. *See id.* at 510. The Court's validity determination was affirmed by the Federal Circuit. *See Avanir Pharms., Inc. v. Par Pharm., Inc.*, 612 Fed. App'x 613 (Fed. Cir. 2015) (per curiam). Additionally, in its decision, this Court stated that "each of the asserted claims of the '282 and '484 patents covers the use of NUEDEXTA® according to its package insert to treat PBA." *Avanir*, 36 F. Supp. 3d at 509. The Court's statement was supported by evidence presented at trial. *See id.* (citing to the plaintiffs' exhibits and the trial transcript).

For the foregoing reasons, similar to the reasons upon which the Court relied when granting Plaintiffs' request for a temporary restraining order, the Court holds that Plaintiffs will likely be able to prevail on the infringement and invalidity claims arising in this action.

**B.** **Irreparable Harm**

The second factor requires that Plaintiffs demonstrate that they will be irreparably harmed absent the issuance of a preliminary injunction. "[T]o satisfy the irreparable harm factor in a patent infringement suit, patentee must establish both of the following requirements: 1) that absent an injunction, it will suffer irreparable harm, and 2) that a sufficiently strong causal nexus relates the alleged harm to the alleged infringement." *Apple Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1374 (Fed. Cir. 2012). Irreparable harm may include "loss of control of reputation, loss of trade, and loss of good will, intangible harms for which it is virtually impossible to ascertain the precise

8

economic consequences." *AstraZeneca AB v. Dr. Reddy's Labs., Inc.*, 145 F. Supp. 3d 311, 319 (D. Del. 2015) (internal quotation marks and citations omitted).

Plaintiffs assert that, absent a preliminary injunction, Otsuka will (1) suffer from irreversible price erosion and loss of market share; and (2) will experience irreversible harm to its operations and reputation. (D.I. 43 at 14-15).

First, Plaintiffs contend that, "within the first 60 days of a Hetero launch," Otsuka will lose "likely upwards of 70% to 80%" of its market share. (*Id.* at 14). Additionally, Plaintiffs assert that Otsuka will "be forced to lower its prices and/or offer discounts and rebates it otherwise would not have offered" – "the net effective price of NUEDEXTA® will likely never return to its pre-Hetero levels." (*Id.* at 3, 15). Defendants claim that Plaintiffs' loss of market share and price erosion arguments are "insufficient to establish irreparable harm" because "any damages resulting from a generic launch are calculable." (D.I. 51 at 18). The Court agrees with Defendants. Although price erosion and loss of business opportunities may be valid grounds for irreparable harm, the Court is not persuaded that Plaintiffs' economic injuries could not be calculable and compensated through monetary damages. *See Metalcraft of Mayville, Inc. v. Toro Co.*, 848 F.3d 1358, 1368 (Fed. Cir. 2017) ("Where the injury cannot be quantified, no amount of money damages is calculable, and therefore the harm cannot be adequately compensated and is irreparable.").

Second, Plaintiffs argue that "Otsuka will suffer irreversible harm to its operations and reputation." (D.I. 43 at 15). Specifically, Plaintiffs explain that, if the Court enables Hetero to launch its product, Otsuka may have to eliminate the sales and marketing team dedicated to NUEDEXTA®. (*Id.*). According to Plaintiffs, NUEDEXTA®'s sales and marketing team "are the most effective sources of education and information about the condition and its effective

9

treatment," and "withdrawal of these resources will likely have a negative impact on physician and patient perception of all Otsuka therapies and overall reputation." (*Id.* at 16). Defendants, however, assert that these harms are "mere speculation about potential outcomes of Otsuka's own decisions to eliminate its sales force and marketing team." (D.I. 51 at 19).

The Court disagrees with Defendants. Plaintiffs submit the Declaration of Louis Allesandrine, a vice president at Otsuka, who confirms that the elimination of the NUEDEXTA® marketing and sales force teams "*will be* the case," "if Hetero is allowed to launch Defendants' ANDA product." (D.I. 44 ¶ 22 (Declaration of Louis Allesandrine) (emphasis added)). Furthermore, Plaintiffs have proffered support that Otsuka will suffer a loss to goodwill and reputation with patients and healthcare providers because these individuals "rely on the information and education [about PBA] provided by Otsuka, and the withdrawal of these resources will likely have a negative impact on physician and patient perception of all Otsuka therapies and overall reputation." (D.I. 43 at 16). Such a loss in goodwill and reputation constitutes irreparable harm. *See Celsis in Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012). Furthermore, such loss would be caused directly by Defendants, as NUEDEXTA® is currently the only FDA-approved treatment for PBA on the market. (D.I. 43 at 6).

Defendants contend that Otsuka cannot demonstrate irreparable harm because "Otsuka offers no excuse for its inexplicable delay in filing suit." (D.I. 51 at 4). More specifically, Hetero claims it "has been free to launch its noninfringing product since FDA's August 2024 approval," but "Otsuka waited over nine months to file suit and seek injunctive relief." (*Id.* at 18).

## CONFIDENTIAL MATERIAL REDACTED

Conversely, Plaintiffs assert that any delay in this case is the "direct result" of Hetero's failure to properly serve notice of its paragraph IV certification ("the Notice Letter").[4] (D.I. 61 at 7). ██████████████████████████████████████████████████████████

██████████████████ (D.I. 43 at 8; *see also* D.I. 46, Exs. 7-8 (Declaration of John P. Galanek)). As a result, "Otsuka never received Hetero's Notice Letter and was unaware of Hetero's ANDA until after FDA approval."[5] (*Id.*). ██████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████

Defendants are correct that, in certain circumstances, a delay in moving for preliminary injunctive relief can defeat the presumption of irreparable harm. *See Kos Pharms., Inc. v. Andrx. Corp.*, 369 F.3d 700, 727 (3d Cir. 2004). Here, however, based on the information before the Court, Plaintiffs' delay in filing for a TRO and preliminary injunction does not vitiate an initial finding of irreparable harm. Indeed, the delay here appears to be attributed in part to improper notice of Defendants' ANDA, ████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[4] "When an ANDA contains a paragraph IV certification, the ANDA applicant must give notice to the patentee and the NDA holder and provide a detailed basis for its belief that the patent is not infringed, invalid, or unenforceable." *Andrx Pharms., Inc. v. Biovail Corp.*, 276 F.3d 1368, 1371 (Fed. Cir. 2002) (citing to 21 C.F.R. § 314.95(c)(6)). Notice must be sent "by registered or certified mail, return receipt requested, or by a designated delivery service." 21 C.F.R. § 314.95(a).

[5] Otsuka asserts that "[i]f Hetero had served proper notice of its certification under the rule, Otsuka would have sued within 45 days, and a 30-month stay would still be in place and there would be no need for a preliminary injunction." (D.I. 43 at 3).

Appx26

## CONFIDENTIAL MATERIAL REDACTED

███████████████████ As a result, the Court does not conclude that any delay in filing suit negates a finding of irreparable harm to Plaintiffs.

For the foregoing reasons, similar to the reasons upon which the Court relied when granting Plaintiffs' request for a temporary restraining order, the Court holds that Plaintiffs will suffer irreparable harm absent the issuance of a preliminary injunction.

**C.    Balance of Equities**

The third factor requires that the Court consider the balance of equities. To do so, the Court must balance "the harm that will occur to the moving party from the denial of the preliminary injunction with the harm that the non-moving party will incur if the preliminary injunction is granted." *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1457 (Fed. Cir. 1988).

Plaintiffs assert that the harms they would suffer in the absence of a preliminary injunction outweigh any alleged harms that Defendants would suffer in maintaining the status quo. (D.I. 43 at 16). Plaintiffs claim that, if the Court does not issue a preliminary injunction, Otsuka will "sustain irreversible losses in market share and revenue," "would be forced to eliminate its sales force and marketing team," and "would suffer incalculable harm to its goodwill and reputation." (*Id.* at 17). Plaintiffs submit declarations from corporate representatives that support these statements.[6] (*See* D.I. 44, D.I. 45, D.I. 46). Conversely, Defendants do not sufficiently explain to the Court why they will be harmed if a preliminary injunction is granted. ██████████████

---

[6] Plaintiffs further explain that the "harm to Otsuka is particularly egregious because Hetero's ANDA is only approved due to its failure to provide Otsuka with proper notice of Hetero's Paragraph IV Certification." (D.I. 23 at 17). Defendants, however, assert that notice was proper, but even if it was not, the Court "does not have jurisdiction to conduct judicial review of the alleged inadequacy of delivery of Hetero's notice." (D.I. 51 at 19). Defendants' argument is overbroad. "Although this Court lacks jurisdiction to order the FDA to rescind Hetero's ANDA approval, it can find that Hetero violated the regulations governing service of its Notice Letter and assign that violation weight in the balance of the equities." (D.I. 61 at 10).

████████████████████████████████████████████ (*See* D.I. 17).  The

Court, therefore, determines that a balance of equities tips in favor of Plaintiffs.

### D.    <u>Public Interest</u>

The fourth factor requires the Court to consider whether the issuance of a preliminary injunction is in the public interest.  "In considering whether the public interest favors the grant of an injunction, the district court should focus on whether a critical public interest would be injured by the grant of injunctive relief."  *Metalcraft of Mayville, Inc.*, 848 F.3d at 1369.

Plaintiffs contend that the public interest weighs in favor of an injunction for several reasons.  First, Plaintiffs explain that PBA patients may be misdiagnosed or mistreated if Otsuka's marketing and sales team is eliminated because Otsuka educates doctors and healthcare professionals about PBA.  (D.I. 43 at 19; *see also id.* at 20 ("the public interest favors maintaining the status quo for as long as possible so that the dedicated NUEDEXTA® sales force and marketing team can continue to grow the population of PBA patients effectively treated for the condition.")).  Second, Plaintiffs assert that there is a strong public interest in protecting and preserving a patent holder's rights.  (D.I. 43 at 20).  Third, Plaintiffs contend that "the public interest favors requiring ANDA filers to follow the Hatch-Waxman Act," which "provides for a 30-month stay in ANDA cases where the NDA holder sues after receiving notice of the ANDA."  (*Id.*).  In contrast, Defendants assert that the public interest in protecting patents is not relevant because its product does not infringe the '282 patent and "the '282 patent does not appear to cover NUEDEXTA® either."  (D.I. 51 at 20).  Defendants further assert that "there is significant public interest in allowing launch of Hetero's product, which will lower costs and improve access to patients."  (*Id.*).  Ultimately, however, the Court finds that the public interest weighs in favor of issuing the preliminary injunction.

13

# CONFIDENTIAL MATERIAL REDACTED

There is a significant "public interest in encouraging investment in drug development and protecting the exclusionary rights conveyed in valid pharmaceutical patents." *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1384 (Fed. Cir. 2006) (internal quotation marks and citation omitted). At the same time, there is a strong public interest in the availability of less expensive forms of branded medications. *See Genetech, Inc. v. Immunex R.I. Corp.*, 395 F. Supp. 3d 357, 366 n.6 (D. Del. 2019). "While the statutory framework under which [Defendants] filed its ANDA does seek to make low cost generic drugs available to the public, it does not do so by entirely eliminating the exclusionary rights conveyed by pharmaceutical patents." *Pfizer Inc. v. Teva Pharms., USA Inc.*, 429 F.3d 1364, 1382 (Fed. Cir. 2005). "Nor does the statutory framework encourage or excuse infringement of valid pharmaceutical patents." *Id.* Additionally, Defendants submitted their ANDA with "with full knowledge of the effect of its application," including the patentee's ability to file suit and obtain the benefit of an automatic thirty-month stay under ordinary circumstances.[7] *Belcher Pharms., LLC v. Int'l Medication Sys.*, 379 F. Supp. 3d 326, 332 (D. Del. 2019). As a result, the Court concludes that issuance of a preliminary injunction favors the public interest and Plaintiffs, "who hold a patent that the Court has found will likely be proven to be valid, enforceable and infringed by [Defendants'] proposed generic product." *Research Foundation of State University of New York v. Mylan Pharms., Inc.*, 723 F. Supp. 2d 638, 663 (D. Del. 2010); *see also Impax Labs v. Aventis Pharms., Inc.*, 235 F. Supp. 2d 390, 397 (D. Del. 2002) ("[T]here is a strong public interest in protecting valid patents by preventing the premature entry of generic drugs into the marketplace.").

---

[7] ████████████████████████████████████████████████

14

Therefore, under the circumstances of this action, the Court finds that the issuance of a preliminary injunction will benefit the public interest and serve the overarching purpose of preserving the status quo during the pendency of the litigation.

### E.    The Court Waives the Rule 65(c) Bond

Rule 65 of the Federal Rules of Civil Procedures provides that the Court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

In 1988, the Third Circuit confirmed that a court may waive the bond requirement "where there is no risk of monetary loss to the defendant." *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 103 (3d Cir. 1988) (citing *System Operations, Inc. v. Scientific Games Dev. Corp.*, 555 F.2d 1131, 1145-46 (3d Cir.1977)).

In 1991, the Third Circuit "recognized two" additional "categories of exceptions to" the normal requirement of a bond. *See Cradle of Liberty Council, Inc. v. City of Phila.*, No. 08-2429, 2010 U.S. Dist. LEXIS 20484, at *3 (E.D. Pa. Mar. 2, 2010) (citing *Temple Univ. v. White*, 941 F.2d 201, 219-20 (3d Cir. 1991)). "First, the Third Circuit provided that a district court in deciding whether to require a bond should first examine the equities of potential hardships to the parties" and second, a "district court should consider the impact that a bond requirement would have on enforcement of an important federal right or public interest in order to prevent undue restriction of them." *Id.* at *3-5 (cleaned up). The Third Circuit has explained that, when a district court grants one of these so-called *Temple* exceptions, the court shall "make specific findings." *Elliott v. Kiesewetter*, 98 F.3d 47, 60 (3d Cir. 1996).[8]

---

[8] In 2015, the Third Circuit stated that it had "articulated only one exception to the bond requirement." *Globus Med., Inc. v. Vortex Spine, LLC*, 605 F. App'x 126, 129 (3d Cir. 2015).

## CONFIDENTIAL MATERIAL REDACTED

The Court has "discretion" when deciding the first *Temple* exception, i.e., when determining whether the balance of equities weighs in favor of waiving the bond. *Elliott*, 98 F.3d 47, 60. Where "the risk of financial harm is speculative at best and where a bond would have a chilling effect on access to justice, the balance of equities firmly supports waiving the bond." *See N. America's Bldg. Trades Unions v. DOD*, Civil Action No. 25-1070 (RC), 2025 U.S. Dist. LEXIS 94372, at *48 (D.D.C. May 16, 2025). Similarly, district courts have not required a bond where the plaintiff's motion for a preliminary injunction was not based on "tenuous legal grounds." *See Youth Justice Coal v. City of L.A.*, No. CV 16-07932 VAP (RAOx), 2018 U.S. Dist. LEXIS 242940, at *24-25 (C.D. Cal. Mar. 15, 2018).

In the instant action, Plaintiffs' motion was not based on "tenuous legal grounds." *See id.* In fact, "the risk of financial harm" to Defendants "is speculative at best and" requiring a bond may "have a chilling effect on access to justice." *See N. America's Bldg. Trades Unions*, 2025 U.S. Dist. LEXIS 94372, at *48. Indeed, requiring a multi-million dollar bond where, in circumstances as in the instant action, Plaintiffs' case on the merits for infringement and non-invalidity is likely to succeed, the subject patent has been previously challenged and tested by several generic companies in the past and upheld by the district court and the Federal Circuit, and ███████████████████████████████████████████████████████████████████ (which the brand name company would obtain without being required to post a bond), leaving the brand name company to seek a temporary restraining order and preliminary injunction and have to post a multi-million dollar

---

That exception, according to the 2015 opinion, occurred "when the injunction does not subject the enjoined party to compensable monetary losses." *Id.* However, that case was "not an opinion of the full Court and pursuant to I.O.P. 5.7 [did] not constitute binding precedent." *Globus Med., Inc.*, 605 F. App'x 126, 127 n.*.

bond under Rule 65(c) of the Federal Rules of Civil Procedure to maintain its exclusivity until the expiration of its previously upheld patent when a generic wants to attempt to prematurely launch its generic product without valid justification, would be improvident. Under the circumstances of this action, the equities weigh strongly in favor of waiving the Rule 65(c) bond.

## III.    <u>CONCLUSION</u>

For the reasons explained above, Plaintiffs have demonstrated (1) a likelihood of success on the merits of its claim; (2) a likelihood of irreparable harm in the absence of a preliminary injunction; (3) that the balance of equities tips in their favor; and (4) that the preliminary injunction is in the public interest. The Court therefore grants Otsuka's Amended Motion for a Preliminary Injunction (D.I. 41, in part). In addition, under the circumstances of this action, the Court waives the requirement of a bond under Rule 65(c) of the Federal Rules of Civil Procedure. The Court will enter an Order consistent with this Memorandum Opinion.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| OTSUKA AMERICA PHARMACEUTICAL, INC. and AVANIR PHARMACEUTICALS, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>HETERO LABS LIMITED, HETERO LABS LTD. UNIT-III, and CAMBER PHARMACEUTICALS, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)  Civil Action No. 25-647-GBW<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**ORDER**

At Wilmington this 23rd day of July 2025, **IT IS HEREBY ORDERED** as follows:

1. Otsuka's Amended Motion for a Preliminary Injunction (D.I. 41, in part) is **GRANTED**.

2. Defendants Hetero Labs Limited, Hetero Labs Ltd. Unit-III, and Camber Pharmaceuticals, Inc., their officers, agents, servants, and employees are enjoined until the current expiration of United States Patent No. 7,659,282 ("the '282 patent") on August 13, 2026, the earlier expiration or termination of the '282 patent, or until further Order of Court ceasing the preliminary injunction, whichever is earlier, from commercially manufacturing, using, offering to sell, or selling within the United States, or importing into the United States their generic version of Otsuka's NUEDEXTA® product described in ANDA No. 218426.

1

3. The requirement of a bond under Rule 65(c) of the Federal Rules of Civil Procedure is **WAIVED**.

4. Because the accompanying Memorandum Opinion is filed under seal, the parties shall meet and confer and, no later than thirty (30) days after entry of this Order, file a proposed redacted version of the Memorandum Opinion, along with a motion supported by a declaration that contains a clear, factually detailed explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure." *In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019). If the parties do not file a proposed redacted version and corresponding motion by the deadline, or if the Court determines the motion lacks a meritorious basis, the Memorandum Opinion will be unsealed in whole or in part.

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

Appx34

US007659282B2

(12) **United States Patent**
Yakatan et al.

(10) Patent No.: **US 7,659,282 B2**
(45) Date of Patent: **Feb. 9, 2010**

(54) **PHARMACEUTICAL COMPOSITIONS COMPRISING DEXTROMETHORPHAN AND QUINIDINE FOR THE TREATMENT OF NEUROLOGICAL DISORDERS**

(75) Inventors: **Gerald Yakatan**, Del Mar, CA (US); **James Berg**, San Diego, CA (US); **Laura E. Pope**, Carlsbad, CA (US); **Richard A. Smith**, La Jolla, CA (US)

(73) Assignee: **Avanir Pharmaceuticals, Inc.**, Aliso Viejo, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 847 days.

(21) Appl. No.: **11/035,213**

(22) Filed: **Jan. 12, 2005**

(65) **Prior Publication Data**

US 2005/0203125 A1    Sep. 15, 2005

**Related U.S. Application Data**

(63) Continuation of application No. PCT/US03/22303, filed on Jul. 17, 2003.

(60) Provisional application No. 60/396,661, filed on Jul. 17, 2002.

(51) **Int. Cl.**
*A01N 43/90*    (2006.01)
*A01N 43/42*    (2006.01)
*A61K 31/44*    (2006.01)

(52) **U.S. Cl.** ..................................... **514/289**; 514/305

(58) **Field of Classification Search** ................. 514/305, 514/289
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,536,809 A | 10/1970 | Appelzweig |
| 3,598,123 A | 8/1971 | Zaffaroni |
| 3,845,770 A | 11/1974 | Theeuwes et al. |
| 3,916,899 A | 11/1975 | Theeuwes et al. |
| 4,008,719 A | 2/1977 | Theeuwes et al. |
| 4,316,888 A | 2/1982 | Nelson |
| 4,806,543 A | 2/1989 | Choi |
| 5,034,400 A | 7/1991 | Olney |
| 5,166,207 A | 11/1992 | Smith |
| 5,206,248 A | 4/1993 | Smith |
| 5,321,012 A | 6/1994 | Mayer et al. |
| 5,350,756 A | 9/1994 | Smith |
| 5,352,683 A | 10/1994 | Mayer et al. |
| 5,366,980 A | 11/1994 | Smith |
| 5,502,058 A | 3/1996 | Mayer et al. |
| 5,556,838 A | 9/1996 | Mayer et al. |
| 5,863,927 A | 1/1999 | Smith et al. |
| 6,207,674 B1 | 3/2001 | Smith |
| 2002/0068718 A1 | 6/2002 | Pierce |

| | | |
|---|---|---|
| 2004/0087479 A1 | 5/2004 | Sosnowski et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO 96 09044 | 3/1996 |
| WO | WO 00/17366 A2 | 3/2000 |
| WO | WO 00/59486 A2 | 10/2000 |

OTHER PUBLICATIONS

Gould. 1986, Salt selection for basic drugs. International Journal of Pharmaceutics, vol. 33, pp. 201-217.*

Ben Abraham, et al., "Dextromethorphan for phantom pain attenuation in cancer amputees: a double-blind crossover trial involving three patients", *Clin J Pain*, (2002) 18: 282-285.

Bensimon, et al. "A controlled trial of Riluzole in amyotrophic lateral sclerosis", *N Eng J Med*. (1994) 330:585-91.

Broly. et al. CA 111: 89742z, 1989.

Broly, et al. "Effect of quinidine on the dextromethorphan O-demethylase activity of microsomal fractions from human liver", *Br J Clin Pharmacol*. (1989) 28(1): 29-36.

Broly, et al., CA 112: 210493v, 1990.

Broly, et al., "Inhibitory studies of mexiletine and dextromethorphan oxidation in human liver microsomes", *Biochem Pharmacol*. (1990) 39:1045-1053.

Brooks, "Personality change after severe head injury" *Acta Neurochirurgica* Suppl. (1988) 44: 59-64.

Chase, et al., "Antiparkinsonian and antidyskinetic activity of drugs targeting central glutamatergic mechanisms", *J Neurol*. (2000) 247 Suppl 2:II36-II42.

Cottrell, et al., J. Neurol. Psychopathol., 1926; 7:1-30.

Craviso, et al., "High-affinity dextromethorphan binding sites in guinea pig brain. I. Initial characterization", *Mol Pharmacol*., (1983) 23(3):619-628.

Craviso, et al., "High-affinity dextromethorphan binding sites in guinea pig brain. II. Competition experiments", *Mol Pharmacol*. (1983) 23(3):629-40.

Dayer, et al. "Dextromethorphan O-demethylation in liver microsomes as a prototype creation to monitor cytochrome P-450 db1 activity", *Clin Pharmacol Ther.*, (1989) 45(1):34-40.

(Continued)

*Primary Examiner*—Sreeni Padmanabhan
*Assistant Examiner*—Kara R McMillian

(74) *Attorney, Agent, or Firm*—Townsend and Townsend and Crew LLP

(57) **ABSTRACT**

Pharmaceutical compositions and methods for treating neurological disorders by administering same are provided. The compositions comprise dextromethorphan in combination with quinidine.

**12 Claims, 5 Drawing Sheets**

US 7,659,282 B2

Page 2

OTHER PUBLICATIONS

Desmeules, et al., "Contribution of cytochrome P-4502D6 phenotype to the neuromodulatory effects of dextromethorphan", *J Pharmacol Exp Ther.*, (1999) 288(2): 607-612.

Dickenson, et al., "Evidence for a role of the NMDA receptor in the frequency dependent potentiation of deep rat dorsal horn nociceptive neurons following C fibre stimulation", *Neuropharmacology* (1987) 26(8): 1235-1238.

Dickenson, et al., "Dextromethorphan and levorphanol on dorsal horn nociceptive neurones in the rat", *Neuropharmacology* (1991)30: 1303-1308.

Doble, "The pharmacology and mechanism of action of riluzole", *Neurology* (1996) 47(6 Suppl 4):S233-41.

Droll, et al., "Comparison of three CYP2D6 probe substrates and genotype in Ghanaians, Chinese and Caucasions", *Pharmacogenetics* (1998) 8(4): 325-333.

Due Nielsen, et al, CA 112: 171691m, 1990.

France, et al., "Analgesic effects of phencyclidine-like drugs in rhesus monkeys," *J Pharmacol Exp Ther.*, (1989) 250(1): 197-201.

Grass, et al, "N-methyl-D-aspartate receptor antagonists potentiate morphine's antinociceptive effect in the rat", *Acta Physiol Scand.* (1996) 158(3): 269-73.

Heiskanen, et al., "Analgesic effects of dextromethorphan and morphine in patients with chronic pain", *Pain* (2002) 96(3): 261-267.

Hoffmann, et al, "Dextromethorphan potentiates morphine antinociception, but does not reverse tolerance in rats", *Neuroreport* (1996) 7(3): 838-40.

Inaba, T., et al, "Quinidine: Potent inhibition of sparteine and debrisoquin oxidation in vivo," Br. J. Clin. Pharmacol. 22: 199-200, 1986.

Jerusalem, et al., "ALS", *Neurology* (1996) 47(6 Suppl 4):218S-220S.

Kalin, et al., CA 108: 124860y, 1988.

Kalin et al, "Opiate modulation of separation-induced distress in non-human primates," Brain Research 440: 285-292, 1988.

Kauppila, et al., "Dextromethorphan potentiates the effect of morphine in rats with peripheral neuropathy," *Neuroreport* (1998) 9(6): 1071-4.

Klein, et al., "The effect of prototypic sigma ligands on the binding of [3H] dextromethorphan to guinea pig brain", *Neurosci Lett.*, (1989) 97(1-2):175-80.

Koyuncuoglu, et al, "The treatment of heroin addicts with dextromethorphan: a double-blind comparison of dextromethorphan with chlorpromazine", *Int J Clin Pharmacol Ther Toxicol.* (1990) 28(4): 147-52.

Kronbach, et al., "High-performance liquid chromatographic assays for bufuralol 1'-hydroxylase, debrisoquine 4-hydroxylase, and dextromethorphan O-demethylase in microsomes and purified cytochrome P-450 isozymes of human liver", Anal Biochem. (1987) 162(1):24-32.

Küpfer, A., et al "Dextromethorphan as a safe probe for debrisoquine hydroxylation polymorphism," *Lancet* (1984) 2:517-518,.

Kwiecinski, "Symptomatic treatment and palliative care of ALS", *Neurol Neurochir Pol.* (2001) 35:51-9, abstract only.

Largent, et al., "Structural determinants of sigma receptor affinity", *Mol Pharmacol.* (1987) 32(6):772-84.

Manning, et al., "Continuous co-administration of dextromethorphan or MK-801 with morphine: attenuation of morphine dependence and naloxone-reversible attenuation of morphine tolerance," *Pain* (1996) 67: 79-88.

Mao, et al, "Oral administration of dextromethorphan prevents the development of morphine tolerance and dependence in rats," *Pain* (1996) 67: 361-8.

Musacchio, et al., "Dextromethorphan binding sites in the guinea pig brain", *Cell Mol Neurobiol.*, (1988) 8(2):149-56.

Musacchio, et al., "High affinity dextromethorphan binding sites in guinea pig brain: further characterization and allosteric interactions", *J Pharmacol Exp Ther.*, (1988) 247(2):424-31.

Otton, et al., "In vitro evidence against the oxidation of quinidine by the sparteine/debrisoquine monooxygenase of human liver", *Drug Metab Dispos.* (1988) 16(1):15-7.

Otton, et al., "Use of quinidine inhibition to define the role of the sparteine/debrisoquine cytochrome P450 in metoprolol oxidation by human liver microsomes", *J Pharmacol Exp Ther.*, (1988) 247(1):242-7.

Parvizi, et al., "Pathological laughter and crying—A link to the cerebellum", *Brain*, 2001;124:1708-19.

Physician's Desk Reference, 44th Edition, 1990, pp. 670-671 (Medical Economics Company, 1990).

Plesan, et al., "Comparison of ketamine and dextromethorphan in potentiating the antinociceptive effect of morphine in rats," *Anesth Analg.* (1998) 86(4): 825-9,.

Ramachander, et al., "Determination of dextrorphan in plasma and evaluation of bioavailability of dextromethorphan hydrobromide in humans", *J Pharm Sci.* (1977) 66(7):1047-8.

Ross, et al., "Pathological display of affect in patients with depression and right frontal brain damage. An alternative mechanism", *J Nerv Ment Dis.* (1987) 175(3):165-72.

Sang, "NMDA-receptor antagonists in neuropathic pain: experimental methods to clinical trials", *Pain Symptom Manage.* (2000) 19(1 Suppl): S21-25.

Shaw et al., Brain Sciences in Psychiatry, London: Butterworth, 1982 (Contents pages only) 3 pages.

Smith et al., "The treatment of affective lability with dextromethorphan", *Neurology*, (1995) 45:604P.

Vinik, "Diabetic neuropathy: pathogenesis and therapy", *Am J Med.*, (1999) 107: 17S-26S.

von Moltke et al., "Multiple human cytochromes contribute to biotransformation of dextromethorphan in-vitro: role of CYP2C9, CYP2C19, CYP2D6, and CYP3A", *J Pharm Pharmacol.*, (1998) 50(9): 997-1004.

Weinbroum, et al., "The role of dextromethorphan in pain control", *Can J Anaesth.*, 2000: 47: 585-596.

Dere, et al., "NMDA-recptor antagonism via dextromethorphan and ifenprodil modulates graded anxiety test performance of C57BL/6 mice", *Behav. Pharmacol.* (2004) 14(3)245-249; Abstract 1 page.

Liu et al., "Dextromethorphan protects dopaminergic neurons against inflammation-mediated degeneration through inhibition of microglial activation", *J Pharmacol Exp Ther.* (2003) 305(1):212-218.

Pope, et al., "Pharmacokinetics of dextromethorphan after single or multiple dosing in combination with quinidine in extensive and poor metabolizers", *J Clin Pharmacol.* (2004) 44(10):1132-1142.

Albers, G. W., et al, "Safety and tolerance of oral dextromethorphan in patients at risk for brain ischemia," Stroke 22: 1075-1077, 1991.

Andersen et al., *Pathoanatomic Correlation Between Poststroke Pathological Crying and Damage to Brain Areas Involved in Serotonergic Neurotranmission*, Stroke, 1994; 25:1050-2.

Applebaum, J. S., et al, "Dextromethorphan in the treatment of ALS: A pilot study," Abstract No. 960S (p. 393) in Neurology 41 (Suppl. 1), Mar. 1991.

Askmark et al., J. Neurol. Neurosurg. Psychiatry, 1993; 56:197-200.

Bisaga, A., et al, "Opiate withdrawal with dextromethorphan [letter]," Amer. J. Psychiatry 154: 584 (1997).

Blin et al., Clin. Neuropharmacol., 1996; 19: 189-192.

Brinn, R., et al, "Sparteine oxidation is practically abolished in quinidine-treated patients," Br. J. Clin. Pharmacol. 22: 194-197, 1986.

Brosen, K., et al, "Extensive metabolizers of debrisoquin become poor metabolizers during quinidine treatment," Pharmacol. Toxicol. 60: 312-314, 1987.

Carpenter et al., Brain Res., Jan. 26, 1988 439(1-2):372-5.

Choi, et al. *Dextrorphan and Levorphanol Selectivity Block N-Methyl-d-Aspartate Receptor-Mediated Neurotoxity on Cortical Neurons*, The Journal of Pharmacology and Experimental Therapeutics, vol. 242, No. 2, (1987) pp. 713-720.

Dark, et al., *Pathology Laughing and Crying*, Austr. N. Zeal. J. Psychiatry, 1996; 30:472-9.

Debonnel, et al., *Modulation of NMDA and Dopaminerigic Neurotransmissions by Sigman Ligands: Possible Implications for the Treatment of Psychiatric Disorders*, Life Sci., 1996; 58:721-34.

Dickenson, A.H., "A cure for wind up/ NMDA receptor antagonists as potential analgesics," Trends in Pharm. Sci. 11: 307-309, 1990.

US 7,659,282 B2

Page 3

Feinstein et al., *Prevalence and Neurobehavorial Correlates of Pathological Laughing and Crying in Multiple Sclerosis*, Arch. Neurol., 1997; 54:1116-21.

Funck-Brentano et al., *Genetically-determined interaction between propafenone and low dose quinidine: Role of active metabolites in Modulating net Drug Effect*, Br. J. Clin. Pharmacol., Apr. 1989, 27(4):435-44.

Funck-Brentano et al., *Effect of Low Dose Quinidine on Encainide Pharmacokinetics and Pharmacodynamics, Influence of Genetic Polymorphism*, J. Pharmacol. Exp. Ther., Apr. 1989, 249(1):134-42.

Gallagher, J.P., *Pathological Laughter and Crying in ALS: a Search for their Origin*, Acta Neurol. Scand. 1989; 80:114-7.

Gredal et al., *A Clinical Trial of Dextromethorphan in Amyotrophic Lateral Sclerosis*, Acta Neurol. Scand. 1997; 96: 8-13.

Guttendorf, R. J., et al, "Simplified phenotyping with dextromethorphan by thin-layer chromatography," Ther. Drug. Monit. 10: 490-498, 1988.

Hildebrand et al., *Determination of Dextromethorphan Metabolizer Phenotype in Healthy Volunteers*, Eur. J. Clin. Pharmacol., 1989; 36:315-318.

Hollander et al., *High-dose Dextromethorphan in Amyotrophic Lateral Sclerosis: Phase I Safety and Pharmacokinetic Studies*, Ann. Neurol., 1994; 36:920-4.

House et al., *Emotionalism After Stroke*, BMJ, 1989; 298:991-4.

Iannoccone et al., *Pharmacologic Treatment of Emotional Lability*, Clin. Neuropharm., 1996; 19:532-5.

Jackson et al. *Amyotrophic Lateral Sclerosis*, Semin. Neurol. 1998; 18:27-39.

Kim et al., *Metabolism to Dextrorphan is not essential for Dextromethorphan's Anticonvulsant Activity Against Kainate in Mice*, Life Sci., 2003; 72: 769-783.

Koppel, C., et al., "Urinary metabolism of dextromethorphan in man," Arzneim.-Forsch./Drug Research 37: 1304-1306, 1987.

Mao, J., et al. "Intrathecal treatment with dextrorphan or ketamine potently reduces pain-related behaviors in a rat model of peripheral mononeuropathy," Brain Research 605: 164-168, 1993.

Maurice et al., *The Interaction between Neuroactive Steroids and the σ1 receptor function: Behavioral Consequences and Therapeutic opportunities*, Brain Res. Brain Res. Rev., 2001; 37:116-32.

McCarthy, J.P., "Some less familiar drugs of abuse," Med. J. Australia 1971 (2): 1078-1081.

McQuay, H.J., et al, "Dextromethorphan for the treatment of neuraphatic pain: a double-blind randomised controlled crossover trial with integral n-of-1 design," Pain 59: 127-133, 1994.

Miller et al., *Practice Parameter: The Care of the Patient with Amyotrophic Lateral Sclerosis (An Evidence-based Review)* Neurol., 1999; 52:1311-23.

Netzer et al., *Dextromethorphan Blocks N-Methyl-D-aspartate-induced Currents and voltage-operated inward currents in cultured cortical Neurons*, Eur. J. Pharmacol., 1993; 238: 209-216.

Nielsen, M. D., et al, "A dose-effect study of the in vivo inhibitory effect of quinidine on sparteine oxidation in man," Br. J. Clin. Pharmacol. 29: 299-304, 1990.

Palmer GC, *Neuroprotections by NMDA Receptor Antagonists in a Variety of Neropathologies*, Curr. Drug Targets, 2001; 2:241-271.

Poeck, K., Pathophysiology of emotional disorders associated with brain damage. In: P.J. Vinken, G.W. Bruyn, editors. Handbook of Clinical Neurology. Amsterdam: North-Holland Publishing Company 1969; pp. 343-367.

Sang et al., *Dextromethorphan and Memantine In Painful Diabetic Neuropathy and Postherpetic Neuralgia*, Anesthesiology, 2002; 96: 1053-1061.

Schadel et al., *Pharmacokinetics of Dextromethorphan and Metabolites i Humans: Influence of the CYP2D^6 Phenotype and Quinidine Inhibition*, J. Clin. Psychopharmacol., 1995; 15:263-9.

Schiffer et al., *Treatment of Pathologic Laughing and Weeping with Mithriptyline*, N. Engl. J. Med. 1985, 312: 1480-1482.

Schmid et al., *Polymorphic Dextromethorphan Metabolism: Co-Segregation of Oxicative O-Demethylation with Debrisoquin Hydroxylation*, Clin. Pharmacol. Ther., 1985; 38: 618-624.

Starkstein et al., *Prevalence and Clinical Correlates of Pathological affective display in Alzheimer's disease*, J. Neurol. Neurosurg. Psychiatry, 1995; 59:55-64.

Tortella, F.C., et al, "Dextromethorphan and neuromodulation: old drug coughs up new activities," Trends in Pharm. Sci. 10: 501-507, 1989.

Udaka et al., *Pathologic Laughing and Crying Treated with Levodopa*, Arch. Neurol. 1984, 41: 1095-1096.

Vetticaden et al., *Phenotypic Differences in Dextromethorphan Metabolism*, Pharm. Res., Jan. 1989, 6(1):13-9.

Walker, E. O., and Hunt, V. P., "An open label trial of dextromethorphan in Huntington's Disease," Clin. Neuropharmacol. 12: 322-330 (1989).

Wilson, S.A. Kinner, *Some Problems in Neurology*, J. Neurol. Psychopathol., 1924; IV:299-333.

Wolf et al., *Treatment of "emotional Incontinence" with Levodopa* Neurol., 1979; 29:1435-6.

Zhang et al. "Dextromethorphan: Enhancing its Systemic Availablity by Way of Low-dose QWuinidine-mediated Inhibition of Cytochrome P4502D6," Clin. Pharm. 7 Ther., 51(6) :647-655, 1992.

PCT Search Report in equivalent PCT International Application No. PCT/US2003/022303.

International Preliminary Examination Report in equivalent PCT International Application No. PCT/US2003/022303.

Abdel-Rahman et al. Drug Metab Dispos. Jul. 1999;27(7):770-5.

Abdul et al. Br J Clin Pharmacol. Sep. 1999;48(3):382-7.

Andersen et al. Lancet. 342 (1993) 837-9.

Beck et al. J Clin Psychol. 40 (1984) 1365-7.

Bertelsen et al. Drug Metab Dispos. Mar. 2003;31(3):289-93.

Capon et al. Clin Pharmacol Ther. Sep. 1996;60(3):295-307.

Choi D. Brain Res. 403 (1987) 333-6.

Fernandes et al. J Clin Psychopharmacol. Jun. 2002;22(3):326-9.

Frison et al. Stat. Med. 11 (1992) 1685-704.

Gorski et al. Biochem Pharmacol. Jul. 5, 1994;48(1):173-82.

Granvil et al. J Pharmacol Exp Ther. Jun. 2002;301(3):1025-32.

Güzey et al. Ther Drug Monit. Jun. 2002;24(3):436-7.

Holford et al Br. J. Clin. Pharmacol. 11 (1981) 187-95.

Hou et al. Clin Pharmacol Ther. Apr. 1996;59(4):411-7.

House et al. Br. Med. J. 298 (1989) 991-4.

Jurima-Romet et al. Toxicol In Vitro. Jun. 2000;14(3):253-63.

Kaufer et al. J Neuropsychiatry Clin Neurosci 12 (2000) 233-9.

Kerry et al. Br J Clin Pharmacol. Sep. 1994;38(3):243-8.

McDonald et al. Ann. Neurol. 50 (2001) 121-7.

Metman et al. Neurol. 51 (1998) 203-6.

Moghadamnia et al. Br J Clin Pharmacol. Jul. 2003;56(1):57-67.

Moore et al. J. Neurol. Neurosurg. and Psychiatry. 63 (1997) 89-93.

Müller et al. Brain Injury. 77 (1996) 1309-11.

Musacchio et al. Mol. Pharmacol. 35 (1989) 1-5.

Pope et al. J. Clin. Pharmacol. 39 (1999) 984.

Robinson, B. Journal of Gerontology 38 (1983) 344-8.

Schmider et al. Biopharm Drug Dispos. Apr. 1997;18(3):227-40.

Shin et al. Drug Metab Dispos. Sep. 1999;27(9):1078-84.

Steinberg et al. J Neurosurg. 84 (1996) 860-6.

Tyndale et al. Drug Metab Dispos. Aug. 1999;27(8):924-30.

Voirol et al. Brain Res. Feb. 14, 2000;855(2):235-43.

Wienkers et al. Drug Metab Dispos. Dec. 2002;30(12):1372-7.

Yamamoto et al. Drug Metab Dispos. Jan. 2003;31(1):60-6.

* cited by examiner

**U.S. Patent**    Feb. 9, 2010    Sheet 1 of 5    US 7,659,282 B2



*FIG. 1*

**U.S. Patent**          Feb. 9, 2010          Sheet 2 of 5          **US 7,659,282 B2**



*FIG. 2*

Case: 25-2016    Document: 28    Page: 109    Filed: 10/21/2025



FIG. 3

SCREENED
70

RECEIVED STUDY MEDICATION
36

MAXIMUM TOLERATED DOSE: 30[a] mg
5

COMPLETED STUDY
3

DID NOT COMPLETE STUDY
2
ADVERSE EVENT[c] 1
PROTOCOL VIOLATION 1

MAXIMUM TOLERATED DOSE: 60[b] mg
6

COMPLETED STUDY
5

DID NOT COMPLETE STUDY
1
ADVERSE EVENT 1

MAXIMUM TOLERATED DOSE: 90 mg
2

COMPLETED STUDY
2

MAXIMUM TOLERATED DOSE: 120 mg
23

COMPLETED STUDY
23

[a] THIS GROUP INCLUDED SUBJECTS WHO TOOK TWO 15-mg CAPSULES/DAY AS WELL AS SUBJECTS WHO TOOK ONE 30-mg CAPSULE/DAY

[b] THIS GROUP INCLUDED ONE SUBJECT WHOSE MTD WAS 45 mg

[c] THIS SUBJECT WITHDREW AFTER 1 DOSE OF STUDY DRUG FOR SURGICAL RESECTION OF A PRE-EXISTING COLON POLYP

**U.S. Patent**       Feb. 9, 2010       Sheet 4 of 5       US 7,659,282 B2



FIG. 4



FIG. 5

**U.S. Patent**          Feb. 9, 2010          Sheet 5 of 5          US 7,659,282 B2



*FIG. 6*



*FIG. 7*

US 7,659,282 B2

1

# PHARMACEUTICAL COMPOSITIONS COMPRISING DEXTROMETHORPHAN AND QUINIDINE FOR THE TREATMENT OF NEUROLOGICAL DISORDERS

## RELATED APPLICATION

This application is a continuation, under 35 U.S.C. § 120, of International Patent Application No. PCT/US2003/022303, filed on Jul. 17, 2003 under the Patent Cooperation Treaty (PCT), which was published by the International Bureau in English on Jan. 22, 2004, which designates the United States and claims the benefit of U.S. Provisional Application No. 60/396,661, filed Jul. 17, 2002.

## FIELD OF THE INVENTION

Pharmaceutical compositions and methods for treating neurological disorders are provided. The compositions comprise dextromethorphan in combination with quinidine.

## BACKGROUND OF THE INVENTION

Patients suffering from neurodegenerative diseases or brain damage such as is caused by stroke or head injury often are afflicted with emotional problems associated with the disease or injury. The terms emotional lability and pseudobulbar affect are used by psychiatrists and neurologists to refer to a set of symptoms that are often observed in patients who have suffered a brain insult such as a head injury, stroke, brain tumor, or encephalitis, or who are suffering from a progressive neurodegenerative disease such as Amyotrophic Lateral Sclerosis (ALS, also called motor neuron disease or Lou Gehrig's disease), Parkinson's disease, Alzheimer's disease, or multiple sclerosis. In the great majority of such cases, emotional lability occurs in patients who have bilateral damage (damage which affects both hemispheres of the brain) involving subcortical forebrain structures.

Emotional lability, which is distinct from clinical forms of reactive or endogenous depression, is characterized by intermittent spasmodic outbursts of emotion (usually manifested as intense or even explosive crying or laughing) at inappropriate times or in the absence of any particular provocation. Emotional lability or pseudobulbar affect is also referred to by the terms emotionalism, emotional incontinence, emotional discontrol, excessive emotionalism, and pathological laughing and crying. The feelings that accompany emotional lability are often described in words such as "disconnectedness," since patients are fully aware that an outburst is not appropriate in a particular situation, but they do not have control over their emotional displays.

Emotional lability or pseudobulbar affect becomes a clinical problem when the inability to control emotional outbursts interferes in a substantial way with the ability to engage in family, personal, or business affairs. For example, a businessman suffering from early-stage ALS or Parkinson's disease might become unable to sit through business meetings, or a patient might become unable to go out in public, such as to a restaurant or movie, due to transient but intense inability to keep from crying or laughing at inappropriate times in front of other people. These symptoms can occur even though the patient still has more than enough energy and stamina to do the physical tasks necessary to interact with other people. Such outbursts, along with the feelings of annoyance, inadequacy, and confusion that they usually generate and the visible effects they have on other people, can severely aggravate the other symptoms of the disease; they lead to feelings

2

of ostracism, alienation, and isolation, and they can render it very difficult for friends and family members to provide tolerant and caring emotional support for the patient.

## SUMMARY OF THE INVENTION

There remains a need for additional or improved forms of treatment for emotional lability and other chronic disorders, such as chronic pain. Such a treatment preferably provides at least some degree of improvement compared to other known drugs, in at least some patients. A method for treating emotional lability in at least some patients suffering from neurologic impairment, such as a progressive neurologic disease, is desirable.

A method of treating emotional lability, pseudobulbar affect, and other chronic conditions in human patients who are in need of such treatment, without oversedation or otherwise significantly interfering with consciousness or alertness is provided. The treatment involves administering dextromethorphan in combination with a minimum dosage of quinidine.

In a first embodiment, a method for treating pseudobulbar affect or emotional lability is provided, the method including administering to a patient in need thereof dextromethorphan in combination with quinidine, wherein an amount of dextromethorphan administered includes from about 20 mg/day to about 200 mg/day, and wherein an amount of quinidine administered includes from about 10 mg/day to less than about 50 mg/day.

In an aspect of the first embodiment, the pseudobulbar affect or emotional lability is caused by a neurodegenerative disease or condition or a brain injury.

In a second embodiment, a method for treating neuropathic pain is provided, the method including administering to a patient in need thereof dextromethorphan in combination with quinidine, wherein an amount of dextromethorphan administered includes from about 20 mg/day to about 200 mg/day, and wherein an amount of quinidine administered includes from about 10 mg/day to less than about 50 mg/day.

In a third embodiment, a method for treating a neurodegenerative disease or condition is provided, the method including administering to a patient in need thereof dextromethorphan in combination with quinidine, wherein an amount of dextromethorphan administered includes from about 20 mg/day to about 200 mg/day, and wherein an amount of quinidine administered includes from about 10 mg/day to less than about 50 mg/day.

In an aspect of the third embodiment, the neurodegenerative disease or condition is selected from the group consisting of amyotrophic lateral sclerosis, multiple sclerosis, Parkinson's disease, and Alzheimer's disease.

In a fourth embodiment, a method for treating a brain injury is provided, the method including administering to a patient in need thereof dextromethorphan in combination with quinidine, wherein an amount of dextromethorphan administered includes from about 20 mg/day to about 200 mg/day, and wherein an amount of quinidine administered includes from about 10 mg/day to less than about 50 mg/day.

In an aspect of the fourth embodiment, the brain injury is selected from the group consisting of stroke, traumatic brain injury, ischemic event, hypoxic event, and neuronal death.

In aspects of the first through fourth embodiments, the dextromethorphan and the quinidine are administered as one combined dose per day.

In aspects of the first through fourth embodiments, the dextromethorphan and the quinidine are administered as at least two combined doses per day.

US 7,659,282 B2

3

In aspects of the first through fourth embodiments, the amount of quinidine administered includes from about 20 mg/day to about 45 mg/day.

In aspects of the first through fourth embodiments, the amount of dextromethorphan administered includes from about 20 mg/day to about 60 mg/day.

In aspects of the first through fourth embodiments, at least one of the quinidine and the dextromethorphan is in a form of a pharmaceutically acceptable salt.

In aspects of the first through fourth embodiments, the pharmaceutically acceptable salt is selected from the group consisting of salts of alkali metals, salts of lithium, salts of sodium, salts of potassium, salts of alkaline earth metals, salts of calcium, salts of magnesium, salts of lysine, salts of N,N'-dibenzylethylenediamine, salts of chloroprocaine, salts of choline, salts of diethanolamine, salts of ethylenediamine, salts of meglumine, salts of procaine, salts of tris, salts of free acids, salts of free bases, inorganic salts, salts of sulfate, salts of hydrochloride, and salts of hydrobromide.

In aspects of the first through fourth embodiments, the quinidine includes quinidine sulfate and the dextromethorphan includes dextromethorphan hydrobromide, and wherein an amount of quinidine sulfate administered includes from about 30 mg/day to 60 mg/day and wherein an amount of dextromethorphan hydrobromide administered includes from about 30 mg/day to about 60 mg/day.

In a fifth embodiment, a method for treating pseudobulbar affect or emotional lability is provided, the method including administering to a patient in need thereof dextromethorphan in combination with quinidine, wherein the dextromethorphan and the quinidine are administered in a combined dose, and wherein a weight ratio of dextromethorphan to quinidine in the combined dose is about 1:1.25 or less.

In an aspect of the fifth embodiment, the pseudobulbar affect or emotional lability is caused by a neurodegenerative disease or condition or a brain injury.

In a sixth embodiment, a method for treating neuropathic pain is provided, the method including administering to a patient in need thereof dextromethorphan in combination with quinidine, wherein the dextromethorphan and the quinidine are administered in a combined dose, and wherein a weight ratio of dextromethorphan to quinidine in the combined dose is about 1:1.25 or less.

In a seventh embodiment, a method for treating a neurodegenerative disease or condition is provided, the method including administering to a patient in need thereof dextromethorphan in combination with quinidine, wherein the dextromethorphan and the quinidine are administered in a combined dose, and wherein a weight ratio of dextromethorphan to quinidine in the combined dose is about 1:1.25 or less.

In an aspect of the seventh embodiment, the neurodegenerative disease or condition is selected from the group consisting of amyotrophic lateral sclerosis, multiple sclerosis, Parkinson's disease, and Alzheimer's disease.

In an eighth embodiment, a method for treating a brain injury is provided, the method including administering to a patient in need thereof dextromethorphan in combination with quinidine, wherein the dextromethorphan and the quinidine are administered in a combined dose, and wherein a weight ratio of dextromethorphan to quinidine in the combined dose is about 1:1.25 or less.

In an aspect of the eighth embodiment, the brain injury is selected from the group consisting of stroke, traumatic brain injury, ischemic event, hypoxic event, and neuronal death.

4

In aspects of the fifth through eighth embodiments, the weight ratio of dextromethorphan to quinidine in the combined dose is about 1:0.75 or less.

In aspects of the fifth through eighth embodiments, the amount of quinidine administered includes from about 20 mg/day to about 45 mg/day, and wherein the amount of dextromethorphan administered includes from about 20 mg/day to about 60 mg/day.

In aspects of the fifth through eighth embodiments, at least one of the quinidine and the dextromethorphan is in a form of a pharmaceutically acceptable salt.

In aspects of the fifth through eighth embodiments, the pharmaceutically acceptable salt is selected from the group consisting of salts of alkali metals, salts of lithium, salts of sodium, salts of potassium, salts of alkaline earth metals, salts of calcium, salts of magnesium, salts of lysine, salts of N,N'-dibenzylethylenediamine, salts of chloroprocaine, salts of choline, salts of diethanolamine, salts of ethylenediamine, salts of meglumine, salts of procaine, salts of tris, salts of free acids, salts of free bases, inorganic salts, salts of sulfate, salts of hydrochloride, and salts of hydrobromide.

In aspects of the fifth through eighth embodiments, the quinidine includes quinidine sulfate and the dextromethorphan includes dextromethorphan hydrobromide, and wherein an amount of quinidine sulfate administered includes from about 30 mg/day to about 60 mg/day and wherein an amount of dextromethorphan hydrobromide administered includes from about 30 mg/day to about 60 mg/day.

In aspects of the fifth through eighth embodiments, one combined dose is administered per day.

In aspects of the fifth through eighth embodiments, two or more combined doses are administered per day.

In a ninth embodiment, a pharmaceutical composition suitable for use in treating pseudobulbar affect or emotional lability is provided, the composition including a tablet or a capsule, the tablet or capsule including dextromethorphan and quinidine, wherein a weight ratio of dextromethorphan to quinidine is about 1:1.25 or less.

In an aspect of the ninth embodiment, the pseudobulbar affect or emotional lability is caused by a neurodegenerative disease or condition or a brain injury.

In a tenth embodiment, a pharmaceutical composition suitable for use in treating neuropathic pain is provided, the composition including a tablet or a capsule, the tablet or capsule including dextromethorphan and quinidine, wherein a weight ratio of dextromethorphan to quinidine is about 1:1.25 or less.

In an eleventh embodiment, a pharmaceutical composition suitable for use in treating a neurodegenerative disease or condition is provided, the composition including a tablet or a capsule, the tablet or capsule including dextromethorphan and quinidine, wherein a weight ratio of dextromethorphan to quinidine is about 1:1.25 or less.

In an aspect of the eleventh embodiment, the neurodegenerative disease or condition is selected from the group consisting of amyotrophic lateral sclerosis, multiple sclerosis, Parkinson's disease, and Alzheimer's disease.

In a twelfth embodiment, a pharmaceutical composition suitable for use in a brain injury is provided, the composition including a tablet or a capsule, the tablet or capsule including dextromethorphan and quinidine, wherein a weight ratio of dextromethorphan to quinidine is about 1:1.25 or less.

In an aspect of the twelfth embodiment, the brain injury is selected from the group consisting of stroke, traumatic brain injury, ischemic event, hypoxic event, and neuronal death.

US 7,659,282 B2

**5**

In aspects of the ninth through twelfth embodiments, the weight ratio of dextromethorphan to quinidine is about 1:0.75 or less.

In aspects of the ninth through twelfth embodiments, the quinidine is present in an amount of from about 20 mg to about 45 mg, and wherein the dextromethorphan is present in an amount of from about 20 mg to about 60 mg.

In aspects of the ninth through twelfth embodiments, at least one of the quinidine and the dextromethorphan is in a form of a pharmaceutically acceptable salt.

In aspects of the ninth through twelfth embodiments, the pharmaceutically acceptable salt is selected from the group consisting of salts of alkali metals, salts of lithium, salts of sodium, salts of potassium, salts of alkaline earth metals, salts of calcium, salts of magnesium, salts of lysine, salts of N,N'-dibenzylethylenediamine, salts of chloroprocaine, salts of choline, salts of diethanolamine, salts of ethylenediamine, salts of meglumine, salts of procaine, salts of tris, salts of free acids, salts of free bases, inorganic salts, salts of sulfate, salts of hydrochloride, and salts of hydrobromide.

In aspects of the ninth through twelfth embodiments, the quinidine includes quinidine sulfate and the dextromethorphan includes dextromethorphan hydrobromide, wherein the quinidine sulfate is present in an amount of from about 30 mg to about 60 mg, and wherein the dextromethorphan hydrobromide is present in an amount of from about 30 mg to about 60 mg.

In a thirteenth embodiment, use of dextromethorphan and quinidine in the preparation of a medicament for treating pseudobulbar affect or emotional lability is provided, wherein the medicament includes a capsule or a tablet, and wherein dextromethorphan and quinidine are present in the capsule or tablet at a weight ratio of dextromethorphan to quinidine of 1:1.25 or less.

In an aspect of the thirteenth embodiment, the pseudobulbar affect or emotional lability is caused by a neurodegenerative disease or condition or a brain injury.

In a fourteenth embodiment, use of dextromethorphan and quinidine in the preparation of a medicament for treating neuropathic pain is provided, wherein the medicament includes a capsule or a tablet, and wherein dextromethorphan and quinidine are present in the capsule or tablet at a weight ratio of dextromethorphan to quinidine of 1:1.25 or less.

In a fifteenth embodiment, use of dextromethorphan and quinidine in the preparation of a medicament for treating a neurodegenerative disease or condition is provided, wherein the medicament includes a capsule or a tablet, and wherein dextromethorphan and quinidine are present in the capsule or tablet at a weight ratio of dextromethorphan to quinidine of 1:1.25 or less.

In an aspect of the fifteenth embodiment, the neurodegenerative disease or condition is selected from the group consisting of amyotrophic lateral sclerosis, multiple sclerosis, Parkinson's disease, and Alzheimer's disease.

In a sixteenth embodiment, use of dextromethorphan and quinidine in the preparation of a medicament for treating a brain injury is provided, wherein the medicament includes a capsule or a tablet, and wherein dextromethorphan and quinidine are present in the capsule or tablet at a weight ratio of dextromethorphan to quinidine of 1:1.25 or less.

In an aspect of the sixteenth embodiment, the brain injury is selected from the group consisting of stroke, traumatic brain injury, ischemic event, hypoxic event, and neuronal death.

**6**

In aspects of the thirteenth through sixteenth embodiments, dextromethorphan and quinidine are present in the capsule or tablet at a weight ratio of dextromethorphan to quinidine of 1:0.75 or less.

In aspects of the thirteenth through sixteenth embodiments, at least one of the quinidine and the dextromethorphan is in a form of a pharmaceutically acceptable salt.

In aspects of the thirteenth through sixteenth embodiments, the pharmaceutically acceptable salt is selected from the group consisting of salts of alkali metals, salts of lithium, salts of sodium, salts of potassium, salts of alkaline earth metals, salts of calcium, salts of magnesium, salts of lysine, salts of N,N'-dibenzylethylenediamine, salts of chloroprocaine, salts of choline, salts of diethanolamine, salts of ethylenediamine, salts of meglumine, salts of procaine, salts of tris, salts of free acids, salts of free bases, inorganic salts, salts of sulfate, salts of hydrochloride, and salts of hydrobromide.

In aspects of the thirteenth through sixteenth embodiments, the quinidine includes quinidine sulfate and the dextromethorphan includes dextromethorphan hydrobromide, wherein the quinidine sulfate is present in an amount of from about 30 mg to about 60 mg, and wherein the dextromethorphan hydrobromide is present in an amount of from about 30 mg to about 60 mg.

In aspects of the thirteenth through sixteenth embodiments, the quinidine is present in an amount of from about 20 mg to about 45 mg, and wherein the dextromethorphan is present in an amount of from about 20 mg to about 60 mg.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** provides a box plot of CNS-LS scores for Clinical Study #4. The distributions of CNS-LS scores are symmetrical and contain only one outlier. These distributions support the use of ANCOVA for the analysis of the CNS-LS scores. As prospectively specified in the study protocol, the differences in mean improvement in CNS-LS cores, adjusted for center and baseline CNS-LS scores, were analyzed by using linear regression according to the ANCOVA method of Frison and Pocock. The results of this analysis are in Table 30. The results of the additional analyses without any adjustments or with an adjustment for baseline CNS-LS score alone are also in this table.

FIG. **2** provides a plot depicting adjusted mean reductions in CNS-LS scores for the three treatment groups from the primary efficacy analysis of the ITT population of Clinical Study #4. Reductions in CNS-LS below the horizontal lines are statistically significantly different from 30DM/30Q at the significance levels indicated.

FIG. **3** provides the disposition of subjects by MTD group participating in Clinical Study #5.

FIG. **4** depicts Mean Sleep Ratings from the Subject Diaries of subjects participating in Clinical Study #5.

FIG. **5**. Mean Present Pain Intensity Ratings from the Subject Diaries of subjects participating in Clinical Study #5.

FIG. **6**. Mean Activity Ratings from the Subject Diaries of subjects participating in Clinical Study #5.

FIG. **7**. Mean Pain Ratings from the Subject Diaries of subjects participating in Clinical Study #5.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

The following description and examples illustrate a preferred embodiment of the present invention in detail. Those of skill in the art will recognize that there are numerous varia-

US 7,659,282 B2

7                                                                 8

tions and modifications of this invention that are encom-
passed by its scope. Accordingly, the description of a pre-
ferred embodiment should not be deemed to limit the scope of
the present invention.

Emotional lability or pseudobulbar affect is associated
with a number of neurological diseases, such as stroke (House
et al., BMJ, 1989; 298:991-4), multiple sclerosis (MS)
(Cotrell et al., J. Neurol. Psychopathol., 1926; 7:1-30; Fein-
stein et al., Arch. Neurol., 1997; 54:1116-21), amyotrophic
lateral sclerosis (ALS) (Miller et al., Neurol., 1999; 52:1311-
23; Jackson et al., Semin. Neurol. 1998; 18:27-39; Poeck, K.,
Pathophysiology of emotional disorders associated with
brain damage. In: P. J. Vinken, G. W. Bruyn, editors. Hand-
book of Clinical Neurology. Amsterdam: North-Holland
Publishing Company 1969; pp. 343-67), Alzheimer's disease
(Starkstein et al., J. Neurol. Neurosurg. Psychiatry, 1995;
59:55-64), and traumatic brain injury (Brooks, N., Acta Neu-
rochirurgica Suppl., 44 1988; 59-64). Studies have suggested
that pseudobulbar affect occurs in up to 50% of patients with
ALS (Gallagher, J. P., Acta Neurol. Scand. 1989; 80:114-7).

Emotional lability or pseudobulbar affect in the context of
neurological injury can be considered a disconnection syn-
drome resulting from loss of cortical communication with the
brainstem or cerebellum Wilson S A K, J Neurol. Psycho-
pathol., 1924; IV:299-333; Parvizi et al., Brain, 2001; 24:
1708-19). At the neurotransmitter level, disruptions of
ascending and descending serotonergic pathways arising in
the brainstem, and dysregulation of dopaminergic projections
to the striatum and cortex have been implicated (Andersen et
al., Stroke, 1994; 25:1050-2; Ross et al., J. Nerv. Ment. Dis.,
1987; 175:165-72; Shaw et al., Brain Sciences in Psychiatry,
London: Butterworth, 1982; Udaka et al., Arch. Neurol. 1984;
41:1095-6).

A body of evidence suggests that pseudobulbar affect can
be modulated through pharmacologic intervention. In 1979,
Wolf reported that levodopa was effective in subjects with
pathological laughing (Wolf et al., Neurol., 1979; 29:1435-
6.). However, in a follow-up study, only 10 of 25 subjects
responded satisfactorily to treatment (Udaka et al., Arch.
Neurol., 1984; 41:1095-6). There have been reports of symp-
tomatic benefit with other drugs, including amantadine, imi-
pramine, desipramine, nortriptyline, amitriptyline, sertraline,
fluoxetine, levodopa, methylphenidate, and thyrotropin-re-
leasing hormone (Dark et al., Austr. N. Zeal. J. Psychiatry,
1996; 30:472-9; Iannoccone et al., Clin. Neuropharm., 1996;
19:532-5).

The best previously known therapies for treating emotional
lability involve the drugs amitriptyline, amantadine, and
levodopa. Although reports such as Udaka et al., Arch. Neu-
rol. 1984, 41: 1095-1096, and Schiffer et al., N. Engl. J. Med.
1985, 312: 1480-1482 indicate that these compounds may be
effective in helping reduce pathological displays of emotion
in some patients, they make it clear that none of these prior art
drugs are effective in all patients, and even in patients who
receive some benefit, the effect usually stops far short of an
effective cure. A common practice for many clinical neurolo-
gists is to prescribe amitriptyline and amantadine, one at a
time, in the hope that one of them might be able to provide any
level of improvement in the patient's condition. However, all
both fall short of offering an effective cure. In addition,
levodopa is not satisfactory, since it has other effects and is a
relatively powerful drug.

ALS is a neurodegenerative disease produced by progres-
sive loss of upper and lower motor neurons. Up to 50 percent
of patients with ALS exhibit emotional lability, and it is more
prevalent in those with the bulbar form of ALS (Gallagher J P,
Acta Neurol. Scand., 1989; 80:114-7). Based on the notion

that excitotoxicity secondary to impaired recycling of
glutamate may be a factor in the etiology of ALS, riluzole, a
glutamate release inhibitor, has been used to treat ALS
(Jerusalem et al. Neurology, 1996; 47:S218-20; Doble A.,
Neurology, 1996; 47:S233-41). Riluzole modestly extends
life span but does not confer symptomatic benefit (Bensimon
et al., N. Eng. J. Med., 1994; 330:585-91; Kwiecinski H,
Neurol. Neurochir. Pol., 2001; 35:51-9).

Because of the possibility that an excitotoxic process
involving glutamate is etiologically implicated in ALS, sev-
eral investigators have attempted to modify or arrest the
course of ALS by the administration of dextromethorphan
(DM). DM is a noncompetitive antagonist of the N-methyl-
D-aspartate-sensitive ionotropic glutamate receptor, and it
acts by reducing the level of excitatory activity. However, DM
is extensively metabolized to dextrorphan (DX) and a number
of other metabolites. Cytochrome P4502D6 (CYP2D6) is the
key enzyme responsible for the formation of DX from DM. A
subset of the population, 5 to 10% of Caucasians, has reduced
activity of this enzyme (Hildebrand et al., Eur. J. Clin. Phar-
macol., 1989; 36:315-318). Such individuals are referred to
as "poor metabolizers" of DM in contrast to the majority of
individuals who are referred to as "extensive metabolizers" of
DM (Vetticaden et al., Pharm. Res., 1989; 6:13-9).

A number of in vitro studies have been undertaken to
determine the types of drugs that inhibit CYP2D6 activity.
Quinidine (Q) is one of the most potent of those that have been
studied (Inaba et al., Br. J. Clin. Pharmacol., 1986; 22:199-
200). These observations led to the hypothesis that concomi-
tant dosing with Q could increase the concentration of DM in
plasma.

A number of chronic disorders other than emotional labil-
ity also have symptoms which are known to be very difficult
to treat, and often fail to respond to safe, non-addictive, and
non-steroid medications. Disorders such as intractable
coughing fail to respond to conventional medicines and are
typically treated by such drugs as codeine, morphine, or the
anti-inflammatory steroid prednisone. These drugs are unac-
ceptable for long-term treatment due to dangerous side
effects, long-term risks to the patient's health, or the danger of
addiction. There has been no satisfactory treatment for the
severe itching and rash associated with dermatitis. Drugs
such as prednisone and even tricyclic antidepressants, as well
as topical applications have been employed, but do not appear
to offer substantial and consistent relief. Chronic pain due to
conditions such as stroke, cancer, and trauma, as well as
neuropathic pain resulting from conditions such as diabetes
and shingles (herpes zoster), for example, is also a problem
which resists treatment. Neuropathic pain includes, for
example, diabetic neuropathy, postherpetic neuralgia, phan-
tom limb pain, trigeminal neuralgia, and sciatica. Posther-
petic neuralgia (PHN) is a complication of shingles and
occurs in approximately ten percent of patients with herpes
zoster. The incidence of PHN increases with age. Diabetic
neuropathy is a common complication of diabetes which
increases with the duration of the disease. The pain for these
types of neuropathies has been described as a burning steady
pain often punctuated with stabbing pains, pins and needles
pain, and toothache-like pain. The skin can be sensitive with
dysesthetic sensations to even light touch and clothing. The
pain can be exacerbated by activity, temperature change, and
emotional upset. The pain can be so severe as to preclude
daily activities or result in sleep disturbance or anorexia. The
mechanisms involved in producing pain of these types are not
well understood, but may involve degeneration of myelinated
nerve fibers. It is known that in diabetic neuropathy, both
small and large nerve fibers deteriorate resulting in reduced

US 7,659,282 B2

9

thresholds for tolerance of thermal sensitivity, pain, and vibration. Dysfunction of both large and small fiber functions is more severe in the lower limbs when pain develops. Most of the physiological measurements of nerves that can be routinely done in patients experiencing neuropathic pain demonstrate a slowing of nerve conduction over time. To date, treatment for neuropathic pain has been less than universally successful. Chronic pain is estimated to affect millions of people.

Dextromethorphan is widely used as a cough syrup, and it has been shown to be sufficiently safe in humans to allow its use as an over-the-counter medicine. It is well tolerated in oral dosage form, either alone or with quinidine, at up to 120 milligrams (mg) per day, and a beneficial effect may be observed when receiving a substantially smaller dose (e.g., 30 mg/day) (U.S. Pat. No. 5,206,248 to Smith).

The chemistry of dextromethorphan and its analogs is described in various references such as Rodd, E. H., Ed., Chemistry of Carbon Compounds, Elsevier Publ., N.Y., 1960; Goodman and Gilman's Pharmacological Basis of Therapeutics; Choi, Brain Res., 1987, 403: 333-336; and U.S. Pat. No. 4,806,543. Its chemical structure is as follows:



Dextromethorphan is the common name for (+)-3-methoxy-N-methylmorphinan. It is one of a class of molecules that are dextrorotatory analogs of morphine-like opioids. The term "opiate" refers to drugs that are derived from opium, such as morphine and codeine. The term "opioid" is broader. It includes opiates, as well as other drugs, natural or synthetic, which act as analgesics and sedatives in mammals.

Most of the addictive analgesic opiates, such as morphine, codeine, and heroin, are levorotatory stereoisomers (they rotate polarized light in the so-called left-handed direction). They have four molecular rings in a configuration known as a "morphinan" structure, which is depicted as follows:



In this depiction, the carbon atoms are conventionally numbered as shown, and the wedge-shaped bonds coupled to carbon atoms 9 and 13 indicate that those bonds rise out of the plane of the three other rings in the morphinan structure. Many analogs of this basic structure (including morphine) are pentacyclic compounds that have an additional ring formed by a bridging atom (such as oxygen) between the number 4 and 5 carbon atoms.

10

Many dextrorotatory analogs of morphine are much less addictive than the levorotatory compounds. Some of these dextrorotatory analogs, including dextromethorphan and dextrorphan, are enantiomers of the morphinan structure. In these enantiomers, the ring that extends out from carbon atoms 9 and 13 is oriented in the opposite direction from that depicted in the above structure.

While not wishing to be limited to any particular mechanism of action, dextromethorphan is known to have at least three distinct receptor activities which affect central nervous system (CNS) neurons. First, it acts as an antagonist at N-methyl-D-aspartate (NMDA) receptors. NMDA receptors are one of three major types of excitatory amino acid (EAA) receptors in CNS neurons. Since activation of NMDA receptors causes neurons to release excitatory neurotransmitter molecules (primarily glutamate, an amino acid), the blocking activity of dextromethorphan at these receptors reduces the level of excitatory activity in neurons having these receptors. Dextromethorphan is believed to act at the phencyclidine (PCP) binding site, which is part of the NMDA receptor complex. Dextromethorphan is relatively weak in its NMDA antagonist activity, particularly compared to drugs such as MK-801 (dizocilpine) and phencyclidine. Accordingly, when administered at approved dosages, dextromethorphan is not believed to cause the toxic side effects (discussed in U.S. Pat. No. 5,034,400 to Olney) that are caused by powerful NMDA antagonists such as MK-801 or PCP.

Dextromethorphan also functions as an agonist at certain types of inhibitory receptors; unlike EAA receptors, activation of inhibitory receptors suppresses the release of excitatory neurotransmitters by affected cells. Initially, these inhibitory receptors were called sigma opiate receptors. However, questions have been raised as to whether they are actually opiate receptors, so they are now generally referred to as sigma (σ) receptors. Subsequent experiments showed that dextromethorphan also binds to another class of inhibitory receptors that are closely related to, but distinct from, sigma receptors. The evidence, which indicates that non-sigma inhibitory receptors exist and are bound by dextromethorphan, is that certain molecules which bind to sigma receptors are not able to completely block the binding of dextromethorphan to certain types of neurons that are known to have inhibitory receptors (Musacchio et al., Cell Mol. Neurobiol., 1988 June, 8(2):149-56; Musacchio et al., J. Pharmacol. Exp. Ther., 1988 November, 247(2):424-31; Craviso et al., Mol. Pharmacol., 1983 May, 23(3):629-40; Craviso et al., Mol. Pharmacol., 1983 May, 23(3):619-28; and Klein et al., Neurosci. Lett., 1989 Feb. 13, 97(1-2):175-80). These receptors are generally called "high-affinity dextromethorphan receptors" or simply "DM receptors" in the scientific literature. As used herein, the phrase "dextromethorphan-binding inhibitory receptors" includes both sigma and non-sigma receptors which undergo affinity-binding reactions with dextromethorphan and which, when activated by dextromethorphan, suppress the release of excitatory neurotransmitters by the affected cells (Largent et al., Mol. Pharmacol., 1987 December, 32(6):772-84).

Dextromethorphan also decreases the uptake of calcium ions (Ca++) by neurons. Calcium uptake, which occurs during transmission of nerve impulses, involves at least two different types of channels, known as N-channels and L-channels. Dextromethorphan suppressed calcium uptake fairly strongly in certain types of cultured neurons (synaptosomes) which contain N-channels; it also suppressed calcium uptake, although less strongly, in other cultured neurons (PC12 cells) which contain L-channels (Carpenter et al., Brain Res., 1988 Jan. 26, 439(1-2):372-5).

US 7,659,282 B2

11

An increasing body of evidence indicates dextromethorphan has therapeutic potential for treating several neuronal disorders (Zhang et al., Clin. Pharmacol. Ther. 1992; 51: 647-655; Palmer G C, Curr. Drug Targets, 2001; 2: 241-271; and Liu et al., J. Pharmacol. Exp. Ther. 2003; 21: 21; Kim et al., Life Sci., 2003; 72: 769-783). Pharmacological studies demonstrate that DM is a noncompetitive NMDA antagonist that has neuroprotective, anticonvulsant and antinociceptive activities in a number of experimental models (Desmeules et al., J. Pharmacol. Exp. Ther., 1999; 288: 607-612). In addition to acting as an NMDA antagonist, both DM and its primary metabolite, dextrorphan, bind to sigma-1 sites, inhibit calcium flux channels and interact with high voltage-gated sodium channels (Dickenson et al., Neuropharmacology, 1987; 26: 1235-1238; Carpenter et al., Brain Res., 1988; 439: 372-375; Netzer et al., Eur. J. Pharmacol., 1993; 238: 209-216). Recent reports indicate that an additional neuroprotective mechanism of DM may include interference with the inflammatory responses associated with some neurodegenerative disorders that include Parkinson's disease and Alzheimer's disease (Liu et al., J. Pharmacol. Exp. Ther., 2003; 21: 21). The potential efficacy of DM as a neuroprotectant was explored in limited clinical trials in patients with amyotrophic lateral sclerosis (Gredal et al., Acta Neurol. Scand. 1997; 96: 8-13; Blin et al., Clin. Neuropharmacol., 1996; 19: 189-192) Huntington's disease (Walker et al., Clin. Neuropharmacol., 1989; 12: 322-330) and Parkinson's Disease (Chase et al., J. Neurol., 2000; 247 Suppl 2: 1136-42). DM was also examined in patients with various types of neuropathic pain (Mcquay et al., Pain, 1994; 59: 127-133; Vinik A I, Am. J. Med., 1999; 107: 17S-26S; Weinbroum et al., Can. J. Anaesth., 2000; 47: 585-596; Sang et al., Anesthesiology, 2002; 96: 1053-1061; Heiskanen et al., Pain, 2002; 96: 261-267; Ben Abraham et al., Clin. J. Pain, 2002; 18: 282-285; Sang C N, J. Pain Symptom Manage., 2000; 19: S21-25). Although the pharmacological profile of DM points to clinical efficacy, most clinical trials have been disappointing with equivocal efficacy for DM compared to placebo treatment.

Several investigators suggested that the limited benefit seen with DM in clinical trials is associated with rapid hepatic metabolism that limits systemic drug concentrations. In one trial in patients with Huntington's disease, plasma concentrations were undetectable in some patients after DM doses that were eight times the maximum antitussive dose (Walker et al., Clin. Neuropharmacol., 1989; 12: 322-330).

As discussed above, DM undergoes extensive hepatic O-demethylation to dextrorphan that is catalyzed by CYP2D6. This is the same enzyme that is responsible for polymorphic debrisoquine hydroxylation in humans (Schmid et al., Clin. Pharmacol. Ther., 1985; 38: 618-624). An alternate pathway is mediated primarily by CYP3A4 and N-demethylation to form 3-methoxymorphinan (Von Moltke et al., J. Pharm. Pharmacol., 1998; 50: 997-1004). Both DX and 3-methoxymorphinan can be further demethylated to 3-hydroxymorphinan that is then subject to glucuronidation. The metabolic pathway that converts DM to DX is dominant in the majority of the population and is the principle for using DM as a probe to phenotype individuals as CYP2D6 extensive and poor metabolizers (Kupfer et al., Lancet 1984; 2: 517-518; Guttendorf et al., Ther. Drug Monit., 1988; 10: 490-498). Approximately 7% of the Caucasian population shows the poor metabolizer phenotype, while the incidence of poor metabolizer phenotype in Chinese and Black African populations is lower (Droll et al., Pharmacogenetics, 1998; 8: 325-333). A study examining the ability of DM to increase pain threshold in extensive and poor metabolizers found antinociceptive effects of DM were significant in poor metabo-

12

lizers but not in extensive metabolizers (Desmeules et al., J. Pharmacol. Exp. Ther., 1999; 288: 607-612). The results are consistent with direct effects of parent DM rather than the DX metabolite on neuromodulation.

One approach for increasing systemically available DM is to coadminister the CYP2D6 inhibitor, quinidine, to protect DM from metabolism (Zhang et al., Clin. Pharmacol. Ther. 1992; 51: 647-655). Quinidine administration can convert subjects with extensive metabolizer phenotype to poor metabolizer phenotype (Inaba et al., Br. J. Clin. Pharmacol., 1986; 22: 199-200). When this combination therapy was tried in amyotrophic lateral sclerosis patients it appeared to exert a palliative effect on symptoms of pseudobulbar affect (Smith et al., Neurol., 1995; 54: 604P). Combination treatment with DM and quinidine also appeared effective for patients with chronic pain that could not be adequately controlled with other medications. This observation is consistent with a report that showed DM was effective in increasing pain threshold in poor metabolizers and in extensive metabolizers given quinidine, but not in extensive metabolizers (Desmeules et al., J. Pharmacol. Exp. Ther., 1999; 288: 607-612). To date, most studies have used quinidine doses ranging from 50 to 200 mg to inhibit CYP2D6 mediated drug metabolism, but no studies have identified a minimal dose of quinidine for enzyme inhibition.

The highly complex interactions between different types of neurons having varying populations of different receptors, and the cross-affinity of different receptor types for dextromethorphan as well as other types of molecules which can interact with some or all of those same types of receptors, render it very difficult to attribute the overall effects of dextromethorphan to binding activity at any particular receptor type. Nevertheless, it is believed that dextromethorphan suppresses neuronal activity by means of at least three molecular functions: it reduces activity at (excitatory) NMDA receptors; it inhibits neuronal activity by binding to certain types of inhibitory receptors; and it suppresses calcium uptake through N-channels and L-channels.

Unlike some analogs of morphine, dextromethorphan has little or no agonist or antagonist activity at various other opiate receptors, including the mu (μ) and kappa (κ) classes of opiate receptors. This is highly desirable, since agonist or antagonist activity at those opiate receptors can cause undesired side effects such as respiratory depression (which interferes with breathing) and blockade of analgesia (which reduces the effectiveness of pain-killers).

Accordingly, emotional lability or pseudobulbar affect can be treated in at least some patients by means of administering a drug which functions as an antagonist at NMDA receptors and as an agonist at dextromethorphan-binding inhibitory receptors, and wherein the drug is also characterized by a lack of agonist or antagonist activity at mu or kappa opiate receptors, namely, dextromethorphan.

It has long been known that in most people (estimated to include about 90% of the general population in the United States), dextromethorphan is rapidly metabolized and eliminated by the body (Ramachander et al., J. Pharm. Sci., 1977 July, 66(7):1047-8; and Vetticaden et al., Pharm. Res., 1989 January, 6(1):13-9). This elimination is largely due to an enzyme known as the P450 2D6 (or IID6) enzyme, which is one member of a class of oxidative enzymes that exist in high concentrations in the liver, known as cytochrome P450 enzymes (Kronbach et al., Anal. Biochem., 1987 April, 162 (1):24-32; and Dayer et al., Clin. Pharmacol. Ther., 1989 January, 45(1):34-40). In addition to metabolizing dextromethorphan, the P450 2D6 isozyme also oxidizes sparteine and debrisoquine. It is known that the P450 2D6

US 7,659,282 B2

13

enzyme can be inhibited by a number of drugs, particularly quinidine (Brinn et al., Br. J. Clin. Pharmacol., 1986 August, 22(2):194-7; Inaba et al., Br. J. Clin. Pharmacol., 1986 August, 22(2):199-200; Brosen et al., Pharmacol. Toxicol., 1987 April, 60(4):312-4; Otton et al., Drug Metab. Dispos., 1988 January-February, 16(1):15-7; Otton et al., J. Pharmacol. Exp. Ther., 1988 October, 247(1):242-7; Funck-Brentano et al., Br. J. Clin. Pharmacol., 1989 April, 27(4):435-44; Funck-Brentano et al., J. Pharmacol. Exp. Ther., 1989 April, 249(1):134-42; Nielsen et al., Br. J. Clin. Pharmacol., 1990 March, 29(3):299-304; Broly et al., Br. J. Clin. Pharmacol., 1989 July, 28(1):29-36).

Patients who lack the normal levels of P450 2D6 activity are classified in the medical literature as "poor metabolizers," and doctors are generally warned to be cautious about administering various drugs to such patients. "The diminished oxidative biotransformation of these compounds in the poor metabolizer (PM) population can lead to excessive drug accumulation, increased peak drug levels, or in some cases, decreased appearance of active metabolites . . . Patients with the PM phenotype are at increased risk of potentially serious untoward effects . . . " (Guttendorf et al., Ther. Drug Monit., 1988, 10(4):490-8, page 490). Accordingly, doctors are cautious about administering quinidine to patients, and rather than using drugs such as quinidine to inhibit the rapid elimination of dextromethorphan, researchers working in this field have administered very large quantities (such as 750 mg/day) of dextromethorphan to their patients, even though this is known to introduce various problems (Walker et al., Clin Neuropharmacol., 1989 August, 12(4):322-30; and Albers et al., Stroke, 1991 August, 22(8):1075-7).

Dextromethorphan is a weak, noncompetitive NMDA receptor antagonist that binds with moderate-to-high affinity to the phencyclidine site of the receptor complex. However, DM has additional, unique pharmacological properties. Binding studies suggest it is a ligand at the high affinity sigma 1 site, where it initially was proposed to act as an antagonist (Tortella et al., TiPS, 1989; 10:501-7) but more recently as an agonist (Maurice et al., Brain Res. Brain Res. Rev., 2001; 37:116-32). Sigma ligands also modulate NMDA responses (Debonnel et al., Life Sci., 1996; 58:721-34). Due to its inhibitory actions on glutamate, a number of investigators have treated ALS patients with DM in the hope of modifying or arresting the disease (Askmark et al., J. Neurol. Neurosug. Psychiatry, 1993; 56:197-200; Hollander et al., Ann. Neurol., 1994; 36:920-4; and Blin et al., Clin. Neuropharmacol., 1996; 19:189-92). These trials have failed to demonstrate any benefit, possibly due to the rapid and extensive metabolism of DM that occurs in approximately 90 percent of the Caucasian population (referred to as extensive metabolizers) (see Hildebrand et al., Eur. J. Clin. Pharmacol., 1989; 36:315-8).

DM metabolism is primarily mediated by CYP2D6 in extensive metabolizers. This can be circumvented by co-administration of quinidine, a selective CYP2D6 inhibitor, at Q doses 1 to 1.5 logs below those employed for the treatment of cardiac arrhythmias (Schadel et al., J. Clin. Psychopharmacol., 1995; 15:263-9). Blood levels of DM increase linearly with DM dose following co-administration with Q but are undetectable in most subjects given DM alone, even at high doses (Zhang et al., Clin. Pharmac. & Therap., 1992; 51:647-55). The observed plasma levels in these individuals thus mimic the plasma levels observed in individuals expressing the minority phenotype where polymorphisms in the gene result in reduced levels of P450 2D6 (poor metabolizers). Unexpectedly, during a study of DM and Q in ALS patients, patients reported that their emotional lability improved during treatment. Subsequently, in a placebo controlled cross-

14

over study (N=12) conducted to investigate this, the concomitant administration of DM and Q administered to ALS patients was found to suppress emotional lability (P<0.001 compared to placebo) (Smith et al., Neurology, 1995; 45:A330).

Rapid dextromethorphan elimination may be overcome by co-administration of quinidine along with dextromethorphan (U.S. Pat. No. 5,206,248 to Smith). The chemical structure of quinidine is as follows:



Quinidine co-administration has at least two distinct beneficial effects. First, it greatly increases the quantity of dextromethorphan circulating in the blood. In addition, it also yields more consistent and predictable dextromethorphan concentrations. Research involving dextromethorphan or co-administration of quinidine and dextromethorphan, and the effects of quinidine on blood plasma concentrations, are described in the patent literature (U.S. Pat. No. 5,166,207, U.S. Pat. No. 5,863,927, U.S. Pat. No. 5,366,980, U.S. Pat. No. 5,206,248, and U.S. Pat. No. 5,350,756 to Smith).

The discovery that dextromethorphan can reduce the internal feelings and external symptoms of emotional lability or pseudobulbar affect in some patients suffering from progressive neurological disease suggests that dextromethorphan is also likely to be useful for helping some patients suffering from emotional lability due to other causes, such as stroke or other ischemic (low blood flow) or hypoxic (low oxygen supply) events which led to neuronal death or damage in limited regions of the brain, or head injury or trauma as might occur during an automobile, motorcycle, or bicycling accident or due to a gunshot wound.

In addition, the results obtained to date also suggest that dextromethorphan is likely to be useful for treating some cases of emotional lability which are due to administration of other drugs. For example, various steroids, such as prednisone, are widely used to treat autoimmune diseases such as lupus. However, prednisone has adverse events on the emotional state of many patients, ranging from mild but noticeably increased levels of moodiness and depression, up to severely aggravated levels of emotional lability that can impair the business, family, or personal affairs of the patient.

In addition, dextromethorphan in combination with quinidine can reduce the external displays or the internal feelings that are caused by or which accompany various other problems such as "premenstrual syndrome" (PMS), Tourette's syndrome, and the outburst displays that occur in people suffering from certain types of mental illness. Although such problems may not be clinically regarded as emotional lability, they involve manifestations that appear to be sufficiently similar to emotional lability to suggest that dextromethorphan can offer an effective treatment for at least some patients suffering from such problems.

One of the significant characteristics of the treatments of preferred embodiments is that the treatments function to

US 7,659,282 B2

15

reduce emotional lability without tranquilizing or otherwise significantly interfering with consciousness or alertness in the patient. As used herein, "significant interference" refers to adverse events that would be significant either on a clinical level (they would provoke a specific concern in a doctor or psychologist) or on a personal or social level (such as by causing drowsiness sufficiently severe that it would impair someone's ability to drive an automobile). In contrast, the types of very minor side effects that can be caused by an over-the-counter drug such as a dextromethorphan-containing cough syrup when used at recommended dosages are not regarded as significant interference.

The magnitude of a prophylactic or therapeutic dose of dextromethorphan in combination with quinidine in the acute or chronic management of emotional lability or other chronic conditions can vary with the particular cause of the condition, the severity of the condition, and the route of administration. The dose and/or the dose frequency can also vary according to the age, body weight, and response of the individual patient.

In general, it is preferred to administer the dextromethorphan and quinidine in a combined dose, or in separate doses administered substantially simultaneously. The preferred weight ratio of dextromethorphan to quinidine is about 1:1.5 or less, preferably about 1:1.45, 1:1.4, 1:1.35, or 1:1.3 or less, more preferably about 1:1.25, 1:1.2, 1:1.15, 1:1.1, 1:1.05, 1:1, 1:0.95, 1:0.9, 1:0.85, 1:0.8, 1:0.75, 1:0.7, 1:0.65, 1:0.6, 1:0.55 or 1:0.5 or less. In certain embodiments, however, dosages wherein the weight ratio of dextromethorphan to quinidine is greater than about 1:1.5 may be preferred, for example, dosages of about 1:1.6, 1:1.7, 1:1.8, 1:1.9, 1:2 or greater. Likewise, in certain embodiments, dosages wherein the ratio of dextromethorphan to quinidine is less than about 1:0.5 may be preferred, for example, about 1:0.45, 1:0.4, 1:0.35, 1:0.3, 1:0.25, 1:0.2, 1:0.15, or 1:0.1 or less. When dextromethorphan and quinidine are administered at the preferred ratio of 1:1.25 or less, it is generally preferred that less than 50 mg quinidine is administered at any one time, more preferably about 45, 40, or 35 mg or less, and most preferably about 30, 25, or 20 mg or less. It may also be preferred to administer the combined dose (or separate doses simultaneously administered) at the preferred ratio of 1:1.25 or less twice daily, three times daily, four times daily, or more frequently so as to provide the patient with a preferred dosage level per day, for example: 60 mg quinidine and 60 mg dextromethorphan per day provided in two doses, each dose containing 30 mg quinidine and 30 mg dextromethorphan; 50 mg quinidine and 50 mg dextromethorphan per day provided in two doses, each dose containing 25 mg quinidine and 25 mg dextromethorphan; 40 mg quinidine and 40 mg dextromethorphan per day provided in two doses, each dose containing 20 mg quinidine and 20 mg dextromethorphan; 30 mg quinidine and 30 mg dextromethorphan per day provided in two doses, each dose containing 15 mg quinidine and 15 mg dextromethorphan; or 20 mg quinidine and 20 mg dextromethorphan per day provided in two doses, each dose containing 10 mg quinidine and 10 mg dextromethorphan. The total amount of dextromethorphan and quinidine in a combined dose may be adjusted, depending upon the number of doses to be administered per day, so as to provide a suitable daily total dosage to the patient, while maintaining the preferred ratio of 1:1.25 or less. These ratios are particularly preferred for the treatment of emotional lability and neuropathic pain.

In general, the total daily dose for dextromethorphan in combination with quinidine, for the conditions described herein, is about 10 mg or less up to about 200 mg or more dextromethorphan in combination with about 1 mg or less up to about 150 mg or more quinidine; preferably from about 15

16

or 20 mg to about 65, 70, 75, 80, 85, 90, 95, 100, 110, 120, 130, 140, 150, 160, 170, 180, or 190 mg dextromethorphan in combination with from about 2.5, 5, 7.5, 10, 15, or 20 mg to about 55, 60, 65, 70, 75, 80, 85, 90, 95, 100, 110, 120, 130, or 140 mg quinidine; more preferably from about 25, 30, 35, or 40 mg to about 55 or 60 mg dextromethorphan in combination with from about 25, 30, or 35 mg to about 40, 45, or 50 mg quinidine. In particularly preferred embodiments, the daily dose of dextromethorphan (DM) to quinidine (Q) is: about 20 mg DM to 20 mg Q; 20 mg DM to 30 mg Q; 20 mg DM to 40 mg Q; 20 mg DM to 50 mg Q; 20 mg DM to 60 mg Q; 30 mg DM to 20 mg Q; 30 mg DM to 30 mg Q; 30 mg DM to 40 mg Q; 30 mg DM to 50 mg Q; 30 mg DM to 60 mg Q; 40 mg DM to 20 mg Q; 40 mg DM to 30 mg Q; 40 mg DM to 40 mg Q; 40 mg DM to 50 mg Q; 40 mg DM to 60 mg Q; 50 mg DM to 20 mg Q; 50 mg DM to 30 mg Q; 50 mg DM to 40 mg Q; 50 mg DM to 50 mg Q; 50 mg DM to 60 mg Q; 60 mg DM to 20 mg Q; 60 mg DM to 30 mg Q; 60 mg DM to 40 mg Q; 60 mg DM to 50 mg Q; or 60 mg DM to 60 mg Q. A single dose per day or divided doses (two, three, four or more doses per day) can be administered.

Preferably, a daily dose for emotional lability is about 20 mg to about 60 mg dextromethorphan in combination with about 20 mg to about 60 mg quinidine, in single or divided doses. Particularly preferred daily dose for emotional lability is about 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, or 30 mg dextromethorphan in combination with about 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, or 30 mg quinidine; about 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, or 40 mg dextromethorphan in combination with about 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, or 30 mg quinidine; about 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, or 50 mg dextromethorphan in combination with about 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, or 30 mg quinidine; or about 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, or 60 mg dextromethorphan in combination with about 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, or 30 mg quinidine; in single or divided doses.

In general, the total daily dose for dextromethorphan in combination with quinidine, for chronic pain, such as neuropathic pain, intractable coughing, dermatitis, tinnitus, and sexual dysfunction is preferably about 10 mg or less up to about 200 mg or more dextromethorphan in combination with about 1 mg or less up to about 150 mg or more quinidine. Particularly preferred total daily dosages for chronic pain, such as neuropathic pain, intractable coughing, dermatitis, tinnitus, and sexual dysfunction are about 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, or 30 mg dextromethorphan in combination with about 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, or 30 mg quinidine; about 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, or 40 mg dextromethorphan in combination with about 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, or 30 mg quinidine; about 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, or 50 mg dextromethorphan in combination with about 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, or 30 mg quinidine; or about 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, or 60 mg dextromethorphan in combination with about 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, or 30 mg quinidine; in single or divided doses. Similar daily doses for other indications as mentioned herein are generally preferred.

In managing treatment, the therapy is preferably initiated at a lower daily dose, preferably about 20 or 30 mg dextromethorphan in combination with about 2.5 mg quinidine per day, and increased up to about 60 mg dextromethorphan in combination with about 75 mg quinidine, or higher, depending on the patient's global response. It is further preferred that infants, children, patients over 65 years, and those with impaired renal or hepatic function, initially receive low doses, and that they be titrated based on individual response(s) and

Appx58

US 7,659,282 B2

17

blood level(s). Generally, a daily dosage of 20 to 30 mg dextromethorphan and 20 to 30 mg quinidine is well-tolerated by most patients.

It can be preferred to administer dosages outside of these preferred ranges in some cases, as will be apparent to those skilled in the art. Further, it is noted that the ordinary skilled clinician or treating physician will know how and when to interrupt, adjust, or terminate therapy in consideration of individual patient response.

Any suitable route of administration can be employed for providing the patient with an effective dosage of dextromethorphan in combination with quinidine. For example, oral, rectal, transdermal, parenteral (subcutaneous, intramuscular, intravenous), intrathecal, topical, inhalable, and like forms of administration can be employed. Suitable dosage forms include tablets, troches, dispersions, suspensions, solutions, capsules, patches, and the like. Administration of medicaments prepared from the compounds described herein can be by any suitable method capable of introducing the compounds into the bloodstream. Formulations of preferred embodiments can contain a mixture of active compounds with pharmaceutically acceptable carriers or diluents as are known by those of skill in the art.

The present method of treatment of emotional lability can be enhanced by the use of dextromethorphan in combination with quinidine as an adjuvant to known therapeutic agents, such as fluoxetine hydrochloride, marketed as PROZAC® by Eli Lilly and Company, and the like. Preferred adjuvants include pharmaceutical compositions conventionally employed in the treatment of the disordered as discussed herein.

The pharmaceutical compositions of the present invention comprise dextromethorphan in combination with quinidine, or pharmaceutically acceptable salts of dextromethorphan and/or quinidine, as the active ingredient and can also contain a pharmaceutically acceptable carrier, and, optionally, other therapeutic ingredients.

The terms "pharmaceutically acceptable salts" or "a pharmaceutically acceptable salt thereof" refer to salts prepared from pharmaceutically acceptable, non-toxic acids or bases. Suitable pharmaceutically acceptable salts include metallic salts, e.g., salts of aluminum, zinc, alkali metal salts such as lithium, sodium, and potassium salts, alkaline earth metal salts such as calcium and magnesium salts; organic salts, e.g., salts of lysine, N,N'-dibenzylethylenediamine, chloroprocaine, choline, diethanolamine, ethylenediamine, meglumine (N-methylglucamine), procaine, and tris; salts of free acids and bases; inorganic salts, e.g., sulfate, hydrochloride, and hydrobromide; and other salts which are currently in widespread pharmaceutical use and are listed in sources well known to those of skill in the art, such as The Merck Index. Any suitable constituent can be selected to make a salt of an active drug discussed herein, provided that it is non-toxic and does not substantially interfere with the desired activity. In addition to salts, pharmaceutically acceptable precursors and derivatives of the compounds can be employed. Pharmaceutically acceptable amides, lower alkyl esters, and protected derivatives of dextromethorphan and/or quinidine can also be suitable for use in compositions and methods of preferred embodiments. In particularly preferred embodiments, the dextromethorphan is administered in the form of dextromethorphan hydrobromide, and the quinidine is administered in the form of quinidine sulfate. For example, a dose of 30 mg dextromethorphan hydrobromide (of molecular formula $C_{18}H_{25}NO.HBr.H_2O$) and 30 quinidine sulfate (of molecular formula $(C_{20}H_{24}N_2O_2)_2.H_2SO_4.2H_2O$) may be administered (corresponding to an effective dosage of

18

approximately 22 mg dextromethorphan and 25 mg quinidine). Other preferred dosages include, for example, 45 mg dextromethorphan hydrobromide and 30 quinidine sulfate (corresponding to an effective dosage of approximately 33 mg dextromethorphan and approximately 25 mg quinidine); 60 mg dextromethorphan hydrobromide and 30 quinidine sulfate (corresponding to an effective dosage of approximately 44 mg dextromethorphan and approximately 25 mg quinidine); 45 mg dextromethorphan hydrobromide and 45 quinidine sulfate (corresponding to an effective dosage of approximately 33 mg dextromethorphan and 37.5 mg quinidine); 60 mg dextromethorphan hydrobromide and 60 quinidine sulfate (corresponding to an effective dosage of approximately 44 mg dextromethorphan and 50 mg quinidine).

The compositions can be prepared in any desired form, for example, tables, powders, capsules, suspensions, solutions, elixirs, and aerosols. Carriers such as starches, sugars, microcrystalline cellulose, diluents, granulating agents, lubricants, binders, disintegrating agents, and the like can be used in oral solid preparations. Oral solid preparations (such as powders, capsules, and tablets) are generally preferred over oral liquid preparations. However, in certain embodiments oral liquid preparations can be preferred over oral solid preparations. The most preferred oral solid preparations are tablets. If desired, tablets can be coated by standard aqueous or non-aqueous techniques.

In addition to the common dosage forms set out above, the compounds can also be administered by sustained release, delayed release, or controlled release compositions and/or delivery devices, for example, such as those described in U.S. Pat. Nos. 3,845,770; 3,916,899; 3,536,809; 3,598,123; and 4,008,719.

Pharmaceutical compositions suitable for oral administration can be provided as discrete units such as capsules, cachets, tablets, and aerosol sprays, each containing predetermined amounts of the active ingredients, as powder or granules, or as a solution or a suspension in an aqueous liquid, a non-aqueous liquid, an oil-in-water emulsion, or a water-in-oil liquid emulsion. Such compositions can be prepared by any of the conventional methods of pharmacy, but the majority of the methods typically include the step of bringing into association the active ingredients with a carrier which constitutes one or more ingredients. In general, the compositions are prepared by uniformly and intimately admixing the active ingredients with liquid carriers, finely divided solid carriers, or both, and then, optionally, shaping the product into the desired presentation.

For example, a tablet can be prepared by compression or molding, optionally, with one or more additional ingredients. Compressed tablets can be prepared by compressing in a suitable machine the active ingredient in a free-flowing form such as powder or granules, optionally mixed with a binder, lubricant, inert diluent, surface active or dispersing agent. Molded tablets can be made by molding, in a suitable machine, a mixture of the powdered compound moistened with an inert liquid diluent.

Preferably, each tablet contains from about 30 mg to about 60 mg of dextromethorphan and from about 30 mg to about 45 mg quinidine, and each capsule contains from about 30 mg to about 60 mg of dextromethorphan and from about 30 mg to about 45 mg quinidine. Most preferably, tablets or capsules are provided in a range of dosages to permit divided dosages to be administered. For example, tablets, cachets or capsules can be provided that contain about 10 mg dextromethorphan and about 5, 10, or 15 mg quinidine; about 20 mg dextromethorphan and about 10, 20 or 30 mg quinidine; about 30 mg dextromethorphan and about 15, 30, or 45 mg quinidine;

US 7,659,282 B2

19                                                                                    20

and the like. A dosage appropriate to the patient, the condition to be treated, and the number of doses to be administered daily can thus be conveniently selected. While it is generally preferred to incorporate both dextromethorphan and quinidine in a single tablet or other dosage form, in certain embodiments it can be desirable to provide the dextromethorphan and quinidine in separate dosage forms.

It has been unexpectedly discovered that patients suffering from emotional lability and other conditions as described herein can treat with dextromethorphan in combination with an amount of quinidine substantially lower than the minimum amount heretofore believed to be necessary to provide a significant therapeutic effect. As used herein, a "minimum effective therapeutic amount" is that amount which provides a satisfactory degree of inhibition of the rapid elimination of dextromethorphan from the body, while producing no adverse effect or only adverse events of an acceptable degree and nature. More specifically, a preferred effective therapeutic amount is within the range of from about 20, 25 or 30 mg to about 60 mg of dextromethorphan and less than about 50 mg of quinidine per day, preferably about 20 or 30 mg to about 60 mg of dextromethorphan and about 30 mg to about 45 mg of quinidine per day, the amount being preferably administered in a divided dose based on the plasma half-life of dextromethorphan. For example, in a preferred embodiment dextromethorphan and quinidine are administered in specified mg increments to achieve a target concentration of dextromethorphan of a specified level in μg/mL plasma, with a maximum preferred specified dosage of dextromethorphan and quinidine based on body weight. The target dose is then preferably administered every 12 hours. Since the level of quinidine is minimized, the side effects observed at high dosages of quinidine are minimized or eliminated, a significant benefit over compositions containing dextromethorphan in combination with higher levels of quinidine.

The combination of dextromethorphan and quinidine of preferred embodiments can also be extremely effective in formulations for the treatment for other chronic disorders which do not respond well to other treatments. Dextromethorphan in combination with quinidine can be used to effectively treat severe or intractable coughing, which has not responded adequately to non-addictive, non-steroid medications, with minimal side-effects. Intractable coughing is a consequence of respiratory infections, asthma, emphysema, and other conditions affecting the pulmonary system.

Dextromethorphan in combination with quinidine as in the preferred embodiments can also be used in pharmaceutical compositions for treating dermatitis. As used herein, "dermatitis" or "eczema" is a skin condition characterized by visible skin lesions and/or an itching or burning sensation on the skin. Dextromethorphan in combination with quinidine as in the preferred embodiments can also be used in pharmaceutical compositions for the treatment of chronic pain from conditions such as stroke, trauma, cancer, and pain due to neuropathies such as herpes zoster infections and diabetes. Other conditions that can be treated using dextromethorphan in combination with quinidine according to the preferred embodiments can include sexual dysfunctions, such as priapism or premature ejaculation, as well as tinnitus.

Clinical Study #1

Clinical testing was conducted to determine the lowest dose of quinidine which inhibits the conversion of dextromethorphan to dextrorphan; and to chronicle the occurrence of side effects during administration of dextromethorphan/quinidine.

Testing protocol specifications and a detailed time and events schedule were prepared to assure consistent execution of the protocol throughout the study conduct.

A phenotyping study directed to dextromethorphan was conducted. The study was an open-label single dose study. Subjects were screened to ensure they met the inclusion and exclusion criteria. Subjects received a single oral dose of dextromethorphan hydrobromide 30 mg capsule taken with 240 mL of tap water. A total of fifty-eight subjects were screened and fifty subjects dosed. The study determined each subject's ability to metabolize dextromethorphan. Subjects who met the inclusion/exclusion criteria remained in house for dosing. Each subject was administered one 30 mg capsule (P.M.) of dextromethorphan. Urine was collected predose through 12 hours postdose and analyzed for dextromethorphan and dextrorphan. A blood sample (5 mL) was collected for analysis of plasma dextromethorphan, dextrorphan, and quinidine predose and at 2, 4 and 8 hours postdose. Following a wash-out period of at least two days, forty-eight subjects determined to be extensive metabolizers of dextromethorphan were asked to participate in the quinidine dosing study. Forty-six of these subjects were determined to be extensive metabolizers of dextromethorphan. One adverse effect was reported during the study (a headache, classified as mild, that resolved without intervention).

Thereafter, a quinidine dose determination study was conducted. The study was an open-label, randomized, multiple dose study. Subjects identified as extensive metabolizers received an evening dose on Day 1, at 12-hour intervals for the next six days, with a final morning dose on Day 8. All subjects were instructed to dose themselves at home on eight occasions with medication dispensed to them. Subjects maintained a diary during the study to record adverse effects.

Subjects randomized to Treatment A received fourteen oral doses of dextromethorphan hydrobromide 30 mg capsule taken with 240 mL of tap water. Subjects randomized to Treatment B received fourteen oral doses of dextromethorphan hydrobromide 30 mg/quinidine 2.5 mg capsule taken with 240 mL of tap water. Subjects randomized to Treatment C received fourteen oral doses of dextromethorphan hydrobromide 30 mg/quinidine 10 mg capsule taken with 240 mL of tap water. Subjects randomized to Treatment D received fourteen oral doses of dextromethorphan Hydrobromide 30 mg/quinidine 25 mg capsule taken with 240 mL of tap water. Subjects randomized to Treatment E received fourteen oral doses of dextromethorphan hydrobromide 30 mg/quinidine 50 mg capsule taken with 240 mL of tap water. Subjects randomized to Treatment F received fourteen oral doses of dextromethorphan hydrobromide 30 mg/quinidine 75 mg capsule taken with 240 mL of tap water.

All subjects enrolled in the study except for one satisfied the inclusion/exclusion criteria as listed in the protocol. Medical histories, clinical laboratory evaluations, and performed physical examinations were reviewed prior to subjects being enrolled in the study. The subjects were instructed not to consume any grapefruit products while participating in the study. Over-the-counter medications were prohibited three days prior to dosing and during the study, and prescription medications (with the exception of oral contraceptives) were prohibited fourteen days prior to dosing and during the study.

A total of forty-six subjects, twenty-two males and twenty-four females, were enrolled in the study and forty-five subjects, twenty-two males and twenty-three females, completed the study. The subjects were screened within twenty-one days prior to study enrollment. The screening procedure included medical history, physical examination (height, weight, frame

US 7,659,282 B2

21

size, vital signs, and ECG), and clinical laboratory tests (hematology, serum chemistry, urinalysis, HIV antibody screen, serum pregnancy, and a screen for THECA).

Subjects were dosed in the clinic on the following schedule: Day 1 (P.M.), Day 2 (A.M.), Day 3 (P.M.), Day 4 (A.M.) and Day 7 (P.M.). The subjects reported to the clinic on Day 8 for the A.M. dosing and remained in house for 8 hours postdose. Subjects self medicated at home on Day 2 (P.M.), Day 3 (A.M.), Day 4 (P.M.), Day 5 (A.M. and P.M.), Day 6 (A.M. and P.M.), and Day 7 (A.M.). Subjects were dosed twice daily except they received only a PM dose on Day 1 and an AM dose on Day 8.

A clinical laboratory evaluation (hematology, chemistries, urinalysis), vital signs, ECG, and a brief physical examination were performed at the completion of the study. Subjects were instructed to inform the study physician and/or safety nurses of any adverse events that occurred during the study.

Blood samples (5 mL) were collected on Day 8 prior to dosing and at 2, 4, and 8 hours postdose for analysis of dextromethorphan, dextrorphan, and quinidine. A total of eight blood samples (40 mL) were drawn during the study (including the dextromethorphan screen) for drug analysis. Plasma samples were separated by centrifugation and then frozen at −20° C. and kept frozen until assayed. Urine was collected predose through twelve hours post doses 1, 5, and 13. Urine samples were pooled for the entire collection interval. At the end of the interval, the total volume was recorded and two aliquots were frozen at −20° C. until assayed for dextromethorphan and dextrorphan.

A total of forty-six subjects were dosed and forty-five subjects completed the study. One subject was discontinued/ withdrawn from the study as not tolerating adverse events experienced. The mean age of the subjects was 51 years (range of 20 through 86), the mean height of the subjects was 67.6 inches (range of 61.5 through 74.5), and the mean weight of the subjects was 162.9 pounds (range 101.0 through 229.0).

A total of eight subjects were enrolled in Treatment Groups B, D, and E. Seven subjects were enrolled in Treatment Groups A and C.

A total of 150 adverse events were experienced by thirty-four subjects (74%). Other than one serious adverse effect, all adverse events were classified as mild (96%) or moderate (4%). The most frequently reported adverse events included headache, loose stool, lightheadedness, dizziness, and nausea. The relationship to study drug was classified as possibly, probably, or almost certainly for 120 of the 150 adverse events (80%). There were no clear differences between dose groups in the type or frequency of adverse events observed. No clinically significant trends regarding vital signs, physical examinations or clinical laboratory tests were observed.

Clinical Study #2

The objectives of this study were to determine pharmacokinetic parameters of dextromethorphan upon single-dose and multiple-doses of a capsule formulation containing 30 mg dextromethorphan hydrobromide and 25 mg quinidine sulfate capsules, to determine the differences in these pharmacokinetic parameters for extensive metabolizers and poor metabolizers, and to chronicle the occurrence of side effects during administration of the formulation. This study had an open-label, single, and multiple dose design.

Ten subjects were enrolled in the study. A total of nine subjects completed the study. Ten subjects were included in safety analyses, and nine were included in pharmacokinetic analyses. All subjects enrolled in this study were judged by the investigator to be normal, healthy volunteers.

22

The test formulation was 30 mg dextromethorphan hydrobromide and 25 mg quinidine sulfate capsules. All subjects received one 30 mg dextromethorphan hydrobromide and 25 mg quinidine sulfate capsule taken orally with 240 mL of water every 12 hours for a total of 15 doses.

The noncompartmental pharmacokinetic parameters Cmax, Tmax, and AUC (0-12) were calculated from the plasma concentration-time data for dextromethorphan, dextrorphan, and quinidine on Days 1, 4, and 8. In addition, the parameters Kel and T ½el were calculated for dextrorphan (Day 8), and quinidine (Days 1, 4, and 8).

The amount of dextromethorphan and dextrorphan excreted in the urine was calculated from the 12-hour urine collections on Day 1 (postdose 1), Day 8 (postdose 15), and Days 9-14. The molar metabolic ratio (dextromethorphan: dextrorphan) was calculated for each urine-collection day.

Subjects were evaluated by physical examination, vital signs, electrocardiogram (ECG), clinical laboratory (hematology, serum chemistry, and urinalysis), and adverse event assessment.

Descriptive statistics for each parameter, including mean, median, standard deviation, coefficient of variation, N, minimum, and maximum were calculated for all of the subjects by Day. In addition, descriptive statistics were presented by the subgroups: extensive metabolizer (EM) and poor metabolizer (PM).

A normal theory, general linear model (GLM) was applied to the log-transformed parameters Cmax and AUC (0-12), and untransformed Tmax (dextromethorphan and dextrorphan), and to untransformed parameters Cmax, AUC (0-12), and Tmax (quinidine). The ANOVA model included the factors group (EM or PM), subject within group, day, and the interaction term day by group. The group effect was tested using the subject within group mean square, and all other main effects were tested using the residual error (error mean square). In addition, tests of the hypotheses Day 1=Day 4, Day 1=Day 8, and Day 4=Day 8 were performed.

Safety and tolerability were assessed via data listings and calculation of summary statistics as follows: hematology, serum chemistry, and urinalysis test results from predose and postdose were listed in by-subject data listings. Descriptive statistics were reported by time point of collection, and changes from predose to postdose were summarized and statistically tested using the paired t-test ($H_o$: change=0). Shift tables describing out-of-range shifts from predose to postdose were created. Out-of-normal range and clinically significant laboratory values were listed by subject.

Descriptive statistics (mean, standard deviation, minimum, maximum, and sample size) were reported by time point (screen and Day 8 postdose) for vital sign measurements: systolic and diastolic blood pressure, pulse rate, respiration and temperature. Summary statistics were presented by metabolizer type. Differences between screening and postdose measurements were presented and statistically tested using a paired t-test ($H_o$: difference=0). Individual vital signs results were listed in by-subject data listings. Changes in physical examination results that occurred from predose to postdose were also identified.

Twelve-lead ECGs were recorded prior to dosing. Descriptive statistics (mean, standard deviation, minimum, maximum, and sample size) were reported by time point (predose and Day 8 postdose) for ECG measurements: QRS, PR, QTc, and heart rate. Summary statistics were presented by metabolizer type. Differences between predose and Day 8 postdose measurements were presented and statistically testing using a paired t-test ($H_o$: difference=0). ECG results were listed in by-subject data listings.

Appx61

US 7,659,282 B2

23

Adverse events were classified using the 5th Edition of the COSTART dictionary. Summary tables include number of subjects reporting the adverse event and as percent of number of subjects dosed by metabolizer type. Summary tables were also presented by adverse event frequency, severity, and relationship to study medication. Adverse events were listed by subject, including verbatim term, severity, frequency, and relationship to treatment in data listings.

Mean pharmacokinetic parameters for dextromethorphan, dextrorphan, and quinidine are summarized in Table 1 in extensive metabolizers of dextromethorphan (EMs), poor metabolizers of dextromethorphan (PMs), and all subjects.

24

nausea, vomiting, anxiety, depersonalization, insomnia, and somnolence. The majority of the adverse events were mild in severity and all were resolved without treatment. Prolonged QT intervals and decreased ventricular rates were observed for the extensive metabolizer group following dosing. No clinically significant trends regarding vital signs, physical examinations, or routine clinical laboratory tests were observed.

Over the course of this study, low dose quinidine inhibited the metabolism of dextromethorphan, resulting in increased systemic availability. This effect was most pronounced in extensive metabolizers. The mean urinary metabolic ratio

TABLE 1

| Compound | Parameter | Day | Metabolizer Type | | | | | | | | |
| | | | EM | | | PM | | | All Subjects | | |
| | | | Mean | N | S.D. | Mean | N | S.D. | Mean | N | S.D. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Dextromethorphan | Cmax | 1 | 15.89 | 7 | 8.22 | 22.30 | 2 | 0.14 | 17.31 | 9 | 7.66 |
| | (ng/mL) | 4 | 76.69 | 7 | 15.28 | 105.70 | 2 | 9.48 | 83.13 | 9 | 18.71 |
| | | 8 | 95.50 | 7 | 19.92 | 136.20 | 2 | 3.25 | 104.54 | 9 | 24.92 |
| | Tmax (hr) | 1 | 6.85 | 7 | 2.78 | 8.00 | 2 | 0.00 | 7.11 | 9 | 2.46 |
| | | 4 | 5.42 | 7 | 1.90 | 6.00 | 2 | 2.82 | 5.55 | 9 | 1.94 |
| | | 8 | 5.99 | 7 | 2.58 | 4.99 | 2 | 1.41 | 5.77 | 9 | 2.33 |
| | AUC (0-12) | 1 | 133.27 | 7 | 59.86 | 198.33 | 2 | 6.97 | 147.73 | 9 | 59.30 |
| | (ng * hr./ml) | 4 | 811.68 | 7 | 151.7 | 1146.4 | 2 | 84.43 | 886.07 | 9 | 199.8 |
| | | 8 | 1049.0 | 7 | 243.3 | 1533.5 | 2 | 80.97 | 1156.7 | 9 | 301.4 |
| | T ½el (hr) | 1 | 13.13 | 6 | 3.41 | 41.96 | 2 | 4.47 | 20.33 | 8 | 13.76 |
| Dextrorphan | Cmax | 1 | 124.86 | 7 | 53.26 | 10.80 | 2 | 3.39 | 99.51 | 9 | 68.25 |
| | (ng/ml) | 4 | 79.33 | 7 | 18.63 | 37.05 | 2 | 0.21 | 69.93 | 9 | 24.65 |
| | | 8 | 123.51 | 7 | 17.07 | 51.45 | 2 | 4.17 | 107.50 | 9 | 35.08 |
| | Tmax (hr) | 1 | 4.00 | 7 | 0.00 | 3.00 | 2 | 1.42 | 3.78 | 9 | 0.67 |
| | | 4 | 2.21 | 7 | 1.40 | 2.00 | 2 | 0.00 | 2.17 | 9 | 1.22 |
| | | 8 | 41.18 | 7 | 11.57 | 2.99 | 2 | 1.41 | 32.70 | 9 | 19.61 |
| | AUC (0-12) | 1 | 933.83 | 7 | 324.8 | 90.95 | 2 | 19.08 | 748.52 | 9 | 466.2 |
| | (ng * hr/mL.) | 4 | 849.22 | 7 | 181.9 | 365.27 | 2 | 30.37 | 741.68 | 9 | 265.4 |
| | | 8 | 1000.5 | 7 | 147.2 | 530.40 | 2 | 82.39 | 896.04 | 9 | 245.1 |
| Quinidine | Cmax | 1 | 0.09 | 7 | 0.02 | 0.08 | 2 | 0.01 | 0.09 | 9 | 0.02 |
| | (μg/ml) | 4 | 0.15 | 7 | 0.03 | 0.14 | 2 | 0.01 | 0.15 | 9 | 0.03 |
| | | 8 | 0.16 | 7 | 0.04 | 0.16 | 2 | 0.02 | 0.16 | 9 | 0.03 |
| | Tmax (hr) | 1 | 1.71 | 7 | 0.27 | 1.50 | 2 | 0.00 | 1.67 | 9 | 0.25 |
| | | 4 | 1.65 | 7 | 0.37 | 1.52 | 2 | 0.00 | 1.62 | 9 | 0.33 |
| | | 8 | 1.99 | 7 | 0.01 | 1.49 | 2 | 0.00 | 1.88 | 9 | 0.22 |
| | AUC (0-12) | 1 | 0.48 | 7 | 0.18 | 0.51 | 2 | 0.13 | 0.49 | 9 | 0.17 |
| | (μg * hr/ml) | 4 | 1.20 | 7 | 0.21 | 0.97 | 2 | 0.05 | 1.15 | 9 | 0.21 |
| | | 8 | 1.31 | 7 | 0.19 | 1.07 | 2 | 0.02 | 1.26 | 9 | 0.19 |
| | T ½el (hr) | 1 | 8.11 | 7 | 2.95 | 8.25 | 2 | 2.65 | 8.14 | 9 | 2.72 |
| | | 4 | 6.86 | 7 | 1.11 | 6.51 | 2 | 0.70 | 6.78 | 9 | 1.01 |
| | | 8 | 7.66 | 7 | 1.09 | 6.66 | 2 | 0.41 | 7.44 | 9 | 1.05 |

Mean urinary metabolic ratios (dextromethorphan:dextrorphan) are summarized in Table 2 for extensive metabolizers of dextromethorphan (EMs), poor metabolizers of dextromethorphan (PMs), and all subjects.

TABLE 2

| | Metabolizer Type | | | | | | | | |
| | EM | | | PM | | | All Subjects | | |
| DAY | Mean | N | S.D. | Mean | N | S.D. | Mean | N | S.D. |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 0.268 | 7 | 0.227 | 1.790 | 2 | 0.493 | 0.608 | 9 | 0.721 |
| 8 | 0.804 | 7 | 0.366 | 1.859 | 2 | 0.507 | 1.039 | 9 | 0.591 |
| 9 | 0.445 | 6 | 0.170 | 1.398 | 2 | 0.597 | 0.683 | 8 | 0.516 |
| 10 | 0.198 | 7 | 0.152 | 2.538 | 2 | 1.593 | 0.718 | 9 | 1.183 |
| 11 | 0.145 | 7 | 0.125 | 2.200 | 2 | 1.136 | 0.601 | 9 | 0.997 |
| 12 | 0.091 | 7 | 0.086 | 3.333 | 2 | 0.090 | 0.812 | 9 | 1.432 |
| 13 | 0.037 | 7 | 0.064 | 2.250 | 2 | 0.554 | 0.529 | 9 | 0.997 |
| 14 | 0.027 | 5 | 0.061 | 2.061 | 2 | 0.115 | 0.608 | 7 | 0.995 |

No serious adverse events occurred during this study. Drug related adverse events included asthenia, diarrhea, anorexia,

(dextromethorphan:dextrorphan) increased at least 29-fold in extensive metabolizers by Day 8. The plasma dextrorphan AUC (0-12) increased approximately 8-fold between Day 1 and Day 8, whereas the mean plasma dextrorphan AUC (0-12) remained the same between Day 1 and Day 8.

The effect of quinidine on dextromethorphan metabolism in poor metabolizers was unclear. The urinary metabolic ratios did not appear to change with quinidine treatment. The excretion of both dextromethorphan and dextrorphan increased. However, dextrorphan excretion increased proportionally to dextromethorphan. This suggests that quinidine did not inhibit dextromethorphan metabolism to dextrorphan in poor metabolizers. However, there was 6.1-fold increase in dextromethorphan AUC (0-12) from Day 1 to Day 8, compared to a 4.8-fold increase in dextrorphan AUC (0-12), which is consistent with a small decrease in metabolic clearance.

US 7,659,282 B2

25

Quinidine pharmacokinetics were similar between extensive metabolizers and poor metabolizers. Mean quinidine elimination half-life values (6.78 to 8.14 hours) were similar to previously reported values.

Dextromethorphan hydrobromide and quinidine sulfate capsules administered as a single-dose or multiple-doses product appeared to be well tolerated in this healthy population.

Clinical Study #3

The objectives of this study were to determine the lowest dose of quinidine sulfate that effectively inhibits the conversion of 45 mg of dextromethorphan to dextrorphan and the lowest dose of quinidine that effectively inhibits the conversion of 60 mg of dextromethorphan to dextrorphan, and to chronicle the occurrence of side effects during administration of dextromethorphan in combination with quinidine.

This dose interaction study was a Phase 1, open-label, parallel group, multiple-dose, single-center, safety, and pharmacokinetic study. A total of sixty-four subjects were planned, and sixty-five subjects were enrolled in the study. A total of forty-seven subjects completed the study and were included in the pharmacokinetic analyses. All subjects were included in safety analyses. Males and females between 18 and 60 years of age, identified as extensive metabolizers of dextromethorphan, were enrolled. All subjects were judged to be healthy volunteers. Enrolled subjects met inclusion and exclusion criteria.

The test formulation was dextromethorphan hydrobromide and quinidine sulfate capsules, administered orally with water. Subjects receiving Treatment A received an oral dose of one dextromethorphan hydrobromide of 60 mg/0 mg quinidine sulfate capsule taken twice daily with 240 mL of water on Days 1 through 8. Subjects receiving Treatment B received an oral dose of one dextromethorphan hydrobromide of 60 mg/30 mg quinidine sulfate capsule taken twice daily with 240 mL of water on Days 1 through 8. Subjects receiving Treatment C received an oral dose of one dextromethorphan hydrobromide of 60 mg/45 mg quinidine sulfate capsule taken twice daily with 240 mL of water on Days 1 through 8. Subjects receiving Treatment D received an oral dose of one dextromethorphan hydrobromide of 60 mg/60 mg quinidine sulfate capsule taken twice daily with 240 mL. of water on Days 1 through 8. Subjects receiving Treatment E received an oral dose of one dextromethorphan hydrobromide of 45 mg/0 mg quinidine sulfate capsule taken twice daily with 240 mL of water on Days 1 through 8. Subjects receiving Treatment F received an oral dose of one dextromethorphan hydrobromide of 45 mg/30 mg quinidine sulfate capsule taken twice daily with 240 mL of water on Days 1 through 8. Subjects receiving Treatment G received an oral dose of one dextromethorphan hydrobromide of 45 mg/45 mg quinidine sulfate capsule taken twice daily with 240 mL of water on Days 1 through 8. Subjects receiving Treatment H received an oral dose of one dextromethorphan hydrobromide of 45 mg/60 mg quinidine sulfate capsule taken twice daily with 240 mL of water on Days 1 through 8. For Treatments B, C, D, F, G, and H, subjects received a single dose of dextromethorphan hydrobromide (either 60 mg for Treatments B, C, and D or 45 mg for Treatments F, G, and H) without quinidine for the first dose and then 14 does of the designated capsule, i.e., all subjects received one dose of either Treatment A or E as a baseline.

The first dose of Treatments A and E was considered as reference. Dextromethorphan hydrobromide 30 mg capsules

26

were used for phenotyping. Subjects received a single oral dose of one dextromethorphan hydrobromide 30 mg capsule taken with 240 mL of water.

The plasma pharmacokinetic parameters, Cmax, Tmax, AUC (0-5), and AUC (0-12) were calculated using noncompartmental analysis. Pharmacokinetic parameters were summarized and descriptive statistics for all groups were calculated. Changes in these parameters from baseline were calculated and summarized. Urine metabolic ratios (dextromethorphan/dextrorphan) were calculated. Descriptive statistics for all groups were calculated, and changes in metabolic ratio from baseline were calculated and summarized.

Adverse events assessments, monitoring of hematology, blood chemistry, and urine values, measurements of vital signs and electrocardiogram (ECG) as well as the performance of physical examinations were evaluated for safety.

The effect of quinidine on the pharmacokinetics of dextromethorphan was assessed by measuring serial plasma dextromethorphan and dextrorphan concentrations on Days 1 and 8, quinidine concentrations on Day 8, and the amount of dextromethorphan and dextrorphan excreted in the urine for 12-hour urine collections on Day, 1, Day 3, and Day 7, following a multiple dose administration of dextromethorphan and quinidine. The noncompartmental pharmacokinetic parameters Cmax, Tmax, AUC (0-5), and AUC (0-12) were calculated from the plasma concentration-time data for dextromethorphan and dextrorphan on Days 1 and 8, quinidine on Day 8. The amount of dextromethorphan and dextrorphan excreted in the urine was calculated from the 12-hour urine collections on Day 1, Day 3, and Day 7. The molar metabolic ratio (dextromethorphan: dextrorphan) was calculated for each urine-collection day. To assess the effect of quinidine on dextromethorphan, analysis of variance was performed using SAS PROC Mixed on the parameter AUC of dextromethorphan from the 4 dextromethorphan and quinidine treatments, respectively, for 60 mg and 45 mg dextromethorphan doses. Least square means of doses, the differences (pairwise comparisons) between doses, plus the P-values for the significance of the differences were presented. To assess the effect of dextromethorphan on quinidine, analysis of variance was performed using SAS PROC Mixed on the parameter AUC of quinidine. Least square means of doses, the differences (pairwise comparisons) between doses, plus the P-values for the significance of the differences were presented.

Safety and tolerability were assessed through calculation of summary statistics and were displayed in data listings of individual subjects. Adverse events were coded using the MedDRA Adverse Event Dictionary (Version 3.0, 2000). The frequency, type, severity, and relationship to study drug of treatment-emergent adverse events were displayed and compared across treatments.

For laboratory tests, the study screening and poststudy measurements, along with the change between these time points, were summarized by descriptive statistics (median, mean, standard deviation, minimum, maximum, and sample size) for serum chemistry and hematology tests. Shift tables from screening to poststudy for serum chemistry, hematology, and urinalysis laboratory tests were constructed. Out-of-range clinical laboratory results and their associated recheck values were listed.

Appx63

US 7,659,282 B2

| 27 | 28 |

Descriptive statistics (median, mean, standard deviation, minimum, maximum, and sample size) were calculated for vital signs and 12-lead electrocardiogram (ECG) measurements for baseline and postdose, along with the change between these time points. The ECG shift table from baseline to postdose was also presented.

The arithmetic means of pharmacokinetic parameters of plasma dextromethorphan, dextrorphan, and quinidine following Treatments A, B, C, D, E, F, G, and H, and results of statistical comparisons between treatment groups are presented in the following tables. Table 3 provides a summary of the plasma DM pharmacokinetic parameters following a 60 mg dose of dextromethorphan.

TABLE 3

| Pharmacokinetic Parameters | Day* | Treatment A Mean | Treatment A S.D. | Treatment B Mean | Treatment B S.D. | Treatment C Mean | Treatment C S.D. | Treatment D Mean | Treatment D S.D. |
|---|---|---|---|---|---|---|---|---|---|
| Cmax (ng/mL) | 1 | 3.7 | 3.70 | 2.1 | 2.82 | 3.5 | 3.19 | 4.8 | 4.74 |
|  | 8 | 7.7 | 7.01 | 191.8 | 45.48 | 204.8 | 22.93 | 231.9 | 96.36 |
|  | C | 4.0 | 4.75 | 189.7 | 43.90 | 201.3 | 22.19 | 227.1 | 97.52 |
| Tmax (hr) | 1 | 2.6 | 0.96 | 2.5 | 0.57 | 2.4 | 0.56 | 3.5 | 1.05 |
|  | 8 | 2.1 | 0.38 | 3.5 | 1.73 | 3.7 | 1.17 | 5.2 | 1.94 |
|  | C | -0.5 | 1.12 | 1.0 | 1.42 | 1.3 | 1.51 | 1.7 | 1.97 |
| AUC(0-t) (ng * hr/mL) | 1 | 23.0 | 23.64 | 12.1 | 16.04 | 20.7 | 17.39 | 32.0 | 34.66 |
|  | 8 | 52.3 | 46.72 | 1963.0 | 608.50 | 2121.0 | 278.50 | 2252.0 | 689.30 |
|  | C | 29.3 | 34.57 | 1951.0 | 600.30 | 2100.0 | 275.90 | 2220.0 | 697.70 |
| AUC (0-12) (ng * hr/mL) | 1 | 23.2 | 23.50 | 12.3 | 15.93 | 20.7 | 17.39 | 32.2 | 34.45 |
|  | 8 | 52.3 | 46.72 | 1963.0 | 608.50 | 2121.0 | 278.50 | 2252.0 | 689.30 |
|  | C | 29.2 | 34.79 | 1951.0 | 600.10 | 2100.0 | 275.90 | 2220.0 | 697.80 |
| 1n (Cmax) | 1 | 0.9 | 1.07 | 0.1 | 1.21 | 0.9 | 1.05 | 1.2 | 0.88 |
|  | 8 | 1.6 | 1.03 | 5.2 | 0.24 | 5.3 | 0.11 | 5.4 | 0.40 |
|  | C | 2.3 | 1.03 | 219.5 | 132.00 | 108.8 | 92.40 | 85.0 | 54.87 |
| In (AUC(0-12) | 1 | 2.7 | 1.07 | 2.0 | 1.08 | 2.8 | 0.95 | 3.1 | 0.98 |
|  | 8 | 3.6 | 1.02 | 7.5 | 0.33 | 7.7 | 0.13 | 7.7 | 0.32 |
|  | C | 2.6 | 1.22 | 324.9 | 185.30 | 170.9 | 130.30 | 141.0 | 114.80 |

*= Code C corresponds to the change from the baseline, calculated as follows: for the untransformed parameters, it is the difference between Day 8 and Baseline values, for the ln-transformed parameters, it is the ratio of Day 8 over Baseline values.

Appx64

US 7,659,282 B2

| 29 | 30 |

Table 4 provides a summary of statistical comparisons of plasma dextromethorphan AUC (0-12) relating to the effect of quinidine doses on a 60 mg dose of dextromethorphan.

### TABLE 4

| Treatment Comparison | Geometric Means | | Ratio of GEOMEANS | P |
|---|---|---|---|---|
| A vs. D | 35.11 | 2159.23 | 0.02 | 0.0001 |
| B vs. D | 1888.72 | 2159.23 | 0.87 | 0.7601 |
| C vs. D | 2108.96 | 2159.23 | 0.98 | 0.9608 |

Table 5 provides a summary of statistical comparisons of plasma dextromethorphan AUC (0-t) relating to the effect of quinidine doses on a 60 mg dose of dextromethorphan.

### TABLE 5

| Treatment Comparison | Geometric Means | | Ratio of GEOMEANS | P |
|---|---|---|---|---|
| A vs. D | 35.11 | 2159.23 | 0.02 | 0.0001 |
| B vs. D | 1888.72 | 2159.23 | 0.87 | 0.7601 |
| C vs. D | 2108.96 | 2159.23 | 0.98 | 0.9608 |

Table 6 provides a summary of plasma dextromethorphan pharmacokinetic parameters following a 45 mg dose of dextromethorphan.

### TABLE 6

| Pharmacokinetic Parameters | Day* | Treatment E Mean | S.D. | Treatment F Mean | S.D. | Treatment G Mean | S.D. | Treatment H Mean | S.D. |
|---|---|---|---|---|---|---|---|---|---|
| Cmax (ng/mL) | 1 | 2.3 | 1.60 | 9.6 | 13.91 | 3.6 | 5.04 | 1.7 | 1.08 |
| | 8 | 4.2 | 3.01 | 141.5 | 74.68 | 138.9 | 25.97 | 136.1 | 50.59 |
| | C | 1.9 | 2.03 | 131.9 | 62.92 | 135.3 | 23.87 | 134.4 | 50.80 |
| Tmax (hr) | 1 | 3.5 | 0.93 | 2.9 | 0.37 | 3.4 | 1.40 | 3.0 | 1.0 |
| | 8 | 3.4 | 0.50 | 4.3 | 1.70 | 3.3 | 1.80 | 3.6 | 2.07 |
| | C | −0.1 | 1.16 | 1.4 | 1.51 | −0.1 | 1.21 | 0.6 | 2.20 |
| AUC(0-t) (ng * hr/mL) | 1 | 14.9 | 11.39 | 77.5 | 120.80 | 25.4 | 36.89 | 10.2 | 7.08 |
| | 8 | 31.3 | 23.85 | 1438.0 | 842.60 | 1403.0 | 283.10 | 1464.0 | 588.60 |
| | C | 16.3 | 17.0 | 1360.0 | 736.20 | 1378.0 | 259.50 | 1453.0 | 589.30 |
| AUC (0-12) (ng * hr/mL) | 1 | 15.0 | 11.36 | 77.5 | 120.80 | 25.5 | 36.79 | 10.3 | 6.98 |
| | 8 | 31.5 | 23.64 | 1488.0 | 842.60 | 1403.0 | 283.10 | 1464.0 | 588.50 |
| | C | 16.5 | 16.82 | 1360.0 | 736.20 | 1378.0 | 259.60 | 1453.0 | 589.50 |
| 1n (Cmax) | 1 | 0.5 | 0.95 | 1.2 | 1.56 | 0.5 | 1.33 | 0.4 | 0.55 |
| | 8 | 1.1 | 1.09 | 4.8 | 0.52 | 4.9 | 0.19 | 4.8 | 0.45 |
| | C | 1.9 | 0.93 | 62.6 | 54.58 | 138.3 | 107.10 | 100.3 | 59.37 |
| ln (AUC(0-t) | 1 | 2.2 | 1.45 | 3.2 | 1.64 | 2.3 | 1.45 | 2.1 | 0.65 |
| | 8 | 3.0 | 1.23 | 7.1 | 0.54 | 7.2 | 0.19 | 7.2 | 0.50 |
| | C | 2.6 | 1.60 | 89.6 | 78.74 | 241.2 | 206.30 | 188.5 | 112.20 |
| ln (AUC(0-12) | 1 | 2.3 | 1.34 | 3.2 | 1.64 | 2.4 | 1.39 | 2.2 | 0.62 |
| | 8 | 3.0 | 1.17 | 7.1 | 0.54 | 7.2 | 0.19 | 7.2 | 0.50 |
| | C | 2.5 | 1.38 | 89.6 | 78.74 | 218.9 | 177.50 | 185.4 | 113.80 |

*= Code C corresponds to the change from the baseline, calculated as follows: for the untransformed parameters, it is the difference between Day 8 and Baseline values, for the ln-transformed parameters, it is the ratio of Day 8 over Baseline values.

US 7,659,282 B2

31

Table 7 provides a summary of statistical comparisons of plasma dextromethorphan AUC (0-12) relating to the effect of quinidine doses on a 60 mg dose of dextromethorphan.

TABLE 7

| Treatment Comparison | Geometric | Means | Ratio of GEOMEANS | P |
|---|---|---|---|---|
| E vs. H | 20.89 | 1342.73 | 0.02 | 0.0001 |
| F vs. H | 1266.94 | 1342.73 | 0.94 | 0.8945 |
| G vs. H | 1380.84 | 1342.73 | 1.03 | 0.9490 |

Table 8 provides a summary of statistical comparisons of plasma dextromethorphan AUC (0-t) relating to the effect of quinidine doses on a 60 mg dose of dextromethorphan.

32

TABLE 8

| Treatment Comparison | Geometric | Means | Ratio of GEOMEANS | P |
|---|---|---|---|---|
| E vs. H | 20.18 | 1342.73 | 0.02 | 0.0001 |
| F vs. H | 1266.94 | 1342.73 | 0.94 | 0.8980 |
| G vs. H | 1380.84 | 1342.73 | 1.03 | 0.9490 |

Table 9 provides a summary of plasma dextromethorphan pharmacokinetic parameters following a 60 mg dose of dextromethorphan.

TABLE 9

| Pharmacokinetic Parameters | Day* | Treatment A Mean | S.D. | Treatment B Mean | S.D. | Treatment C Mean | S.D. | Treatment D Mean | S.D. |
|---|---|---|---|---|---|---|---|---|---|
| Cmax (ng/mL) | 1 | 663.6 | 111.69 | 858.1 | 75.95 | 885.4 | 33.23 | 655.5 | 145.57 |
| | 8 | 709.6 | 88.82 | 176.7 | 41.40 | 90.1 | 24.55 | 110.8 | 27.68 |
| | C | 46.0 | 142.71 | −681.4 | 75.24 | −795.3 | 57.72 | −544.8 | 126.32 |
| Tmax (hr) | 1 | 2.2 | 0.37 | 2.0 | 0.01 | 2.0 | 0.03 | 2.0 | 0.01 |
| | 8 | 2.1 | 0.38 | 1.6 | 1.60 | 5.3 | 5.77 | 4.3 | 4.13 |
| | C | −0.0 | 0.58 | −0.4 | 1.59 | 3.3 | 5.78 | 2.3 | 4.13 |
| AUC(0-t) | 1 | 3240.0 | 494.10 | 3953.0 | 516.80 | 3669.0 | 468.10 | 3237.0 | 515.10 |
| (ng * hr/mL) | 8 | 3608.0 | 386.80 | 1830.0 | 443.10 | 958.0 | 248.80 | 1157.0 | 281.30 |
| | C | 367.9 | 581.60 | −2123.0 | 322.70 | −2711.0 | 467.40 | −2080.0 | 369.40 |
| AUC (0-12) | 1 | 3240.0 | 494.10 | 3953.0 | 516.80 | 3669.0 | 468.10 | 3237.0 | 515.10 |
| (ng * hr/mL) | 8 | 3608.0 | 386.80 | 1830.0 | 443.10 | 958.0 | 248.80 | 1157.0 | 281.30 |
| | C | 367.9 | 581.60 | −2123.0 | 322.70 | −2711.0 | 467.40 | −2080.0 | 369.40 |
| 1n (Cmax) | 1 | 6.5 | 0.16 | 6.8 | 0.09 | 6.8 | 0.04 | 6.5 | 0.23 |
| | 8 | 6.6 | 0.12 | 5.2 | 0.24 | 4.5 | 0.27 | 4.7 | 0.27 |
| | C | 1.1 | 0.22 | 0.2 | 0.05 | 0.1 | 0.03 | 0.2 | 0.04 |
| ln (AUC(0-t) | 1 | 8.1 | 0.15 | 8.3 | 0.13 | 8.2 | 0.13 | 8.1 | 0.16 |
| | 8 | 8.2 | 0.11 | 7.5 | 0.26 | 6.8 | 0.25 | 7.0 | 0.27 |
| | C | 1.1 | 0.19 | 0.5 | 0.08 | 0.3 | 0.07 | 0.4 | 0.06 |
| ln (AUC(0-12) | 1 | 8.1 | 0.15 | 8.3 | 0.13 | 8.2 | 0.13 | 8.1 | 0.16 |
| | 8 | 8.2 | 0.11 | 7.5 | 0.26 | 6.8 | 0.25 | 7.0 | 0.27 |
| | C | 1.1 | 0.19 | 0.5 | 0.08 | 0.3 | 0.07 | 0.4 | 0.06 |

*= Code C corresponds to the Change from the baseline, calculated as follows: for the untransformed parameters, it is the difference between Day 8 and Baseline values, for the ln-transformed parameters, it is the ratio of Day 8 over Baseline values.

Appx66

US 7,659,282 B2

33

Table 10 provides a summary of statistical comparisons of plasma dextromethorphan AUC (0-12) as relates to the effect of quinidine doses on 60 mg of Dextromethorphan.

TABLE 10

| Treatment Comparison | Geometric | Means | Ratio of GEOMEANS | P |
|---|---|---|---|---|
| A vs. D | 3589.57 | 1125.35 | 3.19 | 0.0001 |
| B vs. D | 1786.16 | 1125.35 | 1.59 | 0.0046 |
| C vs. D | 937.28 | 1125.35 | 0.83 | 0.2521 |

Table 11 provides a summary of statistical comparisons of plasma dextromethorphan AUC (0-t) as relates to the effect of quinidine doses on 60 mg of Dextromethorphan.

34

TABLE 11

| Treatment Comparison | Geometric | Means | Ratio of GEOMEANS | P |
|---|---|---|---|---|
| A vs. D | 3589.57 | 1125.35 | 3.19 | 0.0001 |
| B vs. D | 1786.16 | 1125.35 | 1.59 | 0.0046 |
| C vs. D | 937.28 | 1125.35 | 0.83 | 0.2521 |

Table 12 provides a summary of plasma dextromethorphan pharmacokinetic parameters following a 45 mg dose of dextromethorphan.

TABLE 12

| Pharmacokinetic Parameters | Day* | Treatment E Mean | S.D. | Treatment F Mean | S.D. | Treatment G Mean | S.D. | Treatment H Mean | S.D. |
|---|---|---|---|---|---|---|---|---|---|
| Cmax (ng/mL) | 1 | 587.4 | 172.23 | 446.6 | 216.16 | 554.0 | 209.23 | 607.3 | 125.85 |
| | 8 | 599.2 | 199.89 | 89.1 | 25.97 | 86.8 | 23.11 | 77.7 | 15.81 |
| | C | 11.9 | 94.36 | −357.5 | 215.39 | −467.2 | 188.06 | −529.6 | 126.09 |
| Tmax (hr) | 1 | 2.0 | 0.00 | 2.0 | 0.01 | 2.2 | .038 | 2.0 | 0.01 |
| | 8 | 2.0 | 0.01 | 2.3 | 1.38 | 1.0 | 1.12 | 1.3 | 1.20 |
| | C | 0.0 | 0.01 | 0.3 | 1.38 | −1.2 | 1.25 | 0.7 | 1.20 |
| AUC(0-t) | 1 | 2618.0 | 603.10 | 2260.0 | 751.50 | 2462.0 | 737.10 | 2860.0 | 580.40 |
| (ng * hr/mL) | 8 | 2898.0 | 900.50 | 920.7 | 275.90 | 874.1 | 283.80 | 782.6 | 129.9 |
| | C | 280.7 | 430.70 | −1340.0 | 751.40 | −1588.0 | 537.30 | −2078.0 | 535.00 |
| AUC (0–12) | 1 | 2618.0 | 603.10 | 2260.0 | 751.50 | 2481.0 | 732.00 | 2860.0 | 580.40 |
| (ng * hr/mL) | 8 | 2898.0 | 900.50 | 920.7 | 275.90 | 874.1 | 238.80 | 782.6 | 129.90 |
| | C | 280.7 | 430.70 | −1340.0 | 751.40 | −1607.0 | 536.50 | −2078.0 | 535.00 |
| 1n (Cmax) | 1 | 6.3 | 0.30 | 6.0 | 0.62 | 6.3 | 0.37 | 6.4 | 0.20 |
| | 8 | 6.3 | 0.35 | 4.5 | 0.29 | 4.4 | 0.27 | 4.3 | 0.20 |
| | C | 1.0 | 0.19 | 0.3 | 0.24 | 0.2 | 0.03 | 0.1 | 0.04 |
| ln (AUC(0-t) | 1 | 7.8 | 0.22 | 7.7 | 0.39 | 7.8 | 0.27 | 7.9 | 0.21 |
| | 8 | 7.9 | 0.31 | 6.8 | 0.31 | 6.7 | 0.28 | 6.7 | 0.17 |
| | C | 1.1 | 0.17 | 0.5 | 0.24 | 0.4 | 0.05 | 0.3 | 0.06 |
| ln (AUC(0-12) | 1 | 7.8 | 0.22 | 7.7 | 0.39 | 7.8 | 0.27 | 7.9 | 0.21 |
| | 8 | 7.9 | 0.31 | 6.8 | 0.31 | 6.7 | 0.28 | 6.7 | 0.17 |
| | C | 1.1 | 0.17 | 0.5 | 0.24 | 0.4 | 0.05 | 0.3 | 0.06 |

*= Code C corresponds to the Change from the baseline, calculated as follows: for the untransformed parameters, it is the difference between Day 8 and Baseline values, for the ln-transformed parameters, it is the ratio of Day 8 over Baseline values.

US 7,659,282 B2

35

36

Table 13 provides a summary of statistical comparisons of plasma dextromethorphan AUC (0-12) as relates to the effect of quinidine doses on a 45 mg dose of dextromethorphan.

TABLE 13

| Treatment Comparison | Geometric | Means | Ratio of GEOMEANS | P |
|---|---|---|---|---|
| E vs. H | 2777.40 | 773.75 | 3.59 | 0.0001 |
| F vs. H | 884.33 | 773.75 | 1.14 | 0.4276 |
| G vs. H | 846.26 | 773.75 | 1.09 | 0.5933 |

Table 14 provides a summary of statistical comparisons of plasma dextromethorphan AUC (0-t) as relates to the effect of quinidine doses on a 45 mg dose of dextromethorphan.

TABLE 14

| Treatment Comparison | Geometric | Means | Ratio of GEOMEANS | P |
|---|---|---|---|---|
| E vs. H | 277.40 | 773.75 | 3.59 | 0.0001 |
| F vs. H | 884.33 | 773.75 | 1.14 | 0.4276 |
| G vs. H | 846.26 | 773.75 | 1.09 | 0.5933 |

Table 15 provides a summary of plasma dextromethorphan pharmacokinetic parameters following a 60 mg dose of dextromethorphan.

TABLE 15

| Pharmacokinetic Parameters | Day* | Treatment A | | Treatment B | | Treatment C | | Treatment D | |
|---|---|---|---|---|---|---|---|---|---|
| | | Mean | S.D. | Mean | S.D. | Mean | S.D. | Mean | S.D. |
| Cmax (mcg/mL) | 8 | 0.0 | 0.00 | 0.1 | 0.05 | 0.3 | 0.02 | 0.3 | 0.15 |
| Tmax (mcr) | 8 | — | — | 2.3 | 1.26 | 1.3 | 0.58 | 1.8 | 0.40 |
| AUC(0-Tt) (mcg-hr/mL) | 8 | 0.0 | 0.00 | 0.9 | 0.40 | 1.9 | 0.10 | 2.4 | 1.29 |
| AUC(0-12) (mcg * hr/mL) | 8 | 0.0 | 0.00 | 1.0 | 0.34 | 1.9 | 0.10 | 2.5 | 1.22 |
| 1n(Cmax) | 8 | — | — | -2.0 | 0.33 | -1.3 | 0.07 | -1.1 | 0.43 |
| 1n[AUC(0-t)] | 8 | — | — | -0.2 | 0.40 | 0.6 | 0.05 | 0.8 | 0.58 |
| 1n[AUC(0-12)] | 8 | — | — | -0.1 | 0.33 | 0.6 | 0.05 | 0.8 | 0.51 |

*= For Quinidine, only Day 8 data were analyzed

Table 16 provides a summary of plasma dextromethorphan pharmacokinetic parameters following a 45 mg dose of dextromethorphan.

TABLE 16

| Pharmacokinetic Parameters | Day* | Treatment E | | Treatment F | | Treatment G | | Treatment H | |
|---|---|---|---|---|---|---|---|---|---|
| | | Mean | S.D. | Mean | S.D. | Mean | S.D. | Mean | S.D. |
| Cmax (mcg/mL) | 8 | 0.0 | 0.00 | 0.2 | 0.11 | 0.3 | 0.13 | 0.3 | 0.06 |
| Tmax (mcr) | 8 | — | — | 1.6 | 0.79 | 1.2 | 0.57 | 1.8 | 1.3 |
| AUC(0-Tt) (mcg-hr/mL) | 8 | 0.0 | 0.00 | 1.0 | 0.77 | 2.0 | 0.91 | 2.3 | 0.71 |
| AUC(0-12) (mcg * hr/mL) | 8 | 0.0 | 0.00 | 1.1 | 0.74 | 2.0 | 0.88 | 2.3 | 0.64 |
| 1n(Cmax) | 8 | — | — | -1.8 | 0.58 | -1.3 | 0.44 | -1.1 | 0.19 |
| 1n[AUC(0-t)] | 8 | — | — | -0.2 | 0.66 | 0.6 | 0.48 | 0.8 | 0.33 |
| 1n[AUC(0-12)] | 8 | — | — | -0.1 | 0.61 | 0.6 | 0.44 | 0.8 | 0.28 |

*= For Quinidine, only Day 8 data were analyzed

US 7,659,282 B2

| 37 | 38 |

Table 17 provides a summary of statistical comparisons of plasma quinidine AUC (0-12) as relates to different dextromethorphan/quinidine dose combinations.

Table 18 provides a summary of statistical comparisons of plasma quinidine AUC (0-t) as relates to different dextromethorphan/quinidine dose combinations.

TABLE 18

| Treatment Comparison | Geometric | Means | Ratio of GEOMEANS | P |
|---|---|---|---|---|
| F vs. B | 0.84 | 0.84 | 1.00 | 0.9987 |
| G vs. C | 1.84 | 1.89 | 0.97 | 0.9421 |
| H vs. D | 2.18 | 2.12 | 1.03 | 0.9294 |

TABLE 17

| Treatment Comparison | Geometric | Means | Ratio of GEOMEANS | P |
|---|---|---|---|---|
| F vs. B | 0.94 | 0.94 | 1.00 | 0.9925 |
| G vs. C | 1.88 | 1.89 | 1.00 | 0.9930 |
| H vs. D | 2.24 | 2.23 | 1.01 | 0.9765 |

A summary of the metabolic ratios for urinary pharmacokinetic parameters following a 60 mg dose of dextromethorphan are provided in Table 19.

TABLE 19

| Period | Pharmacokinetic Parameters | Treatment A | | Treatment B | | Treatment C | | Treatment D | |
|---|---|---|---|---|---|---|---|---|---|
| | | Arithmetic Mean | S.D. | Arithmetic Mean | S.D. | Arithmetic Mean | S.D. | Arithmetic Mean | S.D. |
| 0-12 hr | Ae | 0.0013 | 0.0023 | 0.0010 | 0.0015 | 0.0027 | 0.0048 | 0.0041 | 0.0070 |
| | CumAe | 0.0013 | 0.0023 | 0.0010 | 0.0015 | 0.0027 | 0.0048 | 0.0041 | 0.0070 |
| 12-24 hr | Ae | 0.0058 | 0.0055 | 0.0865 | 0.0496 | 0.2748 | 0.2228 | 0.2934 | 0.2046 |
| | CumAe | 0.0031 | 0.0039 | 0.0253 | 0.0116 | 0.0641 | 0.0504 | 0.0632 | 0.0362 |
| 60-72 hr | Ae | 0.0133 | 0.0122 | 0.8139 | 0.3464 | 1.3598 | 0.7454 | 2.0366 | 0.9219 |
| | CumAe | 0.0058 | 0.0061 | 0.1248 | 0.0545 | 0.2374 | 0.1904 | 0.2966 | 0.1670 |
| 156-168 hr | Ae | 0.0179 | 0.0163 | 0.6513 | 0.4119 | 1.1785 | 0.1517 | 1.3023 | 0.7430 |
| | CumAe | 0.0085 | 0.0092 | 0.2005 | 0.1129 | 0.3493 | 0.1676 | 0.4374 | 0.1767 |

0-12 hr collecting period corresponds to Baseline, when only Dextromethorphan (no Quinidine) was administered at the specific dose.

Ae = Amount excreted (mcg)

CumAe = Cumulative Amount Excreted (mcg)

US 7,659,282 B2

**39**

A summary of statistical comparisons of urinary metabolic ratio for Ae (156-168 Hr) as relates to the effect of quinidine doses on a 60 mg dose of dextromethorphan are provided Table 20.

TABLE 20

| Treatment Comparison | Geometric | Means | Ratio of GEOMEANS | P |
|---|---|---|---|---|
| A vs. D | 0.01 | 1.12 | 0.01 | 0.0001 |
| B vs. D | 0.54 | 1.12 | 0.49 | 0.1947 |
| C vs. D | 1.17 | 1.12 | 1.05 | 0.9347 |

A summary of statistical comparisons of urinary metabolic ratio for CumAe (156-168 Hr) as relates to the effect of quinidine doses on a 60 mg dose of dextromethorphan are provided Table 21.

TABLE 21

| Treatment Comparison | Geometric | Means | Ratio of GEOMEANS | P |
|---|---|---|---|---|
| A vs. D | 0.01 | 0.41 | 0.02 | 0.0001 |
| B vs. D | 0.18 | 0.41 | 0.45 | 0.0822 |
| C vs. D | 0.32 | 0.41 | 0.80 | 0.6485 |

A summary of the metabolic ratios for urinary pharmacokinetic parameters following a 45 mg dose of dextromethorphan are provided in Table 22.

**40**

TABLE 24

| Treatment Comparison | Geometric | Means | Ratio of GEOMEANS | P |
|---|---|---|---|---|
| E vs. H | 0.01 | 0.32 | 0.02 | 0.0001 |
| F vs. H | 0.47 | 0.32 | 1.48 | 0.2201 |
| G vs. H | 0.43 | 0.32 | 1.36 | 0.3345 |

The data suggest that co-administration of dextromethorphan and quinidine sulfate is safe and moderately well tolerated up to the highest dose level (60 mg dextromethorphan/60 mg quinidine).

There were a total of 279 treatment-emergent adverse events experienced by forty-eight of the sixty-five subjects dosed (74%) during the trial. There were 206 adverse events reported by twenty-seven of the thirty-two subjects dosed (84%) following the 60 mg dextromethorphan treatments and seventy-three adverse events reported by twenty-one of the thirty-three subjects dosed (64%) following the 45 mg dextromethorphan treatments. Twelve subjects following the 60 mg dextromethorphan treatments and five subjects following the 45 mg dextromethorphan treatments were discontinued from the trial due to adverse events.

Dizziness, nausea, and headache were the most common adverse events following both dextromethorphan groups, and fewer adverse events were reported following the 45 mg dextromethorphan treatments. All of the adverse events were mild or moderate in severity and no serious adverse events

TABLE 22

| Period | Pharmacokinetic Parameters | Treatment A | | Treatment B | | Treatment C | | Treatment D | |
|---|---|---|---|---|---|---|---|---|---|
| | | Arithmetic Mean | S.D. | Arithmetic Mean | S.D. | Arithmetic Mean | S.D. | Arithmetic Mean | S.D. |
| 0-12 hr | Ae | 0.0022 | 0.0043 | 0.0454 | 0.0768 | 0.0130 | 0.0271 | 0.0017 | 0.0025 |
| | CumAe | 0.0022 | 0.0043 | 0.0454 | 0.0768 | 0.0130 | 0.0271 | 0.0017 | 0.0025 |
| 12-24 hr | Ae | 0.0044 | 0.0043 | 0.2338 | 0.1996 | 0.2647 | 0.1224 | 0.3252 | 0.1955 |
| | CumAe | 0.0032 | 0.0043 | 0.1078 | 0.1130 | 0.0798 | 0.0393 | 0.0774 | 0.0554 |
| 60-72 hr | Ae | 0.0089 | 0.0096 | 1.2159 | 0.4110 | 1.2594 | 0.5056 | 0.8073 | 0.4256 |
| | CumAe | 0.0052 | 0.0061 | 0.3673 | 0.1438 | 0.2837 | 0.1087 | 0.1889 | 0.0621 |
| 156-168 hr | Ae | 0.0087 | 0.0097 | 0.9387 | 0.2688 | 1.6276 | 0.7287 | 0.8770 | 0.4967 |
| | CumAe | 0.0059 | 0.0054 | 0.4826 | 0.1201 | 0.4912 | 0.2480 | 0.3468 | 0.1477 |

0-12 hr collecting period corresponds to Baseline, when only Dextromethorphan (no Quinidine) was administered at the specific dose.
Ae = Amount excreted (mcg)
CumAe = Cumulative Amount Excreted (mcg)

A summary of statistical comparisons of urinary metabolic ratio for Ae (156-168 Hr) as relates to the effect of quinidine doses on a 45 mg dose of dextromethorphan are provided Table 23.

TABLE 23

| Treatment Comparison | Geometric | Means | Ratio of GEOMEANS | P |
|---|---|---|---|---|
| E vs. H | 0.01 | 0.75 | 0.01 | 0.0001 |
| F vs. H | 0.90 | 0.75 | 1.20 | 0.5713 |
| G vs. H | 1.46 | 0.75 | 1.95 | 0.0469 |

A summary of statistical comparisons of urinary metabolic ratio for CumAe (156-168 Hr) as relates to the effect of quinidine doses on a 45 mg dose of dextromethorphan are provided Table 24.

occurred. No clinically significant differences were observed between the treatment groups regarding clinical laboratory results, vital signs, physical examination, or ECG results.

Over the course of this study, quinidine inhibited the metabolism of dextromethorphan dosed at 45 and 60 mg resulting in increased systemic availability of dextromethorphan. The 60 mg quinidine dose resulted in the largest dextromethorphan AUC at both the 45 and 60 mg dextromethorphan doses, compared to the 30 and 45 mg quinidine doses. The statistical comparisons, however, showed there were not only statistically significant differences in the quinidine inhibition of dextromethorphan metabolism among the different quinidine doses. Based on dextromethorphan AUC statistical comparisons, the lowest effective dose of quinidine that inhibits the metabolism of 45 and 60 mg dextromethorphan is 30 mg. Thus, a 30 mg quinidine dose is recommended for dextromethorphan inhibition.

Appx70

US 7,659,282 B2

**41**

The occurrence of side effects during the co-administration of dextromethorphan and quinidine sulfate indicated the treatments were moderately well tolerated up to the highest dose level (60 mg dextromethorphan/60 mg quinidine).

Clinical Study #4

The objectives of this study were to compare and evaluate the efficacy, safety, and tolerance of a combination of 30DM/30Q taken twice daily relative to 30 mg DM and 30 mg Q taken individually in a population of ALS subjects with pseudobulbar affect.

This was a multicenter, randomized, double-blind, controlled, parallel-group study. All study drugs were self-administered orally every twelve hours for twenty-eight days. The study included a screening visit and three other clinic visits on Days 1, 15, and 29. Day 29 was the last day the subject was on study and could occur anywhere between the morning of Day 26 and the morning of Day 32.

Subjects with clinically diagnosed pseudobulbar affect were screened for general health within four weeks before entry into the study. All eligible subjects had attained a score of 13 or above on the Center for Neurologic Study-Lability Scale (CNS-LS) at the clinic visit on Day 1.

Subjects were randomized to one of three treatment groups to receive 30DM/30Q, or 30 mg DM, or 30 mg Q. They received a diary in which they recorded the date and time each dose was taken, the number of laughing/crying episodes experienced, and any adverse events that had occurred since the last visit. Diary cards were collected on Day 15 and at the time of study completion.

Subjects completed the CNS-LS questionnaire and visual analog scales assessing quality of life (QOL) and quality of relationships (QOR) every two weeks (Days 1, 15, and 29) during the treatment period. A clinical psychologist, or other approved clinician, administered the Hamilton Rating Scale for Depression (HRSD) at the Screening Visit and on Day 29. Safety was evaluated on Day 15 and Day 29 by examining adverse events, results of physical examinations, vital signs, clinical laboratory values, and resting electrocardiograms (ECGs). In addition to blood samples to provide clinical laboratory data, blood was also taken for pharmacokinetic analysis and CYP2D6 genotyping. Each subject completed a diary in which the number of episodes experienced, medications taken, and any adverse events were recorded daily.

DM and Q were chosen as control groups because they are the components of the drug investigated in this study (30DM/30Q).

Subjects included in the study were 18 to 80 years of age, inclusive. The subjects had a confirmed diagnosis of ALS or probable ALS according to the World Federation of Neurology (WFN) criteria, and a clinical history of pseudobulbar affect. Every effort was made by the to continue a subject in the study; however, if the subject decided to withdraw, all efforts were made to complete all assessments listed on Day 29 in Table 25. An explanation of why the subject withdrew from the study was obtained. Subjects who withdrew from the study could not re-enter it, and no subject who had been randomized was replaced.

The study drugs were randomized in blocks of four. Each block contained two assignments to the 30DM/30Q, one to DM and one to Q in random order. Specifically, each block was constructed by selecting one of the four possibilities to be received first. From the three remaining treatments, one was selected to be received next, and so forth. Subject numbers were allocated to study sites in one block of four assignments at a time.

**42**

There were three treatments administered in the study: 30DM/30Q, or 30 mg DM, or 30 mg Q. Study medications were provided as hard, gelatin capsules. The contents of the capsules is listed in Table 25. All medication used in the study was prepared according to current Good Manufacturing Practice (cGMP).

TABLE 25

| Ingredient | Amount (mg) | | |
|---|---|---|---|
| | DM/Q | DM | Q |
| Dextromethorphan hydrobromide monohydrate USP | 31.50 | 31.50 | 0.00 |
| Quinidine sulfate dihydrate USP | 31.40 | 0.00 | 31.40 |
| Croscarmellose sodium NF | 7.80 | 7.80 | 7.80 |
| Microcrystalline cellulose NF | 94.00 | 109.70 | 109.75 |
| Colloidal silicone dioxide NF | 0.65 | 0.65 | 0.65 |
| Lactose monohydrate NF | 94.00 | 109.70 | 109.75 |
| Magnesium stearate NF | 0.65 | 0.65 | 0.65 |

Subjects took one capsule twice a day (every 12 hours) for twenty-eight days. The first dose was taken in the evening of Day 1, and the final dose was taken in the morning of Day 29. The investigators were supplied with capsules of 30DM/30Q, DM, and Q in identical blister-packs, and all capsules were identical in appearance and weight.

Subjects could not take any disallowed medications during the study or for one week before the start of dosing on Day 1. These medications included amantadine, amitriptyline, any anti-depressant medication including St. John's Wort, any monoamine oxidase inhibitor, aspirin (for pain or fever acetaminophen was recommended), captopril, cimetidine, desipramine, dextromethorphan (over-the-counter cough medicines), digoxin, diltiazem, erythromycin, fluoxetine, imipramine, itraconazole, ketoconazole, nortriptyline, paroxetine, quinidine, quinine, and verapamil. At each visit, subjects were queried as to whether or not they had taken any medications, and if they had, the medication was recorded on the Case Report Form.

Subjects were instructed to bring unused study medication to the visit on Day 15 visit and to return all unused study medication to the clinic at the end of study participation. Percent of doses taken was calculated as the total number of doses taken divided by the total number of doses planned, and the result was multiplied by 100. Subjects were considered to be compliant if they had taken 80% of their prescribed doses.

The primary efficacy variable was the CNS-LS score. All efficacy variables involving a change were determined by the baseline score being subtracted from the mean of the non-missing scores on Days 15 and 29. The secondary efficacy variables were laughing/crying episodes, QOL, scores, and QOR scores. All efficacy variables involving a change were determined by subtracting the baseline score from the mean of the scores on Days 15 and 29.

The CNS-LS questionnaire used to assess primary efficacy is a seven-item self-report measure that provides a score for total pseudobulbar affect; it required approximately five minutes for the subject to complete. The range of possible scores was 7 to 35. The cut-off score of 13 was selected because it has been reported in the literature to provide the highest incremental validity, accurately predicting the neurologists' diagnoses for 82% of participants with a sensitivity of 0.84 and a specificity of 0.81. This questionnaire is the only instrument for the measurement of pseudobulbar affect validated for use with ALS subjects.

Secondary efficacy was assessed by using two, 10-cm visual analog scales (VAS). One scale asked subjects to rate

US 7,659,282 B2

**43**

how much uncontrollable laughter, tearfulness, or anger had affected the overall quality of their life during the past week, and one scale asked subjects to rate how much uncontrollable laughter, tearfulness, or anger had affected the quality of their relationships with others during the past week. Each scale required less than one minute to complete. The subjects recorded episodes of pathological laughing and crying in a diary daily.

Safety was assessed by the following measurements: adverse events; clinical laboratory values; vital signs; physical examinations; and resting ECGs. An adverse event was defined an untoward medical occurrence or unintended change from the subject's baseline (pre-treatment) condition, including intercurrent illness, that occurs during the course of a clinical trial after treatment has started, whether considered related to treatment or not. An adverse event was any unfavorable and unintended sign (including an abnormal laboratory finding, for example), symptom, or disease temporally associated with the use of a medicinal product, whether or not considered related to the medicinal product. Changes associated with normal growth and development not varying in frequency or magnitude from that ordinarily anticipated clinically are not adverse events (for example, onset of menstruation occurring at a physiologically appropriate time). Clinical adverse events were described by diagnosis and not by symptoms when possible (for example, cold or seasonal allergies, instead of "runny nose").

The severity of adverse events was graded on a 3-point scale and reported in detail as indicated on the Case Report Form: mild—easily tolerated, causing minimal discomfort, and not interfering with normal everyday activities; moderate—sufficiently discomforting to interfere with normal everyday activities; and severe—incapacitating and/or preventing normal everyday activities. The relationship of study medication to each adverse event was determined by the investigator by using the following definitions: not related—the event was clearly related to other factors, such as the subject's clinical state, therapeutic interventions, or concomitant medications administered to the subject; unlikely—the event was most likely produced by other factors, such as the subject's clinical state, therapeutic interventions, or concomitant medications administered to the subject, and did not follow a known response pattern to the study drug; possible—the event followed a reasonable temporal sequence from the time of drug administration, and/or followed a known response pattern to the study drug, but could have been produced by other factors, such as the subject's clinical state, therapeutic interventions, or concomitant medications administered to the subject; probable—the event followed a reasonable temporal sequence from the time of drug administration, followed a known response pattern to the trial drug, and could not be reasonably explained by other factors, such as the subject's clinical state, therapeutic interventions, or concomitant medications administered to the subject; highly probable—the event followed a reasonable temporal sequence from the time of drug administration, and followed a known response pattern to the trial drug, and could not be reasonably explained by other factors, such as the subject's clinical state, therapeutic interventions, or concomitant medications administered to the subject, and either occurs immediately following study drug administration or improves on stopping the drug or reappears on repeat exposure.

A serious adverse event was any adverse event occurring at any dose that resulted in any of the following outcomes: death; life-threatening experience (one that places the subject at immediate risk of death from the adverse event as it occurred, for example, it does not include an adverse event

**44**

that, had it occurred in a more severe form, might have caused death); persistent or significant disability/incapacity (disability is a substantial disruption of a person's ability to conduct normal life functions); in-patient hospitalization or prolongation of hospitalization; and congenital anomaly/birth defect.

Subjects were instructed to promptly report any adverse event. The serious adverse event was assessed for the following details: seriousness of event, start date, stop date, intensity, frequency, relationship to test drug, action taken regarding test drug, treatment required, and outcome to date. These details were recorded on the Case Report Form. Such preliminary reports were followed by detailed descriptions that included copies of hospital case reports, autopsy reports, and other documents when requested and applicable.

Blood and urine were collected at the screening visit on Day 29 for clinical chemistry, hematology, urinalysis, and pregnancy testing. In the event of an abnormal laboratory test value, the test was repeated within one week, and the subject was followed up until the value returned to the normal range and/or until an adequate explanation of the abnormality was found.

Values were obtained for systolic and diastolic blood pressure, heart rate, and respiration rate on the screening visit and all other study visits. All values outside the pre-defined ranges were flagged in the subject data listings. Electrocardiography (twelve lead) was used to obtain ventricular rate (VR), QT, Q-$T_c$ intervals, pulse rate (PR), and QRS duration. A blood sample (10 mL whole blood) was taken from each subject at the Screening Visit for CYP2D6 genotyping to determine which subjects were poor metabolizers of DM and which were extensive metabolizers. Blood samples were taken on Day 29 for the determination of concentrations of DM, DX, and Q in plasma. The relationship between the concentration of drug in plasma and changes in CNS-LS scores was determined, and the effect of the CYP2D6 genotype on this relationship was evaluated.

Sample sizes of forty-eight subjects in the 30DM/30Q group and twenty-four subjects in each of the DM and Q groups were sufficient to detect a difference in CNS-LS score of 5.5 between the DM/Q group and each of the other groups. These calculations were based on standard deviations of 7, 5, and 3 in the DM/Q, DM, and Q groups, respectively. The power is approximately 85% based on a 2-sided, 5% test, assuming baseline/Day 15 and baseline/Day 29 correlations are both 0.3, and the Day 15/Day 29 correlation is 0.7. The assumptions on which sample sizes were based were drawn from a small, fourteen subject crossover study, in which DM/Q subjects had a mean change from baseline of −6.6 points with standard deviation of 7.5; and placebo-treated subjects had a mean change of +0.83 with a standard deviation of 3.2.

A total of 140 subjects were randomized to treatment; seventy were in the 30DM/30Q group, thirty-three were in the DM group, and thirty-seven were in the Q group. The sample size calculations required that there be only forty-eight subjects in the 30DM/30Q group and twenty-four subjects in each of the other treatment groups. Therefore, under the assumptions made in the sample size calculations, the number of subjects in each group was adequate to detect the defined difference in treatment effect. The percent of subjects with compliance ≧80% was 73.5 in the 30DM/30Q group, 87.9 in the DM group, and 86.5 in the Q group.

Three data sets were analyzed in this study; the safety data set consisting of data for 140 subjects, the intent-to-treat data

US 7,659,282 B2

45

46

set consisting of data for 129 subjects, and the efficacy-evaluable data set consisting of data for 101 subjects. The definitions of these three populations are as follows: safety population—all randomized subjects; intent-to-treat population—all randomized subjects who are not "poor metabolizers" of cytochrome P450 2D6; and efficacy evaluable population—all subjects in the ITT population who were protocol adherent. Subjects were considered adherent if they completed the visit on Day 29, completed all study procedures, and took 80% of their scheduled doses.

The demographic characteristics of the ITT population are provided in Table 26; the history of ALS is in Table 27, and the scores at baseline for depression, pseudobulbar affect, QOL, and QOR are in Table 28.

TABLE 26

| Category | 30DM/30Q (N = 65) | DM (N = 30) | Q (N = 34) | P-values[a] 30DM/ 30Q vs DM | 30DM/ 30Q vs Q |
|---|---|---|---|---|---|
| Age (years) | | | | | |
| n | 65 | 30 | 34 | | |
| Mean | 54.82 | 53.77 | 55.32 | 0.7788 | 0.9976 |
| Std Dev | 12.79 | 11.25 | 9.47 | | |
| Median | 55 | 54 | 58 | | |
| Min/Max | 38/82 | 33/75 | 35/72 | | |
| Gender, n (%) | | | | | |
| Female | 23 (35.4) | 14 (46.7) | 12 (35.3) | 0.1549 | 0.8105 |
| Male | 42 (64.6) | 16 (53.3) | 22 (64.7) | | |
| Race, n (%) | | | | | |
| Asian | 0 (0) | 1 (3.3) | 0 (0) | 0.2100 | 0.5522 |
| Black | 2 (3.1) | 0 (0) | 0 (0) | | |
| Caucasian | 58 (89.2) | 25 (83.3) | 31 (91.2) | | |
| Hispanic | 5 (7.7) | 3 (10.0) | 3 (8.8) | | |
| Other | 0 (0.00) | 1 (3.3) | 0 (0.00) | | |

[a]P-values to compare means for continuous variables are computed by using ANOVA with an adjustment for treatment and center to obtain overall F-tests. P-values for categorical values were computed by using Cochran-Mantel-Haenszel chi-square with an adjustment for center.

TABLE 27

| Category | 30DM/30Q (N = 65) | DM (N = 30) | Q (N = 34) | P-values[a] 30DM/ 30Q vs DM | 30DM/ 30Q vs Q |
|---|---|---|---|---|---|
| ALS Type, n (%) | | | | | |
| Bulbar | 29 (44.6) | 14 (46.7) | 21 (61.8) | 0.8341 | 0.0793 |
| Limb | 36 (55.4) | 16 (53.3) | 13 (38.2) | | |
| Weekly Episode of Laughing/ Crying | | | | | |
| n | 65 | 30 | 34 | | |
| Mean | 22.18 | 38.93 | 19.35 | 0.0897 | 0.7043 |
| Std Dev | 31.62 | 66.28 | 19.04 | | |
| Median | 11 | 17 | 13 | | |
| Min/Max | 2/210 | 1/350 | 2/70 | | |

[a]P-values to compare means for continuous variables are computed by using ANOVA with an adjustment for treatment and center to obtain overall F-tests. P-values for categorical values were computed by using Cochran-Mantel-Haenszel chi-square with an adjustment for center.

TABLE 28

| Baseline Characteristics[a] | 30DM/30Q (N = 65) | DM (N = 30) | Q (N = 34) | P-values[b] 30DM/ 30Q vs DM | 30DM/ 30Q vs Q |
|---|---|---|---|---|---|
| HRSD | | | | | |
| N | 65 | 30 | 34 | | |
| Mean | 5.37 | 4.27 | 5.79 | 0.1404 | 0.7066 |
| Std Dev | 4.33 | 3.05 | 4.20 | | |
| Median | 4.0 | 3.5 | 5.0 | | |
| Min/Max | 0/16 | 0/14 | 0/15 | | |
| CNS-LS | | | | | |
| n | 65 | 30 | 34 | | |
| Mean | 20.06 | 21.40 | 22.26 | 0.3202 | 0.0705 |
| Std Dev | 5.46 | 6.17 | 5.22 | | |
| Median | 19.0 | 20.0 | 21.0 | | |
| Min/Max | 11/33 | 13/35 | 13/33 | | |
| VAS-QOL | | | | | |
| n | 65 | 30 | 34 | | |
| Mean | 35.05 | 47.57 | 46.56 | 0.0209 | 0.0261 |
| Std Dev | 26.70 | 27.24 | 26.93 | | |
| Median | 33.0 | 48.5 | 42.0 | | |
| Min/Max | 0/96 | 5/95 | 2/100 | | |
| VAS-QOR | | | | | |
| n | 65 | 30 | 34 | | |
| Mean | 31.77 | 41.07 | 42.18 | 0.1435 | 0.0646 |
| Std Dev | 28.50 | 28.16 | 29.93 | | |
| Median | 28.0 | 41.5 | 34.5 | | |
| Min/Max | 0/95 | 0/95 | 0/100 | | |

[a]HRSD = Hamilton Rating Scale for Depression; CNS-LS = Center for Neurologic Study Lability Scale; VAS = Visual Analog Scale; QOL = Quality of Life; QOR = Quality of Relationships. Baseline measurements for HRSD were done at screening. Baseline measurements for CNS-LS, VAS-QOL, and VAS-QOR were done on Day 1.
[b]P-values to compare means were computed by using ANOVA with an adjustment for treatment and center to obtain overall F-tests.

There were no statistically significant differences between the 30DM/30Q group and the DM and Q groups for any demographic variable. The only statistically significant difference in the baseline characteristics was in the QOL scores. Subjects in the 30DM/30Q group rated their QOL better at baseline than did the subjects in either of the other two treatment groups. Similar demographic results were obtained in the efficacy-evaluable population, and the trend in the baseline characteristics was in the same direction as that in the ITT population. The population of interest in the primary and secondary analyses of efficacy was the ITT population. Therefore, all results shown in the text are those obtained from this population.

The primary efficacy analysis was the change from baseline in CNS-LS scores, adjusted for center and baseline CNS-LS score. The descriptive statistics for the ITT Population are in Table 29.

TABLE 29

| Change in Score[a] | 30DM/30Q (N = 65) | DM (N = 30) | Q (N = 34) |
|---|---|---|---|
| n | 61 | 30 | 34 |
| Mean | −7.39 | −5.12 | −4.91 |
| Std Dev | 5.37 | 5.56 | 5.56 |
| Median | −6.50 | −4.50 | −4.25 |
| Min/Max | −24.00/0.0 | −25.00/2.0 | −21.00/2.0 |

[a]Change in CNS-LS scores was defined as the mean of scores on Day 15 and Day 29 minus the baseline (Day 1) score.

US 7,659,282 B2

47

The distributions of CNS-LS scores at baseline, Day 15, and Day 29 for each of the three treatment groups are provided in FIG. 1. These distributions have not been adjusted for baseline scores or for study site. As shown in FIG. 1, the distributions of CNS-LS scores are symmetrical and contain only one outlier. These distributions support the use of ANCOVA for the analysis of the CNS-LS scores. As prospectively specified in the protocol, the differences in mean improvement in the CNS-LS scores, adjusted for center and baseline CNS-LS scores, were analyzed by using linear regression according to the ANCOVA method of Frison and Pocock. The results of this analysis are in Table 30. The results of additional analyses without any adjustments or with an adjustment for baseline CNS-LS scores alone are also in this table.

TABLE 30

| Statistics | 30DM/30Q vs DM | 30DM/30Q vs Q |
|---|---|---|
| Unadjusted difference in mean score | −2.27 | −2.47 |
| Std Err | 1.22 | 1.17 |
| p-value | 0.0652 | 0.0366 |
| Difference in mean score adjusted for baseline CNS-LS score | −2.97 | −3.65 |
| Std Err | 1.03 | 1.00 |
| p-value | 0.0046 | 0.0004 |
| *Difference in mean score adjusted for baseline CNS-LS score and center[b]* | *−3.29* | *−3.71* |
| *Std Err* | *1.00* | *0.97* |
| *p-value* | *0.0013* | *0.0002* |

[a]Change in CNS-LS scores was defined as the mean of the scores on Day 15 and Day 29 minus the baseline (Day 1) score.
[b]Analysis in italics was pre-specified in the Statistical Analysis Plan.

The mean score in the group treated with 30DM/30Q was statistically significantly different from the mean scores of the group treated with DM and from the mean scores of the group treated with Q. Therefore, subjects treated with 30DM/30Q showed a significant improvement in pseudobulbar affect.

The results for the analysis pre-specified in the protocol are shown graphically in FIG. 2. Adjusted mean reductions in CNS-LS scores for the three treatment groups from the primary efficacy analysis of the ITT population. Reductions in CNS-LS scores below the horizontal lines are statistically significantly different from 30DM/30Q at the significance levels indicated.

The primary efficacy analysis was also done for the efficacy-evaluable and the safety populations. These results are in Table 31. The results in these populations also showed that 30DM/30Q significantly improved pseudobulbar affect.

TABLE 31

| | | | P-values vs 30DM/30Q | |
|---|---|---|---|---|
| Statistics[b] | DM | Q | DM | Q |
| ITT Population (n = 125) | | | | |
| Difference vs 30DM/30Q | −3.29 | −3.71 | 0.0013 | 0.0002 |
| Std Error | 1.00 | 0.97 | | |
| Efficacy Evaluable Population (n = 101) | | | | |
| Difference vs 30DM/30Q | −3.78 | −5.00 | 0.0009 | <0.0001 |
| Std Error | 1.10 | 1.10 | | |

48

TABLE 31-continued

| | | | P-values vs 30DM/30Q | |
|---|---|---|---|---|
| Statistics[b] | DM | Q | DM | Q |
| Safety Population (n = 136) | | | | |
| Difference vs 30DM/30Q | −3.09 | −4.23 | 0.0016 | <0.0001 |
| Std Error | 0.96 | 0.93 | | |

[a]The ITT and EFF populations excluded poor metabolizers.
[b]Differences are mean differences in the CNS-LS reduction, controlling for baseline CNS-LS and study site, using the analysis pre-specified in the Statistical Analysis Plan.

The results in these populations also showed that 30DM/30Q significantly improved pseudobulbar affect.

The primary efficacy data were also analyzed by using linear regression according to the ANCOVA method of Frison and Pocock with an adjustment for center, baseline CNS-LS scores, and treatment-by-center interaction. Because of small sample sizes at some centers, this interaction could not be estimated.

An analysis of secondary efficacy data was conducted. Weekly episode counts were analyzed by using the Poisson regression model as specified in the statistical analysis plan, and the results are in Table 32.

TABLE 32

| Episode[a] Statistic | 30DM/30Q (N = 65) | DM (N = 30) | Q (N = 34) |
|---|---|---|---|
| Laughing | | | |
| n | 62 | 30 | 34 |
| Wtd. Mean[b] | 4.70 | 35.29 | 6.79 |
| Wtd. Std Dev | 49.66 | 709.97 | 53.93 |
| Median | 0.66 | 2.50 | 2.23 |
| Min/Max | 0.00/116.67 | 0.00/726.55 | 0.00/45.00 |
| Crying | | | |
| n | 62 | 30 | 34 |
| Wtd. Mean[b] | 2.04 | 4.30 | 5.64 |
| Wtd. Std Dev | 33.99 | 32.86 | 28.14 |
| Median | 0.44 | 0.70 | 4.00 |
| Min/Max | 0.00/66.00 | 0.00/21.00 | 0.00/19.83 |
| Laughing/Crying | | | |
| n | 62 | 30 | 34 |
| Wtd. Mean[b] | 6.74 | 39.58 | 12.45 |
| Wtd. Std Dev | 69.23 | 707.62 | 69.91 |
| Median | 2.00 | 2.60 | 6.19 |
| Min/Max | 0.00/116.67 | 0.00/726.55 | 0.00/49.00 |

[a]The number of episodes were collected continuously by each subject in a diary. The diaries were reviewed at the visits on Days 15 and 29.
[b]The mean across all subjects was the weighted mean of each subject's mean (total number of episodes divided by the total number of days). The weight is the number of days in the study for each subject.

This analysis of episode rates, pre-specified in the protocol, showed that total episodes were 6.4 times greater (calculated by using the episode rates from the Poisson regression model with an adjustment for center) in the DM group than in the 30DM/30Q group and were 1.9 times greater in the Q group than in the 30DM/30Q group. A single outlier in the DM group was a subject who reported 10 times more episodes than any other subject in the study—an average of over 100 episodes per day. When this outlier was omitted, the ratios were 2.3 and 1.8 for the DM and Q groups, respectively. In each case, the calculated p-values were <0.0001. Separate assessments for crying and laughing were also highly statistically significant. This subject's extreme episodes counts

US 7,659,282 B2

**49**         **50**

were primarily laughing episodes; as a result, the estimated effects on crying were changed little by omitting this subject.

For the assessments for episode counts described above, there is evidence of substantial overdispersion in the data, signifying that the data did not meet the assumptions of the model. A number of additional analyses were carried out to assess the sensitivity of the conclusions to model specification; these analyses are discussed below.

When the data were analyzed by using the quadratic-variance (mean dispersion) negative binomial model (one model for overdispersion), the results indicated that 30DM/30Q crying rates were twice as large as those for DM (p=0.06) and 4.5 times as large as those for Q (p<0.001). The corresponding factors for laughing were 2.6 (p=0.10) and 0.9 (p=0.84) and for total are 2.6 (p=0.013) and 1.5 (p=0.29). However, there is a continued lack of fit of the data in this model also.

The data were also analyzed by using the proportional-variance (constant dispersion) negative binomial model (another model that takes overdispersion into account). The results, indicated by an analysis of residuals, showed a better fit to this overdispersed data. The estimated ratios from this model for crying were 2.0 (p=0.007) and 3.3 (p<0.001) relative to DM and Q, respectively. For laughing, the ratios were 1.4 and 1.5, with p-values of 0.21 and 0.13 for DM and Q, respectively. (With the outlier subject omitted, the laughing ratios were 1.5 (p=0.14) and 1.6 (p=0.05). Total counts had ratios of 1.7 and 1.8, with p-values 0.02 and 0.006 relative to DM and Q, respectively.

When center was omitted from the model as a sensitivity analysis, the magnitude of response was similar to the analyses with center. The p-values increased somewhat, as expected. The normal probability plots of residuals from these models, however, indicate that adjustment for center substantially improved the normality of the residuals.

Additional studies to determine the sensitivity of the results to model assumptions were also carried out. These analyses explored nonparametric approaches, as well as an assessment designed to examine "steady-state" differences between groups.

The assessment of statistical significance of the relative effects of 30DM/30Q, DM, and Q is dependent on the model assumptions used. However, statistical estimates of the relative effects in all models consistently favored 30DM/30Q over DM and Q, even when statistical significance was not reached. In the model for which the assumptions best describe the observed data, these differences were statistically significant.

To help quantify and understand how changes in the primary efficacy variable, CNS-LS score, affect episode count, the effect of a 1-point difference in CNS-LS score on the episode rate during the previous two weeks was estimated. For each 1-point increase in CNS-LS score, the average episode rate increased 12%. Thus, a 3.5-point decrease in CNS-LS score would correspond to a 50% decrease in episode rate. This was true for both laughing and crying episodes. Summary statistics of QOL and QOR scores are in provided in Table 33.

TABLE 33

| Change in Score[a] | 30DM/30Q (N = 65) | DM (N = 30) | Q (N = 34) |
|---|---|---|---|
| QOL | All Days | | |
| n | 51 | 27 | 32 |
| Mean | −23.34 | −17.41 | −18.97 |
| Std Dev | 24.38 | 27.61 | 28.30 |
| Median | −19.0 | −11.0 | −14.3 |
| Min/Max | −84.0/29 | −90.5/27 | −98.0/19 |
| QOR | | | |
| n | 51 | 27 | 32 |
| Mean | −22.36 | −9.98 | −14.14 |
| Std Dev | 27.32 | 22.09 | 27.54 |
| Median | −12.00 | −4.50 | −10.50 |
| Min/Max | −90.0/24.0 | −71.0/23.5 | −74.5/42.0 |
| QOL | Day 15 | | |
| n | 52 | 28 | 33 |
| Mean | −20.54 | −17.14 | −15.94 |
| Std Dev | 23.05 | 29.06 | 28.51 |
| Median | −18 | −13 | −6 |
| Min/Max | −84/28 | −90/55 | −96/22 |
| QOR | | | |
| n | 52 | 28 | 33 |
| Mean | −20.77 | −11.75 | −12.15 |
| Std Dev | 26.11 | 24.88 | 29.05 |
| Median | −10 | −7 | −2 |
| Min/Max | −89/25 | −71/34 | −84/41 |
| QOL | Day 29 | | |
| n | 60 | 29 | 33 |
| Mean | −24.13 | −19.31 | −21.15 |
| Std Dev | 25.77 | 29.29 | 30.97 |
| Median | −17 | −7 | −14 |
| Min/Max | −90/30 | −91/27 | −100/23 |
| QOR | | | |
| n | 59 | 29 | 33 |
| Mean | −22.42 | −10.38 | −15.67 |
| Std Dev | 27.92 | 23.62 | 27.85 |
| Median | −13.0 | −3.0 | −13.0 |
| Min/Max | −91/34 | −71/26 | −77/43 |

[a]The change in VAS scores for all days was defined as the mean of the scores on Days 15 and 29 minus the score on Day 1; the change in score for Day 15 was defined as the score on Day 15 minus the score on Day 1; and the score on Day 29 was defined as the score on Day 29 minus the score on Day 1.

The differences in the mean changes in QOL and QOR scores between 30DM/30Q and DM and Q, adjusted for baseline and study site, are in Table 34. The group treated with 30DM/30Q showed a statistically significant improvement in these scores when compared with the group treated with DM and compared with the group treated with Q. These results were similar for all time periods.

TABLE 34

| Variable Statistics[a] | 30DM/30Q vs DM | 30DM/30Q vs Q |
|---|---|---|
| QOL | All Days | |
| Difference | −15.00 | −14.67 |
| Std Err | 4.58 | 4.44 |
| p-value[b] | 0.0015 | 0.0013 |

US 7,659,282 B2

51

52

### TABLE 34-continued

| Variable Statistics[a] | 30DM/30Q vs DM | 30DM/30Q vs Q |
|---|---|---|
| QOR | | |
| Difference | −18.35 | −16.08 |
| Std Err | 4.27 | 4.16 |
| p-value | <0.0001 | 0.0002 |
| QOL | Day 15 | |
| Difference | −11.11 | −12.60 |
| Std Err | 4.03 | 4.63 |
| p-value | 0.0235 | 0.0077 |
| QOR | | |
| Difference | −15.04 | −15.25 |
| Std Err | 4.49 | 4.32 |
| p-value | 0.0012 | 0.0006 |
| QOL | Day 29 | |
| Difference | −16.33 | −13.57 |
| Std Err | 4.78 | 4.62 |
| p-value | 0.0009 | 0.0041 |
| QOR | | |
| Difference | −19.14 | −14.77 |
| Std Err | 4.33 | 4.24 |
| p-value | <0.0001 | 0.0007 |

[a]Change in VAS "all-day" scores was defined as the mean of the scores on Day 15 and Day 29 minus the baseline (Day 1) score. Change in the scores on Day 15 and Day 29 was defined as the score on that day minus the baseline score. Differences in changed scores were adjusted for baseline levels and center effects.
[b]P-values were computed by using linear regression according to the ANOVA method of Frison and Pocock with an adjustment for center and baseline QOL and QOR scores.

To account for multiple comparisons, all the secondary efficacy variables were combined and analyzed simultaneously by using the O'Brien Rank Sum Method, as specified in the protocol. The results showed that subjects treated with 30DM/30Q had a statistically significant reduction in episodes of laughing and crying and an improvement in QOL and QOR relative to the subjects treated with DM (p=0.0041) or Q (p=0.0001) after adjustment for multiple comparisons. 30DM/30Q was statistically significantly better than either DM or Q in improving pseudobulbar affect, number of episodes of laughing and crying, QOL, and QOR in subjects with ALS.

The extent of exposure to study medication, in terms of number of doses taken, is reported in Table 35. The mean days of exposure were very similar across all treatment groups.

### TABLE 35

| Exposure Statistics[a] | 30DM/30Q (N = 70) | DM (N = 33) | Q (N = 37) |
|---|---|---|---|
| n | 68 | 33 | 36 |
| Mean | 24.4 | 27.6 | 28.0 |
| Std Dev | 9.66 | 6.25 | 4.40 |
| Median | 29.0 | 29.0 | 29.0 |
| Min/Max | 3/32 | 7/33 | 5/32 |

[a]Exposure was calculated by using the date of the last dose of study drug minus the date of the first dose of study drug + 1.

Nausea was the most common adverse event experienced, and it afflicted more subjects [twenty-three (32.9%)] in the 30DM/30Q group than in either the DM [2 (6.1%)] or the Q [3 (8.1%)] groups. However, in the 30DM/30Q group, nausea was judged to be mild or moderate in twenty of the twenty-three subjects, but it was judged to be at least possibly related to treatment with 30DM/30Q in nineteen of the twenty-three

subjects. All instances of nausea in the DM and Q groups were mild or moderate, and all but one was judged to be at least possibly related to treatment. Dizziness was also reported by more subjects [fourteen (20%)] in the 30DM/30Q group than in either the DM [five (15.2%)] or the Q [one (2.7%)] groups. All instances of this adverse event in all treatment groups were mild or moderate, and almost all were judged to be at least possibly related to treatment. Somnolence was the third event that was reported by more subjects [nine (12.9%)] in the 30DM/30Q group than in either the DM [one (3.0%)] or the Q [zero (0%)] groups. All instances of this adverse event in all treatment groups were mild or moderate, and almost all were judged to be at least possibly related to treatment. Three subjects experienced loose stools as an adverse event, and all of them were in the DM group. All instances of the event were mild, and all were judged to be related to treatment.

A total of twenty-two subjects withdrew from the study because of adverse events; seventeen (24.3%) were in the 30DM/30Q group, two (6.1%) in the DM group, and three (8.1%) in the Q group. The seventeen subjects in the 30DM/30Q group experienced fifty adverse events, and most of these [seventeen (34%)] were related to the nervous system. All of these fifty events except four were mild or moderate, and all but one were judged to be at least possibly related to treatment. One subject had a severe headache, one subject had severe nausea and severe vomiting, and one subject had severe respiratory failure. The subject died as a result of the respiratory failure. This was judged not related to study medication. The other two subjects recovered without sequelae.

In the DM group, there were seven adverse events experienced by two subjects. All of these events except one were mild or moderate, and all were judged to be related to treatment. One subject, who had six of the seven adverse events, experienced severe diarrhea; received appropriate drug treatment for this condition; and recovered without sequelae.

Three subjects in the Q group experienced five adverse events. One subject had a severe kidney infection that was judged to be not related to treatment, and one subject had severe muscle cramping that was judged to be related to treatment. Both of these subjects recovered without sequelae. All other adverse events were mild or moderate, and most were judged to be not related to treatment.

Overall, there were four serious adverse events experienced by subjects in this study. Three subjects in the 30DM/30Q group reported serious adverse events, but only one of these discontinued taking the drug. All three of these serious adverse events were judged to be not related to the study drug. The only other serious adverse event was experienced by a subject in the Q group. This subject continued on the study drug, and the event was also judged to be not related to the study drug. There was no death during the study; one subject in the 30DM/30Q group died because of respiratory failure unrelated to study medication.

There was no statistically significant change in hematology, clinical chemistry, or urinalysis values from Baseline to Day 29 in any treatment group, nor any statistically significant change among the treatment groups in any laboratory value except a significant increase in CPK in the DM group relative to the 30DM/30Q group. There were no clinically relevant changes from Baseline to Day 29 in systolic blood pressure, diastolic blood pressure, heart rate, or respiration. There were no clinically relevant changes from Baseline to Day 29 in the results of physical examinations. There was a statistically significant difference in the change from Baseline to Day 29 in VR and in the QT interval between the 30DM/30Q and Q groups. However, these changes were so

Appx76

US 7,659,282 B2

53 54

small that they were not clinically relevant. There was no statistically significant difference among the treatment groups in $QT_c$, PR, and QRS duration.

Since the nature, frequency, and intensity of the adverse events were within acceptable limits in this subject population, and there were no clinically relevant findings for any other safety variable, 30DM/30Q is safe in this subject population.

The CYP2D6 genotypes in each treatment group of the safety population were determined and are provided in Table 36. As defined in the Statistical Analysis Plan, the ITT population did not include poor metabolizers. Extensive metabolizer was the most prevalent genotype in all treatment groups in the ITT population.

TABLE 36

| Genotype | 30DM/30Q (N = 70) n (%) | DM (N = 33) n (%) | Q (N = 37) n (%) |
|---|---|---|---|
| Poor metabolizer | 5 (7.2) | 3 (9.1) | 3 (8.1) |
| Extensive metabolizer | 61 (88.4) | 30 (90.9) | 32 (86.5) |
| Ultrarapid metabolizer | 3 (4.3) | 0 (0.0) | 2 (5.4) |

Q in this combination product inhibits the rapid first-pass metabolism of DM. Therefore, it was expected that the concentrations of DM in plasma would be higher and the concentration of its metabolite, DX, would be lower in subjects who had received 30DM/30Q. The concentrations of DM and DX in the group receiving 30DM/30Q and the group receiving DM are provided in Table 37.

TABLE 37

| | 30DM/30Q N = 70 | | DM N = 33 | | P-values[b] | |
|---|---|---|---|---|---|---|
| Statistics | DM | DX | DM | DX | DM | DX |
| n | 35 | 35 | 23 | 23 | | |
| Mean | 96.37 | 89.46 | 5.18 | 295.92 | <0.0001 | <0.0001 |
| Std Dev | 46.71 | 52.25 | 4.97 | 143.21 | | |
| Median | 96.26 | 78.24 | 4.55 | 262.35 | | |
| Min/Max | 1.07/212.40 | 8.17/235.27 | 0.35/15.81 | 101.07/526.65 | | |

[a]Only those subjects whose time of blood collection was within 8 hours of the time of their last dose of study medication were included in this table.
[b]P-value from ANOVA with adjustment for treatment.

The mean DM concentration was 18.6-fold higher in the 30DM/30Q group than in the DM group, and the mean DX concentration was 3.3-fold lower in the 30DM/30Q group than in the DM group. These differences were both statistically significant. The data for the levels in plasma of all subjects show the same results as in those subjects whose blood was collected within eight hours of the last dose of study medication.

The results of the study demonstrate that 30DM/30Q was statistically significantly more effective than its components in the treatment of pseudobulbar affect as indicated by the primary and all secondary endpoints. Expected adverse events were reported, and no unexpected safety issues emerged. More subjects in the 30DM/30Q group had adverse events than in either of the other groups, and seventeen subjects in the 30DM/30Q group discontinued the study because of adverse events; however, all adverse events except four in the subjects who discontinued were mild or moderate. Only two of the seventeen subjects had severe adverse events (headache, nausea, vomiting), and these events, although

debilitating, resolved without sequelae. There were three subjects treated with 30DM/30Q with serious events, and all of the events were unrelated to this treatment. Furthermore, as the results of the assessments of QOL and QOR were markedly and statistically significantly better in the subjects treated with 30DM/30Q, the benefits of the drug outweighed any discomfort caused by the adverse events. Therefore, 30DM/30Q was very effective in treating pseudobulbar affect in ALS subjects, and the drug was safe and well tolerated.

Clinical Study #5

The primary objective of this study was to evaluate the safety and tolerability of capsules containing dextromethorphan hydrobromide and quinidine sulfate (DM/Q) during an open-label, dose-escalation study to the subject's maximum tolerated dose (MTD), not to exceed 120 mg DM/120 mg Q per day. The secondary objective was to obtain a preliminary assessment of the efficacy of DM/Q in the treatment of pain associated with diabetic neuropathy.

This was an open-label, dose-escalation study in subjects experiencing pain associated with diabetic neuropathy. After screening for inclusion/exclusion criteria, subjects underwent a washout period during which all analgesics were discontinued. This was followed by twenty-nine days of treatment with capsules containing 30 mg DM/30 mg Q, beginning with one capsule per day and escalating approximately weekly to a maximum permitted dose of four capsules per day. Subjects who could not tolerate a dose level could return to the previous level; could substitute a capsule containing 15 mg DM/30 mg Q; or, if they were unable to tolerate the lowest dose level, could be discontinued from the study.

Subjects were screened for general health, including electrocardiography, within four weeks before Day 1 of dosing. The first dose of DM/Q was administered at the clinic, and a resting electrocardiogram was obtained one hour after this dose and interpreted on site. If the corrected QT interval ($QT_c$) determined in this preliminary interpretation was not $\geq$450 msec for males or $\geq$470 msec for females, and the $QT_c$ did not change from the screening electrocardiogram by more than 30 msec, the subject was issued study medication to take as directed by the physician. The subject was instructed on the use of a daily diary to record study medication taken and scores from rating scales for sleep, present and average pain intensity, and activity.

Subjects visited the clinic every two weeks during the four-week duration of the study and were contacted by telephone during weeks without clinic visits. At each subsequent study visit or weekly phone call, the subjects were given the Pain Intensity Rating Scale and the Pain Relief Rating Scale and were queried regarding any adverse events that might have occurred since their previous visit. Subjects were admin-

US 7,659,282 B2

55

istered the Peripheral Neuropathy Quality of Life (QOL) Instrument on Days 1 and 29 (or the final visit). Blood samples were taken at the visits on Day 15 and Day 29 to determine concentrations in plasma of DM, DX, and Q.

Subjects selected were 18 to 80 years of age, inclusive, and had a confirmed diagnosis of diabetes mellitus. Subject had acceptable glycemic control, with total glycosylated hemoglobin (HbA1c)<12%, had been on established diabetic therapy for at least 3 months, had a clinical diagnosis of distal symmetrical diabetic neuropathy, and had daily pain associated with diabetic neuropathy for the previous 3 months. Subjects scored moderate or greater ($\geqq$2) on the Pain Intensity Rating Scale before receiving DM/Q on Day 1.

Every effort was made to continue each subject in the study. However, if a subject decided to withdraw, all efforts were made to complete all assessments and an explanation of why the subject withdrew from the study was provided.

Subjects received capsules containing 30 mg DM/30 mg Q or 15 mg DM/30 mg Q in increasing dosages, to a maximum of 120 mg DM/120 mg Q. Study medications were provided as hard gelatin capsules; Capsule A was opaque orange, and Capsule B was opaque white. The contents of the capsules are listed in Table 38.

TABLE 38

| Ingredient | Amount (mg) | |
| --- | --- | --- |
| | Capsule A 30 mg DM/ 30 mg Q | Capsule B[a] 15 mg DM/ 30 mg Q |
| Dextromethorphan hydrobromide monohydrate USP (DM) | 31.50[b] | 15.75[c] |
| Quinidine sulfate dihydrate USP (Q) | 31.40[d] | 31.40[d] |
| Croscarmellose sodium NF | 7.80 | 7.80 |
| Microcrystalline cellulose NF | 94.00 | 101.87 |
| Colloidal silicone dioxide NF | 0.050 | 0.065 |
| Lactose monohydrate NF | 94.00 | 101.88 |
| Magnesium stearate NF | 0.05 | 0.05 |

[a]For optional use if Capsule A was not tolerated.
[b]Equivalent to 30.0 mg dextromethorphan hydrobromide.
[c]Equivalent to 15.0 mg dextromethorphan hydrobromide.
[d]Equivalent to 30.0 mg quinidine sulfate.

Subjects received capsules containing DM/Q in escalating doses, as indicated in Table 39. Subjects who could not tolerate a dose level were permitted to return to the previous level, substitute a capsule containing 15 mg DM/30 mg Q, or be discontinued from the study if they were unable to tolerate the lowest dose level.

TABLE 39

| Study Day | AM Dose | | | PM Dose | | | Total Daily Dose | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Number of Capsules | DM (mg) | Q (mg) | Number of Capsules | DM (mg) | Q (mg) | Number of Capsules | DM (mg) | Q (mg) |
| 1 (in clinic) | 0 | 0 | 0 | 1 | 30 | 30 | 1 | 30 | 30 |
| 2 to 3 | 0 | 0 | 0 | 1 | 30 | 30 | 1 | 30 | 30 |
| 4 to 13 | 1 | 30 | 30 | 1 | 30 | 30 | 2 | 60 | 60 |
| 14 to 20 | 1 | 30 | 30 | 2 | 60 | 60 | 3 | 90 | 90 |
| 21 to 29 | 2 | 60 | 60 | 2 | 60 | 60 | 4 | 120 | 120 |

Subjects could not take any disallowed medications during the study or for one week (or two weeks, where applicable) before the start of dosing on Day 1. These medications included: amantadine; amitriptyline; any antidepressant medication, including St. John's Wort; any monoamine oxi-

56

dase inhibitor; analgesics (only acetaminophen could be used); captopril; cimetidine; carbonic anhydrase inhibitors; desipramine; dextromethorphan (OTC cough medicines); digoxin; diltiazem; erythromycin; fluoxetine; haloperidol; imipramine; itraconazole; ketoconazole; nortriptyline; paroxetine; quinidine or other antiarrhythmic drugs; sodium bicarbonate; thiazide diuretics; and verapamil. If a subject was unable to complete the washout period without analgesia, he/she was permitted to begin the dose-escalation phase of the study, provided that sufficient washout of other disallowed, non-pain medications had occurred. Daily, low-dose aspirin was not considered an analgesic and was permitted for cardiac prophylaxis.

Acetaminophen was the only analgesic permitted as a rescue pain medication and was to be taken at the dosage specified on the package label. Subjects were instructed to consult the study clinic before taking any medication, including over-the-counter (OTC) medications, and they were counseled that acetaminophen-containing products that also contained other analgesics (e.g., codeine) or dextromethorphan should be avoided.

Subjects were instructed to bring unused study medication to the clinic on Day 15 and to return all unused study medication to the clinic at the final visit. Diary cards were collected from subjects at these visits. The percent of doses taken was calculated as the total number of doses taken divided by the total number of doses prescribed, multiplied by 100.

Safety was assessed by the following measurements: adverse events; clinical laboratory values; vital signs; physical examinations; electrocardiograms; and measurements of nerve conduction velocity.

Subjects underwent nerve conduction studies at Screening and on Day 29 (or the final visit). Nerve conduction velocity was measured with surface stimulation and recording. Bilateral sural nerve sensory studies and a unilateral peroneal nerve motor study were performed or supervised by a clinical electromyographer certified by the American Board of Electrodiagnostic Medicine. Techniques were standardized to minimize variability among electromyographers. Limb temperature was maintained above a standard temperature in all studies. Results were interpreted at a central reading laboratory.

Efficacy was assessed through the following instruments: Pain Intensity Rating Scale; Diary Present Pain Intensity Scale; Pain Relief Rating Scale; Diary Activity Rating Scale; Peripheral Neuropathy QOL Instrument; Diary Average Pain Rating Scale; and Diary Sleep Rating Scale.

Score on the Pain Intensity Rating Scale was determined on Day 8, Day 15, Day 22, and Day 29 (or the final visit). Subjects indicated the amount of pain experienced in the lower extremities within the previous twenty-four hours by using a 5-point Likert scale (0=None, 1=Mild, 2=Moderate,

US 7,659,282 B2

57

3=Severe, 4=Extreme). Subjects were required to complete the Pain Intensity Rating Scale at the clinic on Day 1, before entry into the study and on Day 15 and Day 29 (or the final visit). The scale was also administered verbally in telephone calls to the subject during weeks when no clinic visit was scheduled (Day 8 and Day 22).

The Pain Relief Rating Scale was completed on Day 8, Day 15, Day 22, and Day 29 (or the final visit). Subjects indicated the amount of pain relief experienced in the lower extremities relative to the end of the washout/screening phase by using a 6-point Likert scale (−1=Worse; 0=None, 1=Slight, 2=Moderate, 3=A lot, 4=Complete). Subjects were required to complete the scale at the clinic on Day 15 and Day 29 (or the final visit). The Pain Relief Rating Scale was also administered verbally in telephone calls to the subject during weeks when no clinic visit was scheduled (Day 8 and Day 22).

The QOL score was obtained at the clinic on Day 1 and Day 29 (or the final visit). QOL was assessed by using the Peripheral Neuropathy QOL Instrument-97 as in Vickrey et al., Neurorehabi. Neural. Repair, 2000; 14:93-104. This is a self-administered, health-related, QOL measure for peripheral neuropathy. It incorporates the Health Status Survey SF-36 scale in its entirety and includes additional questions determined to be particularly relevant to subjects with peripheral neuropathy.

The instrument comprises 21 subscales containing items about general health issues, specific peripheral neuropathy issues, health symptoms or problems, assessment of overall health, and feelings in general and about health. All of the items use scales 3-, 4-, 5-, or 6-point categorical rating scales, except for number of disability days, overall health rating (0 to 100), and a yes/no question about sexual activity.

To analyze the QOL results, a scoring algorithm was used to convert the categorical item ratings to appropriate percent ratings. The most favorable rating was 100%, the least favorable was 0%, and the intermediate percents were spaced at equal intervals, depending on the number of points in the scale (e.g., 0, 25, 50, 75, 100 for a 5-point ascending scale; 100, 50, 0 for a 3-point descending scale). The converted ratings for each item in a subscale were averaged to provide the subscale scores. All subscale scores were constructed so that a higher value reflected a more favorable result. The composite QOL score was obtained by averaging all subscale scores, except for number of disability days.

The subject diary included a sleep rating scale and a present pain intensity scale to be completed in the morning, and an activity rating scale and an average pain rating scale to be completed in the evening. In the Sleep Rating Scale, subjects were instructed to circle the number on a scale of 0 to 10 that best described the extent that pain had interfered with their sleep in the past 24 hours (0=Does not interfere and 10=Completely interferes). In the Present Pain Intensity Scale, subjects were instructed to circle the statement that best described their present pain intensity: 0—No Pain; 1—Mild; 2—Discomforting; 3—Distressing; 4—Horrible; and 5—Excruciating. In the Activity Rating Scale, subjects were instructed to circle the number on a scale of 0 to 10 (the same as the Sleep Rating Scale) that best described the extent that pain had interfered with their general activity in the past 24 hours (0=Does not interfere and 10=Completely interferes).

58

In the Average Pain in Past 12 Hours Rating Scale, subjects were instructed to circle the number on a scale of 0 to 10 (the same as the Sleep Rating Scale) that best described their average pain intensity during the past 12 hours (0=None and 10=Worst pain ever). The rating scales used as efficacy measures are well-established instruments in pain research, and the Peripheral Neuropathy QOL instrument, in particular, contains material that is specific for subjects with peripheral neuropathy.

Efficacy evaluations consisted of inferential analyses and summary statistics, calculated on all subjects and on subjects categorized by MTD, for the following variables (except where noted): change from baseline in the Pain Intensity Rating Scale score on Days 8, 15, 22, and 29 (or the final visit); the Pain Relief Rating Scale score on Days 8, 15, 22, and 29 (or the final visit); change from baseline in the composite score on the Peripheral Neuropathy Quality of Life Instrument on Day 29 (or the final visit); Sleep Interference score calculated from values recorded in the diary for the Sleep Rating Scale (the score for Day 15 was the average of the Sleep Rating Scale scores from the subject diary for Days 13, 14, and 15; the score for Day 29 was the average of the Day 27, 28, and 29 scores; and the Final Visit score was the average of scores from the final 3 consecutive days of study treatment); Daily Present Pain Intensity, Activity, Pain, and Sleep Rating scales, recorded in subject diaries; the percent of subjects experiencing improved scores for each of the efficacy variables.

The disposition of subjects is provided in FIG. 3. Subjects are classified by MTD group in this figure and in subsequent summary tables and figures. Except for a subject with an MTD of 45 mg, who was classified with the 60-mg group (see below), subjects in the 30-, 60-, and 90-mg groups received this dose, which was the highest dose permitted in the study but is technically not an MTD. For brevity these groupings are all referred to as "MTDs."

Of the thirty-six subjects who were enrolled and received study medication, thirty-three completed the study. One subject completed the study with an MTD of 45 mg DM. Because there was only one subject with this MTD, this subject is included with the 60-mg MTD group in the data tables and in FIG. 3. The number of subjects in each MTD group and overall in each study site is reported in Table 40.

TABLE 40

| Site | MTD (mg) 30 | 45 | 60 | 90 | 120 | Total |
|------|-----|-----|-----|-----|-----|-------|
| 01 | 1 | 0 | 0 | 0 | 4 | 5 |
| 02 | 1 | 0 | 0 | 0 | 3 | 4 |
| 03 | 0 | 0 | 3 | 0 | 0 | 3 |
| 04 | 2 | 1 | 2 | 2 | 5 | 12 |
| 05 | 1 | 0 | 0 | 0 | 11 | 12 |
| Total | 5 | 1 | 5 | 2 | 23 | 36 |

Only one population was used in the data analyses. Analyses and summaries were performed by using all 36 subjects who took study medication. The demographic characteristics of the study population are reported in Table 41.

US 7,659,282 B2

**59**

TABLE 41

| Charac-teristic | Maximum Tolerated Dose (mg)[a] | | | | Total |
| | 30[b] (N = 5) | 60[c] (N = 6) | 90 (N = 2) | 120 (N = 23) | (N = 36) |
|---|---|---|---|---|---|
| Age (years) | | | | | |
| n | 5 | 6 | 2 | 23 | 36 |
| Mean | 62.2 | 57.7 | 57.0 | 57.1 | 57.9 |
| SD[d] | 10.99 | 8.14 | 9.90 | 11.99 | 10.94 |
| Median | 65.0 | 59.0 | 57.0 | 56.0 | 57.0 |
| Min/Max | 49/77 | 45/67 | 50/64 | 22/78 | 22/78 |
| Gender, n (%) | | | | | |
| Male | 4 (80.0) | 3 (50.0) | 1 (50.0) | 11 (47.8) | 19 (52.8) |
| Female | 1 (20.0) | 3 (50.0) | 1 (50.0) | 12 (52.2) | 17 (47.2) |
| Race, n (%) | | | | | |
| Caucasian | 3 (60.0) | 5 (83.3) | 2 (100.0) | 15 (65.2) | 25 (69.4) |
| Black | 1 (20.0) | 0 (0.0) | 0 (0.0) | 2 (8.7) | 3 (8.3) |
| Asian | 0 (0.0) | 0 (0.0) | 0 (0.0) | 0 (0.0) | 0 (0.0) |
| Other[e] | 1 (20.0) | 1 (16.7) | 0 (0.0) | 6 (26.1) | 8 (22.2) |

[a]Maximum Tolerated Dose is the last dose taken when the subject left or completed the study.
[b]This group included subjects who took two 15-mg capsules/day as well as subjects who took one 30-mg capsule/day.
[c]This group included one subject whose MTD was 45 mg.
[d]SD = Standard deviation.
[e]All of the subjects in the category "Other" were described as Hispanic.

**60**

The history of the subjects' diabetic neuropathy is summarized in Table 42.

TABLE 42

| Characteristic | Maximum Tolerated Dose (mg)[a] | | | | Total |
| | 30[b] (N = 5) | 60[c] (N = 6) | 90 (N = 2) | 120 (N = 23) | (N = 36) |
|---|---|---|---|---|---|
| Duration of Diabetic Neuropathy (years) | | | | | |
| n | 5 | 6 | 2 | 23 | 36 |
| Mean | 3.9 | 3.8 | 3.2 | 5.3 | 4.7 |
| SD | 4.30 | 5.01 | 0.21 | 6.35 | 5.63 |
| Median | 2.5 | 0.9 | 3.2 | 2.4 | 2.5 |
| Min/Max | 0.6/11.4 | 0.2/10.4 | 3.0/3.3 | 0.5/24.3 | 0.2/24.3 |
| Duration of Daily Pain (months) | | | | | |
| n | 5 | 6 | 2 | 23 | 36 |
| Mean | 30.2 | 30.0 | 9.0 | 38.0 | 34.0 |
| SD | 30.99 | 17.47 | 4.24 | 46.32 | 39.42 |
| Median | 24.0 | 27.0 | 9.0 | 18.0 | 24.0 |
| Min/Max | 7/84 | 7/60 | 6/12 | 4/180 | 4/180 |

[a]Maximum Tolerated Dose is the last dose taken when the subject left or completed the study.
[b]This group included subjects who took two 15-mg capsules/day as well as subjects who took on 30-mg capsule/day.
[c]This group included one subject whose MTD was 45 mg.

Subjects enrolled in the study had received their diagnosis of diabetic neuropathy a minimum of 0.2 years and a maximum of 24.3 years previously (median of 2.5 years). Subjects had experienced daily pain from their diabetic neuropathy for a minimum of four months and a maximum of 180 months/15.0 years (median of 24.0 months/2.0 years).

Concomitant medications were reported for up to 30 days before the study and throughout the treatment period. Concomitant medications reported by at least 10% of subjects overall are listed in Table 43 by WHO term.

TABLE 43

| Drug Category WHO Preferred Term | Maximum Tolerated Dose (mg)[a] | | | | Total |
| | 30[b] (N = 5) n (%) | 60[c] (N = 6) n (%) | 90 (N = 2) n (%) | 120 (N = 23) n (%) | (N = 36) n (%) |
|---|---|---|---|---|---|
| Analgesics | | | | | |
| Paracetamol (acetaminophen) | 0 (0.0) | 1 (16.7) | 1 (50.0) | 2 (8.7) | 4 (11.4) |
| ACE inhibitors | | | | | |
| Lisinopril | 0 (0.0) | 1 (16.7) | 0 (0.0) | 4 (17.4) | 5 (14.3) |
| Diuretics | | | | | |
| Furosemide | 0 (0.0) | 1 (16.7) | 0 (0.0) | 4 (17.4) | 5 (14.3) |
| Hydrochlorothiazide | 2 (40.0) | 1 (16.7) | 0 (0.0) | 2 (8.7) | 5 (14.3) |
| Anticoagulants | | | | | |
| Acetylsalicylic acid[d] | 1 (20.0) | 2 (33.3) | 1 (50.0) | 6 (26.1) | 10 (28.6) |
| Lipid-lowering agents | | | | | |
| Atorvastatin | 1 (20.0) | 0 (0.0) | 0 (0.0) | 5 (21.7) | 6 (17.1) |
| Antidiabetic agents | | | | | |
| Glibenclamide | 1 (20.0) | 1 (16.7) | 1 (50.0) | 5 (21.7) | 8 (22.9) |
| Glipizide | 0 (0.0) | 2 (33.3) | 0 (0.0) | 2 (8.7) | 4 (11.4) |
| Insulin | 2 (40.0) | 0 (0.0) | 0 (0.0) | 3 (13.0) | 5 (14.3) |

Appx80

US 7,659,282 B2

61

62

TABLE 43-continued

| Drug Category WHO Preferred Term | Maximum Tolerated Dose (mg)[a] | | | | |
|---|---|---|---|---|---|
| | 30[b] (N = 5) n (%) | 60[c] (N = 6) n (%) | 90 (N = 2) n (%) | 120 (N = 23) n (%) | Total (N = 36) n (%) |
| Insulin human injection, isophane | 0 (0.0) | 2 (33.3) | 0 (0.0) | 2 (8.7) | 4 (11.4) |
| Metformin | 1 (20.0) | 1 (16.7) | 1 (50.0) | 6 (26.1) | 9 (25.7) |
| Metformin hydrochloride | 0 (0.0) | 1 (16.7) | 0 (0.0) | 6 (26.1) | 7 (20.0) |
| Oral antidiabetics | 1 (20.0) | 1 (16.7) | 1 (50.0) | 11 (47.8) | 17 (48.6) |
| Nutritional supplements | | | | | |
| Ascorbic acid | 1 (20.0) | 0 (0.0) | 1 (50.0) | 2 (8.7) | 4 (11.4) |
| Calcium | 1 (20.0) | 1 (16.7) | 1 (50.0) | 3 (13.0) | 6 (17.1) |
| Multivitamins | 0 (0.0) | 0 (0.0) | 1 (50.0) | 3 (13.0) | 4 (11.4) |
| Tocopherol | 1 (20.0) | 0 (0.0) | 0 (0.0) | 4 (17.4) | 5 (14.3) |
| Other | | | | | |
| Levothyroxine sodium | 0 (0.0) | 0 (0.0) | 1 (50.0) | 3 (13.0) | 4 (11.4) |
| Sildenafil citrate | 1 (20.0) | 3 (50.0) | 0 (0.0) | 0 (0.0) | 4 (11.4) |
| All other therapeutic products | 1 (20.0) | 1 (16.7) | 0 (0.0) | 2 (8.7) | 4 (11.4) |

[a]Maximum Tolerated Dose is the last dose taken when the subject left or completed the study.
[b]This group included subjects who took two 15-mg capsules/day as well as subjects who took one 30-mg capsule/day.
[c]This group included one subject whose MTD was 45 mg.
[d]All subjects who took acetylsalicylic acid concurrently with their study treatment did so for the indication of cardiac prophylaxis and not analgesia.

Use of rescue medication (acetaminophen) was limited. Only four subjects took rescue medication: one took acetaminophen on twenty-eight out of twenty-nine study days, one on sixteen study days, and two on only one study day. Overall, there was little use of rescue medication for pain during this study; subjects took rescue medication on an average of 1.3 days each (4.5% of study days).

The extent of exposure to study medication is in Table 44.

TABLE 44

| Exposure Statistic | Maximum Tolerated Dose (mg)[a] | | | | |
|---|---|---|---|---|---|
| | 30[b] (N = 5) | 60[c] (N = 6) | 90 (N = 2) | 120 (N = 23) | Total (N = 36) |
| Amount of DM Taken (mg) | | | | | |
| n | 4 | 6 | 2 | 23 | 35 |
| Mean | 960.0 | 1442.5 | 2160 | 2321.7 | 2006.1 |
| SD | 667.68 | 682.42 | 42.43 | 121.94 | 609.17 |
| Median | 1095 | 1530 | 2160 | 2310 | 2310 |
| Min/Max | 30/1620 | 270/2370 | 2130/2190 | 2010/2640 | 30/2640 |
| Amount of Q Taken (mg) | | | | | |
| n | 4 | 6 | 2 | 23 | 35 |
| Mean | 1200.0 | 1525.0 | 2160.0 | 2321.7 | 2047.7 |
| SD | 781.15 | 682.90 | 42.43 | 121.94 | 562.49 |
| Median | 1575 | 1620 | 2160 | 2310 | 2310 |
| Min/Max | 30/1620 | 270/2370 | 2130/2190 | 2010/2640 | 30/2640 |
| Days on Study Medication[d] | | | | | |
| n | 4 | 6 | 2 | 23 | 35 |
| Mean | 22.0 | 25.3 | 29.0 | 29.0 | 27.6 |
| SD | 14.00 | 9.48 | 0.00 | 1.22 | 6.13 |

TABLE 44-continued

| Exposure Statistic | Maximum Tolerated Dose (mg)[a] | | | | |
|---|---|---|---|---|---|
| | 30[b] (N = 5) | 60[c] (N = 6) | 90 (N = 2) | 120 (N = 23) | Total (N = 36) |
| Median | 29 | 29 | 29 | 29 | 29 |
| Min/Max | 1/29 | 6/30 | 29/29 | 25/32 | 1/32 |

[a]Maximum Tolerated Dose is the last dose taken when the subject left or completed the study.
[b]This group included subjects who took two 15-mg capsules/day as well as subjects who took one 30-mg capsule/day.
[c]This group included one subject whose MTD was 45 mg.
[d]Number of days on study medication was calculated by using the date of the last dose of study drug minus the date of the first dose of study drug, plus 1.

The number of subjects with adverse events is reported in Table 45.

TABLE 45

| Category | Maximum Tolerated Dose (mg)[a] | | | | |
|---|---|---|---|---|---|
| | 30[b] (N = 5) n (%) | 60[c] (N = 6) n (%) | 90 (N = 2) n (%) | 120 (N = 23) n (%) | Total (N = 36) n (%) |
| Adverse Events | 4 (80.0) | 6 (100.0) | 2 (100.0) | 19 (82.6) | 31 (86.1) |
| Serious Adverse Events | 1 (20.0) | 2 (33.3) | 0 (0.0) | 0 (0.0) | 3 (8.3) |
| Discontinued Because of Adverse Events | 1 (20.0) | 1 (16.7) | 0 (0.0) | 0 (0.0) | 2 (5.6) |

[a]Maximum Tolerated Dose is the last dose taken when the subject left or completed the study.
[b]This group included subjects who took two 15-mg capsules/day as well as subjects who took one 30-mg capsule/day.
[c]This group included one subject whose MTD was 45 mg.

The majority of subjects had at least one adverse event during the study. Nearly all of the adverse events were mild or moderate in intensity. Four subjects had a total of seven serious adverse events. Two subjects had four severe adverse

US 7,659,282 B2

63

events. One subject had severe insomnia and recovered with a reduced dose of study drug; and one subject had severe fatigue and severe rigors, and recovered without change in study drug. Adverse events experienced by at least 5% of subjects overall are reported in Table 46.

64

and was hospitalized that day. On Day 33 the subject died suddenly while still in the hospital; his primary care physician indicated myocardial infarction and arrhythmia as the presumed causes of death. The investigator indicated that this subject's COPD exacerbation was not related to study drug

TABLE 46

| Adverse Event Preferred Term | Maximum Tolerated Dose (mg)[a] | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 30[b] (N = 5) | | 60[c] (N = 6) | | 90 (N = 2) | | 120 (N = 23) | | Total (N = 36) | |
| | n | (%) | n | (%) | n | (%) | n | (%) | n | (%) |
| Alanine aminotransferase increased | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) | 2 | (8.7) | 2 | (5.6) |
| Appetite decreased NOS[d] | 1 | (20.0) | 0 | (0.0) | 0 | (0.0) | 1 | (4.3) | 2 | (5.6) |
| Back pain | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) | 2 | (8.7) | 2 | (5.6) |
| Constipation | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) | 3 | (13.0) | 3 | (8.3) |
| Diarrhea NOS | 2 | (40.0) | 0 | (0.0) | 1 | (50.0) | 3 | (13.0) | 6 | (16.7) |
| Dizziness (exc. vertigo) | 1 | (20.0) | 2 | (33.3) | 1 | (50.0) | 5 | (21.7) | 9 | (25.0) |
| Dry mouth | 2 | (40.0) | 1 | (16.7) | 0 | (0.0) | 1 | (4.3) | 4 | (11.1) |
| Fatigue | 0 | (0.0) | 3 | (50.0) | 1 | (50.0) | 2 | (8.7) | 6 | (16.7) |
| Flatulence | 2 | (40.0) | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) | 2 | (5.6) |
| Gamma-glutamyltransferase increased | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) | 2 | (8.7) | 2 | (5.6) |
| Headache NOS | 1 | (20.0) | 3 | (50.0) | 1 | (50.0) | 4 | (17.4) | 9 | (25.0) |
| Insomnia NEC[e] | 1 | (20.0) | 0 | (0.0) | 1 | (50.0) | 1 | (4.3) | 3 | (8.3) |
| Libido decreased | 1 | (20.0) | 0 | (0.0) | 0 | (0.0) | 1 | (4.3) | 2 | (5.6) |
| Nausea | 2 | (40.0) | 2 | (33.3) | 1 | (50.0) | 5 | (21.7) | 10 | (27.8) |
| Somnolence | 2 | (40.0) | 0 | (0.0) | 1 | (50.0) | 3 | (13.0) | 6 | (16.7) |
| Syncope | 0 | (0.0) | 0 | (0.0) | 0 | (0.0) | 2 | (8.7) | 2 | (5.6) |
| Tinnitus | 0 | (0.0) | 0 | (0.0) | 1 | (50.0) | 1 | (4.3) | 2 | (5.6) |
| Upper respiratory tract infection NOS | 0 | (0.0) | 1 | (16.7) | 0 | (0.0) | 2 | (8.7) | 3 | (8.3) |

[a]Maximum Tolerated Dose is the last dose taken when the subject left or completed the study.
[b]This group included subjects who took two 15-mg capsules/day as well as subjects who took one 30-mg capsule/day.
[c]This group included one subject whose MTD was 45 mg.
[d]NOS = Not otherwise specified.
[e]NEC = Not elsewhere classified.

Nausea was the most common adverse event experienced, occurring in 10 (27.8%) subjects overall. Nausea was judged to be mild in seven subjects (19.4%) and moderate in three subjects. Nausea was judged to be at least possibly related to treatment in all cases. There was no apparent relationship between the maximum tolerated dose and the occurrence, severity, or relationship of nausea to study drug. Dizziness was reported by nine subjects (25.0%) overall. Dizziness was mild in six subjects (16.7%) and moderate in three subjects (8.3%). For the majority of these subjects (seven versus two), dizziness was judged to be at least possibly related to treatment. Nine subjects (25.0%) reported headache. All instances of this adverse event were mild or moderate, and the majority (six out of nine) were judged to be possibly related to treatment. Two subjects withdrew from the study because of adverse events. One subject, with an MTD of 30 mg, withdrew after one dose of study medication because of a pre-existing colon polyp that required resection. The other subject, with an MTD of 60 mg, withdrew on Day 6 because of recurring, intermittent chest pain.

One subject had an exacerbation of Chronic Obstructive Pulmonary Disease (COPD) at the time of his final visit on Day 29, was counseled to contact his primary care physician,

and that his myocardial infarction and arrhythmia were unlikely to be related to study drug.

One subject, whose MTD was 60 mg, had a history of hypertension (four years) and atypical chest pain (two years). She developed recurring, intermittent chest pain on Day 6 and was admitted to the hospital on Day 7. She discontinued study medication. All tests for cardiac causes were negative. The subject recovered on Day 8, was discharged on Day 9, and returned to work on Day 10. The underlying cause of this subject's chest pain was unclear and her chest pain was possibly related to study drug.

All of the clinical laboratory adverse events were mild or moderate in intensity. Two subjects had elevated creatine kinase values, two subjects had elevated liver enzyme values accompanied by other abnormalities, and one subject had blood in the stool. Two subjects recovered from all of their

US 7,659,282 B2

65

66

clinical laboratory adverse events, one subject did not recover, and the outcome of the adverse events was unknown for 2 subjects because they did not return to the study clinic for follow-up testing. The majority of these adverse events were judged to have a "possible" relationship to study drug. None of the clinical laboratory adverse events were serious adverse events, and none required a dosage reduction or discontinuation of study drug.

There were no clinically relevant changes from Baseline to Day 29 in systolic blood pressure, diastolic blood pressure, heart rate, or respiration at any MTD. There were no clinically relevant changes in the results of physical examinations during study treatment. There was no clinically relevant difference among the MTD groups in mean QT, $QT_c$, PR, or QRS duration, or change in any electrocardiogram values during the study.

There were no meaningful differences in motor conduction velocities in the distal peroneal nerve segment, between the fibular head and ankle, for each of the 4 MTD groups at Screening. The mean baseline motor conduction velocity was 39.2 m/sec (range of 26.6 to 49.0 m/sec). There were also no differences between the change in motor nerve conduction from Screening to the final visit for each of the MTDs. The mean change in motor conduction velocity in the fibular head-to-ankle segment for the total study population was 0.8 m/sec (range of −4.0 to +7.7 m/sec). There was a marked slowing of conduction velocity in the proximal peroneal nerve segment, between the fibular head and popliteal fossa, for the 120-mg MTD group (−6.7 m/sec) and for the total study population (−5.5 m/sec). However, this can be explained by the unusually high nerve conduction velocity measured in this segment at Screening (mean of 47.6 m/sec and range of 21.7 to 66.7 m/sec in the 120-mg MTD group).

Twelve of the twenty-three subjects in this group had baseline motor conduction velocities greater than 50 m/sec; these unusually high values for this population could reflect the short distance over which this segment of the nerve was stimulated, which could have resulted in measurement errors.

Any significant slowing of nerve conduction velocity would manifest more severely in distal segments of nerve, as is seen electrophysiologically in diabetic neuropathy, because the frequency of this condition increases with length of the nerve pathway. For these reasons, the proximal conduction velocities measured in this study were interpreted as an assessment of the presence of focal peroneal neuropathy at the fibular head, and not as a measure of safety or tolerance of the study medication. In conclusion, there was no electrophysiologic evidence to suggest that the analgesic property of DM/Q is due to a toxic effect on peripheral nerves.

The combination of DM/Q, at daily doses from 30 mg DM/30 mg Q to 120 mg DM/120 mg Q, was safe and well tolerated in this subject population. The nature, frequency, and intensity of adverse events were within acceptable limits. Although five subjects had at least one laboratory adverse event, all were mild or moderate in intensity and none required a change in study drug dosing. There were no findings of clinical concern for vital signs, physical examinations, or electrocardiographic results. No clinically significant changes in nerve conduction velocity were detected. Study treatment was well tolerated; and the majority of subjects had an MTD of the highest permissible dose (120 mg DM/120 mg Q).

The frequencies of subjects with each pain intensity score at each time point are reported in Table 47.

TABLE 47

| | Pain Intensity Rating Scale Score | | | | | |
| Study Visit | 0 (None) | 1 (Mild) | 2 (Moderate) | 3 (Severe) | 4 (Extreme) | Total |
| --- | --- | --- | --- | --- | --- | --- |
| Day 1 | 0 (0.0) | 0 (0.0) | 20 (55.6) | 15 (41.7) | 1 (2.8) | 36 (100.0) |
| Day 8 | 3 (9.1) | 14 (42.4) | 14 (42.4) | 2 (6.1) | 0 (0.0) | 33 (100.0) |
| Day 15 | 5 (15.2) | 18 (54.6) | 10 (30.3) | 0 (0.0) | 0 (0.0) | 33 (100.0) |
| Day 22 | 10 (30.3) | 15 (45.5) | 6 (18.2) | 2 (6.1) | 0 (0.0) | 33 (100.0) |
| Final Visit | 14 (40.0) | 14 (40.0) | 5 (14.3) | 2 (5.7) | 0 (0.0) | 35 (100.0) |

Appx83

US 7,659,282 B2

67

On Day 1 (baseline), all subjects had a pain intensity of 2 (moderate) or greater, as specified in the protocol inclusion-criteria. By the final visit, only a minority of subjects (20.0%) had moderate or greater pain, and 40% reported no pain.

68

The changes from baseline in the Pain Intensity Rating

Scale scores are reported in Table 48.

TABLE 48

| | | Maximum Tolerated Dose (mg)[a] | | | | | P-value | |
| | | $30^b$ | $60^c$ | 90 | 120 | Total | Baseline | |
| Visit | Statistic | (N = 5) | (N = 6) | (N = 2) | (N = 23) | (N = 36) | and MTD[d] | Baseline[e] |
|---|---|---|---|---|---|---|---|---|
| Day 8 | n | 3 | 5 | 2 | 23 | 33 | 0.9525 | <0.0001 |
| | Mean | −1.0 | −1.0 | −0.5 | −1.1 | −1.0 | | |
| | SD | 1.00 | 1.00 | 0.71 | 0.90 | 0.88 | | |
| | Median | −1.0 | −1.0 | −0.5 | −1.0 | −1.0 | | |
| | Min/Max | −2/0 | −2/0 | −1/0 | −3/0 | −3/0 | | |
| Day | n | 3 | 5 | 2 | 23 | 33 | 0.4858 | <0.0001 |
| 15 | Mean | −0.3 | −1.8 | −0.5 | −1.4 | −1.3 | | |
| | SD | 0.58 | 0.45 | 0.71 | 0.84 | 0.85 | | |
| | Median | 0.0 | −2.0 | −0.5 | −1.0 | −1.0 | | |
| | Min/Max | −1/0 | −2/−1 | −1/0 | −3/0 | −3/0 | | |
| Day | n | 3 | 5 | 2 | 23 | 33 | 0.2053 | <0.0001 |
| 22 | Mean | −0.3 | −1.6 | −1.5 | −1.6 | −1.5 | | |
| | SD | 0.58 | 0.55 | 0.71 | 1.08 | 1.00 | | |
| | Median | 0.0 | −2.0 | −1.5 | −2.0 | −2.0 | | |
| | Min/Max | −1/0 | −2/−1 | −2/−1 | −3/1 | −3/1 | | |
| Day | n | 3 | 5 | 2 | 22 | 32 | 0.1628 | <0.0001 |
| 29 | Mean | −0.7 | −1.6 | −2.5 | −1.8 | −1.7 | | |
| | SD | 0.58 | 0.55 | 0.71 | 0.96 | 0.92 | | |
| | Median | −1.0 | −2.0 | −2.5 | −2.0 | −2.0 | | |
| | Min/Max | −1/0 | −2/−1 | −3/−2 | −3/0 | −3/0 | | |
| Final | n | 4 | 6 | 2 | 23 | 35 | 0.0348 | <0.0001 |
| Visit | Mean | −0.5 | −1.5 | −2.5 | −1.8 | −1.6 | | |
| | SD | 0.58 | 0.55 | 0.71 | 0.95 | 0.94 | | |
| | Median | −0.5 | −1.5 | −2.5 | −2.0 | −2.0 | | |
| | Min/Max | −1/0 | −2/−1 | −3/−2 | −3/0 | −3/0 | | |

[a]Maximum Tolerated Dose is the last dose taken when the subject left or completed the study.

[b]This group included subjects who took two 15-mg capsules/day as well as subjects who took one 30-mg capsule/day.

[c]This group included one subject whose MTD was 45 mg.

[d]P-value for MTD from a regression model that models the efficacy variable as a function of both baseline score and MTD.

[e]P-value for mean change in score from a regression model that models the efficacy variable as a function of baseline score.

US 7,659,282 B2

69

70

Mean scores on the Pain Intensity Rating Scale decreased between baseline and each subsequent visit for subjects over-all. This decrease was highly significant (all p-val-ues<0.0001). For the change from baseline to the final visit, the score decreases were significantly related to MTD (p=0.0348), but there was no significant effect of MTD on scores for any of the other visits (all p-values≧0.1628).

Frequencies of subjects with each pain relief score at each study visit are reported in Table 49.

TABLE 49

| | Pain Relief | | | | | | |
|---|---|---|---|---|---|---|---|
| Study Visit | −1 (Worse) | 0 (None) | 1 (Slight) | 2 (Moderate) | 3 (A Lot) | 4 (Complete) | Total |
| Day 8 | 0 (0.0) | 3 (9.1) | 6 (18.2) | 13 (39.4) | 8 (24.2) | 3 (9.1) | 33 (100.0) |
| Day 15 | 0 (0.0) | 1 (3.0) | 5 (15.2) | 6 (18.2) | 18 (54.6) | 3 (9.1) | 33 (100.0) |
| Day 22 | 0 (0.0) | 1 (3.0) | 5 (15.2) | 4 (12.1) | 17 (51.5) | 6 (18.2) | 33 (100.0) |
| Final Visit | 0 (0.0) | 1 (2.9) | 6 (17.7) | 5 (14.7) | 13 (38.2) | 9 (26.5) | 34 (100.0) |

In general, pain relief scores increased during the study. At Day 8, only 33.3% of subjects reported "a lot" or "complete" pain relief; by the final visit, the majority (64.7%) did so. No subject reported "worse" pain compared to baseline at any visit, and only 1 subject reported "None" at any visit after Day 8.

Summary statistics for Pain Relief Scale scores are reported in Table 50.

TABLE 50

| | | Maximum Tolerated Dose (mg)[a] | | | | | P-value | |
|---|---|---|---|---|---|---|---|---|
| Visit | Statistic | 30[b] (N = 5) | 60[c] (N = 6) | 90 (N = 2) | 120 (N = 23) | Total (N = 36) | MTD[d] | Difference from 0[e] |
| Day 8 | n | 3 | 5 | 2 | 23 | 33 | 0.4880 | <0.0001 |
| | Mean | 2.7 | 2.0 | 2.0 | 2.0 | 2.1 | | |
| | SD | 0.58 | 1.58 | 0.00 | 1.09 | 1.09 | | |
| | Median | 3.0 | 2.0 | 2.0 | 2.0 | 2.0 | | |
| | Min/Max | 2/3 | 0/4 | 2/2 | 0/4 | 0/4 | | |
| Day 15 | n | 3 | 5 | 2 | 23 | 33 | 0.7953 | <0.0001 |
| | Mean | 2.0 | 2.8 | 2.5 | 2.5 | 2.5 | | |
| | SD | 1.00 | 1.10 | 0.71 | 0.99 | 0.97 | | |
| | Median | 2.0 | 3.0 | 2.5 | 3.0 | 3.0 | | |
| | Min/Max | 1/3 | 1/4 | 2/3 | 0/4 | 0/4 | | |
| Day 22 | n | 3 | 5 | 2 | 23 | 33 | 0.6110 | <0.0001 |
| | Mean | 2.3 | 2.6 | 3.0 | 2.7 | 2.7 | | |
| | SD | 0.58 | 1.14 | 0.00 | 1.15 | 1.05 | | |
| | Median | 2.0 | 3.0 | 3.0 | 3.0 | 3.0 | | |
| | Min/Max | 2/3 | 1/4 | 3/3 | 0/4 | 0/4 | | |
| Day 29 | n | 3 | 5 | 2 | 22 | 32 | 0.6263 | <0.0001 |
| | Mean | 2.3 | 2.6 | 3.5 | 2.7 | 2.7 | | |
| | SD | 1.15 | 1.14 | 0.71 | 1.20 | 1.14 | | |
| | Median | 3.0 | 3.0 | 3.5 | 3.0 | 3.0 | | |
| | Min/Max | 1/3 | 1/4 | 3/4 | 0/4 | 0/4 | | |
| Final Visit | n | 3 | 6 | 2 | 23 | 34 | 0.7958 | <0.0001 |
| | Mean | 2.3 | 2.7 | 3.5 | 2.7 | 2.7 | | |
| | SD | 1.15 | 1.03 | 0.71 | 1.23 | 1.15 | | |
| | Median | 3.0 | 3.0 | 3.5 | 3.0 | 3.0 | | |
| | Min/Max | 1/3 | 1/4 | 3/4 | 0/4 | 0/4 | | |

[a]Maximum Tolerated Dose is the last dose taken when the subject left or completed the study.
[b]This group included subjects who took two 15-mg capsules/day as well as subjects who took one 30-mg capsule/day.
[c]This group included one subject whose MTD was 45 mg.
[d]P-value for MTD from a regression model that models the efficacy variable as a function of MTD.
[e]P-value from a t-test testing that the mean of the total column is significantly different from 0.

Appx85

US 7,659,282 B2

71

Mean scores on the Pain Relief Rating Scale increased significantly from the first assessment on Day 8 to each subsequent visit for subjects overall (all p-values<0.0001). There was no significant effect of MTD on pain relief scores at any visit (all p-values≧0.4880).

The change from baseline in the composite score from the Peripheral Neuropathy QOL Instrument is reported in Table 51.

72

TABLE 52-continued

| Scale | P-value |
|---|---|
| Sleep | <0.0001 |
| Social Functioning | <0.0001 |
| Sexual Function | 0.7714 |
| Health Distress | <0.0001 |

TABLE 51

| Visit/ Variable | Statistic | Maximum Tolerated Dose (mg)[a] | | | | Total (N = 36) | P-value | |
|---|---|---|---|---|---|---|---|---|
| | | 30[b] (N = 5) | 60[c] (N = 6) | 90 (N = 2) | 120 (N = 23) | | Baseline and MTD[d] | Baseline[e] |
| Day 1 (Baseline)/ Score | n | 4 | 6 | 2 | 23 | 35 | N/A[f] | N/A |
| | Mean | 61.3 | 69.7 | 72.8 | 63.7 | 65.0 | | |
| | SD | 15.26 | 13.68 | 0.18 | 13.48 | 13.26 | | |
| | Median | 60.8 | 66.8 | 72.8 | 65.3 | 66.7 | | |
| | Min/Max | 47.1/76.4 | 49.8/86.9 | 72.7/72.9 | 35.6/87.2 | 35.6/87.2 | | |
| Day 29/ Score | n | 3 | 5 | 2 | 22 | 32 | N/A | N/A |
| | Mean | 68.3 | 75.7 | 79.0 | 75.5 | 75.0 | | |
| | SD | 13.38 | 15.88 | 4.68 | 9.93 | 10.82 | | |
| | Median | 66.3 | 79.9 | 79.0 | 75.4 | 76.5 | | |
| | Min/Max | 56.0/82.6 | 49.1/91.8 | 75.7/82.3 | 51.4/88.5 | 49.1/91.8 | | |
| Day 29/ Change from Baseline | n | 3 | 5 | 2 | 22 | 32 | 0.1397 | <0.0001 |
| | Mean | 2.4 | 8.8 | 6.2 | 12.1 | 10.3 | | |
| | SD | 10.87 | 13.35 | 4.85 | 10.77 | 10.95 | | |
| | Median | 6.9 | 10.7 | 6.2 | 12.8 | 10.4 | | |
| | Min/Max | −10.1/10.2 | −6.8/27.7 | 2.7/9.6 | −10.2/34.5 | −10.2/34.5 | | |
| Final Visit/ Score | n | 3 | 6 | 2 | 23 | 34 | N/A | N/A |
| | Mean | 68.3 | 77.6 | 79.0 | 75.4 | 75.4 | | |
| | SD | 13.38 | 14.99 | 4.68 | 9.71 | 10.71 | | |
| | Median | 66.3 | 80.0 | 79.0 | 75.1 | 76.5 | | |
| | Min/Max | 56.0/82.6 | 49.1/91.8 | 75.7/82.3 | 51.4/88.5 | 49.1/91.8 | | |
| Final Visit/ Change from Baseline | n | 3 | 6 | 2 | 23 | 34 | 0.1828 | <0.0001 |
| | Mean | 2.4 | 7.9 | 6.2 | 11.6 | 9.8 | | |
| | SD | 10.87 | 12.11 | 4.85 | 10.76 | 10.78 | | |
| | Median | 6.9 | 7.2 | 6.2 | 12.7 | 9.9 | | |
| | Min/Max | — | −6.8/27.7 | 2.7/9.6 | 10.2/34.5 | 10.2/34.5 | | |
| | | 10.1/10.2 | | | | | | |

[a]Maximum Tolerated Dose is the last dose taken when the subject left or completed the study.
[b]This group included subjects who took two 15-mg capsules/day as well as subjects who took one 30-mg capsule/day.
[c]This group included one subject whose MTD was 45 mg.
[d]P-value for MTD from a regression model that models the efficacy variable as a function of both baseline score and MTD.
[e]P-value for mean change in score from a regression model that models the efficacy variable as a function of baseline score.
[f]N/A = Not applicable.

Mean composite scores on the Peripheral Neuropathy QOL Instrument increased (i.e., improved) significantly from Day 1 (baseline) to Day 29 and to the final visit for subjects overall (both p-values<0.0001). Change from baseline to either Day 29 or the final visit was not related to MTD (all p-values≧0.1837).

P-values for change from baseline to the final visit in individual QOL scales are reported in Table 52.

TABLE 52

| Scale | P-value |
|---|---|
| Physical Functioning | 0.0012 |
| Role Limitations | 0.0003 |
| Disease-Targeted Pain | <0.0001 |
| Energy/Fatigue | 0.0001 |
| Upper Extremities | 0.0007 |
| Balance | 0.0001 |
| Self Esteem | 0.1258 |
| Emotional Well Being | 0.0277 |
| Stigma | 0.7851 |
| Cognitive Function | 0.0313 |
| Emotional Role Limitations | 0.2956 |
| General Health Perceptions | <0.0001 |

TABLE 52-continued

| Scale | P-value |
|---|---|
| Severity | 0.0129 |
| Disability Days | 0.1096 |
| Health Change | 0.0001 |
| Overall Health Rating | 0.0064 |
| Satisfaction with Sexual Functioning | 0.3413 |

[d]P-value for the change from baseline. A regression model was used to test whether the mean baseline value was different from the mean value at the final visit.

The majority of individual QOL scale items improved significantly between baseline and the final visit ($^{15}/_{21}$, 74.1%).

Sleep interference scores, calculated for Day 15, Day 29, and the final visit, are reported in Table 53.

US 7,659,282 B2

73 74

## TABLE 53

| | | Maximum Tolerated Dose (mg)[b] | | | | Total | |
|---|---|---|---|---|---|---|---|
| Visit | Statistic | 30[c] (N = 5) | 60[d] (N = 6) | 90 (N = 2) | 120 (N = 23) | (N = 36) | P-value MTD[e] |
| Day 15 | n | 3 | 5 | 2 | 23 | 33 | 0.8509 |
| | Mean | 1.4 | 2.2 | 2.2 | 1.8 | 1.8 | |
| | SD | 1.35 | 1.66 | 0.71 | 1.64 | 1.54 | |
| | Median | 1.7 | 2.0 | 2.2 | 1.3 | 1.7 | |
| | Min/ Max | 0/3 | 0/4 | 2/3 | 0/5 | 0/5 | |
| Day 29 | n | 3 | 5 | 2 | 22 | 32 | 0.1405 |
| | Mean | 1.6 | 2.5 | 0.2 | 1.2 | 1.4 | |
| | SD | 1.35 | 2.09 | 0.24 | 1.29 | 1.47 | |
| | Median | 1.3 | 2.0 | 0.2 | 0.7 | 0.8 | |
| | Min/ Max | 0/3 | 0/5 | 0/0 | 0/5 | 0/5 | |
| Final Visit | n | 3 | 5 | 2 | 23 | 33 | 0.1077 |
| | Mean | 1.6 | 2.5 | 0.2 | 1.1 | 1.3 | |
| | SD | 1.35 | 2.09 | 0.24 | 1.20 | 1.41 | |
| | Median | 1.3 | 2.0 | 0.2 | 0.7 | 1.0 | |
| | Min/ Max | 0/3 | 0/5 | 0/0 | 0/6 | 0/6 | |

[a]The score for Day 15 is the average of the Sleep Rating Scale scores from the subject diary for Days 13, 14, and 15; the score for Day 29 is the average of the Day 27, 28, and 29 scores; and the Final Visit score is the average of the final 3 consecutive days of study treatment.
[b]Maximum Tolerated Dose is the last dose taken when the subject left or completed the study.
[c]This group included subjects who took two 15-mg capsules/day as well as subjects who took one 30-mg capsule/day.
[d]This group included one subject whose MTD was 45 mg.
[e]P-value for MTD from a regression model that models the efficacy variable as a function of MTD.

Mean sleep interference scores declined during the study, indicating decreasing interference of the subjects' pain with their sleep. There was no significant effect of MTD on sleep interference scores at any visit (all p values ≧0.1077). Results from the Sleep Rating Scale are plotted by study day in FIG. 4. Sleep scores decreased significantly (regression p<0.001) from Day 2 to the final study day (the lower the score, the less pain was judged to interfere with sleep).

Results from the Present Pain Intensity Rating Scale are plotted by study day in FIG. 5. Present Pain Intensity scores decreased significantly (regression p<0.001) from Day 2 to the final study day. Results from the Activity Rating Scale are plotted by study day in FIG. 6. Activity scores decreased significantly (regression p<0.001) from Day 1 to the final study day (the lower the score, the less pain was judged to interfere with general activity). Results from the Pain Rating Scale are plotted by study day in FIG. 7. Scores for average pain over the previous twelve hours decreased significantly (regression p<0.001) from Day 1 to the final study day.

An improvement in efficacy score was defined as an improvement from the first recorded value to the last recorded value, except for the Pain Relief Rating Scale, where an improvement was defined as a value>0 for the last recorded value. The frequencies of subjects whose score improved during the study are presented for each efficacy measure in Table 54.

## TABLE 54

| | Maximum Tolerated Dose (mg)[b] | | | | | Total | P-value | |
|---|---|---|---|---|---|---|---|---|
| Efficacy Variable | 30[c] (N = 5) | 60[d] (N = 6) | 90 (N = 2) | 120 (N = 23) | | (N = 36) | MTD[e] | 50%[f] |
| | n (%) | n (%) | n (%) | n (%) | | n (%) | | |
| Pain Intensity Rating Scale | 2 (50.0) | 6 (100.0) | 2 (100.0) | 21 (91.3) | | 31 (86.6) | 0.1698 | <0.0001 |
| Pain Relief Rating Scale | 3 (100.0) | 5 (100.0) | 2 (100.0) | 22 (95.7) | | 32 (97.0) | 0.9419 | <0.0001 |
| QOL Composite Score | 2 (66.7) | 5 (83.3) | 2 (100.0) | 19 (82.6) | | 28 (82.4) | 0.6877 | 0.0002 |
| Sleep Rating Scale (Diary) | 3 (100.0) | 5 (83.3) | 2 (100.0) | 20 (87.0) | | 30 (88.2) | 0.7222 | <0.0001 |
| Present Pain Intensity Rating Scale (Diary) | 2 (66.7) | 3 (50.0) | 2 (100.0) | 16 (69.6) | | 23 (67.6) | 0.5877 | 0.0396 |
| Activity Rating Scale (Diary) | 2 (50.0) | 5 (83.3) | 2 (100.0) | 20 (87.0) | | 29 (82.9) | 0.1668 | 0.0001 |
| Pain Rating Scale (Diary) | 3 (75.0) | 5 (83.3) | 2 (100.0) | 20 (87.0) | | 30 (85.7) | 0.5772 | <0.0001 |

[a]An improvement in efficacy score is an improvement from the first recorded value to the last recorded value, except for the Pain Relief Rating Scale, where an improvement is a value > 0 for the last recorded value.
[b]Maximum Tolerated Dose is the last dose taken when the subject left or completed the study.
[c]This group included subjects who took two 15-mg capsules/day as well as subjects who took one 30-mg capsule/day.
[d]This group included one subject whose MTD was 45 mg.
[e]P-value for MTD from a regression model that models improvement in the efficacy variable as a function of MTD.
[f]P-value from a test that the total percent of subjects whose score improved = 50%.

Appx87

US 7,659,282 B2

75

A significant proportion of subjects improved during the study in every efficacy measure (all p-values≦0.0396). Improvement was not related to MTD for any of the efficacy measures (all p-values≧0.1668).

Subjects treated with open-label DM/Q, in the dose range of 30 mg DM/30 mg Q to 120 mg DM/120 mg Q, reported a statistically significant reduction in pain from diabetic peripheral neuropathy and in the extent to which this pain interfered with general activity and sleep. Subjects receiving this treatment also experienced statistically significant improvement in their QOL.

The CYP2D6 phenotypes of subjects, based upon their genotype results, are summarized in Table 55. There were no intermediate or ultra-rapid metabolizers in this study population.

76

TABLE 55

| | Maximum Tolerated Dose (mg)[a] | | | | |
|---|---|---|---|---|---|
| Phenotype | 30[a] (N = 5) n (%) | 60[a] (N = 6) n (%) | 90 (N = 2) n (%) | 120 (N = 23) n (%) | Total (N = 36) n (%) |
| Extensive Metabolizer | 5 (100.0) | 5 (83.3) | 2 (100.0) | 23 (100.0) | 35 (97.2) |
| Poor Metabolizer | 0 (0.0) | 1 (16.7) | 0 (0.0) | 0 (0.0) | 1 (2.8) |

[a]Maximum Tolerated Dose is the last dose taken when the subject left or completed the study.
[b]This group included subjects who took two 15-mg capsules/day as well as subjects who took one 30-mg capsule/day.
[c]This group included one subject whose MTD was 45 mg.

All except one subject were extensive metabolizers. Concentrations in plasma of DM increased between the visit on Day 15 and the final visit for the 90-mg and 120-mg MTDs. A similar increase in concentration was seen for the metabolite DX and for Q. Concentrations of DM, DX, and Q in plasma of extensive metabolizers at the final visit are summarized by MTD in Table 56.

TABLE 56

| Drug or Metabolite (ng/mL) | Statistic | MTD[b] (mg) | | | | Total |
|---|---|---|---|---|---|---|
| | | 30[c] N = 5 | 60[d] N = 5 | 90 N = 2 | 120 N = 23 | N = 35 |
| DM | n | 3 | 5 | 2 | 23 | 33 |
| | Mean | 59.0 | 46.2 | 117.0 | 192.6 | 153.7 |
| | SD | 30.28 | 67.38 | 44.47 | 98.93 | 106.01 |
| | Median | 67.4 | 1.5 | 117.0 | 178.0 | 144.5 |
| | Min/Max | 25.4/84.2 | 0.0/150.2 | 85.5/148.4 | 48.7/388.5 | 0.0/388.5 |
| DX | n | 3 | 5 | 2 | 23 | 33 |
| | Mean | 70.7 | 65.4 | 88.4 | 146.6 | 123.9 |
| | SD | 48.49 | 67.38 | 34.83 | 96.88 | 91.94 |
| | Median | 94.6 | 58.2 | 88.4 | 122.6 | 102.6 |
| | Min/Max | 14.9/102.6 | 0.0/135.6 | 63.8/113.0 | 53.2/417.9 | 0.0/417.9 |
| Q | n | 3 | 5 | 2 | 23 | 33 |
| | Mean | 114.0 | 41.8 | 114.5 | 269.0 | 211.1 |
| | SD | 48.75 | 66.72 | 70.00 | 176.88 | 175.28 |
| | Median | 137.0 | 0.0 | 114.5 | 211.0 | 164.0 |
| | Min/Max | 58/147 | 0/153 | 65/164 | 74/681 | 0/681 |

[a]One of the thirty-six subjects was a poor metabolizer.

[b]Maximum Tolerated Dose is the last dose taken when the subject left or completed the study.

[c]This group included subjects who took two 15-mg capsules/day as well as subjects who took one 30-mg capsule/day.

[d]This group included one subject whose MTD was 45 mg.

Appx88

US 7,659,282 B2

77

For comparison, the poor metabolizer (MTD of 60 mg) had the following concentrations in plasma at the final visit: DM 126.4 ng/mL, DX 41.0 ng/mL, and Q 165.0 ng/mL. Correlations between the concentration of DM in plasma with pain intensity ratings on Day 15, Day 29, and the final visit are summarized in Table 57 (extensive metabolizers only).

TABLE 57

| Visit | $n^b$ | Correlation Coefficient | P-value |
|---|---|---|---|
| Day 15 | 33 | −0.3479 | 0.0473 |
| Day 29 | 30 | −0.1336 | 0.4817 |
| Final Visit | 33 | −0.1487 | 0.4088 |

[a]One of the thirty-six subjects was a poor metabolizer.
[b]Data were not available for all subjects.

There was a weak, negative correlation between concentration of DM in plasma and rating of pain intensity at Day 15 (coefficient of −0.3572) and negligible correlations at the other time points ($\leq$−0.1487). The Day 15 correlation was statistically significant (p=0.0473), but the correlations at Day 29 and the final visit were not (p$\geq$0.4088). However, a weak or nonexistent correlation between concentrations of drug in plasma and pain ratings is a typical result in pharmacodynamic studies of analgesics.

The safety results demonstrate that the combination of DM/Q, in the dose range from 30 mg DM/30 mg Q to 120 mg DM/120 mg Q, is safe and well tolerated in the treatment of subjects with pain associated with diabetic peripheral neuropathy, and provide indications of efficacy in pain reduction.

The preferred embodiments have been described in connection with specific embodiments thereof. It will be understood that it is capable of further modification, and this application is intended to cover any variations, uses, or adaptations of the invention following, in general, the principles of the invention and including such departures from the present disclosure as come within known or customary practices in the art to which the invention pertains and as may be applied to the essential features hereinbefore set forth, and as fall within the scope of the invention and any equivalents thereof. All references cited herein, including but not limited to technical literature references and patents, are hereby incorporated herein by reference in their entireties.

78

What is claimed is:

1. A method for treating pseudobulbar affect or emotional lability, the method comprising administering to a patient in need thereof dextromethorphan in combination with quinidine, wherein the amount of dextromethorphan administered comprises from about 20 mg/day to about 80 mg/day and wherein the amount of quinidine administered comprises from about 10 mg/day to less than about 30 mg/day with the proviso that the weight to weight ratio of dextromethorphan to quinidine is 1:0.5 or less.

2. The method of claim 1, wherein the pseudobulbar affect or emotional lability is caused by a neurodegenerative disease or condition or a brain injury.

3. The method of claim 1, wherein the dextromethorphan and the quinidine are administered as one combined dose per day.

4. The method of claim 1, wherein the dextromethorphan and the quinidine are administered as at least two combined doses per day.

5. The method of claim 1, wherein the amount of quinidine administered comprises from about 20 mg/day to about 30 mg/day.

6. The method of claim 1, wherein the amount of dextromethorphan administered comprises from about 20 mg/day to about 60 mg/day.

7. The method of claim 1, wherein at least one of the quinidine and the dextromethorphan is in a form of a pharmaceutically acceptable salt.

8. The method of claim 1, wherein at least one of the quinidine and the dextromethorphan is in a form of a pharmaceutically acceptable salt selected from the group consisting of salts of free acids, inorganic salts, salts of sulfate, salts of hydrochloride, and salts of hydrobromide.

9. The method of claim 1 wherein about 20 mg quinidine sulfate is administered per day.

10. The method of claim 9, wherein about 60 mg dextromethorphan hydrobromide is administered per day.

11. The method of claim 1, wherein about 60 mg dextromethorphan hydrobromide is administered per day.

12. The method of claim 1 wherein the dextromethorphan and quinidine are administered in separate doses.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO.          : 7,659,282 B2                                                Page 1 of 1
APPLICATION NO. : 11/035213
DATED               : February 9, 2010
INVENTOR(S)       : Yakatan et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page:

The first or sole Notice should read --

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1123 days.

Signed and Sealed this

Eighteenth Day of January, 2011

*David J. Kappos*

David J. Kappos
*Director of the United States Patent and Trademark Office*

Appx90

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** <u>2025-2016</u>

**Short Case Caption:** <u>Otsuka America Pharmaceutical, Inc. v. Hetero Labs Limited</u>

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes <u>13,972</u> words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: <u>10/14/2025</u>

Signature: <u>/s/ Ehab M. Samuel</u>

Name: <u>Ehab M. Samuel</u>

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing paper entitled

## NON-CONFIDENTIAL APPELLANT'S BRIEF

was filed with the Clerk of the United States Court of Appeals for the Federal Circuit via the CM/ECF SYSTEM. Counsel registered with the CM/ECF system have been served by operation of the Court's CM/ECF SYSTEM per Fed. R. App. P. 25 and Fed. Cir. R. 25(c) on the 14th day of October 2025.

Date: October 14, 2025

/s/ Ehab Samuel
Ehab M. Samuel
ORBIT IP, LLP
620 Newport Center Drive, Suite 1100
Newport Beach, CA 92660
(310) 887-1333
Counsel for Defendants-Appellants

FORM 31. Certificate of Confidential Material

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 2025-2016

**Short Case Caption:** Otsuka America Pharmaceutical, Inc. v. Hetero Labs Limited

---

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).

- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

---

The foregoing document contains ___0___ number of unique words (including numbers) marked confidential.

☑ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☐ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 10/14/2025

Signature: /s/ Ehab M. Samuel

Name: Ehab M. Samuel