**2025-2016**

# United States Court of Appeals for the Federal Circuit

OTSUKA AMERICA PHARMACEUTICAL, INC., AVANIR
PHARMACEUTICALS, LLC, fka Avanir Pharmaceuticals Inc.,

*Plaintiffs-Appellees,*

– v. –

HETERO LABS LIMITED, HETERO LABS LIMITED UNIT-III,
CAMBER PHARMACEUTICALS INC.,

*Defendants-Appellants.*

*On Appeal from the United States District Court for the
District of Delaware in No. 1:25-cv-00647-GBW,
Gregory Brian Williams, Judge*

## NON-CONFIDENTIAL ANSWERING BRIEF OF PLAINTIFFS-APPELLEES

ALEXANDRA K. KIM
QUINN EMANUEL URQUHART &
   SULLIVAN, LLP
111 Huntington Avenue, Suite 520
Boston, Massachusetts 02199
(617) 712-7100
alexandrakim@quinnemanuel.com

F. DOMINIC CERRITO
ERIC C. STOPS
JAMES E. BAKER
ELLYDE R. THOMPSON
JOHN P. GALANEK
QUINN EMANUEL URQUHART &
   SULLIVAN, LLP
295 Fifth Avenue, 9th Floor
New York, New York 10016
(212) 849-7000
nickcerrito@quinnemanuel.com
ericstops@quinnemanuel.com
jamesbaker@quinnemanuel.com
ellydethompson@quinnemanuel.com
johngalanek@quinnemanuel.com

*Counsel for Plaintiffs-Appellees*

DECEMBER 8, 2025

## REPRESENTATIVE CLAIM

This brief concerns claims 1-12 of U.S. Patent No. 7,659,282 ("the '282 patent).  Claim 1, the only independent claim, is representative:

1.   A method for treating pseudobulbar affect or emotional liability, the method comprising administering to a patient in need thereof dextromethorphan in combination with quinidine, wherein the amount of dextromethorphan administered comprises from about 20 mg/day to about 80 mg/day and wherein the amount of quinidine administered comprises from about 10 mg/day to less than 30 mg/day with the proviso that the weight to weight ratio of dextromethorphan to quinidine to 1:0.5 or less.

# CERTIFICATE OF INTEREST

Counsel for Otsuka America Pharmaceutical, Inc. and Avanir Pharmaceuticals, LLC (fka Avanir Pharmaceuticals Inc.), Eric C. Stops, certifies the following:

1. **Represented Entities.**  Provide the full names of all entities represented by undersigned counsel in this case.  Fed. Cir. R. 47.4(a)(1).

Otsuka America Pharmaceutical, Inc.
Avanir Pharmaceuticals, LLC, fka Avanir Pharmaceuticals Inc.

2. **Real Party in Interest.**  Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.  Fed. Cir. R. 47.4(a)(2).

None.

3. **Parent Corporations and Stockholders.**  Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  Fed. Cir. R. 47.4(a)(3).

Otsuka America, Inc.

4. **Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

**Morris, Nichols, Arsht & Tunnell LLP**: Jeremy A. Tigan, Cameron Clark

5. **Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

Yes.

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.**    Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

Not applicable.

# TABLE OF CONTENTS

REPRESENTATIVE CLAIM ............................................................... i

CERTIFICATE OF INTEREST ........................................................... ii

TABLE OF CONTENTS ................................................................... iv

CONFIDENTIAL MATERIAL OMITTED ........................................... vii

STATEMENT OF RELATED CASES ..................................................... 1

INTRODUCTION ............................................................................. 2

COUNTER-STATEMENT OF ISSUES .................................................. 5

COUNTER-STATEMENT OF THE CASE AND FACTUAL
    BACKGROUND ......................................................................... 6

    A.     NUEDEXTA® ................................................................... 6

    B.     The '282 Patent ............................................................... 7

        1.     Relevant Claims Of The '282 Patent ............................. 7

        2.     The Specification Of The '282 Patent .......................... 8

        3.     The Prosecution History Of The '282 Patent ................. 9

    C.     The Prior NUEDEXTA® Litigation ................................. 11

    D.     Hetero's ANDA .............................................................. 12

    E.     The District Court Proceedings ........................................ 14

SUMMARY OF THE ARGUMENT ..................................................... 15

STANDARD OF REVIEW ................................................................ 19

ARGUMENT .................................................................................. 20

I.     HETERO FAILS TO SHOW THAT THE DISTRICT COURT
    ABUSED ITS DISCRETION IN ISSUING THE PRELIMINARY
    INJUNCTION.............................................................................. 20

    A.     The District Court Correctly Found That Otsuka Is Likely To
       Succeed On The Merits .................................................... 20

        1.     The District Court Properly Construed
           "Dextromethorphan" And "Quinidine" ...................... 20

           a.     The *Claims* Of The '282 Patent Support Otsuka's
              Construction................................................. 22

|   | b. | The *Specification* Of The '282 Patent  Supports Otsuka's Construction | 24 |
|   | c. | The *Prosecution History* Of The '282  Patent Supports Otsuka's Construction | 31 |
|   | d. | Hetero's Claim Construction Leads To The Absurd Result That NUEDEXTA® Is Allegedly Not Covered | 34 |
|   | e. | The District Court Correctly  Weighed Expert Testimony | 36 |
|   | f. | Otsuka Did Not Mislead The District Court | 37 |
|   | g. | The District Court's Construction  Was Not "Fundamentally Flawed" | 39 |
| 2. | | The District Court Correctly Found That Hetero Was Unlikely To Succeed On Its Indefiniteness Defense | 42 |
|   | a. | The District Court's Determination  Is Supported By The Intrinsic Record | 43 |
|   | b. | The District Court Properly  Found *Avanir* To Be "Instructive" | 47 |
| B. | | The District Court Did Not Abuse Its Discretion By  Finding That Otsuka Would Be Irreparably Harmed | 48 |
| C. | | The District Court Correctly Found That  The Balance Of Equities Favored Otsuka | 52 |
| D. | | The District Court Properly Considered Public Interest | 54 |
| II. | | THE DISTRICT COURT DID NOT ABUSE ITS  DISCRETION BY DECLINING TO REQUIRE A BOND | 56 |
| A. | | Hetero Failed To Address The Exception  The District Court Actually Applied | 56 |
| B. | | The District Court Made Specific Findings Demonstrating  The Balance Of Equities Weighs Strongly In Otsuka's Favor | 58 |
| 1. | | Otsuka's Motion Was Not  Based on Tenuous Legal Grounds | 58 |
| 2. | | The Risk Of Financial Harm To Hetero Is Speculative | 59 |

3.    Requiring A Bond Would Have A  Chilling Effect On Access To Justice .......................................................................61

C.    The District Court's Decision Should Be Affirmed............................65

CONCLUSION ........................................................................................66

**CONFIDENTIAL MATERIAL OMITTED**

The material redacted from this brief is subject to a protective order. The confidential information on pages 3, 18, 61, 62, 63, 64 describe confidential information related to Hetero's ANDA. The parties have moved to file similar disclosures under seal in the district court case, which the district court granted. *See, e.g.*, *Otsuka Am. Pharm., Inc., et al. v. Hetero Labs. Ltd., et al.*, No. 1-25-00647, D.I. 60, 134. 143. At the district court, Hetero represented that "[t]he disclosure of this information could harm Hetero's competitive standing in the marketplace by providing sensitive information to other pharmaceutical companies, including other generic companies looking to launch a generic version of NUEDEXTA." *Id.*, D.I. 147 at 1-2. Hetero also represented that "the dispute involves private litigants and relates to Hetero's ANDA, which is confidential and unavailable to the public" and "there is no public interest in the disclosure of the information contained in Hetero's ANDA." *Id.* at 2.

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Abbott Lab'ys. v. TorPharm, Inc.*,
    300 F.3d 1367 (Fed. Cir. 2002) ...................................................25, 65

*Alcon Rsch., Ltd. v. Apotex Inc.*,
    687 F.3d 1362 (Fed. Cir. 2012) ........................................................40

*AstraZeneca LP v. Apotex, Inc.*,
    633 F.3d 1042 (Fed. Cir. 2010) ...................................................19, 58

*Avanir Pharms., Inc. v. Actavis S. Atl. LLC*,
    36 F. Supp. 3d 475 (D. Del. 2014).............................. 6, 7, 11, 12, 35, 36, 37, 39

*Avanir Pharms. Inc. v. Par Pharm. Inc.*,
    612 F. App'x 613 (Fed. Cir. 2015) ...............................................6, 12

*Bayer Schering Pharma AG v. Barr Labs., Inc.*,
    575 F.3d 1341 (Fed. Cir. 2009)........................................................19

*Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*,
    672 F.3d 1270 (Fed. Cir. 2012) ........................................................45

*Dow Chem. v. Nova Chemicals Corp. (Canada)*,
    803 F.3d 620 (Fed. Cir. 2015) .........................................................46

*Elliott v. Kiesewetter*,
    98 F.3d 47 (3d Cir. 1996) .............................................19, 56, 58, 65

*Fenner Investments, Ltd. v. Cellco P'ship*,
    778 F.3d 1320 (Fed. Cir. 2015) ........................................................40

*FMC Corp. v. Sharda USA, LLC*,
    145 F.4th 1326 (Fed. Cir. 2025) ......................................................30

*Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*,
    847 F.2d 100 (3d Cir. 1988) ......................................................56, 57, 65

*High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*,
  49 F.3d 1551 (Fed. Cir. 1995) ...........................................................50

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
  381 F.3d 1111 (Fed. Cir. 2004) ..................................................22, 23

*Jeneric/Pentron, Inc. v. Dillon Co., Inc.*,
  205 F.3d 1377 (Fed. Cir. 2000) ..................................................19, 58

*Lexion Med., LLC v. Northgate Techs., Inc.*,
  641 F.3d 1352 (Fed.Cir.2011) ...........................................................30

*Littelfuse, Inc. v. Mersen USA EP Corp.*,
  29 F.4th 1376 (Fed. Cir. 2022) .........................................................23

*Melinta Therapeutics, LLC v. U.S. Food & Drug Admin.*,
  No. 22-2190, 2022 WL 6100188 (D.D.C. Oct. 7, 2022)................53, 54, 62, 63

*Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*,
  370 F.3d 1354 (Fed. Cir. 2004) .........................................................24

*Natera, Inc. v. NeoGenomics Lab'ys, Inc.*,
  106 F.4th 1369 (Fed. Cir. 2024) ..................................................49, 55

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  572 U.S. 898 (2014)..............................................................................43

*Nobel Biocare Servs. AG v. Instradent U.S., Inc.*,
  903 F.3d 1365 (Fed. Cir. 2018) .........................................................26

*N. Am.'s Bldg. Trades Unions v. Dep't of Def.*,
  783 F. Supp. 3d 290 (D.D.C. 2025)..............................................59, 60

*Nystrom v. TREX Co., Inc.*,
  424 F.3d 1136 (Fed. Cir. 2005) ..................................................29, 30

*Oakley, Inc. v. Sunglass Hut Int'l*,
  316 F.3d 1331 (Fed. Cir. 2003) .........................................................47

*Oatey Co. v. IPS Corp.*,
  514 F.3d 1271 (Fed. Cir. 2008) .........................................................25

*Osram GmbH v. Int'l Trade Comm'n*,
    505 F.3d 1351 (Fed. Cir. 2007) ..........................................................35

*Pfizer Inc. v. Teva Pharms. USA, Inc.*,
    555 F. App'x 961 (Fed. Cir. 2014) ....................................................29

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ...........................................24, 31, 36

*Retractable Techs., Inc. v. Becton, Dickinson & Co.*,
    653 F.3d 1296 (Fed. Cir. 2011) ..........................................................40

*Salazar v. Procter & Gamble Co.*,
    414 F.3d 1342 (Fed. Cir. 2005) ....................................................31, 33

*SmithKline Beecham Corp. v. Apotex Corp.*,
    403 F.3d 1331 (Fed. Cir. 2005) ..........................................................46

*SoClean, Inc. v. Sunset Healthcare Sols., Inc.*,
    52 F.4th 1363 (Fed. Cir. 2022) ...........................................................55

*Sunovion Pharms. v. Teva Pharms. USA, Inc.*,
    731 F.3d 1271 (Fed. Cir. 2013) ..........................................................31

*Temple University v. White*,
    941 F.2d 201 (3d Cir. 1991) .........................................................56, 65

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
    574 U.S. 318 (2015)........................................................................19, 41

*Teva Pharms. USA v. Sandoz, Inc.*,
    789 F.3d 1335 (Fed. Cir. 2015) ..........................................................46

*Thorner v. Sony Computer Ent. Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) ..........................................................22

*Tomasko v. Ira H. Weinstock, P.C.*,
    357 F. App'x 472 (3d Cir. 2009) ........................................................51

*Toro Co. v. White Consol. Indus., Inc.*,
    199 F.3d 1295 (Fed. Cir. 1999) ..........................................................40

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ........................................................25, 36

*Youth Justice Coal. v. City of L.A.*,
    No. 16-07932, 2018 U.S. Dist. LEXIS 242940 (C.D. Cal. Mar. 15,
    2018) .................................................................................................58

*Zambelli Fireworks Mfg. Co. v. Wood*,
    592 F.3d 412 (3d Cir. 2010) .........................................................19, 65

## <u>Statutes and Regulations</u>

21 U.S.C. § 355(j)(5)(B)(iii) ...............................................................61, 64

21 C.F.R. § 314.95 ....................................................12, 54, 61, 62

Fed. R. Civ. P. 65(c)........................................... 5, 15, 19, 57, 18, 61, 65

**STATEMENT OF RELATED CASES**

A prior appeal regarding the '282 patent was previously before this Court. Appeal No. 14-1838. The Court affirmed, among other things, the district court's ruling, which included findings that the '282 patent is valid and that the '282 patent covers the use of Otsuka's commercial product NUEDEXTA® such that there is a nexus between NUEDEXTA®'s commercial success and the claimed inventions. No other case will directly affect or be affected by this Court's decision in the pending appeal.

# INTRODUCTION

The district court properly granted Otsuka America Pharmaceutical, Inc. and Avanir Pharmaceuticals, LLC (together, "Otsuka") a preliminary injunction preventing Hetero Labs Limited, Hetero Labs Limited Unit-III, and Camber Pharmaceuticals Inc. (collectively, "Hetero") from launching their generic version of Otsuka's NUEDEXTA® product. Hetero fails to identify any error warranting reversal.

The district court correctly construed "dextromethorphan" and "quinidine" to include salt forms of those compounds, and Hetero has not shown any clear and unambiguous disavowal of claim scope. *First*, the dependent claims make clear that the disputed terms include salt forms: claim 8 ("at least one of the quinidine and the dextromethorphan is in the form of a pharmaceutically acceptable salt"); claim 9 ("about 20 mg quinidine sulfate is administered"); and claim 10 ("about 60 mg dextromethorphan hydrobromide is administered"). *Second*, the specification discloses for every embodiment that "the quinidine includes quinidine sulfate" and "the dextromethorphan includes dextromethorphan hydrobromide." *Third*, in the prosecution history the examiner explicitly acknowledged "dextromethorphan" and "quinidine" in the pending claims included "dextromethorphan hydrobromide" and "quinidine sulfate." Moreover, a prior district court decision (affirmed by this Court on appeal) found that the claims of the '282 patent cover a product containing 20 mg

CONFIDENTIAL MATERIAL REDACTED

dextromethorphan hydrobromide and 10 mg quinidine sulfate—the same amounts of the same salts in Hetero's ANDA product. Hetero does not dispute infringement under the district court's construction.

The district court also properly rejected Hetero's indefiniteness defense. The intrinsic evidence makes clear that there is no ambiguity: the claimed weight-to-weight ratio simply refers to the forms of dextromethorphan and quinidine that are administered to the patient.

The district court also properly found that the remaining factors favor an injunction. Hetero does not challenge the district court's factual findings supporting its determination that Otsuka would suffer irreparable harm in the absence of an injunction. Nor does Hetero challenge the district court's findings supporting its determination that the harms to Otsuka outweigh the harms to Hetero. The district court also expressly considered and rejected Hetero's only public interest argument.

The district court also acted within its discretion in waiving the bond requirement. Hetero does not challenge on appeal the district court's finding that Hetero violated the FDA's notice requirements in an effort to ███ rationale ███ ███ the statutory 30-month stay, which deprived Otsuka of the automatic, bond-free 30-month stay it would have otherwise received had Hetero followed the rules. After making specific factual findings concerning Hetero's conscious decision to violate FDA regulations, the strength of Otsuka's case on the merits, and the

3

speculative nature of Hetero's claims of financial harm, the district court properly decided that the balance of the equities in this case constituted exceptional circumstances justifying waiving any bond requirement.

## COUNTER-STATEMENT OF ISSUES

1.     Whether the district court acted within its discretion in finding that Otsuka met the requirements for a preliminary injunction based on its likely success on its infringement claim, irreparable harm in the form of loss of goodwill from the generic entry before patent expiration, and the absence of harm to the public or to Hetero.

2.     Whether the district court acted within its discretion in waiving the Rule 65(c) bond in light of the balance of the equities, including of Hetero's strategic violation of FDA notice regulations that deprived Otsuka of its statutory right to an automatic 30-month stay without a bond.

## COUNTER-STATEMENT OF THE CASE AND FACTUAL BACKGROUND

### A.   NUEDEXTA®

NUEDEXTA® is the first and only FDA-approved treatment for the neurological condition pseudobulbar affect ("PBA"). *Avanir Pharms. v. Actavis S. Atl. LLC*, 36 F. Supp. 3d 475, 481 (D. Del. 2014), *aff'd sub nom. Avanir Pharms. v. Par Pharm*, 612 F. App'x 613 (Fed. Cir. 2015). The FDA approved NUEDEXTA® in October 2010.[1]  *Id*. Otsuka's NUEDEXTA® product is a combination product containing the active ingredients dextromethorphan hydrobromide and quinidine sulfate.

> --------------------**DOSAGE FORMS AND STRENGTHS**---------------------
> Capsules: Dextromethorphan hydrobromide 20 mg/quinidine sulfate
> 10 mg. (3)

Appx408. Each NUEDEXTA® capsule contains 20 mg of dextromethorphan hydrobromide and 10 mg of quinidine sulfate. *Id*.

PBA is "a neurological disorder characterized by intermittent spasmodic outbursts of emotion at inappropriate times or in the absence of any particular provocation." *Avanir Pharms. v. Actavis S. Atl. LLC*, No. 11-701-LPS, D.I. 256 at 11-12 (D. Del. Dec. 3, 2012). PBA occurs in patients with underlying conditions or

---

[1] Otsuka America Inc., Otsuka America's parent company, acquired Avanir, including the NUEDEXTA® franchise, in 2015. Appx387, ¶10. Avanir and Otsuka America are wholly-owned subsidiaries of Otsuka America Inc. *Id*.

injuries that affect the way the brain regulates emotion, such as amyotrophic lateral sclerosis, multiple sclerosis, Alzheimer disease, or traumatic brain injury. Appx387, ¶9. The loss of emotional control caused by PBA is debilitating, causing patients to avoid work and social activities. *Id*. It is estimated that nearly 2 million people in the United States suffer from PBA. *Id*.

Following its launch in 2011, NUEDEXTA® gained a loyal following among doctors and patients and became the standard of care for PBA. Appx388, ¶15. From launch in 2011 through today, doctors have written over 3.36 million prescriptions for NUEDEXTA®. *Id*. This year, Otsuka projects that doctors will write over 138,000 prescriptions. *Id*.

## B.   The '282 Patent

The '282 patent is titled "Pharmaceutical Compositions Comprising Dextromethorphan And Quinidine For The Treatment Of Neurological Disorders." Appx43. The '282 patent "covers the use of NUEDEXTA® according to its package insert to treat PBA" (*Avanir*, 36 F. Supp. 3d at 492) and is listed in the FDA's Orange Book entry for NUEDEXTA® (Appx263). The patent expires August 13, 2026. Appx263.

### 1.   Relevant Claims Of The '282 Patent

Otsuka asserts that Hetero's ANDA Product infringes at least claim 1 of the '282 patent, which recites:

> 1. A method for treating pseudobulbar affect or emotional lability, the method comprising
>
> administering to a patient in need thereof dextromethorphan in combination with quinidine,
>
> wherein the amount of dextromethorphan administered comprises from about 20 mg/day to about 80 mg/day and
>
> wherein the amount of quinidine administered comprises from about 10 mg/day to less than about 30 mg/day
>
> with the proviso that the weight to weight ratio of dextromethorphan to quinidine is 1:0.5 or less.

Appx89. The dependent claims, many of which explicitly call out salts of dextromethorphan and quinidine, are also relevant to the parties' dispute. *Id.*

## 2.    The Specification Of The '282 Patent

The specification of the '282 patent discloses methods of treating neurological disorders, including PBA, by administering the combination of dextromethorphan and quinidine. Appx43. With respect to ***each of its sixteen embodiments***, the '282 patent states that "the quinidine ***includes*** quinidine sulfate" and "the dextromethorphan ***includes*** dextromethorphan hydrobromide." Appx52, 3:21-23[2], 4:23-25; Appx53, 5:22-25, 6:19-21.

The specification also discloses the results of clinical studies testing the safety and efficacy of different combinations of dextromethorphan and quinidine. Appx60-89, 19:61-77:43. In describing the clinical studies, the '282 patent uses the terms

---

[2]  All emphasis has been added unless otherwise indicated.

8

"dextromethorphan" and "quinidine" when referring to doses of salt forms that were administered to subjects. For example, when describing clinical study #3, the specification refers to the administration of 60 mg dextromethorphan hydrobromide as a "60 mg dextromethorphan dose[]" and the administration of 45 mg quinidine sulfate as a "45 mg quinidine dose[]." Appx70, 40:53-67.

### 3. The Prosecution History Of The '282 Patent

The applicants submitted Application No. 11/035,213 (which eventually issued as the '282 patent) on January 12, 2005. Appx43. The original application included 19 claims, including independent claim 1 that recited:

> 1. A method for treating pseudobulbar affect or emotional lability, the method comprising administering to a patient in need thereof dextromethorphan in combination with quinidine, wherein an amount of dextromethorphan administered comprises from about 20 mg/day to about 200 mg/day, and wherein an amount of quinidine administered comprises from about 10 mg/day to less than about 50 mg/day.

Appx955.

On January 9, 2009, the examiner issued a Final Rejection. Appx967-981. Among other bases, the examiner rejected the pending claims on the ground of nonstatutory obviousness-type double patenting. Appx972. As part of her rejection, the examiner characterized the pending claims. Pending claim 1 recited administration of about 20 mg/day to about 200 mg/day of "dextromethorphan" and 10 mg/day to less than about 50 mg/day of "quinidine." Appx973 In comparing the

9

scope of the pending claims to those of another application for purposes of the obviousness-type double patenting analysis, the examiner explained that the claims included "about 20 mg/day to about 200 mg/day" of "***dextromethorphan hydrobromide***" in combination with "about 10 mg/day to less than about 50 mg/day" of "***quinidine sulfate***." Appx973. Thus, the examiner recognized that dextromethorphan and quinidine as used in the claims also referred to the salt forms.

On July 7, 2009, the applicants responded to the Final Rejection, arguing surprising advantages over the prior art. Appx986-997. In support of their nonobviousness arguments, applicants relied on a reference authored by one of the '282 patent inventors, Dr. Laura Pope: Pope, et al., *Pharmacokinetics of Dextromethorphan After Single or Multiple Dosing in Combination With Quinidine in Extensive and Poor Metabolizers*, 44 J. Clin. Pharm. 1132-1142 (2004) ("Pope 2004") (*see, e.g.*, Appx993), which discloses the applicants' clinical studies of dextromethorphan hydrobromide in combination with quinidine sulfate. Appx1018-1028. Notably, Pope 2004 itself uses the terms "dextromethorphan" and "quinidine" to refer to salt forms. For example, Pope 2004 states that "[s]tudy 2 randomized 65 healthy extensive CYP2D6 metabolizers to 8 groups given twice-daily 45- or 60-mg DM doses combined with 0, 30, 45, or 60 mg Q for 7 days." Appx1018. Pope 2004 discloses that these "[d]oses are expressed as dextromethorphan hydrobromide

10

monohydrate and quinidine sulfate dihydrate." Appx1020.  In relying on Pope 2004,

the applicants used "dextromethorphan" and "quinidine" the same way.

### C.    The Prior NUEDEXTA® Litigation

In 2011, six other generic pharmaceutical companies filed ANDAs seeking to

market generic versions of NUEDEXTA® prior to the expiration of the '282 patent.

Appx368.  Otsuka sued each of the ANDA filers in the District of Delaware on three

patents: the '282 patent, U.S. Patent 8,227,484 ("the '484 patent"), and U.S. Patent

RE38,115 ("the '115 patent").[3]  *Id.*   While Otsuka settled with four of the ANDA

filers, two ANDA filers took the case to trial: Par and Impax.  Prior to trial, Par and

Impax both stipulated to infringement of the '282 patent.  *See Avanir*, 36 F. Supp.

3d at 478.

Following a bench trial in 2013, Judge Stark, then sitting in the District of

Delaware, found all three asserted patents, including the '282 patent, valid, and

enjoined Par and Impax from launching their ANDA products prior to the expiration

of the '282 patent.  *Id.* at 510.  Judge Stark also found that the '282 and '484 patents

cover the use of NUEDEXTA® according to its package insert, confirming that the

'282 and '484 patents were properly listed in the Orange Book.  *Avanir*, 36 F. Supp.

---

[3]    The '115 patent expired January 26, 2016 (Compl. (D.I. 1) at Ex. B, *Avanir Pharms. v. Actavis S. Atl. LLC*, No. 11-701-LPS (D. Del. Aug. 10, 2011) and the '484 patent expired July 17, 2023 (Appx906).

3d at 492.  Judge Stark further found that the '115 patent was not infringed by the accused ANDA products.  This court affirmed Judge Stark's decision.  *Avanir*, 612 F. App'x at 613.

### D.    Hetero's ANDA

A decade after the original '282 patent litigation, in August 2023, Hetero filed ANDA No. 218426 ("Hetero's ANDA") seeking approval to market a generic version of NUEDEXTA® ("Hetero's ANDA Product").  Like NUEDEXTA® and the prior ANDA products from the *Avanir* litigation, Hetero's ANDA Product contains "dextromethorphan hydrobromide 20 mg/quinidine sulfate 10 mg."

---

**--------------DOSAGE FORMS AND STRENGTHS-------------**

Capsules:  Dextromethorphan  hydrobromide  20  mg/quinidine sulfate 10 mg. (3)

---

Appx481.  Hetero's ANDA Product also has the same indication as NUEDEXTA® (the treatment of PBA) and follows the same administration schedule as NUEDEXTA® (once a day for the first week, and twice a day thereafter for a daily dose of 40 mg dextromethorphan hydrobromide and 20 mg quinidine sulfate).  *Id.*

Hetero's ANDA contains a paragraph IV certification alleging that the '282 patent is invalid, unenforceable, or will not be infringed by Hetero's ANDA Product. Appx335; Appx518.  Pursuant to 21 C.F.R. § 314.95, Hetero was required to provide notice of its paragraph IV certification to Otsuka "by [U.S.] registered or certified mail, return receipt requested, or by a designated delivery service" as defined in 21

C.F.R. § 314.95(g).  21 C.F.R. § 314.95(a); *see also* Appx530.  As set forth further below, Hetero never provided the required notice, and Otsuka never received—and still to this day has not received—a Paragraph IV Notice Letter from Hetero. Appx1823; Appx1849.  Indeed, Otsuka was unaware of Hetero's ANDA until after FDA approval.  Appx17.

On August 28, 2024, the FDA approved Hetero's ANDA Product.  Appx478-479.  Once FDA-approved, there was nothing blocking Hetero from launching its ANDA Product, but Hetero chose not to launch.  Appx9.  On December 20, 2024, shortly after Otsuka became aware of Hetero's ANDA approval, counsel for Otsuka conferred with in-house counsel for Hetero regarding Hetero's ANDA.  Appx587. Counsel for Hetero stated that he was not aware of any plans by Hetero to launch Hetero's ANDA Product.  Appx587.  On April 21, 2025, counsel for Otsuka again conferred with in-house counsel for Hetero.  Counsel for Hetero again explained that he was not aware of any plans to launch Hetero's ANDA Product.  Appx587.  On May 22, 2025, nearly nine months after the FDA approved Hetero's ANDA, Hetero informed Otsuka, for the first time, that it intended to launch Defendants' ANDA Product before the expiration of the '282 patent.  Appx9; Appx128; Appx336-337; Appx527.

### E.    The District Court Proceedings

On May 27, 2025, Otsuka filed a complaint for patent infringement against Hetero.  Appx120.  On the same day, Otsuka also filed its motion for a temporary restraining order ("TRO") and preliminary injunction ("PI") to enjoin Hetero from launching its ANDA Product before the expiration of the '282 patent.  Appx154. Following Otsuka's filings, Hetero agreed not to launch Defendants' ANDA Product for a limited period of time (Appx319), partially mooting Otsuka's initial TRO request.  On June 2, Hetero filed its Answer to Otsuka's Complaint and produced its ANDA.  Appx320, Appx324.  On June 13, following Hetero's production of its ANDA, Otsuka filed its Amended Motion for Temporary Restraining Order and Preliminary Injunction ("Otsuka's PI Motion").  Appx348-351, Appx357-383.  On June 25, Hetero filed its Opposition to Otsuka's PI Motion.  Appx590-617.  On July 3, Otsuka filed its Reply in support of its PI Motion.  Appx1471-1486.  On July 9, the district court granted Otsuka's request for a TRO.  Appx1-15.  On July 17, the district court held a hearing on Otsuka's PI Motion.  Appx1790-1867.

On July 23, the district court granted Otsuka's PI Motion.  Appx16-35.  The district court found that Otsuka will likely prove infringement of one or more claims of the '282 patent and Hetero has not raised a substantial question of invalidity. Appx19-23.  In support of its findings, the district court construed the terms "dextromethorphan" and "quinidine" as not being limited to only their free base

14

forms, but instead as including their salt forms. Appx21-23. Hetero does not dispute that it infringes under this construction. The district court also found that Otsuka would be irreparably harmed absent a preliminary injunction (Appx23-27), that the balance of equities favored Otsuka (Appx27-28), and an injunction benefits the public interest (Appx28-30). The district court also waived the Rule 65(c) bond. Appx30-32.

## SUMMARY OF THE ARGUMENT

The district court correctly found that Otsuka satisfied the requirements for a preliminary injunction.

As to likelihood of success on the merits, the central dispute concerns claim construction; the district court correctly construed "dextromethorphan" and "quinidine" to include salt forms of those compounds. All categories of intrinsic evidence support this construction. The terms "dextromethorphan" and "quinidine" in independent claim 1 must encompass salt forms because dependent claims 9 and 10 specify "quinidine sulfate" and "dextromethorphan hydrobromide"—which can only be narrower than the independent claim if the independent claim encompasses salts. The specification discloses in all embodiments that "quinidine *includes* quinidine sulfate" and "dextromethorphan *includes* dextromethorphan hydrobromide." The specification also repeatedly uses the terms "dextromethorphan" and "quinidine" when referring to doses of the salt forms

15

administered in clinical studies.  In the prosecution history, the patent examiner characterized the claims as covering "dextromethorphan hydrobromide" and "quinidine sulfate."  Finally, in prior litigation involving the same patent, the district court found that the '282 patent covers NUEDEXTA®—which contains dextromethorphan hydrobromide and quinidine sulfate—and upheld the patent's validity after a full bench trial.

Hetero's proposed construction limiting these terms to their "free base" forms lacks any support in the intrinsic record.  Hetero points to the specification's disclosure of chemical structures, but those disclosures are not definitions and do not constitute the clear and unambiguous disavowal required to limit claim scope.  Hetero's construction would exclude all sixteen embodiments disclosed in the specification—a result that is "rarely, if ever, correct."  It would also lead to the absurd conclusion that the inventors amended their claims to exclude their own commercial product, NUEDEXTA®.

Hetero's indefiniteness defense fares no better.  The claims make clear that the weight-to-weight ratio uses the forms of dextromethorphan and quinidine that are administered to the patient.  A person of ordinary skill would understand with reasonable certainty how to determine infringement: use the weights of the product that is actually accused of infringement.  Here, Hetero's ANDA Product label states

16

it contains 20 mg dextromethorphan hydrobromide and 10 mg quinidine sulfate—a 1:0.5 ratio that falls within the claimed range.

Hetero's challenges to the remaining preliminary injunction factors are equally unavailing. The district court found that Otsuka would suffer irreparable harm from damage to its goodwill and reputation—a finding Hetero does not challenge as clearly erroneous. Hetero's only response is that Otsuka allegedly delayed in seeking relief, but the district court already rejected this argument. Hetero attempts to now rely—for the first time on appeal—on a text message that was never presented to the district court during the preliminary injunction proceedings. This is improper, but, even if considered, the text message does not help Hetero's position: it came from an unidentified individual unaffiliated with Hetero, and did not state that Hetero's ANDA was even filed, much less that it contained a Paragraph IV Certification.

The district court also correctly found that the balance of equities and public interest favor an injunction. Hetero does not challenge the district court's factual findings regarding harms to Otsuka, and the district court expressly considered and rejected Hetero's argument about public access to generics.

Finally, the district court acted within its discretion in waiving the bond requirement. Hetero is the seventh generic filer on NUEDEXTA®, over a decade later than the previous filers, and the patent-in-suit expires in August 2026. Had

CONFIDENTIAL MATERIAL REDACTED

Hetero provided Otsuka with proper Notice of its Paragraph IV Certification, this case would have proceeded like a standard Hatch-Waxman case—Otsuka would have sued within 45 days, and there would have been a bond-free, 30-month stay of FDA approval of Hetero's ANDA while the parties litigated the merits.   That statutorily-mandated 30-month stay alone would have taken the parties to the brink of patent expiration, and any appeal would have extended beyond patent expiration. So instead, Hetero misrepresented to the FDA that it provided Otsuka with proper notice of Paragraph IV Certification, when in fact it had not—and still has not, to this day.   Thus, the district court found Hetero violated the FDA's notice requirements in an effort to ███████ rationale ███████ the statutory 30-month stay.   Hetero does not challenge this finding on appeal.   Under Third Circuit precedent, a district court may waive bond where the equities weigh overwhelmingly in the movant's favor.  The district court did not abuse its discretion in finding that Hetero's deliberate violation of regulatory requirements justified waiving the bond.

This Court should affirm.

## STANDARD OF REVIEW

This Court reviews a district court's decision to grant a preliminary injunction for abuse of discretion. *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1049 (Fed. Cir. 2010). This is "a highly deferential standard of review." *Jeneric/Pentron, Inc. v. Dillon Co., Inc.*, 205 F.3d 1377, 1384 (Fed. Cir. 2000). A district court abuses its discretion only when it "[1] made a clear error of judgment in weighing relevant factors or [2] exercised its discretion based upon an error of law or clearly erroneous factual findings." *AstraZeneca*, 633 F.3d at 1049. This Court may find a district court's factual findings "clearly erroneous" only when, "despite some supporting evidence," the Court "[is] left with the definite and firm conviction that a mistake has been committed." *Bayer Schering Pharma AG v. Barr Labs., Inc.*, 575 F.3d 1341, 1346 (Fed. Cir. 2009). Claim construction is a question of law reviewed *de novo*. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 325 (2015).

A district court's decision whether to require a bond under Federal Rule of Civil Procedure 65(c) is reviewed for abuse of discretion. *Elliott v. Kiesewetter*, 98 F.3d 47, 60 (3d Cir. 1996); *see also Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 426 (3d Cir. 2010). Because this case arises from the District of Delaware, Third Circuit law governs the bond requirement. *See Zambelli*, 592 F.3d at 426.

19

**ARGUMENT**

## I.    HETERO FAILS TO SHOW THAT THE DISTRICT COURT ABUSED ITS DISCRETION IN ISSUING THE PRELIMINARY INJUNCTION

### A.    The District Court Correctly Found That Otsuka Is Likely To Succeed On The Merits

The district court found that Otsuka is likely to succeed on the merits, agreeing with Otsuka's claim construction and rejecting Hetero's invalidity arguments. Appx16-32.  Hetero purports to identify (Appellants' Opening Brief ("Br."), 18-19) "at least five errors" in the district court's analysis.  None of Hetero's alleged "errors" supports reversal.  Indeed, Hetero simply ignores the district court's analysis and the intrinsic evidence contradicting its positions, and asks this Court to impermissibly usurp the role of the district court.

### 1.    The District Court Properly Construed "Dextromethorphan" And "Quinidine"

In granting the preliminary injunction, the district court correctly concluded that the terms "dextromethorphan" and "quinidine" include their salt forms. Appx21-23.    Hetero  argues  that  the  district  court's  construction  of "dextromethorphan" and "quinidine" was erroneous.  Br. 19-20.  But the claims, specification, and the prosecution history use the terms "dextromethorphan" and "quinidine" to include salt forms.  And this construction is consistent with the patent examiner's statements during prosecution and the 2014 district court decision in

20

*Avanir*.   On the other hand, Hetero's construction conflicts with the usage of the terms in the claims, specification, and the file history.

Hetero–despite repeatedly stating that the terms should receive their plain and ordinary meanings (*see, e.g.*, Br. 25)—never clearly says what those meaning are. At the district court, counsel for Hetero repeatedly argued that the terms refer to the "active compounds."  *See, e.g.*, Appx1793, Appx1794, Appx1795.   After counsel for Otsuka pointed out (Appx1840-1841) that the label for Hetero's ANDA Product states that the active ingredient is dextromethorphan hydrobromide (Appx1880; Appx494), Hetero seems to have dropped this characterization.   Instead, Hetero now argues:

> Dextromethorphan and quinidine have plain and ordinary meanings, and the specification and prosecution history utilize those plain and ordinary meanings by specifying the chemical compound with its chemical name and the structure for each compound.

Br. at 19, 23.   The closest that Hetero gets to a clear construction is its statement that "[t]he chemical structures of dextromethorphan and quinidine are depicted in the specification . . . confirming that the patentee intended the terms to refer to the compounds themselves, not their salt forms."   Br. 24.   The chemical name and structure is known as the "free base" form of the compound.  *See* Appx848.   As the district court explained, Hetero's proposed construction is that the compounds should be limited to their "free base" forms, rather than salt forms:

21

> Defendants argue that the compounds listed in the '282 patent–dextromethorphan and quinidine (together, "the effective compounds")–should be construed to mean those compounds in their "free base" forms as opposed to in their hydrated salt forms.

Appx21. But no tribunal considering the '282 patent has ever limited "dextromethorphan" or "quinidine" to only the free base forms. Hetero can show no clear error in the district court's conclusion that "dextromethorphan" and "quinidine" in the '282 patent include salt forms because that interpretation is the only one consistent with the intrinsic evidence. *See Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) ("The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history.").

### a.    The *Claims* Of The '282 Patent Support Otsuka's Construction

"[A] claim construction analysis must begin and remain centered on the claim language itself." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004). Here, the claims of the '282 patent support the district court's determination that "dextromethorphan" and "quinidine" include both salt forms and free base forms of the compounds. Claim 1 of the '282 patent recites a method of treating PBA by administering dextromethorphan in combination with quinidine, but does not specify or limit the form of "dextromethorphan" or

"quinidine." Thus, contrary to Hetero's arguments (Br. 20-22), claim 1 by itself does little to inform whether the terms include salts.

The dependent claims, however, make clear that the terms include the salt forms. For example, dependent claim 7 recites "at least one of the quinidine and the dextromethorphan is in a form of a pharmaceutically acceptable salt." Appx89. Similarly, claims 9 and 10 explicitly limit the administered form to specific salts, reciting "about 20 mg quinidine sulfate is administered per day" (claim 9) and "about 60 mg dextromethorphan hydrobromide is administered per day" (claim 10). *Id.* It is axiomatic that dependent claims must be narrower than the claims from which they depend. *Littelfuse, Inc. v. Mersen USA EP Corp.*, 29 F.4th 1376, 1380 (Fed. Cir. 2022). This can only be true if claim 1 (and thus "dextromethorphan" and "quinidine") covers salts. As the district court found, the only interpretation that gives proper effect to both the independent and dependent claims requires "dextromethorphan" and "quinidine" in claim 1 to include salts. Appx22.

Hetero's arguments for limiting the terms based on the claim language (Br. 20-22) are flawed. Indeed, Hetero's arguments have nothing to do with the syntax or structure of the claims. Rather, Hetero is arguing that because the word "salt" is not used in claim 1, then "dextromethorphan" and "quinidine" can only mean their free base forms. Br. 21. But the fact that claim 1 only recites the words

23

"dextromethorphan" and "quinidine" without mentioning salts is not a disavowal of claim scope. Indeed, claim 1 also does not recite free base forms of the compounds.

Hetero's argument (Br. 21-22) that its "construction follows directly from the claim structure" because claim 1 "sets daily dosage ranges for 'dextromethorphan' and 'quinidine'" "without reference to any salt or hydrate form" fails for the same reason. Contrary to its assertion, Hetero's argument is not based on the "structure" of the claim, it is simply based on claim 1 not explicitly reciting salts. Given the existence of dependent claims that do explicitly recite salt forms, the district court did not err in rejecting Hetero's limiting construction.

### b. The *Specification* Of The '282 Patent Supports Otsuka's Construction

"[T]he specification necessarily informs the proper construction of the claims." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005); *see also Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1360 (Fed. Cir. 2004) ("In most cases, the best source for discerning the proper context of claim terms is the patent specification wherein the patent applicant describes the invention.").

The district court correctly found that "the specification of the '282 patent supports [Otsuka's] claim construction and infringement argument." Appx22. The use of the terms "dextromethorphan" and "quinidine" in the specification,

particularly with respect to dose amounts, confirms that the district court did not err in construing the terms to include salts.

*First*, the specification of the '282 patent repeatedly states that "dextromethorphan *includes* dextromethorphan hydrobromide" and "quinidine *includes* quinidine sulfate." Appx52, 3:21-23. Specifically, for *all sixteen embodiments* of the invention, the '282 patent specification states:

> In aspects of the [first through fourth/fifth through eighth/ninth through twelfth/thirteenth through sixteenth] embodiments, *the quinidine includes quinidine sulfate* and *the dextromethorphan includes dextromethorphan hydrobromide*

*Id.*, 3:21-23, 4:23-25; Appx53, 5:22-25; Appx53, 6:19-21. This alone confirms that the district court correctly construed the terms "dextromethorphan" and "quinidine" to include salts. *See Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276-77 (Fed. Cir. 2008) ("We normally do not interpret claim terms in a way that excludes embodiments disclosed in the specification. . . . where claims can reasonably [be] interpreted to include a specific embodiment, it is incorrect to construe the claims to exclude that embodiment, absent probative evidence to the contrary.").

Hetero's construction, on the other hand, would exclude all sixteen embodiments set forth in the specification. This cannot be correct. *See Abbott Lab'ys. v. TorPharm, Inc.*, 300 F.3d 1367, 1372 (Fed. Cir. 2002) (quoting *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1583 (Fed. Cir. 1996)) (proposed

constructions that "would exclude the preferred embodiment (as well as all other embodiments) disclosed by the patent specifications . . . are 'rarely, if ever, correct'"); *see also Nobel Biocare Servs. AG v. Instradent U.S., Inc.*, 903 F.3d 1365, 1381 (Fed. Cir. 2018) ("[T]here is a strong presumption against a claim construction that excludes a disclosed embodiment.").

Hetero's argument that the cited language "is taken out of context" (Br. 28) because the prior sentences refer to administration in the form of salts is nothing more than an attempt to distract from the plain words of the patent. The specification could not be clearer: "quinidine includes quinidine sulfate" and "dextromethorphan includes dextromethorphan hydrobromide." Any construction that excludes these salt forms cannot be correct.

*Second*, beyond the explicit statements that in all 16 embodiments the terms "dextromethorphan" and "quinidine" include salts, the specification's usage of the terms confirms that they include salts. In particular, contrary to Hetero's argument (Br. 23), the '282 patent repeatedly uses the terms "dextromethorphan" and "quinidine" to refer to the salt forms of those compounds, in particular dextromethorphan hydrobromide and quinidine sulfate.

For example, in clinical study #3, the "test formulation was dextromethorphan hydrobromide and quinidine sulfate capsules, administered orally with water." Appx63, 25:31-33. Subjects received one of eight treatments:

26

| Treatment | Dextromethorphan *hydrobromide* | Quinidine *sulfate* |
|:---:|:---:|:---:|
| A | 60 mg | 0 mg |
| B | 60 mg | 30 mg |
| C | 60 mg | 45 mg |
| D | 60 mg | 60 mg |
| E | 45 mg | 0 mg |
| F | 45 mg | 30 mg |
| G | 45 mg | 45 mg |
| H | 45 mg | 60 mg |

*Id.*, 25:31-65. When describing the results of study #3, the specification uses the term "dextromethorphan" when referring to amounts of dextromethorphan hydrobromide that were administered, and "quinidine" when referring to amounts of quinidine sulfate that were administered:

> Over the course of this study, quinidine inhibited the metabolism of ***dextromethorphan dosed at 45 and 60 mg*** resulting in increased systemic availability of dextromethorphan. The ***60 mg quinidine dose*** resulted in the largest dextromethorphan AUC at both the ***45 and 60 mg dextromethorphan doses***, compared to the ***30 and 45 mg quinidine doses***.

Appx70, 40:53-67. Given the composition of the test formulations, the reference to "dextromethorphan dosed at 45 and 60 mg" refers to the 45 mg and 60 mg of dextromethorphan hydrobromide amounts that were administered, not free base amounts. This is not an isolated occurrence. The '282 patent repeatedly refers to amounts of "dextromethorphan" and "quinidine" when describing amounts of

dextromethorphan hydrobromide and quinidine sulfate.  *See, e.g.*, Appx63, 26:41 (60 mg and 45 mg dextromethorphan doses); Appx65, 29:17-19 ("the effect of quinidine doses on a 60 mg dose of dextromethorphan"), 30:18-19 (45 mg dose of dextromethorphan); Appx66, 31:2-3 ("the effect of quinidine doses on a 60 mg dose of dextromethorphan"), 31:13-14 ("the effect of quinidine doses on a 60 mg dose of dextromethorphan").

Hetero's argument (Br. 29) that these passages "do not mention hydrobromide or sulfate and do not purport to alter the plain and ordinary meaning" only confirms Otsuka's argument—the '282 patent specification uses the terms "dextromethorphan" and "quinidine" when referring to the salt forms without mentioning the salt.  Appx63, 25:31-65.

*Third*, Hetero's argument (Br. 26) that the fact that "[t]he patent expressly teaches how to convert salt dosages into compound-equivalent amounts" somehow supports its construction fails.  In support of this argument, Hetero cites to a portion of the specification that shows the math for converting weights of dextromethorphan hydrobromide and quinidine sulfate to "effective dosages" of dextromethorphan and quinidine:

> In particularly preferred embodiments, the dextro-methorphan is administered in the form of dextro-methorphan hydrobromide, and the quinidine is administered in the form of quinidine sulfate. For example, a dose of 30 mg dextromethorphan hydro-bromide (of molecular formula $C_{18}H_{25}NO \cdot HBr \cdot H_2O$) and

28

30 quinidine sulfate (of molecular formula $(C_{20}H_{24}N_2O_2)_2 \cdot H_2SO_4 \cdot 2H_2O)$ may be administered (corresponding to an effective dosage of approximately 22 mg dextromethorphan and 25 mg quinidine).

Appx59, 17:60-18-2. But this portion of the specification further supports the district court's construction, not Hetero's. Just like the claims, in the first sentence (which Hetero crops in its brief), the specification notes that "dextromethorphan is administered *in the form of* dextromethorphan hydrobromide" and that "quinidine is administered *in the form of* quinidine sulfate." For the same reasons explained above with respect to the dependent claims, this demonstrates that the terms are not limited to their free base forms. Additionally, this passage says nothing about calculating weight-to-weight ratios. Thus, it is unclear how this has any relevance to the forms of dextromethorphan and quinidine that are used to calculate the ratio recited in the patent, much less conclusively limits the terms to their free bases. Indeed, the claims recite the "weight to weight ratio of dextromethorphan to quinidine" not the weight to weight ratio of "effective doses" of dextromethorphan to quinidine. The specification's disclosure of calculating an "effective dose" shows that the inventors knew how to specify an "effective dose" when that was what they meant. The fact that the claims merely recite "dextromethorphan" and "quinidine" without referencing an "effective dosage" confirms that the claims are not so limited. *Pfizer Inc. v. Teva Pharms. USA, Inc.*, 555 F. App'x 961, 965-66 (Fed. Cir. 2014).

For this reason, Hetero's reliance on *Nystrom* is misplaced. In *Nystrom v. TREX Co., Inc.*, the parties disputed whether the term "board" was limited to "wood cut from a log" or should be construed more broadly. 424 F.3d 1136, 1142 (Fed. Cir. 2005). This Court adopted a narrow construction based the patentee's consistent use of the term to mean only "wood cut from a log" in the intrinsic record. *Id.* at 1143-44. Here, by contrast, the '282 patent never once—let alone repeatedly— teaches that the term dextromethorphan must refer only to the free base form. So too with quinidine. Thus, if anything, *Nystrom* supports Otsuka's construction, not Hetero's.

*Finally*, Hetero errs in arguing (Br. 25) that the district court "fail[ed] to engage with the intrinsic evidence." As explained above, the district court clearly engaged with all of the intrinsic record.[4] While Hetero relies on *FMC Corporation v. Sharda USA, LLC*, that case merely confirms that terms are given "their plain and ordinary meaning, which is the meaning that a skilled artisan would ascribe when reading the term in context of the claim, specification, and prosecution history." 145 F.4th 1326, 1331-32 (Fed. Cir. 2025). The Court in *FMC* only faulted the district

---

[4] The district court was not required to make factual findings on every piece of evidence or argument. *Lexion Med., LLC v. Northgate Techs., Inc.*, 641 F.3d 1352, 1359 (Fed.Cir.2011) ("Where the record adequately supports the judgment, the district court does not have an obligation to recite every detail of its reasoning.") (internal citation omitted).

court for construing a term based on disclosures that ***did not appear*** in the specification of the patents-in-suit. *Id.* Here, the specification of the '282 patent contains ample evidence to support the district court's claim construction.

### c.     The *Prosecution History* Of The '282 Patent Supports Otsuka's Construction

The use of the terms "dextromethorphan" and "quinidine" in the prosecution history by the examiner, the applicants, and one of the inventors further confirms that the district court did not clearly err by construing the claims to include salts.

"[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention. . . ." *Phillips*, 415 F.3d at 1317. The *Phillips* standard focuses "on how the patentee used the claim term in the claims, specification, and prosecution history." *Id.* at 1321; *see also Sunovion Pharms. v. Teva Pharms. USA, Inc.*, 731 F.3d 1271, 1276-78 (Fed. Cir. 2013) (affirming construction of term consistent with how patentee used it during prosecution). In addition, "[s]tatements about a claim term made by an examiner during prosecution of an application may be evidence of how one of skill in the art understood the term at the time the application was filed." *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1347 (Fed. Cir. 2005).

Here, in an office action, the examiner characterized the then-pending claims that recited administering "from about 20 mg/day to about 200 mg/day" of "dextromethorphan" and "from about 10 mg/day to less than about 50 mg/day" of

"quinidine" as covering administration of about 20 to above 200 mg/day of "**dextromethorphan hydrobromide**" and about 10 to less than about 50 mg/day of "**quinidine sulfate**." Appx973. Thus, the examiner understood that "dextromethorphan" and "quinidine" included salts.

Hetero incorrectly argues (Br. 31) that the applicants treated "dextromethorphan" and "quinidine" as "distinct chemical compounds" during prosecution. Not so. Instead, in describing the invention and the clinical studies supporting it, the applicants referred to doses of salts of dextromethorphan and quinidine as doses of "dextromethorphan" and "quinidine." For example, in a July 7, 2009 response to the examiner's rejection, after explaining the disclosures of the prior art, applicants explained:

> In contradiction to the teachings of [the prior art], applicants later discovered that maximal inhibition of the CYPD6 enzyme system occurs at 50 mg/day of Q. This discovery was later published in Pope et al (2004). Pope experimented with varying doses of both DM and Q and quantified CYP2D6 inhibition . . . Pope discovered that twice daily administration of 25 mg of Q [50 mg/day of Q] provided equivalent inhibition to that of 150 mg/day of Q taught in the prior art.

Appx993.[5] Applicants also explained that:

> "Pope *et al* (2004) also published that a *low-dose* quinidine formulation with 60 mg/day DM and 20 mg/day Q

---

[5]    In the same response, the applicants defined dextromethorphan as "DM" and quinidine as "Q." Appx985.

> produced approximately 64 ng/mL of DM in the blood, a blood level applicants later discovered provides an equivalent therapeutic benefit as 100 ng/mL."

Appx995 (emphasis original). The subjects described in Pope 2004, however, were administered salt forms of dextromethorphan and quinidine, not the free base forms. Appx1020 ("Study medications were administered orally as hard gelatin capsules containing different combinations of dextromethorphan hydrobromide monohydrate (≥98.0% pure) and quinidine sulfate dihydrate USP (≥99.0% pure.)"). Indeed, Pope 2004 explicitly discloses that its "[d]oses are expressed as dextromethorphan hydrobromide monohydrate and quinidine sulfate dihydrate." *Id.* Thus, the applicants' discussion of doses of dextromethorphan and quinidine that were administered to subjects refers to salt amounts, not the free base amounts, despite not stating hydrobromide or sulfate. Accordingly, the applicants' use of the terms in the prosecution history further supports the district court's construction, and confirms that Hetero's construction is incorrect.

Hetero also is wrong to contend (Br. 32-33) that that the later-cancelled claim 9 from the original application undermines the district court's construction. The claim on which Hetero relies is *not* one of the issued claims of the '282 patent, nor was there any discussion of it during prosecution. There is no indication that the applicant intended to limit the meaning of "quinidine" based on a single, cancelled claim, much less intended a clear and unambiguous disavowal of claim scope.

33

Based on the intrinsic record as a whole, it is clear that the applicants intended "dextromethorphan" and "quinidine" to include salts.

### d.    Hetero's Claim Construction Leads To The Absurd Result That NUEDEXTA® Is Allegedly Not Covered

Hetero argues (Br. 33-34, 39-40) that the applicants' amendment during prosecution limiting the ratio of dextromethorphan to quinidine to 1:0.5 resulted in the claims not covering NUEDEXTA®. Hetero's argument, however, would cause absurd results in view of the timeline of the applicants' amendment and Otsuka's clinical trials. While Otsuka's proposed construction results in a claim reciting the exact ratio of salts in Otsuka's clinical trials and commercial product (i.e., NUEDEXTA®), Hetero's proposed construction leads to the improbable result that the applicant intentionally excluded its own product.

As explained above, from 2007 to 2009, Otsuka successfully ran a phase 3 clinical study of two dextromethorphan/quinidine combinations:    (1) 20 mg dextromethorphan hybrobromide:10 mg quinidine sulfate and (2) 30 mg dextromethorphan hydrobromide:10 mg quinidine sulfate. Appx2730, *see also* Appx2062-2080. Thus, by July 2009 when they amended the claimed ratio to 1:0.5, the applicants had demonstrated success with a formulation with a 1:0.5 ratio of dextromethorphan hydrobromide:quinidine sulfate, which is also the NUEDEXTA® formulation. Hetero's construction, however, would result in the unbelievable scenario that the applicants amended their claims to exclude their own commercial

34

formulation. It is a fundamental tenet of claim construction that a claim interpretation that would exclude the products the patents were designed to cover is rarely the correct construction. *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007). Thus, the applicants' amendment does not support Hetero's construction.

The district court's decision confirms that Hetero's construction excluding NUEDEXTA® makes little sense. As explained above, in *Avanir,* the district court found that the use of NUEDEXTA® according to its package insert is covered by the claims of the '282 patent. *Avanir*, 36 F. Supp. 3d at 492. The defendants in *Avanir* also implicitly adopted the district court's construction, stipulating to infringement despite having the same formulation as NUEDETXA® (and as Hetero's ANDA Product). *See id.* at 478.

Beyond its finding that the use of NUEDETXA® according to its package insert is covered by the '282 patent, the district court implicitly construed the terms by using dextromethorphan/DM and quinidine/Q to refer to the salt forms. For example, the district court found that "the FDA approved Nuedexta at the 40/20 dose of DM/Q." *Avanir*, 36 F. Supp. 3d at 488. The 40/20 dose corresponds to the 40 mg/day dose of dextromethorphan hydrobromide and 20 mg/day dose of quinidine sulfate prescribed in NUEDEXTA®'s package insert. Appx408.

### e.    The District Court Correctly Weighed Expert Testimony

Hetero's challenge to the district court's evaluation of the evidence (Br. 34-37) lacks merit and ignores the well-established principles governing district court fact-finding and expert testimony evaluation.

Hetero argues that the district court violated *Phillips* by not citing or addressing Dr. Buckton's declaration. Br. 37. Hetero is wrong. As *Phillips* makes clear, expert testimony like Dr. Buckton's declaration is extrinsic evidence. *Phillips*, 415 F.3d at 1318. In cases like this one, where the intrinsic evidence is determinative, looking to such testimony is not only unnecessary, but improper. *Vitronics*, 90 F.3d at 1583 ("In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In such circumstances, it is improper to rely on extrinsic evidence."). Given the district court's finding that the correct construction is evident from the intrinsic evidence (Appx21-23), there was no error in not citing Dr. Buckton's declaration.

Even if extrinsic evidence were necessary to determine the meanings of "dextromethorphan" and "quinidine"—it is not—the district court properly gave little weight to Dr. Buckton's opinions because they are not from the perspective of a POSA. The proper POSA for the '282 patent was established in *Avanir* as "at least an M.D. or Ph.D. in an area relevant to pharmacokinetics ('PK') and/or drug interactions, or a Bachelor's degree and at least five years of relevant industry or

36

academic experience in the area of PK and/or drug interactions." *Avanir*, 36 F. Supp. 3d at 483. Hetero did not dispute this POSA definition but offered Dr. Buckton's opinions from the perspective of "an expert in pharmaceutical formulation." Appx600; Appx1793-1794.

As Otsuka's counsel explained at the preliminary injunction hearing, "[t]he vantage point that [Dr. Buckton] was using for . . . viewing the patent and the claims was the wrong one." Appx1839. Since Dr. Buckton is "not offering his opinions from the perspective of the correct person skilled in the art" (Appx1865), they are of minimal value to this inquiry and it was proper for the district court to give little weight to his testimony.[6]

### f.    Otsuka Did Not Mislead The District Court

Hetero incorrectly argues (Br. 38) that "Otsuka repeatedly misstated what Hetero argued, mischaracterized the patent, and misstated the composition of Hetero's product" which allegedly "led the District Court to an incorrect construction." Hetero's accusations are meritless.

As an initial matter, in its section regarding alleged mischaracterizations (Br. 38-41) Hetero does not allege any legal error or abuse of discretion. Thus, whatever

---

[6]    The fact that Dr. Buckton may "have lots of experience in pharmacokinetics" (Appx1857) does not cure this fundamental deficiency. Regardless of Dr. Buckton's credentials, his opinions are directed to the understanding of a POSA with the wrong credentials. Appx634.

the purpose of Hetero's unfounded accusations, it is irrelevant to any issues on appeal.

In any event, Hetero's accusations are false. For example, Hetero argues (Br. 38) that "Otsuka's infringement theory was based on a false premise: that Hetero's claim construction position 'excludes salts' and limits claim 1 to the 'free base form.'" This is incorrect. Otsuka's infringement position was based Hetero's product meeting the limitations of claim 1 under ***Otsuka's*** proposed construction. Appx370-374. Indeed, Hetero does not contest infringement under Otsuka's construction that the district court adopted.

Otsuka also did not misrepresent the composition of NUEDEXTA®. As explained above, in *Avanir*, the district court found that the FDA approved NUEDEXTA® at the 40/20 dose of dextromethorphan/quinidine (i.e. 20 mg dextromethorphan/10 mg quinidine, twice per day) and that the claims of the '282 patent cover the use of NUEDEXTA® according to its package insert. *Avanir*, 36 F. Supp. 3d at 488, 492. Hetero's reliance on the European package insert changes nothing. The European product contains the same ingredients and, thus, contains 20 mg dextromethorphan and 10 mg quinidine under Otsuka's construction, which was adopted by the district court.

Otsuka also did not mischaracterize Hetero's ANDA Product. To the extent that Hetero accuses Otsuka of not informing the district court that Hetero's ANDA

Product contains 20 mg dextromethorphan hydrobromide and 10 mg quinidine sulfate, this is false. Hetero's package insert was in evidence before the district court—indeed, Otsuka's infringement analysis not only included screenshots of the package insert for Hetero's ANDA Product, but also highlighted the portions stating that Hetero's ANDA Product contains 20 mg dextromethorphan hydrobromide and 10 mg quinidine sulfate. Appx372-373 (emphasizing that Hetero's ANDA Product contains dextromethorphan hydrobromide and quinidine sulfate). Any argument that the district court's grant of the preliminary injunction was somehow borne out of a misunderstanding of the contents of Hetero's ANDA Product is meritless.

### g.    The District Court's Construction Was Not "Fundamentally Flawed"

The Court likewise should reject Hetero's catchall argument that "the District Court relied on three erroneous rationales." Br. 41-46.

*First*, Hetero argues (Br. 41) that "the District Court misapplied the doctrine of claim differentiation to justify reading the asserted ratio in claim 1 as referring to salt forms" because it allegedly would enlarge the meaning of a claim beyond what which is supported by the patent documents. Hetero is incorrect. As explained above, dependent claim 7 limits the administration of dextromethorphan and quinidine to salts. Claims 9-11 recite specific doses of quinidine sulfate and dextromethorphan hydrobromide. In order for these dependent claims to be narrower than the independent claim from which they depend (a fundamental tenet

of claim construction), "dextromethorphan" and "quinidine" in claim 1 must include salts. This is claim differentiation. *Alcon Rsch., Ltd. v. Apotex Inc.*, 687 F.3d 1362, 1367 (Fed. Cir. 2012) (holding that each independent claim encompasses the scope of its dependents). The cases upon which Hetero relies (Br. 41-42), *Retractable Techs*, *Toro*, and *Fenner,* are inapposite. In each of those cases, this Court found that even where dependent claims support a broader construction, the use in the specification can still limit the scope of a term. *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1306 (Fed. Cir. 2011); *Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1301-02 (Fed. Cir. 1999); *Fenner Investments, Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1327 (Fed. Cir. 2015). Here, the district court did not use claim differentiation to expand the scope of the terms beyond their use in the specification. Rather, as explained above, the district court's construction is supported by the use of the terms in the specification.

*Second*, Hetero's argument (Br. 44-45) that the district court "misread the specification" merely repeats its arguments about the specification. As explained above, the specification provides substantial evidence for the district court's construction of "dextromethorphan" and "quinidine." *See supra* pp. 24-31.

*Third*, Hetero's argument that the district court improperly relied on the prior litigation regarding the '282 patent is meritless. *Teva Pharms.*, 574 U.S. at 329 ("[P]rior claim construction rulings involving the same patent . . . sometimes will

40

serve as persuasive authority"). Hetero's argument (Br. 45) that the district court "assert[ed] that because the patent had previously been successfully asserted against other generic products, the same result should follow" mischaracterizes the district court's analysis. The district court did not blindly follow the previous decision or simply apply it to Hetero. Rather, after finding that both the claims and the specification supported its construction of the terms "dextromethorphan" and "quinidine" (Appx21-23), the district court cited findings from the prior litigation as additional support.

Hetero faults the district court for citing the prior determination that the '282 patent covers NUEDEXTA®, arguing that it "merely reflected the defendants' stipulation of infringement." Br. 45. Hetero provides no support for this assertion. And, whether NUEDEXTA® was covered by the '282 patent was part of the district court's secondary considerations of nonobviousness inquiry, not the prior ANDA filers' infringement.

Hetero also alleges that the district court "appeared to treat that stipulation-based result as binding against Hetero here" based on a question to counsel for Otsuka regarding whether there were differences between the other generics' ANDA Products and Hetero's ANDA Product. Br. 46. There is no evidence that the court assumed infringement based on its comparison to the other ANDA Products. Rather, the district court's opinion shows that it conducted claim construction and, based on

41

its own analysis, determined that Hetero's ANDA Product infringes the '282 patent. In fact, the district court did not need to rely on the prior case to find infringement – Hetero has no non-infringement defense under the court's claim construction.[7]

For the above reasons, Hetero has not shown that the district court erred in finding that Otsuka was likely to succeed in proving infringement.

### 2. The District Court Correctly Found That Hetero Was Unlikely To Succeed On Its Indefiniteness Defense

Hetero repeatedly asserts that the district court allegedly did not address Hetero's indefiniteness defense. Br. 15, 19, 49-50. Hetero is incorrect. As Hetero itself concedes (Br. 50, 52-53), the district court explicitly acknowledged—and rejected—Hetero's indefiniteness defense both at oral argument (*see* Appx1797-1798, Appx1842-1843) and in its order granting Otsuka's preliminary injunction (*see* Appx21-23). At the district court, Hetero devoted a single, conclusory paragraph of its brief–covering half a page–to its "contingent invalidity defense." Appx612. Hetero should not be heard now to complain that the district court somehow did not give that defense proper attention, when Hetero itself treated it as nothing more than an afterthought. Nevertheless, as explained below, the district

---

[7]    Hetero argues (Br. 46) that Otsuka's counsel ignored "Hetero's self-imposed tightening restrictions." Otsuka did not ignore them, the restrictions simply are not relevant under the district court's construction.

court correctly found that Hetero did not raise a substantial question of invalidity based on indefiniteness.

### a.    The District Court's Determination Is Supported By The Intrinsic Record

A patent is only invalid for indefiniteness "if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).  Here, based on the district court's claim construction, a POSA would have understood the scope of the claims with reasonable certainty.

Hetero argues that the '282 patent claims are indefinite because:

> [I]f "dextromethorphan" and "quinidine" were construed to include salt forms for dextromethorphan and salt forms for quinidine, claim 1's weight ratio would be indefinite because … depending on whether compounds or salts are selected to calculate claim 1's weight ratio, the calculations produce both infringing and no infringing results, which is the hallmark of indefiniteness.

Br. at 50-51.  Contrary to Hetero's arguments, however, the claim language does not allow for picking and choosing between different forms of dextromethorphan and quinidine to determine the weight ratio.  Rather, the ratio limitation of claim 1 simply requires a specific weight-to-weight ratio of dextromethorphan to quinidine, ***in the forms that they are administered.***

Claim 1 recites three interconnected limitations with respect to the dextromethorphan and quinidine:

(1) an "administration" limitation: "administering to a patient in need thereof dextromethorphan in combination with quinidine";

(2) an "amount" limitation: "the amount of dextromethorphan administered comprises from about 20 mg/day to about 80 mg/day and . . . the amount of quinidine administered comprises from about 10 mg/day to less than about 30 mg/day"; and

(3) a "ratio" limitation:  "the weight to weight ratio of dextromethorphan to quinidine is 1:0.5 or less."

The claim structure makes clear that the "amount" and "ratio" limitations both refer back to what is "administered" in the "administration" limitation.  Indeed, the "amount" limitation refers to the amount of "dextromethorphan *administered*" and the amount of "quinidine *administered*."  And the "ratio" limitation must refer to the weights of the "amount" limitation because it would violate cannons of claim construction for "dextromethorphan" and "quinidine" to have one meaning for purposes of the "administration" and "amount" limitations, but a different meaning for the "ratio" limitation.  It is axiomatic that claim terms are "presumed to have the same meaning throughout all of the claims in the absence of any reason to believe otherwise."  *See Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1275 (Fed. Cir. 2012).

The specification further makes clear that "dextromethorphan" and "quinidine" in the "administration" and "amount" limitations refer to the form that was actually administered. For example, in clinical study #3, the dextromethorphan and quinidine "dosed" to the patients explicitly referred to the salts forms set forth in specification as Treatments A-H. Appx63, 25:31-65; *see supra* pp. 26-28.

With this understanding, there is no confusion about the scope of the claim. Rather, as Otsuka's counsel explained at oral argument:

> [W]hat you use is what is in front of you. So this product is 20 mg dextromethorphan hydrobromide, 10 mg quinidine sulfate, those are the numbers that you use. You use what is in the product.

Appx1842-43. Indeed, Hetero's package insert for its ANDA product is clear:

-------------DOSAGE FORMS AND STRENGTHS-------------

Capsules: Dextromethorphan hydrobromide 20 mg/quinidine sulfate 10 mg. (3)

Appx481. Moreover, Hetero's argument that a person of skill in the art would not know what to compare in claim 1 is wholly inapplicable to dependent claims that further limit the quinidine to quinidine sulfate and the dextromethorphan to dextromethorphan hydrobromide. Appx89, claims 7-11.

Hetero's reliance on *SmithKline* (Br. 53) is misplaced. Indeed, far from "precisely describ[ing] the fallacy of Otsuka's response to the District Court's question" during the preliminary injunction hearing, *SmithKline* bears little similarity to this case. There, the issue was whether an ANDA filer's ability to

determine if trace amounts of a crystalline form existed in its own product due to limitations in analytical detection methods should factor into claim construction or indefiniteness. *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1340 (Fed. Cir. 2005). This Court held that indefiniteness is not measured by whether an accused infringer can characterize its own product with perfect precision to determine infringement. *Id*. at 1340-41. But here, Hetero does not argue that it cannot characterize its ANDA Product to determine infringement. And, like the claim in *SmithKline*, the bounds of claim 1 of the '282 patent are unambiguous based on the intrinsic evidence. Thus, *SmithKline* is inapposite.

Hetero's reliance on *Teva* and *Dow* (Br. 54) is similarly misplaced. In both cases, claims were held indefinite because the patents provided no guidance on which ***analytical method*** to use when multiple methods were available and produced different results. *Teva Pharms. USA v. Sandoz, Inc.*, 789 F.3d 1335, 1341 (Fed. Cir. 2015); *Dow Chem. v. Nova Chemicals Corp. (Canada)*, 803 F.3d 620, 634 (Fed. Cir. 2015). Here, however, there is no dispute about analytical methods or measurement techniques; the weights of the forms of dextromethorphan and quinidine are well-known. The question is simply: which form do you use? The intrinsic record answers this: you measure the weight of the form that is "administered."

46

**b.    The District Court Properly
Found *Avanir* To Be "Instructive"**

Hetero argues that the district court's alleged reliance on the *Avanir* decision

in finding Hetero was not likely to succeed on the merits on its indefiniteness defense

was improper because the *Avanir* litigation allegedly did not address indefiniteness.

Br. at 49.  Hetero is incorrect.

*First*, the district court did not blindly adopt the *Avanir* decision, but properly

found "the holdings from the prior [*Avanir*] litigation ***instructive***" in reaching its

conclusion that Otsuka was likely to succeed on the merits of its infringement and

validity claims.  Appx23.  Specifically, the district court credited the prior validity

holding as one of multiple reasons why Otsuka is likely to succeed on the merits of

its validity claim, notwithstanding Hetero's indefiniteness defense.   Appx21-23.

Such reliance on the outcome of prior validity challenges is not improper, even

where the party challenging the validity of the patents-in-suit was not a party to those

prior proceedings.  *See, e.g.*, *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1341-

42 (Fed. Cir. 2003) (holding that Oakley was reasonably likely to withstand a

validity challenge on the basis of indefiniteness in part because the patent-in-suit

"ha[d] already been subjected to re-examination").

*Second*, Hetero's assertion that indefiniteness was not raised in *Avanir* is

incorrect.  The *Avanir* defendants ***did*** argue indefiniteness as a basis for invalidity in

the *Avanir* litigation. Specifically, in their "Joint Initial Invalidity Contentions," the *Avanir* defendants argued that the '282 patent was "invalid for indefiniteness":

> **B.   Indefiniteness**
>
> The Asserted Claims of the '115 and '282 patents are invalid for indefiniteness under 35 U.S.C. § 112, second paragraph. Specifically, several claim terms fail to define the patentable subject matter with a reasonable degree of particularity and distinctness.

*Avanir Pharms. v. Actavis S. Atl. LLC*, No. 11-701-LPS D.I. 334 at 298 (D. Del. Mar. 21, 2013). The district court in *Avanir* upheld the validity of the '282 patent notwithstanding this indefiniteness challenge.

## B.   The District Court Did Not Abuse Its Discretion By Finding That Otsuka Would Be Irreparably Harmed

The district court correctly found that Otsuka would be irreparably harmed in the absence of an injunction. Appx25, 27. In particular, the district court found that Hetero's launch of its ANDA Product would irreparably harm Otsuka by damaging its goodwill and reputation. Appx25. The district court also correctly found that Otsuka did not unduly delay in seeking a preliminary injunction. Appx26. Hetero does not even attempt to show clear error in the district court's analysis. Instead, Hetero incorrectly contends (Br. 54) that the district court ignored and "[s]eriously

[m]isjudged" Hetero's alleged evidence negating irreparable harm.[8]  This argument

fails for multiple reasons.

Hetero's irreparable harm challenge fails as a matter of law because Hetero

does not show any clear error in the district court's irreparable harm findings.

*Natera, Inc. v. NeoGenomics Lab'ys, Inc.*, 106 F.4th 1369, 1379-80 (Fed. Cir. 2024)

(upholding district court's determination of irreparable harm where appellant

showed "no error in the district court's irreparable harm analysis" and "no clear error

in its factual findings").

In support of its determination that Otsuka would suffer irreparable harm

absent an injunction, the district court found:

- Hetero's launch of its ANDA Product would irreparably harm Otsuka by damaging its goodwill and reputation.  Appx25.

- Any delay in Otsuka filing for a temporary restraining order and preliminary injunction "does not vitiate an initial finding of irreparable harm."  Appx26.

- "[T]he delay here appears to be attributed in part to improper notice of Defendants' ANDA, and in part to attempted negotiations between the parties."  *Id.*

---

[8]  Hetero confusingly includes its irreparable harm arguments in its section regarding success on the merits.  Irreparable harm, however, is its own factor in the preliminary injunction analysis.  *Natera*, 106 F.4th at 1375.

Hetero does not challenge any of these findings as clearly erroneous.[9]  They are dispositive.

Hetero relies on *High Tech* (Br. 57) as allegedly presenting "similar circumstances."  But in *High Tech*, the Court found no irreparable harm where the patentee (1) presented no evidence of actual harm; (2) did not practice the patent; and (3) had previously licensed the patent.  *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1556-57 (Fed. Cir. 1995).  None of those is true here.

The only alleged error that Hetero identifies (Br. 55) is that the district court allegedly ignored Hetero's evidence of undue delay.  But Hetero's sole evidence of alleged undue delay on appeal (Br. 54-58)—a text message about Hetero's ANDA from December 2023—was not presented to the district court as part of the preliminary injunction proceedings.  Indeed, Hetero did not rely on the text message in its opposition brief, did not present the text message to the district court during argument on the preliminary injunction, and only mentioned the December 2023 date in passing during the hearing, without any reference to its basis.[10]  Rather, at

---

[9]    In fact, Hetero "assum[es] the District Court correctly resolved these factual issues."  Br. 55.

[10]    The text message is only part of the appeal record because Hetero attached it as an exhibit to its opposition to different motion not at issue here—Otsuka's request

the district court, Hetero argued that Otsuka had unduly delayed from the FDA's approval of Hetero's ANDA Product in August 2024 (Appx613), which the district court rejected. Appx26. Thus, it was not error for the district court to not consider the text message or the December 2023 date. *See Tomasko v. Ira H. Weinstock, P.C.*, 357 F. App'x 472, 479 (3d Cir. 2009) (rejecting argument that district court erred by failing to address specific facts raised for the first time at oral argument).

Even if the text message is properly part of the record, it is completely irrelevant. The text message came from an individual who was not affiliated with Hetero (or any other defendant) and, critically, provides no information indicating that Hetero had already filed an ANDA, much less that it allegedly included a paragraph IV certification. Appx1553. Indeed, even today, Otsuka has not received a proper paragraph IV notice from Hetero. Appx1823; Appx1849. Moreover, while the Otsuka recipient replied promptly, the text chain dies there, and no one at Hetero ever followed up about the ANDA. Appx1553.

In reality, Hetero did not inform Otsuka of its intention to launch at risk until May 22, 2025. Appx9; Appx128; Appx336-337; Appx527. Otsuka sued and moved for an injunction within a week. Appx154. Thus, even if considered, the text chain does not evidence any undue delay by Otsuka.

---

to use confidential documents from the district court action in potential parallel proceedings. Appx1545, Appx1553.

### C.     The District Court Correctly Found That The Balance Of Equities Favored Otsuka

Hetero argues that Otsuka attempted to satisfy its burden of demonstrating that the balance of equities tipped in its favor solely "by claiming that it purportedly did not receive notice of Hetero's Paragraph IV certification." Br. 58. This mischaracterizes the record.

In determining the balance of the equities, the district court found that in the absence of a preliminary injunction Otsuka would experience multiple harms, including (1) irreversible losses in market share and revenue, (2) a need to eliminate its sales force and marketing team, and (3) incalculable harm to its goodwill and reputation. Appx27. Notably, these harms, ***which Hetero does not challenge***, have nothing to do with Hetero's deficient service. Thus, while it is correct that Otsuka did not receive Hetero's Notice Letter, the harms considered in the balance of harms inquiry extend far beyond Hetero's improper notice.

Hetero also argues (Br. 59) that the district court committed legal error by shifting the burden to Hetero with respect to the balance of harms inquiry. Hetero, however, offers no proof that the district court shifted any burden with respect to the balance of equities inquiry. To the contrary, the court found that Hetero "d[id] not sufficiently explain to the Court why they will be harmed if a preliminary injunction is granted." Appx27. When weighed against the unchallenged harms to Otsuka, the

district court found that the scales tip in Otsuka's favor. Appx28. Hetero has failed to show any clear error in this finding.

Beyond that, Hetero has failed to identify any legal error in considering Hetero's violation of FDA regulations in serving its Notice Letter as part of its balancing the equities. Hetero relies (Br. 59) on a footnote in the district court's opinion stating that it could "assign [Hetero's] violation weight in the balance of equities." Appx27, n.6. But Hetero cites no authority that such a violation cannot be considered as part of the balance of equities. Moreover, assigning weight to a finding is a normal part of balancing the equities, not burden shifting.

Hetero's argument (Br. 59) that "[t]he District Court abused its discretion in accepting Otsuka's attorney argument and excusing Otsuka's failure to submit competent evidence" regarding Hetero's improper notice mischaracterizes the district court's findings and the law.

Hetero's argument (Br. 59-60) is based on the mistaken premise that in order to show Hetero's notice was improper, Otsuka was required to prove that it did not receive Hetero's Notice Letter. While it is true that Otsuka did not receive (and still to this day has not received) Hetero's Notice Letter, whether Otsuka received the Notice Letter is not the test of whether service was proper. Indeed, in *Melinta Therapeutics, LLC v. United States Food & Drug Administration*, the patentee (Melinta) acknowledged receipt of the ANDA filer's Notice Letter, but the court still

found that the ANDA filer (Nexus) had not provided proper notice because it did not provide "signature proof of delivery" to the FDA as required under 21 C.F.R. § 314.95(e). No. 22-2190, 2022 WL 6100188, at *4-8 (D.D.C. Oct. 7, 2022). The relevant inquiry is whether Hetero complied with FDA regulations in sending its Notice Letter. Here, as Hetero admits (Br. 61), the district court found Hetero's service of its Notice Letter failed to comply with FDA regulations. Appx26, Appx31. And Hetero has not challenged that factual finding on appeal as clearly erroneous.

Hetero's reliance on text messages between an unidentified individual and an attorney at Otsuka (Br. 61) fails for the same reasons explained above. Not only was this evidence not before the district court with respect to Otsuka's motion for a preliminary injunction, but it is also not evidence that Hetero complied with FDA regulations regarding its Notice Letter. Thus, Hetero has failed to establish that the district court abused its discretion in not requiring proof of lack of receipt of Hetero's notice letter.

### D.    The District Court Properly Considered Public Interest

Hetero devotes less than one full paragraph to challenging the district court's findings on public interest, arguing (Br. 62-63) that the district court "failed to account for the public interest in having prompt access to lower-cost, FDA-approved generics." But the district court expressly acknowledged Hetero's argument that

"there is significant public interest in allowing launch of Hetero's product, which will lower costs and improve access to patients." Appx28. Despite considering this argument, the district court found that "the public interest weighs in favor of issuing the preliminary injunction," citing the significant "public interest in encouraging investment in drug development and protecting the exclusionary rights conveyed in valid pharmaceutical patents," and the "strong public interest in protecting valid patents by preventing the premature entry of generic drugs into the marketplace." Appx28-29.

Hetero's challenge of the district court's public interest determination also fails because Hetero has failed to show that any of the district court's findings (Appx28-30) were clearly erroneous. *Natera*, 106 F.4th at 1383 (affirming preliminary injunction where appellant did not show clear error in district court's factual finding regarding public interest). Instead, Hetero merely repeats the same public interest arguments it made below without explaining why the district court erred in finding that the public interest in protecting valid patent rights outweighs generic access before patent expiration. Br. 62-63. This falls short of meeting Hetero's burden to demonstrate clear error. *SoClean, Inc. v. Sunset Healthcare Sols., Inc.*, 52 F.4th 1363, 1371 (Fed. Cir. 2022).

## II.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY DECLINING TO REQUIRE A BOND

Separately, Hetero errs in arguing (Br. 63-67) that the district court abused its discretion in waiving the bond.  While Hetero does not dispute that the bond may be waived under appropriate circumstances, its brief addresses only two of the three exceptions recognized by Third Circuit law and ignores the exception the district court actually relied upon.  Specifically, the district court invoked the balance of equities exception from *Temple University v. White*, 941 F.2d 201, 219-20 (3d Cir. 1991), made specific findings as required by *Elliott*, 98 F.3d at 60, and concluded the equities weigh "strongly" in favor of waiving the bond.  Appx30-32.  Hetero offers no argument to rebut this basis for the district court's decision.  Its failure to address the applicable exception, combined with the substantial deference owed to the court's discretionary judgment, requires affirmance.

### A.    Hetero Failed To Address The Exception The District Court Actually Applied

The district court carefully analyzed Third Circuit precedent and identified three exceptions to Rule 65(c)'s bond requirement.  Appx30.  First, the district court recognized that, under *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 103 (3d Cir. 1988), a bond is not required "where there is no risk of monetary loss to the defendant."  Appx30. Second, the district court noted that, under *Temple Univ. vs. White*, 941 F.2d 201 at 219-20, a district court may waive a bond by

"examin[ing] the equities of potential hardships to the parties" and determining that the balance weighs in favor of the movant. *Id.* (cleaned up). Third, also under *Temple University*, the district court held that "a district court should consider the impact that a bond requirement would have on enforcement of an important federal right or public interest in order to prevent undue restriction of them." *Id.* (cleaned up).

In waiving the bond, the district court expressly relied on the second exception—the balance of equities test. The district court stated: "The Court has 'discretion' when deciding the first *Temple* exception, i.e., when determining whether the balance of equities weighs in favor of waiving the bond." Appx31. After making specific findings on each equitable factor, the court concluded: "Under the circumstances of this action, the equities weigh strongly in favor of waiving the Rule 65(c) bond." Appx32.

Hetero's brief addresses only the first and third exceptions to bond requirements and ignores the second. Hetero argues the first exception does not apply because it will suffer $80 million in damages. Br. 63-64, 67. Hetero argues the third exception does not apply because Otsuka is unlike the hospital in *Temple* that served low-income Medicaid patients and faced financial collapse. Br. 65-66. This Court does not need to reach the sufficiency of Hetero's arguments under the first or third exceptions because Hetero does not challenging the second exception—

the balance of equities test—that the district court actually applied. Nowhere does Hetero acknowledge that the district court analyzed the relative hardships to both parties, made specific findings on multiple equitable factors, and concluded the balance weighs "strongly" in Otsuka's favor. This omission is dispositive considering the discretionary nature of the district court's findings.

### B. The District Court Made Specific Findings Demonstrating The Balance Of Equities Weighs Strongly In Otsuka's Favor

The district court recognized that, when relying on a *Temple* exception, it must make specific findings to support its decision. Appx30 (citing *Elliott*, 98 F.3d at 60) ("The Third Circuit has explained that, when a district court grants one of these so-called *Temple* exceptions, the court shall 'make specific findings.'"). The court satisfied this requirement through detailed findings related to balance of the equities. These findings are supported by the record and entitled to substantial deference. *AstraZeneca*, 633 F.3d at 1049; *Jeneric/Pentron*, 205 F.3d at 1384.

### 1. Otsuka's Motion Was Not Based on Tenuous Legal Grounds

The district court explained that courts relying on balance of the equities to waive bond have done so "where the plaintiff's motion for a preliminary injunction was not based on 'tenuous legal grounds.'" Appx31 (citing *Youth Justice Coal. v. City of L.A.*, No. 16-07932, 2018 U.S. Dist. LEXIS 242940, at *24 (C.D. Cal. Mar. 15, 2018)). This factor makes sense: when the movant's legal position is strong, the

risk that the injunction will later be deemed wrongful—and thus the risk that the defendant will be entitled to recover on the bond—diminishes correspondingly. Requiring a substantial bond under such circumstances would impose costs on the movant without meaningful corresponding protection for the defendant.

The district court found this factor satisfied based on substantial evidence. Appx31. The district court recognized that the '282 patent "has been previously challenged and tested by several generic companies in the past and upheld by the district court and the Federal Circuit." *Id.* The district court recognized that this is not a case involving an untested patent of uncertain validity. The '282 patent has already survived validity challenges and emerged intact from both district court and appellate review. Based on its own independent analysis of the merits, the district court also found that "Plaintiffs' case on the merits for infringement and non-invalidity is likely to succeed." *Id.* The district court's confidence in Otsuka's likelihood of success—grounded in the court's assessment of the current record and the patent's litigation history—supports its determination that the legal grounds for the injunction are far from tenuous.

## 2. The Risk Of Financial Harm To Hetero Is Speculative

The district court also recognized that the balance of equities test is satisfied when "the risk of financial harm is speculative at best." Appx31 (citing *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 315 (D.D.C. 2025)). The

court then concluded that this was the case with respect to Hetero.  *Id.* ("[T]he risk of financial harm to Defendants is speculative at best.").

The court's logic is straightforward.  Hetero's claim of $80 million in damages assumes the preliminary injunction is wrongful—that Hetero will ultimately prevail on the merits.  But the district court found the opposite.  Given Otsuka's strong likelihood of success on both infringement and validity, the court determined Hetero will likely lose, rendering any claimed "damages" from a properly issued injunction purely speculative.

This reasoning reflects the fundamental purpose of the bond requirement.  A bond protects a defendant from harm caused by a wrongfully issued injunction.  *See* Fed. R. Civ. P. 65(c).  But where the injunction is likely to be proven correct—where the plaintiff is likely to succeed on the merits—there is no "wrongful" injunction from which the defendant needs protection.  Hetero's $80 million figure rests entirely on the premise that it will ultimately prevail and be entitled to sell its generic product.  The district court rejected that premise.  Having found Otsuka likely to succeed, the court was entitled to find Hetero's projected damages speculative. Hetero's expert declaration, which simply assumes Hetero would otherwise be selling its product, does not override the district court's reasoned assessment of the merits.  A court need not accept damages projections built on a foundation the court has already determined will likely crumble.

### 3. Requiring A Bond Would Have A Chilling Effect On Access To Justice

Finally, the district court recognized that the balance of equities test is satisfied "where a bond would have a chilling effect on access to justice." Appx31 (citing *N. Am.'s Bldg. Trades Unions*, 783 F. Supp. 3d at 315). Here, the district court found that "requiring a bond may have a chilling effect on access to justice" because there is evidence that Hetero violated the FDA's notice requirements in an effort to ███████ rationale ███████ the bond-free, statutorily required 30-month stay. Appx31. Under these circumstances, the court held that requiring a bond would be "improvident." Appx32.

This finding carries profound equitable significance. The district court found that Hetero strategically violated mandatory FDA notice requirements to circumvent the Hatch-Waxman Act's automatic stay provisions. *Id.* This was not inadvertent non-compliance—it was deliberate misconduct designed to deprive Otsuka of statutory protections. As explained below, the inequity is compounded by the Hatch-Waxman framework itself: if Hetero had provided proper notice, Otsuka would have obtained the 30-month stay automatically, without posting any bond. 21 U.S.C. § 355(j)(5)(B)(iii).

ANDA applicants like Hetero must provide the NDA holder with notice of their Paragraph IV certification and submit proof of proper notice to the FDA. 21 C.F.R. § 314.95(e). That proof can take one of three forms: [1] "a return receipt,"

CONFIDENTIAL MATERIAL REDACTED

[2] "signature proof of delivery by a designated delivery service," or [3] "a letter acknowledging receipt by the person provided the notice." *Id.*

Option 1—"return receipt"—is a United States Postal Service ("USPS") service that "provides the sender with proof of delivery (the recipient's signature along with information about the delivery address, if different, and the date and time of delivery)." Appx576. The FDA's regulations make clear that return receipt is available only with USPS registered or certified mail, not other delivery services like FedEx or UPS. *See* 21 C.F.R. § 314.95(a).

Option 2—"signature proof of delivery by a designated delivery service"—is available for ANDA filers using a delivery service other than USPS. This option "requires the signature of the recipient or a designated representative." *Melinta Therapeutics,* 2022 WL 6100188, at *5.

Option 3—"a letter acknowledging receipt by the person provided the notice"—requires the intended recipient to acknowledge actual receipt.

Hetero purportedly sent its Notice Letter to Otsuka via UPS, a "designated delivery service." Appx1859; Appx521-525. But it provided shipping information acknowledgment of receipt—the only proof available to Hetero when sending via

UPS.[11]  Appx1859.  In fact, Otsuka never received Hetero's alleged Notice Letter.

Appx1823; Appx1849.  The shipping label reveals why: Hetero sent its Notice Letter

with the instruction ██████ shipping information ██████ Appx522, Appx524.  According to

UPS's manual, this means "a ██████ shipping information ██████ Appx554.  Hetero thus

could not satisfy Option 2's requirements.    Nor did Hetero obtain a letter

acknowledging receipt under Option 3. While Hetero submitted UPS tracking

information (Appx1859; Appx583-85, Appx521-525), the district court correctly

found this does not satisfy the FDA's requirements.  Appx26.

*Melinta* confirms that Hetero's deficient notice precludes any claim of

commercial harm.  In *Melinta*, the ANDA holder sent its notice letter via FedEx and

submitted a "proof of delivery" slip indicating delivery at 10:38 on December 8,

2020, signed by "A.MELNTA."  *Melinta Therapeutics*, 2022 WL 6100188 , at *3.

The signature box contained the notation "C-19," consistent with FedEx's Covid-19

contactless delivery policy.  Melinta admitted the letter was delivered to its office

but argued it was not discovered until March 31, 2021.  *Id.*

The court found the ANDA filer's proof inadequate—even though Melinta

admitted actual delivery and the FedEx slip purported to show a signature—because

---

[11] A "return receipt" under Option 1 also requires the recipient's signature.  Hetero
██████ shipping information ██████.  For this additional reason, Hetero's proof cannot satisfy
Option 1.

no employee named "A. MELNTA" existed.  The proof thus lacked "the signature of the recipient or a designated representative."  *Id.* at *6-7.  The court vacated the FDA's ANDA approval and remanded.

Hetero's proof is even more deficient.  Unlike the patent holder in *Melinta*, Otsuka has not admitted receipt.  And Hetero did not even attempt to obtain (and indeed instructed UPS not to obtain) ███ shipping information ███

As the district court found (Appx31), had Hetero properly served its Notice Letter, Otsuka could have sued within the 45-day window, triggering a 30-month stay of Hetero's ANDA approval—without any bond.  Appx1851.  Given the timing of Hetero's ANDA filing, litigation and any appeal would have extended past the '282 patent's expiration, mooting these proceedings entirely.  Because Hetero failed to comply, its only path to proper proof now would be to resend its Notice Letter in compliance with FDA regulations.  Appx1852.  If it did, Otsuka would sue within 45 days, and the resulting stay—again, without bond—would expire when the '282 patent expires.  21 U.S.C. § 355(j)(5)(B)(iii).  Appx1851.

Hetero argues (Br. 67) that its failure to provide proper notice "under a regulatory scheme is not a basis for refusing to require bond."  But Hetero offers no support for this position beyond bare assertion.  The district court found that "requiring a bond may 'have a chilling effect on access to justice'" precisely because of Hetero's strategic decision to evade the FDA's notice requirements.  Appx31.

Under these circumstances, the "balance of [the] equities weighs overwhelmingly in favor of the party seeking the injunction." *Zambelli Fireworks Mfg.*, 592 F.3d at 426.

### C.     The District Court's Decision Should Be Affirmed

The district court did not abuse its discretion in finding that Hetero's notice failures weighed heavily against requiring a bond. After making specific findings on the balance of the equities, the district court concluded: "Under the circumstances of this action, the equities weigh strongly in favor of waiving the Rule 65(c) bond." Appx32. This represents exactly the careful balancing of relative hardships that *Elliott* and *Temple* require. *See Elliott*, 98 F.3d at 60; *Temple Univ.*, 941 F.2d at 219-20. The court weighed the hardships to both parties and found the balance favored Otsuka. That determination is entitled to substantial deference. Hetero has not shown—and cannot show, given its failure to address the balance of equities exception—any "clear error of judgment in weighing relevant factors" warranting reversal. *Abbott Lab'ys*, 452 F.3d at 1335.

Even if this Court found error in the bond waiver, the proper remedy would be remand—not vacatur of the preliminary injunction or imposition of Hetero's $80 million demand. *Temple* explains that if "the district court had erred in not requiring a bond, [the defendant] would only have been entitled to a remand for reconsideration of that issue." *Temple Univ.*, 941 F.2d at 220 n.28. On remand, "the

district court could have . . . required the posting of a nominal bond." *Id.* "The amount of the bond is left to the discretion of the court." *Frank's GMC*, 847 F.2d at 103. Hetero's $80 million figure is not binding, and the district court could set a nominal amount given its findings on Otsuka's strong case and Hetero's strategic misconduct.

## CONCLUSION

This Court should affirm the district court's grant of a preliminary injunction without bond.

December 8, 2025                   /s/ Eric C. Stops
                                   Eric Stops

F. Dominic Cerrito
Eric C. Stops
James E. Baker
Ellyde R. Thompson
John P. Galanek
QUINN EMANUEL
URQUHART & SULLIVAN, LLP
295 5th Avenue
New York, NY 10016
(212) 849-7000
nickcerrito@quinnemanuel.com
ericstops@quinnemanuel.com
jamesbaker@quinnemanuel.com
ellydethompson@quinnemanuel.com
johngalanek@quinnemanuel.com

Alexandra K. Kim
QUINN EMANUEL
URQUHART & SULLIVAN, LLP
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7100
alexandrakim@quinnemanuel.com

*Attorneys for Plaintiffs-Appellees
Otsuka Pharmaceutical America, Inc.
and Avanir Pharmaceuticals, LLC f/k/a
Avanir Pharmaceuticals, Inc.*

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2025-2016

**Short Case Caption:** Otsuka America Pharmaceutical, Inc. v. Hetero Labs Limited

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 13,841 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 12/08/2025          Signature: /s/ Eric C. Stops

                          Name: Eric C. Stops

**FORM 31. Certificate of Confidential Material**

Form 31
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 2025-2016

**Short Case Caption:** Otsuka America Pharmaceutical, Inc. v. Hetero Labs Limited

---

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).

- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

---

The foregoing document contains ___15___ number of unique words (including numbers) marked confidential.

☑ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☐ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 12/08/2025

Signature: /s/ Eric C. Stops

Name: Eric C. Stops