**Docket No. 2025-2016**

*In the*

# United States Court of Appeals

*For the*

# Federal Circuit

---

OTSUKA AMERICA PHARMACEUTICAL, INC.,
AVANIR PHARMACEUTICALS, LLC,
fka Avanir Pharmaceuticals Inc.,

*Plaintiffs-Appellees,*

v.

HETERO LABS LIMITED, HETERO LABS LIMITED UNIT-III,
CAMBER PHARMACEUTICALS INC.,

*Defendants-Appellants.*

---

*Appeal from the United States District Court for the District of Delaware,*
*Case No.* 1:25-cv-00647-GBW, *Hon. Gregory B. Williams*

## NON-CONFIDENTIAL APPELLANTS' REPLY BRIEF

DAVID A. RANDALL
ORBIT IP, LLP
11400 West Olympic Boulevard, Suite 200
Los Angeles, CA 90064
(310) 887-1333

EHAB M. SAMUEL
ORBIT IP, LLP
620 Newport Center Drive, Suite 1100
Newport Beach, CA 92660
(310) 887-1333

*Counsel for Defendants-Appellants*

December 29, 2025

 

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................4

I.     INTRODUCTION ...................................................................1

II.    THE DISTRICT COURT'S CLAIM CONSTRUCTION
       CONSTITUTED LEGAL ERROR AND IS DISPOSITIVE .......................3

       A.     The Intrinsic Record Belies Otsuka's Construction ............................3

              1.    The Specification Identifies the Claimed Compounds by
                    Chemical Name and Structure—Not by Delivery Form ...............3

              2.    The Specification Ties the Invention and Embodiments to
                    Predictable Compound Levels, Not Salt Levels, in the
                    Blood for Treating Pseudobulbar Affect or Emotional
                    Lability ...........................................................5

              3.    Claim Differentiation and the Original Claims—Especially
                    Original Claim 9—Support Hetero's Construction ......................7

              4.    Otsuka's Remaining Arguments Misread the Intrinsic
                    Record ..........................................................10

              5.    Otsuka's Construction Conflates Compound Identity and
                    Delivery Form .................................................13

       B.     The Prosecution History Confirms the Claimed Weight Ratio Is
              Compound-Based, Not Salt-Based.....................................14

              1.    The Examiner Mapped Compound-Based Prior Art to the
                    Claimed Dextromethorphan and Quinidine ..................................15

              2.    The Prosecution History Confirms That Applicants
                    Narrowed the Numeric Ratio, But Did Not Redefine the
                    Claim Terms...................................................16

              3.    The Examiner's Treatment of Salt-Dependent Claims,
                    Clinical-Study Arguments, and Double-Patenting Analysis
                    Forecloses Otsuka's Construction.................................17

i

C.     The *Avanir* Court Did Not Evaluate the Claimed Ratio or Product Coverage .................................................................20

D.     Otsuka's Disavowal Theory Is Waived and Irrelevant.......................22

E.     Otsuka Waived Any Challenge to Dr. Buckton, Leaving His Testimony Unrebutted..........................................................23

F.     *De Novo* Review Requires Reversal Because Otsuka Concedes Noninfringement Under Hetero's Proposed Construction.................23

III.     THE DISTRICT COURT ERRED IN REJECTING INDEFINITENESS .......................................................................24

A.     The District Court Made No Findings on Indefiniteness ...................24

B.     Under the District Court's Construction, Claim 1 is Indefinite..........26

IV.     THE DISTRICT COURT ERRED ON THE REMAINING PRELIMINARY INJUNCTION FACTORS .................................................29

V.     THE DISTRICT COURT'S IRREPERABLE HARM, NOTICE AND BOND RULINGS CONSTITUTE LEGAL ERROR .................................30

A.     Rule 65(c) Requires a Security Bond Absent Truly Exceptional Circumstances—Which Are Not Present Here ...................................30

B.     Otsuka Failed to Carry Its Burden to Justify a Bond Waiver..............30

C.     Otsuka's "Notice" Argument Improperly Conflates Statutory ANDA Notice with Obligation to Act Diligently After Actual Notice ........................................................................31

VI.     CONCLUSION..................................................................33

ADDENDUM ...............................................................................1

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

CERTIFICATE OF SERVICE

**CONFIDENTIAL MATERIAL OMITTED**

The material redacted from this brief is subject to a protective order. The confidential information is on page 28. Hetero's proposed redactions are limited to information related to Hetero's ANDA. The parties have moved to file similar disclosures under seal in this case, which the District Court has granted. (*See, e.g.,* D.I. 24, 31, 42, 48). Hetero maintains that any disclosure will cause Hetero harm in the marketplace by providing highly sensitive, commercial information to Hetero's competitors. Additionally, the dispute involves private litigants and relates to Hetero's ANDA, which is confidential and unavailable to the public. As such, there is no public interest in the disclosure of the information contained in Hetero's ANDA.

# TABLE OF AUTHORITIES

## CASES

*Bell & Howell Document Management Prods. Co. v. Altek Sys.*, 132 F.3d 701 (Fed. Cir. 1997)......................................................................24

*Curtiss–Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374 (Fed. Cir. 2006) ..............................................................................9

*Dow Chem. Co. v. Nova Chems. Corp. (Can.)*, 803 F.3d 620 (Fed. Cir. 2015)...................................................................... 28, 29

*Elliott v. Kiesewetter*, 98 F.3d 47 (3d Cir. 1996)......................................30

*FMC Corp. v. Sharda USA, LLC*, 145 F.4th 1326 (Fed. Cir. 2025).......................11

*Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100 (3d Cir. 1988) ..............................................................................30

*Glaxo Grp. Ltd. v. Ranbaxy Pharms., Inc.*, 262 F.3d 1333 (Fed. Cir. 2001)......................................................................................29

*High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551 (Fed. Cir. 1995)...........................................................32

*In re Xencor, Inc.*, 130 F.4th 1350 (Fed. Cir. 2025)................................26

*MCM Portfolio LLC v. Hewlett-Packard Co.*, 812 F.3d 1284, 1294 (Fed. Cir. 2015) ....................................................... 22, 23

*Melinta Therapeutics, LLC v. U.S. Food & Drug Admin.*, 2022 WL 6100188 (D.D.C. Oct. 7, 2022).................................................. 32, 33

*Novosteel SA v. U.S., Bethlehem Steel Corp.*, 284 F.3d 1261 (Fed. Cir. 2002)......................................................................................14

*Nutrition 21 v. U.S.*, 930 F.2d 867 (Fed. Cir. 1991) ...............................25

*Nystrom v. TREX Co., Inc.*, 424 F.3d 1136 (Fed. Cir. 2005).....................11

*Oakley, Inc. v. Sunglass Hut Int'l*, 316, F.3d 1331 (Fed. Cir. 2003).......................25

*Oakley, Inc. v. Sunglass Hut Int'l*, No. SA CV 01-1065 AHS(MLGx), 2001 U.S. Dist. LEXIS 23572 (C.D. Cal. Dec. 7, 2001) ....................................25

*Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351 (Fed. Cir. 2007).................12

*Rapoport v. Dement*, 254 F.3d 1053 (Fed. Cir. 2001) ............................................26

*Salazar v. Procter & Gamble Co.*, 414 F.3d 1342 (Fed. Cir. 2005)................ 15, 16

*SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331 (Fed. Cir. 2005).......................................................................................................... 24, 28

*Stauffer v. Brooks Bros. Grp.*, 758 F.3d 1314 (Fed. Cir. 2014) ...................... 14, 17

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335 (Fed. Cir. 2015)...............29

*Thorner v. Sony Computer Enter. Am. LLC*, 669 F.3d 1362 (Fed. Cir. 2012)........................................................................................................................4

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996)....................5

*Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412 (3d Cir. 2010) ....................30

## STATUTES

35 U.S.C. § 112...........................................................................................................28

## RULES

Fed. R. App. P. 10(a) ................................................................................................32

Federal Rule of Civil Procedure 52(a)(2) ........................................................ 25, 28

Federal Rule of Civil Procedure 65(c) ............................................................. 30, 31

Federal Rule of Evidence 803(6) ..............................................................................32

Federal Rule of Evidence 902(11) ............................................................................32

Federal Rule of Evidence 902(12) ............................................................................32

## I.    INTRODUCTION

The claim term "dextromethorphan" means dextromethorphan while the claim term "quinidine" means quinidine. The District Court's departure from the plain and ordinary meanings led it to erroneously construe these terms to include the weight of their salts when calculating the claimed dosage ranges and 1:05 ratio. At the preliminary-injunction stage, that error is dispositive because Otsuka failed to meet its burden to show that Hetero's compound-based construction lacked substantial merit.

The '282 patent identifies dextromethorphan and quinidine as specific chemical compounds—by chemical name and structure—and claims a method for treating pseudobulbar affect or emotional lability by administering those compounds within a specific dosage range and ratio. Nothing in the patent redefines those terms to include salt mass, and a person of ordinary skill (POSA) would understand that dosage and ratio calculations must be based on compound weight, not variable salt weight dependent on delivery form. Instead, the patent consistently distinguishes compound identity from delivery form—a distinction the District Court improperly ignored.

The specification further confirms that the invention is directed to achieving predictable compound blood levels for treating pseudobulbar affect or emotional lability. Dextromethorphan provides the therapeutic effect, while quinidine

1

stabilizes dextromethorphan concentrations in the bloodstream. Efficacy is evaluated based on blood levels of dextromethorphan and quinidine—not salt weights. Consistent with these teachings, the patent explains that when salts are used, salt weights are converted to compound-equivalent amounts so that the same underlying compound quantities are administered regardless of form. Those conversions would be unnecessary—and make little sense—if the claimed dosage ranges and ratio were calculated from salt weight, as Otsuka contends.

The prosecution history reinforces the same point. The Examiner: (i) mapped compound-based prior art directly to the claimed compounds; (ii) evaluated the ratio on a compound basis; and (iii) treated salt administration as a separate limitation requiring separate prior art. The District Court nevertheless relied on claim differentiation to incorrectly alter the meaning of dextromethorphan and quinidine. Claim 1 is agnostic as to delivery form, while the dependent claims specify particular forms of administration. That structure does not justify reading salt mass into claim 1's dosage ranges or ratio.

The District Court compounded its error by making no findings on Hetero's indefiniteness defense, even though its construction permits multiple, conflicting ratio calculations. Critically, Otsuka does not dispute that, under Hetero's construction—where the claimed ratio is calculated based on the compounds themselves—Hetero's ANDA product does not infringe.

This appeal presents multiple independent grounds for reversal. First, *de novo* review confirms the District Court committed legal error in construing the dosage ranges and ratio of "dextromethorphan" and "quinidine" to include their salt weights, and under the correct construction there is no infringement. Second, even if claim construction were not conclusively resolved, the preliminary injunction cannot be sustained because Otsuka failed to meet its burden to demonstrate a likelihood of success on the merits based on the existing record. Third, the injunction must be vacated because the District Court failed to make the findings required by Rule 52 on Hetero's indefiniteness defense, including how the claimed ratio is calculated, which prevents meaningful appellate review. Because Otsuka cannot establish a likelihood of success on the merits under the correct construction, the preliminary injunction must be vacated. The remaining rulings, including the notice and bond determinations, independently rest on legal error as well.

## II. THE DISTRICT COURT'S CLAIM CONSTRUCTION CONSTITUTED LEGAL ERROR AND IS DISPOSITIVE

### A. The Intrinsic Record Belies Otsuka's Construction

#### 1. *The Specification Identifies the Claimed Compounds by Chemical Name and Structure—Not by Delivery Form*

Otsuka argues that the specification's references to salt forms—often using the word "includes"—expand the meaning of "dextromethorphan" and "quinidine" in claim 1 to encompass their salts. Opp. 8, 20–26. That misreads the patent. As explained in Hetero's opening brief, "dextromethorphan" and "quinidine" refer to

specific chemical compounds—identified in the specification by their chemical names and structures—not to one of the various delivery forms in which those compounds may be administered. Br. 23-24. That is their plain and ordinary meaning, and it controls absent a clear contrary definition in the specification.

The specification consistently uses the plain and ordinary meaning of the terms "dextromethorphan" and "quinidine," identifying each as a ***well-known*** chemical compound by name and chemical structure. Appx55, 9:10-41; Appx56, 14:6-33. Otsuka points to no disclosure in the specification redefining those terms to ***include the weight of their salts*** for dosage and ratio calculations. That omission is dispositive.

Otsuka seeks to expand the meaning of "dextromethorphan" and "quinidine" beyond their chemical identities. But the patentees did not act as their own lexicographer by "clearly set[ting] forth a definition of the disputed claim term other than its plain and ordinary meaning" and "clearly express[ing] an intent" to do so. *Thorner v. Sony Computer Enter. Am. LLC*, 669 F.3d 1362, 1365-66 (Fed. Cir. 2012). Citing certain embodiments in which the compounds are administered in salt form— or stating that an embodiment "includes" a salt—does not suffice. *See id.* at 1368. Read as a whole, the intrinsic record preserves the distinction between ***what the compounds are*** and ***how they may be delivered***—a distinction Otsuka's construction improperly collapses.

4

Critically, the District Court never reconciled its salt-inclusive construction with the specification's express distinction between compound identity and delivery form. It did not find that the patent uses "compound" and "salt" interchangeably, nor does Otsuka argue otherwise. Instead, Otsuka asserts that "dextromethorphan includes dextromethorphan hydrobromide," without explaining how its assertion can coexist with the specification's clear separation between the compounds themselves and the salts used to deliver them. Collapsing that distinction without support violates *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582–83 (Fed. Cir. 1996), which emphasizes that evidence of interchangeable usage cannot override a specification that expressly distinguishes the terms—here, between compound identity and salt delivery form.

### 2. The Specification Ties the Invention and Embodiments to Predictable Compound Levels, Not Salt Levels, in the Blood for Treating Pseudobulbar Affect or Emotional Lability

Otsuka argues that the specification's dosing discussion supports measuring the claims by salt weight. Opp. 24-25. The specification teaches otherwise. It ties the invention to **consistent blood levels of the compounds themselves**, not to the weight of any particular salt used for delivery.

The patent explains that dextromethorphan alone is rapidly metabolized, resulting in low and highly variable blood levels that fail to produce reliable clinical results. Appx56, 11:35-12:4 & 12:47-65. The patent disclosure addresses that

5

problem by co-administering quinidine, which slows dextromethorphan's metabolism, thereby increasing and stabilizing the amount of dextromethorphan circulating in the blood. Appx56-57, 12:5-14 & 12:65-13:2.

As the specification explains, quinidine provides "*at least two distinct beneficial effects*": (i) it "*greatly increases the quantity of dextromethorphan circulating in the blood*;" and (ii) "*yields more consistent and predictable dextromethorphan concentrations*." *Id.*, 14:24-27 (emphasis added). Consistent with this teaching, the specification repeatedly measures and discusses the embodiments in terms of blood concentrations of dextromethorphan and quinidine, and correlates those concentrations with observed clinical response. Appx59, 17:17-21 ("Administration of medicaments prepared from the compounds described herein can be by any suitable method capable of introducing the compounds into the bloodstream."); Appx61, 21:18-22, Appx72, 44:16-35, Appx78, 55:2-4 (blood samples taken to measure dextromethorphan and quinidine concentrations); Appx71, 42:47-54, Appx73, 46:51-66, Appx87, 74:30-65 & Table 54 (efficacy clinical analysis). Nowhere does it describe the invention as depending on the weight of the salt administered.

Such teachings are fatal to Otsuka's construction. Different salt forms could contain widely varying proportions of the underlying dextromethorphan or quinidine, meaning that the inclusion of the salt weight in the dosage and ratio measurements

6

would cause the actual amount of dextromethorphan or quinidine entering the bloodstream to vary with salt choice. Such variability would not achieve the specification's express goal of providing consistent and predictable compound levels in the blood.

The specification therefore explains that when salts are used, salt weights are converted to compound-equivalent amounts so the same compound quantities are administered *regardless of form*. Appx59, 17:63-18:14. Such conversion would be unnecessary if the dosage and ratio in claim 1 included salt weight. Critically, Otsuka does not: (i) address these conversion calculations; or (ii) explain why these conversion calculations are required if the ratio is simply the salt-to-salt administered dose. Otsuka's omissions leave Hetero's proposed claim construction unrebutted.

### 3. *Claim Differentiation and the Original Claims—Especially Original Claim 9—Support Hetero's Construction*

Otsuka's assertion that salt forms are "included" in the meaning of the terms "dextromethorphan" and "quinidine" also conflicts with the teachings of the original claims. As a matter of law, a dependent claim cannot broaden the scope of the independent claim from which it depends. The original claims demonstrate that principle and confirm that the patentees used "quinidine" in claim 1 to mean the compound, not its salt.

7

Original claim 1 recited administration of dextromethorphan and quinidine within defined daily limits:

> 1. A method for treating pseudobulbar affect or emotional lability, the method comprising administering to a patient in need thereof dextromethorphan in combination with quinidine, … and wherein an amount of **quinidine** administered comprises from about 10 mg/day to less than about **50 mg/day**.

Appx955.

And original dependent claim 9 expressly recited a specific salt form of quinidine and the corresponding higher numerical limit:

> 9. The method of claim 1, wherein the quinidine comprises **quinidine sulfate** and the dextromethorphan comprises dextromethorphan hydrobromide, and wherein an amount of quinidine sulfate administered comprises from about 30 mg/day to **60 mg/day** …

Appx955-56.

Because it's impossible to have a dependent claim with a broader range than the independent claim from which it depends, the structure and substance of these original claims reflect a deliberate distinction between compound identity (claim 1) and delivery form (claim 9). Claim 1 defines the claimed invention in terms of the quinidine compound, while claim 9 narrows the method to a particular salt form and restates the dosage accordingly.

As the specification explains, and as Dr. Buckton confirms without rebuttal, salt weights are converted to compound-equivalent amounts so that the same quantity of the compounds is administered regardless of delivery form. Appx59,

8

17:60-18:2; Appx630-31, ¶34; Appx639-40, ¶54. Dr. Buckton explained that quinidine sulfate contains approximately **83.33%** quinidine by weight. Appx630–31, ¶34. Applying that conversion:

> **60 mg quinidine sulfate × 0.8333 ≈ 50 mg quinidine**

Thus, original claim 9's upper limit of 60 mg/day quinidine sulfate is simply the salt-equivalent of claim 1's 50 mg/day quinidine compound limit. Original dependent claim 9 thus did not expand claim 1; it simply restated the same compound quantities while narrowing the delivery form to quinidine sulfate. The original claims prove that, when the patentees recited "quinidine" in claim 1, they meant the compound—not its salt.

Otsuka does not dispute this conversion, nor does it explain how its construction avoids violating claim differentiation of the originally filed claims. Opp. 33. A dependent claim cannot broaden the scope of an independent claim. *Curtiss– Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006). Despite arguing that the cases cited by Hetero are inapposite, Otsuka agrees "that even where dependent claims support a broader construction, the use in the specification can still limit the scope of a term." Opp. 40. ***Yet under Otsuka's reading, original claim 9's 60 mg/day limit would exceed—and thus impermissibly broaden—claim 1's 50 mg/day limit***.

9

Otsuka misapplies claim differentiation by arguing that the presence of dependent claims reciting salt forms means claim 1 "covers salts." Opp. 23. Claim 1 is agnostic as to delivery form; the dependent claims 7 or 8 merely narrow how the compounds are administered. That claim structure does not redefine the meaning of "dextromethorphan" or "quinidine"—much less authorize reading salt mass into the claimed ratio. The file history confirms that Otsuka's construction is inconsistent with the intrinsic record and thus incorrect.

### 4. Otsuka's Remaining Arguments Misread the Intrinsic Record

First, Otsuka relies on specification language stating that, in certain embodiments, "the quinidine includes quinidine sulfate" and "the dextromethorphan includes dextromethorphan hydrobromide." Opp. 2, 8, 15 & 20–26. Read in context, those statements do not redefine the terms, and merely describe permissible delivery forms in accord with the specification's explanation that the compounds may be administered as pharmaceutically acceptable salts. Br. 28. Describing how a compound may be delivered does not redefine the compound itself or alter how claimed dosages and ratios are calculated. And repetition of a delivery form in sixteen embodiments cannot override compound identity or rewrite the claim language.

Critically, *none of the sixteen embodiments* discloses or applies the claimed 1:05 ratio, calculates any ratio using salt mass, or administers dextromethorphan and

quinidine at the dosage ranges recited in claim 1. Opp. 8; Appx52, 3:21-23, 4:23-25; Appx53, 5:22-25, 6:19-21. Because the embodiments do not practice—or even implicate—the disputed ratio limitation, they cannot support Otsuka's salt-based construction.

Second, Otsuka's "effective dose" argument lacks merit. Opp. 29. The claims specify concrete daily amounts and a fixed weight-to-weight ratio, which the specification implements—when salts are used—by converting salt weights to compound equivalents. Appx59, 17:63-18:14. Nothing in the intrinsic record suggests that omitting the phrase "effective dose" converts the quantities and ratios of dextromethorphan and quinidine in claim 1 into salt-based measurements.[1]

Third, Otsuka attempts to obscure the analysis by applying labels—"active compound" and "active ingredient"—to a question that depends on claim language and intrinsic meaning. Opp. 21. The claims recite "dextromethorphan" and "quinidine," which the specification identifies by chemical name and structure.

---

[1] Otsuka's criticism of *Nystrom v. TREX Co., Inc.*, 424 F.3d 1136 (Fed. Cir. 2005) rests on a strawman. Opp. 30. Claim 1 is agnostic to delivery form, and Hetero does not seek to limit the claim to a free base form. As in *Nystrom*, Hetero seeks a construction supported by the intrinsic record. *FMC Corp. v. Sharda USA, LLC* confirms that a court errs by departing from a term's plain and ordinary meaning as informed by the specification and prosecution history. 145 F.4th 1326, 1333 (Fed. Cir. 2025).

Regulatory labeling serves FDA compliance purposes and cannot redefine claim scope or displace intrinsic evidence.

Fourth, Otsuka's assertion that claim 1 "by itself" does little to inform whether the terms include salts rests on a flawed premise. Opp. 23. The claims recite dextromethorphan and quinidine by name; they do not state that those compounds "include" their salts. Otsuka's repeated use of "include" ignores the distinction between a compound identity and salt-form delivery—a distinction the intrinsic record preserves.

Fifth, Otsuka argues that Hetero's construction leads to the "absurd" result that the '282 patent does not cover NUEDEXTA. Opp. 16, 34-35. But claim construction is governed by the intrinsic record, not by whether a later-developed product is covered. Otsuka misplaces its reliance on *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007). That case concerns excluding disclosed embodiments. Here, none of the embodiments discloses the claimed ranges or the 1:0.5 ratio. Opp. 35. In any event, NUEDEXTA was covered by a different patent—the '484 patent—which expired on July 17, 2023 (Opp. 11), and *Avanir* required delisting a different Otsuka reissue patent for not covering NUEDEXTA. Br. 1.

Finally, Otsuka's reliance on subsequent clinical studies fails. Opp. 34. The '282 patent claims priority to July 2002—years before the Phase 3 study Otsuka

invokes and long before NUEDEXTA existed. The amendment adding the ratio was made in January 2009, well before FDA approval of NUEDEXTA in October 2010.

Thus, none of these counterarguments by Otsuka undermine Hetero's construction, which is grounded in the claims, the specification, and the original claim structure: quantities and ratios of "dextromethorphan" and "quinidine" are measured using the chemical compounds, while salts are merely optional delivery forms.

### 5. *Otsuka's Construction Conflates Compound Identity and Delivery Form*

Otsuka's does not dispute that it mischaracterized Hetero's position as excluding salts or limiting claim 1 to a "free base" form. Br. 38. That mischaracterization diverts attention from the real issue: not whether salts may be used for administration, but how the claimed quantities and weight-to-weight ratio of dextromethorphan to quinidine are calculated.

Otsuka's reframing reflects a fundamental error—treating the weight of a delivery form as defining the identity and weight of the claimed compound. Otsuka repeatedly described both NUEDEXTA and Hetero's ANDA product as containing "20 mg dextromethorphan and 10 mg quinidine," even though the cited labels disclose only salt quantities—20 mg dextromethorphan hydrobromide and 10 mg quinidine sulfate. Br. 38–39. Otsuka's treatment of its own European label underscores the same error. For the identical formulation, it reports 15.41 mg

13

dextromethorphan and 8.69 mg quinidine—compound-equivalent weights derived from the same salt forms disclosed on the U.S. label. Appx1373–74. Otsuka concedes the European product "contains the same ingredients," Opp. 38, yet ignores what it demonstrates: compound and salt weights are not interchangeable. The distinction matters when the claims require a specific ratio.

Nor does Otsuka's response—that Hetero's label was "in evidence" (Opp. 39)—address the issue. Otsuka repeatedly described it as stating compound weights when it actually only states salt quantities, and then relied on that misstatement of fact to argue infringement. Appx368; Appx373. The District Court adopted the same flawed premise, equating the delivery-form weight with the identity and weight of the claimed compounds.

## B. The Prosecution History Confirms the Claimed Weight Ratio Is Compound-Based, Not Salt-Based

Otsuka asserts that the Examiner "explicitly acknowledged," "recognized," or "understood" that the claim terms "dextromethorphan" and "quinidine" included their salt forms. Opp. at 2, 10, and 32. But Otsuka never previously advanced this argument. Accordingly, it is waived. *Stauffer v. Brooks Bros. Grp.*, 758 F.3d 1314, 1322 (Fed. Cir. 2014); *Novosteel SA v. U.S., Bethlehem Steel Corp.*, 284 F.3d 1261, 1273-74 (Fed. Cir. 2002). Even if this Court considers this argument, Otsuka mischaracterizes the prosecution history: the Examiner never "acknowledged" that independent claim 1 included salts. Instead, as explained below, the Examiner's

14

statements and rejections show that salt administration was treated as an additional limitation, while the claimed ratio was evaluated using dextromethorphan and quinidine as compounds. *See infra* II.B.1.-B.3.

Otsuka cites *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1347 (Fed. Cir. 2005) for the proposition that Examiner statements may evidence how a POSA understood the term at the time the application was filed. Opp. 31. But that principle, properly applied, favors Hetero—not Otsuka. The Examiner's statements confirm that a POSA would understand the claimed weight-to-weight ratio to be calculated between dextromethorphan and quinidine as recited—not between their salt forms. *See infra* II.B.1.-B.3.

### 1. *The Examiner Mapped Compound-Based Prior Art to the Claimed Dextromethorphan and Quinidine*

As originally filed, claim 1 recites only daily dosage ranges— "dextromethorphan administered comprises from about 20 mg/day to about 200 mg/day" and "quinidine administered comprises from about 10 mg/day to less than about 50 mg/day." Appx955-56. Original claim 1 ***did not*** include any weight-ratio requirement. That limitation appears only in original claim 10, which recited a "weight ratio of dextromethorphan to quinidine … about 1:1.25 or less." *Id*.

In the January 9, 2009 Office Action (Appx967–981), the Examiner rejected claim 1 as obvious by mapping the compounds disclosed in *Smith* and *Smith '248* directly onto the limitations. Appx974-77. The Examiner expressly noted that those

references "***do[] not teach the administration of quinidine or dextromethorphan in the form of a pharmaceutically acceptable salt***." Appx978 (emphasis added). That statement—which Otsuka did not dispute during prosecution—cannot be reconciled with its claim now that the Examiner understood the independent claim to include salts.

The Examiner's ratio analysis confirms the same understanding. Addressing original claim 10's ratio limitation, the Examiner equated the then-claimed "about 1:1.25" ratio to ***40 mg of dextromethorphan*** and ***50 mg of quinidine*** disclosed in *Smith*—without any adjustment for salt molecular weights—because *Smith* did not teach salt administration. Appx977-78. Applicants never disputed the Examiner's compound-based mapping to the claimed ratio. Under *Salazar*, this confirms that a POSA would evaluate the claimed ratio using the compounds recited in the claims, not their salt forms.

### 2. *The Prosecution History Confirms That Applicants Narrowed the Numeric Ratio, But Did Not Redefine the Claim Terms*

Applicants later deleted original claim 10 and added a proviso requiring that "the weight to weight ratio of dextromethorphan to quinidine is 1:0.5 or less" in claim 1. Appx983-84. That amendment narrowed the numerical boundary of the ratio to distinguish *Smith*'s 1:2.5 ratio. Appx982-998, Appx989, Appx1003-04. Nothing in the record redefined "dextromethorphan" or "quinidine" in the ratio,

16

altered how the ratio was calculated, or suggested that salt weights should be included in the claimed ratio.

### 3. The Examiner's Treatment of Salt-Dependent Claims, Clinical-Study Arguments, and Double-Patenting Analysis Forecloses Otsuka's Construction

The prosecution history further refutes Otsuka's salt-inclusive theory. The Examiner treated salt administration as a separate limitation necessitating additional prior art. Dependent claims expressly reciting administration "in the form of a pharmaceutically acceptable salt" (such as claims 7–8 in Appx955) were rejected by adding a *Gould* reference—again because *Smith* "does not teach" salt administration. Appx978. If "dextromethorphan" and "quinidine" in independent claim 1 "included" salts, the Examiner would have rejected all the claims by combining *Smith* with *Gould*, or at least issued an additional rejection applying *Gould* to claim 1. The Examiner did neither, indicating that dextromethorphan and quinidine in claim 1 were evaluated as compounds, not their salts.

Otsuka's reliance on later clinical studies—also raised for the first time on appeal and thus waived—does not change this analysis. Opp. 10, 32-33. See *Stauffer*, 758 F.3d at 1322. Describing how drugs were administered in a *Pope 2004* article—published years after the claimed 2002 priority date—cannot retroactively redefine claim terms or convert the claimed weight-to-weight ratio into a salt-mass calculation, particularly when contrary to the intrinsic record.

17

Even putting waiver aside, *Pope 2004* undermines Otsuka's position. Although the study administered capsules containing dextromethorphan hydrobromide monohydrate and quinidine sulfate dihydrate, it consistently measured and reported on the amount of "dextromethorphan (DM)" and "quinidine (Q)", not their salts. Appx1018. The reported results—tables, figures, plasma concentrations, AUC, and Cmax—are all expressed in terms of DM and Q. Appx1022-25. The study's statement that "[d]oses are expressed as" salt simply reflects how the capsules were made; it does not convert the reported *blood concentration* of "64 ng/ml of DM" into salt equivalents as there is no such thing as a measurable concentration of a salt hydrate in the bloodstream. Appx995; Appx1015. Once administered, the salt dissolves, and only the drug compound is present and measurable in the bloodstream.

Critically, *Pope 2004* does not disclose or apply any weight-to-weight ratio. Appx1018-28. Dr. Pope's declaration describes ***qualitative discoveries*** showing therapeutic efficacy "observed in patients with blood levels of dextromethorphan" can be achieved with reduced quinidine dosing. Appx999-1002, ¶12. But those qualitative discoveries are untethered to any numerical ratio—much less the claimed 1:0.5 ratio—or any salt-based calculation.

The same is true of Otsuka's reliance on the Examiner's double-patenting discussion (Opp. 9-10, 31-32), also newly raised on appeal and waived. Even if

considered, the Examiner summarized the claims *collectively*, referring to "Claims 1-10 and 20-27," and described administration of "dextromethorphan or dextromethorphan hydrobromide" and "quinidine or quinidine sulfate." Appx972-93. That phrasing mirrors the claim hierarchy, where independent claims recite the compounds and dependent claims add salt form limitations. It does not show the Examiner understood the independent claim to calculate dosage and the ratio using salt weights. The rejection focused on the "overlap with the range of concentrations claimed"—not on how to interpret the dosage ranges or weight ratio. *Id.*

Finally, the Notice of Allowability (Appx1031-36) confirms this same understanding. It attributes patentability to the discovery that reduced quinidine dosing still achieves effective dextromethorphan blood levels—not to salt identity or salt-based ratios. Appx1034–35.

Read as a whole, the prosecution history refutes Otsuka's claim that the Examiner "recognized" salt weights should be included in the calculations of dosages and the ratio of "dextromethorphan" and "quinidine." Salt administration was treated as a separate limitation, while the claimed dosage ranges and ratio were evaluated between the compounds. The District Court did not address these prosecution-history points, despite Hetero raising them. *See, e.g.,* Appx608–09; Appx638–40, ¶¶53–55.

19

### C. The *Avanir* Court Did Not Evaluate the Claimed Ratio or Product Coverage

Otsuka mischaracterizes *Avanir* by asserting that: (i) the district court—and this Court on appeal—found that the '282 patent "covers" NUEDEXTA; (ii) Judge Stark determined the patent covered NUEDEXTA according to its package insert; and (iii) the prior defendants "implicitly adopted" the district court's "implicitly construed" salt-inclusive terms by stipulating to infringement, and that those rulings confirm proper Orange Book listing. Opp. 1, 11, 35. None of this is correct.

*Avanir* made no claim-construction ruling addressing whether the dosage ranges or the ratio of "dextromethorphan" or "quinidine" includes their salt weights, conducted no comparison of the claims to NUEDEXTA, and issued no finding that the '282 patent "covers" NUEDEXTA or its labeling. *Avanir Pharm., Inc. v. Actavis South Atlantic LLC*, 36 F. Supp.3d 475 (D. Del. 2014). Its reference to NUEDEXTA rested on stipulations and undisputed facts that carry no weight on claim scope. *Id.* at 509.

*Avanir*'s claim construction ruling addressed whether doses could be administered "substantially simultaneously," not the meaning of dextromethorphan or quinidine:

> 7.     "Dextromethorphan in combination with quinidine," as it appears in claim 1 of the '282 patent, is construed to mean "dextromethorphan and quinidine given in a combined dose, or in separate doses administered substantially simultaneously."

*See Avanir Pharms. Inc. v. Actavis et al.*, No. 11-704-LPS, Dkt. 257 at 2 (D. Del. Dec. 3, 2012). The *Avanir* court later confirmed that claim construction was complete years earlier and undertook no further construction on the merits. 36 F.Supp.3d at 478.

Otsuka's secondary claim, that *Avanir* was merely "instructive," also fails. Otsuka never disputes that the District Court treated *Avanir* as effectively controlling, using it to bypass independent claim construction and infringement analysis despite *Avanir's* different posture, record, and stipulation-based outcome. Nor does Otsuka's attempt to recast *Avanir*'s passing reference to NUEDEXTA—made solely in the context of secondary considerations of nonobviousness and based on stipulated facts—convert that reference into a substantive claim-construction or infringement finding. Opp. 41; 36 F.Supp.3d at 507–09. Treating those stipulations as binding here improperly substituted prior agreements for the claim construction and infringement analysis required for Hetero's ANDA, an error that independently warrants reversal.

### D. Otsuka's Disavowal Theory Is Waived and Irrelevant

Otsuka repeatedly argues that Hetero has failed to show "clear and unambiguous disavowal." Opp. 2, 16, 24, 33. But Otsuka—not Hetero—seeks to depart from the plain meaning and therefore bears the burden to justify that departure. Otsuka also failed to raise any disavowal theory in its District Court briefing, instead asserting it for the first time at oral hearing. Appx1846, 57:7-21. As Hetero's counsel noted at the hearing, that argument had not previously been raised. Appx1858, 69:8-9. Because Otsuka introduced this theory for the first time at oral argument, it is waived. *MCM Portfolio LLC v. Hewlett-Packard Co.*, 812 F.3d 1284, 1294 n.3 (Fed. Cir. 2015) (holding that an argument first raised at oral hearing in the district court is waived).

Even if considered, the argument fails. Hetero does not rely on disavowal because none is required. Appx1858, 69:9-10. As discussed above, claim meaning is defined in the first instance by plain and ordinary meaning and the intrinsic record—specifically, the chemical structures disclosed in the specification identifying what "dextromethorphan" and "quinidine" mean. Otsuka's attempt to shift the analysis to disavowal only underscores the lack of support for its construction and the District Court's error on claim construction.

### E. Otsuka Waived Any Challenge to Dr. Buckton, Leaving His Testimony Unrebutted

Otsuka did not challenge Dr. Buckton's qualifications in its District Court briefing and concedes it raised that issue for the first time at oral argument. Opp. 37. That challenge is therefore waived. *MCM Portfolio*, 812 F.3d at 1294 n.3.

On the merits, Otsuka offers no competing expert testimony and identifies no technical issue with Dr. Buckton's opinions. It argues only that his opinions deserve "minimal value" based on alleged POSA mismatches. Opp. 37. But *Avanir* does not impose a universal qualification requirement, and Otsuka cites no authority requiring a single expert to personally satisfy every attribute of a hypothetical POSA across all technical issues. Nor does it show that Dr. Buckton—Head of Department of Pharmaceutics, School of Pharmacy at the University of London (Appx619-22, ¶12; Appx646-68)—lacks familiarity with pharmacokinetic principles. His testimony remains unrebutted, and the District Court erred by disregarding it in favor of attorney argument.

### F. *De Novo* Review Requires Reversal Because Otsuka Concedes Noninfringement Under Hetero's Proposed Construction

Claim construction is reviewed *de novo*. Because the District Court adopted a construction that improperly added salt weight to the claimed dosage ranges and ratio, its likelihood-of-success analysis rests on legal error. Under the correct

23

construction—where "dextromethorphan" and "quinidine" refer to the compounds themselves, Otsuka cannot establish infringement.

Otsuka's additional argument—that the claimed ratio must be calculated based on the product label (Opp. 16-17)—improperly turns claim construction into an inquiry of "***what's in the bottle***," where claim meaning would depend on the accused formulation rather than the meaning fixed by the intrinsic record. Claims are ***never*** construed by evaluating the alleged infringing product. *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1340 (Fed. Cir. 2005). Because Otsuka does not dispute that Hetero does not infringe under the proper construction proposed by Hetero, the preliminary injunction must be reversed and vacated. *Bell & Howell Document Management Prods. Co. v. Altek Sys.*, 132 F.3d 701, 708 (Fed. Cir. 1997) (vacating preliminary injunction because the district court applied an erroneous claim construction in determining likelihood of success).

## III.   THE DISTRICT COURT ERRED IN REJECTING INDEFINITENESS

### A. The District Court Made No Findings on Indefiniteness

Otsuka claims that the "district court correctly found that Hetero was unlikely to succeed on its indefiniteness defense." Opp. 42. But the District Court made no such finding. Its entire discussion consisted of two sentences. It first noted the existence of Hetero's indefiniteness defense and then concluded, ***without analysis***, that Otsuka was likely to succeed. Appx21. That is not the "findings and conclusions"

24

Rule 52(a)(2) requires when granting injunctive relief. *See Nutrition 21 v. U.S.*, 930 F.2d 867, 871 (Fed. Cir. 1991) (vacating preliminary injunction based on district court's failure to make "any findings" on defendants' defenses).

Otsuka attempts to remedy this failure by arguing that the District Court properly "credited the prior [*Avanir*] validity holding as one of the multiple reasons why Otsuka is likely to succeed on the merits of its validity claim, notwithstanding Hetero's indefiniteness defense." Br. 47. But as explained in Appellants' opening brief: (i) Hetero was not a party to the *Avanir* litigation; and (ii) the *Avanir* validity holding decided obviousness and written description challenges, not indefiniteness. Br. 49 (citing *Avanir*, 36 F. Supp. 3d 475, 496).

Otsuka's reliance on *Oakley, Inc. v. Sunglass Hut Int'l*, 316, F.3d 1331, 1341-42 (Fed. Cir. 2003), is likewise misplaced. There, the district court made numerous factual findings on indefiniteness, including: (i) crediting certain expert testimony; (ii) citing supporting equations, figures, and tables from the specification; and (iii) noting that POSAs—as provided for in declarations—could discern the meaning of the disputed claim term. *Oakley, Inc. v. Sunglass Hut Int'l*, No. SA CV 01-1065 AHS(MLGx), 2001 U.S. Dist. LEXIS 23572, at *29 (C.D. Cal. Dec. 7, 2001). No such factual findings were made by the District Court.

Otsuka also argues that the District Court properly relied on the prior *Avanir* validity holdings because the prior *Avanir* defendants raised indefiniteness in their

invalidity contentions. Opp. at 47-48. This argument lacks credibility as the *Avanir* defendants abandoned their undeveloped indefiniteness challenge before trial, thus precluding the *Avanir* court from considering indefiniteness. An abandoned contention cannot be treated as an adjudicated ruling—much less substitute for findings on Hetero's indefiniteness theory. More importantly, the District Court in this case could not have considered the *Avanir* defendants' invalidity contentions because they were not part of the record.

## B. Under the District Court's Construction, Claim 1 is Indefinite

According to Otsuka, claim 1 is not indefinite because it can be simplified to three "interconnected limitations": (1) an "administration" limitation; (2) an "amount" limitation; and (3) a "ratio" limitation." Opp. 44. Otsuka contends that the "claim structure makes clear that the 'amount' and 'ratio' limitations both refer back to what is 'administered' in the 'administration' limitation." *Id*.

Otsuka's simplification ignores the fundamental nature of claim 1, which is a method-of-treatment claim: "A method of treating pseudobulbar affect or emotional lability, the method comprising . . . ." This preamble is limiting and cannot be ignored. *See In re Xencor, Inc.*, 130 F.4th 1350, 1357-58 (Fed. Cir. 2025) ("treating a patient" is limiting in the preamble); *Rapoport v. Dement*, 254 F.3d 1053, 1058-59 (Fed. Cir. 2001) ("method for treatment of sleep apneas" is limiting in the preamble). Based on the method-of-treatment claim limitation, a POSA would understand that

treatment is achieved by the compounds themselves because the weights of the active drugs matter. Appx636, ¶50. Accordingly, a POSA would not expect the claimed dosage ranges and ratios of "dextromethorphan" and "quinidine" to vary when administered in salt form.

Had the District Court made any analysis and findings on indefiniteness, it would have seen that its construction renders claim 1 indefinite because it fails to inform, with reasonable certainty, how the weight-to-weight ratio must be calculated. The District Court's construction—as embedded in claim 1 in red below—requires the calculation of the weight-to-weight ratio by comparing dextromethorphan or its salt to quinidine or its salt, which can be done in at least four different ways:

> 1. A method for treating pseudobulbar affect or emotional lability, the method comprising administering to a patient in need thereof dextromethorphan or its salt in combination with quinidine or its salt, wherein the amount of dextromethorphan or its salt administered comprises from about 20 mg/day to about 80 mg/day and wherein the amount of quinidine or its salt administered comprises from about 10 mg/day to less than about 30 mg/day with the proviso that the weight to weight ratio of dextromethorphan or its salt to quinidine or its salt is 1:0.5 or less.

Under that construction, the ratio compares "dextromethorphan or its salt" to "quinidine or its salt," permitting multiple, materially different calculations depending on whether compound weight, salt weight, hydrate weight, or combinations thereof are used. Br. 53. That ambiguity is embedded in the claim language as construed and is not resolvable from the intrinsic record.

**CONFIDENTIAL MATERIAL REDACTED**

Otsuka's claim that Hetero's indefiniteness argument is conclusory is incorrect. Opp. 42. Hetero explained through its answer (Appx342-44), briefing (Appx612), expert declaration (Appx643-44, ¶¶ 61-64), and at the hearing (Appx1815-17, 26:12-28:8) that a construction allowing multiple ratio calculations cannot be correct. Such a construction renders the claim indefinite, and the District Court made no findings addressing it. *See* Br. 54, citing *Dow Chem. Co. v. Nova Chems. Corp. (Can.)*, 803 F.3d 620, 634 (Fed. Cir. 2015).

Otsuka's additional argument—that one can simply "use what is in front of you" by looking at Hetero's package insert—only underscores the problem. Br. 45. Hetero's package insert explains that its product is a formulation of 20 mg



and 10 mg

(Appx601, ¶4; Appx894), meaning the formulation includes

and affecting the ratio calculation. Appx643–44, ¶¶63-64. Otsuka's argument ignores that Hetero's product has the components listed above. Otsuka offers no principled way to choose among

instead inviting claim scope to vary with formulation details of the accused product. That is precisely the type of indeterminacy § 112 forbids.[2]

---

[2] Otsuka argues that *SmithKline* is inapposite, yet urges a construction under which claim scope varies with the accused product—the very approach this Court rejected.

Thus, Otsuka's criticisms of Hetero's indefiniteness argument lack merit, wrongly focus on the alleged infringing product, and cannot cure the District Court's failure to address this issue. Under the District Court's construction, claim 1 is indefinite, and Otsuka cannot establish a likelihood of success on the merits.

## IV. THE DISTRICT COURT ERRED ON THE REMAINING PRELIMINARY INJUNCTION FACTORS

Likelihood of success on the merits is a threshold requirement for preliminary injunctive relief. *Glaxo Grp. Ltd. v. Ranbaxy Pharms., Inc.*, 262 F.3d 1333, 1339 (Fed. Cir. 2001). As established above, Otsuka cannot satisfy that requirement under the correct claim construction. Moreover, the District Court made no findings on indefiniteness. On that basis, the preliminary injunction was improperly granted.

Even if the Court were to reach the remaining factors, the District Court erred in its irreparable harm, balance of hardships, and bond analyses. Hetero submitted declarations detailing concrete, noncompensable harm from being blocked from launching a noninfringing product, including loss of first-mover advantage after substantial launch preparations. Appx751–53, ¶¶84-89; Appx706-08, ¶¶34–37; Appx759-61; Appx615. The District Court dismissed that evidence without analysis,

---

See Opp. 16, 43; *SmithKline*, 403 F.3d at 1340–41. Otsuka likewise errs in dismissing *Teva* and *Dow Chemical*, as proper calculation of the claimed weight-to-weight ratio of dextromethorphan to quinidine resolves this case. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1344–45 (Fed. Cir. 2015); *Dow Chem.*, 803 F.3d at 634.

credited Otsuka's asserted harms, and waived any bond without findings sufficient under Rule 65(c). These errors independently warrant reversal or, at minimum, remand.

## V. THE DISTRICT COURT'S IRREPERABLE HARM, NOTICE AND BOND RULINGS CONSTITUTE LEGAL ERROR

### A. Rule 65(c) Requires a Security Bond Absent Truly Exceptional Circumstances—Which Are Not Present Here

Rule 65(c) makes a security bond the rule, not the exception. The Third Circuit has emphasized that bond waivers are "so rare that the requirement is almost mandatory." *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 103 (3d Cir. 1988). And it has "never excused" a bond where an injunction restrains "commercial, money-making activities." *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 426 (3d Cir. 2010).

Absent record-supported findings justifying a recognized exception, the District Court's complete waiver of security was erroneous.

### B. Otsuka Failed to Carry Its Burden to Justify a Bond Waiver

Otsuka bore the burden to justify waiving Rule 65(c)'s bond requirement, but presented no evidence doing so. Although Otsuka itself proposed a $5 million bond (Appx1850-54), the District Court waived any bond requirement.

Otsuka contends this waiver was justified under a "balance of equities" exception, citing *Elliott v. Kiesewetter*, 98 F.3d 47, 59-60 (3d Cir. 1996). Opp. 56. But the District Court's "findings" did not comply with *Elliott*. As *Elliott* points out,

30

a bond waiver requires specific findings evaluating plaintiff's potential financial hardship, and that failure to make such findings "suggests that [the court] did not adequately perform the balancing of equities required to find a *Temple University* exception to the Rule 65(c) bond requirement." 98 F.3d at 60. The District Court made no such findings here.

The District Court's waiver of any bond therefore constitutes legal error and requires reversal or, at a minimum, remand.

### C. Otsuka's "Notice" Argument Improperly Conflates Statutory ANDA Notice with Obligation to Act Diligently After Actual Notice

Otsuka produced no evidence supporting its claim that it did not receive Hetero's notice letter, and that failure is dispositive. This Court must therefore accept that Hetero's notice letter was received (Appx521-25), and disputes over the technical method of delivery under the ANDA regulations do not negate that fact. Otsuka's focus on regulatory notice requirements is a red herring designed to distract from its undisputed, months-long delay in seeking injunctive relief.

Otsuka does not dispute that its Senior Director, Associate General Counsel, Mr. Lin, was aware of the existence of Hetero's ANDA no later than December 19,

2023.[3] Rather than confront that evidence, Otsuka reframes the issue as one of regulatory compliance. That conflation is legally irrelevant. Even if statutory notice were imperfect, which it is not, actual notice triggers the equitable obligation to act diligently when seeking a preliminary injunction. *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1557–58 (Fed. Cir. 1995). The District Court erred by crediting Otsuka's notice narrative and attributing delay to "improper notice" and purported settlement discussions, neither supported by evidence. Appx26.

There were no "attempted negotiations," and no evidence supports the District Court's suggestion that Hetero "strategically violated FDA rules." Those conclusions rested entirely on attorney argument, not record evidence. Hetero's conduct complied with FDA rules and practices, and the District Court's contrary conclusions reflect reliance on unsupported advocacy rather than the evidentiary record.

Otsuka's reliance on *Melinta Therapeutics, LLC v. U.S. Food & Drug Admin.*, 2022 WL 6100188 (D.D.C. Oct. 7, 2022) is misplaced. That nonprecedential district

---

[3] Hetero's text-message evidence demonstrating Otsuka's December 2023 notice was filed in response to Otsuka's post-briefing letter reasserting no notice and alleged FDA violation. Appx1553. Thus, it is part of the record on appeal. *See* Fed. R. App. P. 10(a). Otsuka offered no declaration denying receipt or knowledge of Hetero's ANDA per Fed. R. Evid. 803(6), 902(11) and/or 902(12).

court decision involved unusual pandemic-era delivery circumstances and disputed proof of delivery. *Id.* *10. It does not establish that the method used here fails as a matter of law.

Unlike *Melinta*, Hetero submitted evidence demonstrating return receipt using a delivery method long accepted by the FDA.[4] Appx1544-46; Appx1554-1789. Otsuka did not rebut that evidence, deny receipt, or dispute the FDA's longstanding acceptance of the same method in other ANDAs. The District Court nevertheless disregarded that evidence without analyzing the governing regulation or explaining why Hetero's proof was deficient.

Accordingly, Otsuka's undisputed actual notice and lack of diligence independently defeat any notice-based justification for the preliminary injunction.

## VI. CONCLUSION

Hetero respectfully requests this Court to reverse the District Court's decision and vacate the preliminary injunction. At a minimum, the order must be vacated and remanded for legally sufficient findings.

---

[4] The requirement in 21 C.F.R. § 314.95(e) for a "return receipt" is not limited to USPS service and cannot be read to impose the USPS-specific "return receipt requested" language used in §314.95(a), absent any indication the FDA intended those terms to be synonymous. Otsuka identifies no authority suggesting otherwise.

Respectfully submitted,

Date: December 29, 2025                /s/ Ehab M. Samuel
                                      Ehab M. Samuel
                                      ORBIT IP, LLP
                                      620 Newport Center Drive, Suite 1100
                                      Newport Beach, CA 92660
                                      (310) 887-1333
                                      Counsel for Defendants-Appellants

                                      David A. Randall
                                      ORBIT IP, LLP
                                      11400 W. Olympic Blvd., Suite 200
                                      Los Angeles, CA 90064
                                      (310) 887-1333
                                      Counsel for Defendants-Appellants

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2025-2016

**Short Case Caption:** Otsuka America Pharmaceutical, Inc. v. Hetero Labs Limited

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 6,995 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 12/29/2025

Signature: /s/ Ehab M. Samuel

Name: Ehab M. Samuel

FORM 31. Certificate of Confidential Material

Form 31
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 2025-2016

**Short Case Caption:** Otsuka America Pharmaceutical, Inc. v. Hetero Labs Limited

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).

- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

The foregoing document contains ___15___ number of unique words (including numbers) marked confidential.

☑ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☐ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 12/29/2025

Signature: /s/ Ehab M. Samuel

Name: Ehab M. Samuel